license but no other exceptional qualifications such as a hoisting license, welding skills or pesticide expertise. However, Plaintiff agreed with Defendant Leaton that Morgan should be placed on the interview list.

16. Defendant Leaton and Plaintiff scheduled interviews with the remainder of Plaintiff's original list and additional candidates selected by Leaton and Plaintiff on March 5th and 11th, 2004, including the aforementioned Marvin Morgan. A diversity representative of MBCR's Human Resources Department was present during all the interviews. Mr. Morgan is black, a fact which was not known to Plaintiff until the interview. After the interview, Plaintiff and Defendant Leaton selected Morgan as one of 6 individuals to be hired.

17. On Monday, March 29, 2004, the aforementioned Marvin Morgan started his employment with MBCR. That morning, Plaintiff observed Mr. Morgan reporting for training at the wrong location, pointed this out to Mr. Morgan, and actually drove him to the appropriate location.

## TERMINATION OF PLAINTIFF'S EMPLOYMENT FOR "DISCRIMINATION"

18. On Wednesday, March 24, 2004, Plaintiff took a compensation day off from work. On that date he received an e-mail from Defendant Bowden, MBCR's Human Resources Chief, requesting that Plaintiff meet with her and Defendants Urban and Nevero on Friday, March 26, 2004. On Thursday, March 25, 2004, after receiving Defendant Bowden's e-mail, Plaintiff called her office and left a voicemail agreeing to the meeting and requesting a return call as to what the subject of the meeting would be so he could prepare. Plaintiff's only prior interaction with Defendant Bowden had been over some mix-ups in the transfer of life insurance benefits for himself and his

wife when MBCR succeeded Amtrak in the MBTA's commuter rail service operations. Defendant Bowden did not return Plaintiff's telephone call.

19.   At a meeting on March 26, 2004, attended by Defendants Bowden, Urban, Nevero and Plaintiff, Defendant Bowden abruptly informed Plaintiff that the purpose of the meeting was allegations that he had engaged in "racial discrimination" in the selection of resumes for interviews based upon where the candidates lived. Bowden stated that it was "felt" that Plaintiff did not want to consider Mr. Morgan as a candidate because his resume indicated that he was from Dorchester, Massachusetts, an indication, according to Bowden, that Morgan was black.

20.   At the time of the meeting, Plaintiff was taking blood pressure medication which slightly slowed his reactions and speech. Plaintiff was stunned and shocked at the accusation of discrimination and the tone with which it was delivered. Plaintiff took some time to gather himself and to try to remember the details of Morgan's selection as a candidate more than three weeks prior to the meeting. He barely recalled reviewing Morgan's resume more than three weeks earlier and did not even notice when he reviewed Mr. Morgan's resume where Morgan had lived. Plaintiff pointed out to Defendants Bowden, Urban and Nevero that he had agreed that Morgan should be interviewed; participated in the interview; and in the selection of Morgan to hire.

21.   Bowden's response was that she, Urban and Nevero considered Plaintiff's delayed reaction as "stonewalling" the accusation. Plaintiff was at this point completely confounded and pointed out to Defendant Bowden that she had not returned his telephone call requesting that he be informed of the subject of the meeting. All three Defendants were supervising Plaintiff and had obviously met and discussed the

accusation without informing Plaintiff.

22.    The assertion by Defendants Bowden, Urban and Nevero at the meeting that Plaintiff
knew that candidate Morgan was black during the resume selection process because
candidate Morgan was "from Dorchester" is false, without reasonable basis and was
done with actual malice. People of all races live in Dorchester and, in fact, Plaintiff
did not even notice where candidate Morgan or any other candidate was from when
he reviewed their resumes. Plaintiff was extremely upset and disturbed by the
accusation of discrimination which Defendants Bowden, Urban and Nevero had made
with no basis in fact.

23.    On Tuesday, March 30, 2004, Plaintiff was summoned to another meeting with
Defendants Bowden, Urban and Nevero in Nevero's office at 3:00 p.m. At the
meeting, Plaintiff was informed by Defendant Nevero, with no prior warning, that his
employment was terminated effective immediately. Plaintiff was presented with two
letters, one a proposed "resignation" and one a termination. Plaintiff was completely
shocked and stunned.

24.    Plaintiff then inquired as to why he was being fired. Defendant Nevero replied that it
was based on the fact that Plaintiff had discriminated in his screening of candidate's
resumes based on "geography". Plaintiff was informed by Nevero that Plaintiff had
had the opportunity at the previous Friday meeting to "set the record straight" but had
failed to do so. Defendant Bowden then stated that there was also an issue concerning
"female candidates". No explanation was provided to Plaintiff as to what this "issue"

At the meeting on March 30, 2004, Defendant Nevero informed Plaintiff that if he

were to "resign" rather than accept termination, MBCR would inform future employers checking references that Plaintiff had "resigned for personal reasons" rather than inform them of Plaintiff being "terminated for cause". Plaintiff refused to participate in this lie, and walked out of the office. Defendant Urban thereafter followed Plaintiff into his office and instructed Plaintiff to return his identification badge and all other company materials. Defendant Urban insisted that Plaintiff clean out and turn over the keys of his company truck in full view of other employees in the building parking lot in a humiliating fashion.

## INTENTIONAL INTERFERENCE WITH ADVANTAGEOUS RELATIONSHIP

26.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 25 above.

27.    Plaintiff as a railroad employee for over 28 years, and as Assistant Division Engineer held a position of responsibility with MBCR based on his competency, skill and experience. On March 30, 2004, Plaintiff's salary was $70,000 per year, plus benefits including health insurance and a pension. Plaintiff was less than 16 months short of the required service in the Railroad Retirement System to make him eligible for retirement at age 60.

28.    The statements of Defendant Leaton in accusing Plaintiff of racial and sexual discrimination in the resume selection process were false, totally groundless, unprivileged and malicious. The actions of Defendants Bowden, Urban and Nevero in placing any credibility in such specious accusations; interviewing Plaintiff on March 26, 2004, together and in a hostile and confrontational manner, and abruptly accusing him of discriminatory hiring practices with no advance warning; concluding,

based on Plaintiff's stunned reactions to such false and shocking allegations, that he was "stonewalling" the accusations, and then deciding to terminate his employment after more than 28 years as a railroad employee based on such allegations and an additional undisclosed allegation of sexual discrimination were without reasonable grounds and done intentionally and with malice.

29.    The actions of Defendants Leaton, Bowden, Urban and Nevero in causing the termination of Plaintiff's employment were committed intentionally and without privilege and have cost Plaintiff the loss of his advantageous employment relationship, and the loss of wages and benefits including a substantial impairment of his railroad pension rights.  Plaintiff's lost wages and health insurance benefits amount to at least $30,000, and the damage to his pension rights must be determined by an actuary, accountant or other financial professional.

WHEREFORE Plaintiff requests the following relief:

1.    Monetary damages against Defendants in such amount as the Court determines;

2.    Such other relief as the Court deems appropriate.

**JURY DEMAND**

Plaintiff claims a trial by jury.

Respectfully submitted,
Plaintiff Eli Mistovich, Jr.

Dated: 9/22/04

Frank J. Teague, Esq.
Frank J. Teague & Associates
One Liberty Square, 4th Floor
Boston, MA 02109
(617) 350-7700
BBO# 493780

9



# Railroad Retirement Information

## U.S. Railroad Retirement Board

Office of Public Affairs • 844 North Rush Street • Chicago, Illinois 60611-2092

312 751-4777
312 751-7154 fax
www.rrb.gov

To view and download the following text in PDF you need Acrobat Reader version 5.0 or higher. Download a free copy of the latest version of Acrobat Reader now.

For Publication

March 2004

## Benefits Under Railroad Retirement and Social Security

**E**mployers and employees covered by the Railroad Retirement Act pay higher retirement taxes than those covered by the Social Security Act, so that railroad retirement benefits remain substantially higher than social security benefits.

The following questions and answers show the differences in railroad retirement and social security benefits payable at the close of the fiscal year ending September 30, 2003. It also shows the differences in age requirements and payroll taxes under the two systems.

### 1. How do the average monthly railroad retirement and social security benefits paid to retired employees and spouses compare?

The average age annuity being paid by the Railroad Retirement Board at the end of fiscal year 2003 to career rail employees was $2,000 a month, and for all retired rail employees the average was $1,555. The average age retirement benefit being paid under social security was $900 a month. Spouse benefits averaged $600 a month under railroad retirement compared to $440 under social security.

The Railroad Retirement Act also provides supplemental railroad retirement annuities of between $23 and $43 a month, which are payable to employees who retire directly from the rail industry with 25 or more years of service.

### 2. Are the benefits awarded to recent retirees generally greater than the benefits payable to those who retired years ago?

Yes, because recent awards are based on higher average earnings. For career railroad employees retiring at the end of fiscal year 2003, regular annuity awards averaged over $2,625 a month while monthly benefits awarded to workers retiring at full retirement age under social security averaged about $1,205. If spouse benefits are added, the combined benefits for the employee and spouse would approximate $3,700 under railroad retirement coverage, compared to $1,845 under social security. Adding a supplemental annuity to the railroad family's benefit increases average total benefits for current career rail retirees to over $3,735 a month.

### 3. How much are the disability benefits currently awarded?

Disabled railroad workers retiring directly from the railroad industry at the end of fiscal year 2003 were awarded over $2,240 a month on the average while awards for disabled workers under social security averaged almost $925.

While both the Railroad Retirement and Social Security Acts provide benefits to workers who are totally disabled for any regular work, the Railroad Retirement Act also provides disability benefits specifically for career employees who are disabled for work in their regular railroad occupation. Career employees may be eligible for such an occupational disability annuity at age 60 with 10 years of service, or at any age with 20 years of service.

### 4. Can railroaders retire at earlier ages than workers under social security?

Railroad employees with 30 or more years of creditable service are eligible for regular annuities based on age and service the first full month they are age 60, and rail employees with less than 30 years of creditable service are eligible for regular annuities based on age and service the first full month they are age 62.

No early retirement reduction applies if a rail employee retires at age 60 or older with 30 years of service and his or her retirement is after 2001, or if the employee retired before 2002 at age 62 or older with 30 years of service.

Early retirement reductions are otherwise applied to annuities awarded before full retirement age--the age at which an employee can receive full benefits with no reduction for early retirement. This ranges from age 65 for those born before 1938 to age 67 for those born in 1960 or later, the same as under social security.

Under social security, a worker cannot begin receiving retirement benefits based on age until age 62, regardless of how long he or she worked, and social security retirement benefits are reduced for retirement prior to full retirement age regardless of years of coverage.

### 5. Does social security offer any benefits that are not available under railroad retirement?

Social security does pay certain types of benefits that are not available under railroad retirement. For example, social security provides children's benefits when an employee is disabled, retired or deceased. Under current law, the Railroad Retirement Act only provides children's benefits if the employee is deceased.

However, the Railroad Retirement Act includes a special minimum guaranty provision which ensures that railroad families will not receive less in monthly benefits than they would have if railroad earnings were covered by social security. This guaranty is intended to cover situations in which one or more members of a family would otherwise be eligible for a type of social security benefit that is not provided under the Railroad Retirement Act. Therefore, if a retired rail employee has children who would otherwise be eligible

for a benefit under social security, the employee's annuity can be increased to reflect what social security would pay the family.

## 6. How much are monthly benefits for survivors under railroad retirement and social security?

Survivor benefits are generally higher if payable by the Board rather than social security. At the end of fiscal year 2003, the average annuity **being paid** to all aged and disabled widow(er)s averaged $980 a month, compared to $855 under social security.

Benefits **awarded** by the Board at the end of fiscal year 2003 to aged and disabled widow(er)s of railroaders averaged about $1,335 a month, compared to about $735 under social security.

The annuities **being paid** at the end of fiscal year 2003 to widowed mothers/fathers averaged $1,280 a month and children's annuities averaged $745, compared to $645 and $590 a month for widowed mothers/fathers and children, respectively, under social security.

Those **awarded** at the end of fiscal year 2003 averaged $1,320 a month for widowed mothers/fathers and $890 a month for children under railroad retirement, compared to $650 and $610 for widowed mothers/fathers and children, respectively, under social security.

The benefits to aged and disabled widow(er)s and widowed mothers/fathers at the end of fiscal year 2003 reflect the Railroad Retirement and Survivors' Improvement Act of 2001.

## 7. How do railroad retirement and social security lump-sum death benefit provisions differ?

Both the railroad retirement and social security systems provide a lump-sum death benefit. The railroad retirement lump-sum benefit is generally payable only if survivor annuities are not immediately due upon an employee's death. The social security lump-sum benefit may be payable regardless of whether monthly benefits are also due. Both railroad retirement and social security provide a lump-sum benefit of $255. However, if a railroad employee completed 10 years of service before 1975, the average railroad retirement lump-sum benefit payable is $960. Also, if an employee had less than 10 years of service, but had at least 5 years of such service after 1995, he or she would have to have had an insured status under social security law (counting both railroad retirement and social security credits) in order for the $255 lump-sum benefit to be payable.

The social security lump sum is generally only payable to the widow or widower living with the employee at the time of death. Under railroad retirement, if the employee had 10 years of service before 1975, and was not survived by a living-with widow or widower, the lump sum may be paid to the funeral home or the payer of the funeral expenses.

The railroad retirement system also provides, under certain conditions, a residual

lump-sum death benefit which ensures that a railroad family receives at least as much in benefits as the employee paid in railroad retirement taxes before 1975. This benefit is, in effect, a refund of an employee's pre-1975 railroad retirement taxes, after subtraction of any benefits previously paid on the basis of the employee's service. However, an employee's benefits generally exceed taxes within two years; this death benefit is, consequently, seldom payable.

## 8. How do railroad retirement and social security (PDF format) payroll taxes compare?

Railroad retirement payroll taxes, like railroad retirement benefits, are calculated on a two-tier basis. Rail employees and employers pay tier I taxes at the same rate as social security taxes, 7.65 percent, consisting of 6.20 percent on earnings up to $87,900 in 2004 and 1.45 percent for Medicare hospital insurance on all earnings.

In addition, rail employees and employers both pay tier II taxes which are used to finance railroad retirement benefit payments over and above social security levels.

Beginning with the taxes payable for calendar year 2004, tier II taxes on both employers and employees are based on an average account benefits ratio. Depending on that ratio, the tier II tax rate for employers will range between 8.20 percent and 22.10 percent, while the tier II tax rate for employees will be between 0 percent and 4.90 percent.

In 2004, the tier II tax rate on employees is 4.90 percent and on rail employers it is 13.10 percent on employee earnings up to $65,100.

## 9. How much are regular railroad retirement taxes for an employee earning $87,900 in 2004 compared to social security taxes?

The maximum amount of regular railroad retirement taxes that an employee earning $87,900 can pay in 2004 is $9,914.25, compared to $6,724.35 under social security. For railroad employers, the maximum annual regular retirement taxes on an employee earning $87,900 are $15,252.45 compared to $6,724.35 under social security. Employees earning over $87,900, and their employers, will pay more in retirement taxes than the above amounts because the Medicare hospital insurance tax of 1.45 percent is applied to all earnings.

###

- Customer Service Plan
- Index of Frequently Asked Questions
- ... publication ... Index
- ... RAA Appeal Form
- Electronic Reading Room

Case 1:04-cv-12240-EFH    Document 5-2    Filed 11/22/2004    Page 11 of 26

Press Release/Q&A Index | RRB.Gov Home



Rev. 03/09/2004 15:25:50

# COMMONWEALTH OF MASSACHUSETTS
## TRIAL COURT

**MIDDLESEX, ss.**

**SUPERIOR COURT DEPARTMENT**
**CIVIL ACTION NO.**

**04-3746**



```
                                    )
ELI MISTOVICH, JR.,                 )
        Plaintiff,                  )
                                    )
v.                                  )
                                    )
ELIZABETH BOWDEN,                   )
STEPHEN URBAN,                      )
STEPHEN NEVERO and                  )
ALISON LEATON                       )
        Defendants.                 )
                                    )
```

FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
FOR ... ... ... ...ESEX

SEP 2 4 2004

*Edward J. Sullivan*
CLERK

## COMPLAINT

## PARTIES

0515E000009/24/04CIVIL        240.00
0515E000009/24/04...R CHARGE   15.00
0515E000009/24/04SUMMONS       20.00
0515E000009/24/04SECC          20.00

1.  Plaintiff Eli Mistovich, Jr., is a resident of Londonderry, New ........ ...... years prior to March 30, 2004, Plaintiff Mistovich was employed by employers involved in railroad operations and Plaintiff was a participant in the Railroad Retirement System. Plaintiff worked for 3 years with Conrail; 25.5 years with Amtrak (including 16.5 years while Amtrak operated the commuter rail lines for the Massachusetts Bay Transportation Authority ("MBTA")); and 9 months with Amtrak's successor in operating MBTA commuter lines, the Massachusetts Bay Commuter Railroad Company ("MBCR").

2.  At material times hereto, Plaintiff's job assignment with Amtrak and MBCR was Assistant Division Engineer in the Track Division. Plaintiff's job responsibilities included, inter-alia, supervising over 170 employees in track maintenance; overseeing capital and infrastructure improvements; meeting budgetary goals, contract administration; customer service; consulting with outside attorneys in defense of suits; interacting with union representatives over collective bargaining issues; and

interviewing and hiring new employees.

3.      In July of 2003, MBCR succeeded Amtrak in the operation of the MBTA's commuter rail service and most Amtrak employees, including Plaintiff, were transitioned from Amtrak to MBCR with the same job titles, responsibilities, wages and employment benefits.

4.      Defendant Elizabeth Bowden is a resident of Cambridge, Massachusetts. Defendant Bowden is employed as MBCR's Human Resources Chief.

5.      Defendant Stephen Urban is a resident of Attleboro, Massachusetts and is employed as MBCR's Assistant General Manager.

6.      Defendant Stephen Nevero is a resident of Billerica, Massachusetts and is employed as MBCR's Chief Engineer. On or about March 30, 2004, Defendant Navero was Plaintiff's immediate supervisor.

7.      Defendant Alison Leaton is, on information and belief, a resident of Brookline, Massachusetts. In the time period September 2003, through March, 2004, Defendant Leaton was employed by an independent contractor to MBCR handling certain recruiting and employee hiring responsibilities.

## MBCR's HIRING IN 2003 AND 2004

8.      During his employment as Assistant Division Engineer at Amtrak and later MBCR, Plaintiff worked many nights, weekends and extra hours to do his job and to fill in during snowstorms and other emergencies. Plaintiff's job performance evaluations were always satisfactory or better. He was never the subject of any disciplinary action, nor did he receive any warnings from supervisors for unsatisfactory performance.

9.  Starting in 1980, Plaintiff Mistovich had participated in interviewing and hiring new employees in the Track Division at Amtrak. In his Amtrak job performance evaluations, Plaintiff was always rated as satisfactory or better and was commended as having "often exceeded expectations" in "valuing diversity". He was specifically commended on several occasions for exceeding company guidelines in hiring minority and female candidates and in supporting and achieving company policies regarding diversity, affirmative action, equal opportunity, and non-discrimination. Plaintiff has hired and supervised minority and women employees over the years and during over 28 years of employment has never been the subject of any complaints of discrimination.

10. In the winter of 2003, Plaintiff was informed by his supervisors at MBCR that there was a need to hire up to eight entry-level trackmen to replace attrited employees. At this time, the Track Division was short-handed and had been short-handed for some time. This adversely impacted the Division's ability to handle emergency duties, particularly snow removal. Plaintiff is informed and believes that understaffing has resulted in a higher risk of serious injuries of passengers and the death of at least one MBCR employee.

11. At Amtrak, Plaintiff had worked with the Human Resources Department in the hiring process. He had accumulated resumes that were sent to him from time to time over the years and forwarded them to the Human Resources Department when jobs were posted. The HR Department generally supplemented these resumes with others that it had received through recruiting or other sources.

12. In the fall of 2003, Defendant Leaton, working for an independent contractor

3

consultant for MBCR, contacted Plaintiff concerning the hiring of the eight new trackmen. In the winter of 2003-2004 Plaintiff forwarded 60 resumes to Defendant Leaton to review and select candidates for interview. Defendant Leaton then contacted Plaintiff, expressed annoyance with the large number of resumes he had sent and specifically requested Plaintiff to narrow the resumes down to 10 to 15 candidates.

13.    The job posting requirements for the trackman position included a commercial drivers license and/or hoisting license. In response to Defendant Leaton's request to narrow the resume list, Plaintiff eliminated everyone without a commercial drivers license, hoisting license or other skill such as welding which was useful to the Track Division. Plaintiff included one resume of an individual without the appropriate licenses at the specific request of his counterpart in the MBTA. Plaintiff then forwarded the narrowed group of 15 resumes to Defendant Leaton. No resumes of candidates with a commercial drivers license or hoisting license were excluded.

14.    On March 4th and 5th, 2004, Defendant Leaton scheduled interviews for the 15 candidates whose resumes Plaintiff had selected. Several of these candidates did not appear for interviews on March 4th and Defendant Leaton informed Plaintiff that they should select additional candidates from other resumes which Defendant Leaton had obtained from the internet and other sources to substitute for the candidates who did not appear for interviews on March 4, 2004.

15.    One of the resumes which Defendant Leaton asked Plaintiff to review was that of a candidate named Marvin Morgan from Dorchester, Massachusetts. After a quick review of the resume, Plaintiff commented that Mr. Morgan had a commercial drivers

4

license but no other exceptional qualifications such as a hoisting license, welding skills or pesticide expertise. However, Plaintiff agreed with Defendant Leaton that Morgan should be placed on the interview list.

16. Defendant Leaton and Plaintiff scheduled interviews with the remainder of Plaintiff's original list and additional candidates selected by Leaton and Plaintiff on March 5th and 11th, 2004, including the aforementioned Marvin Morgan. A diversity representative of MBCR's Human Resources Department was present during all the interviews. Mr. Morgan is black, a fact which was not known to Plaintiff until the interview. After the interview, Plaintiff and Defendant Leaton selected Morgan as one of 6 individuals to be hired.

17. On Monday, March 29, 2004, the aforementioned Marvin Morgan started his employment with MBCR. That morning, Plaintiff observed Mr. Morgan reporting for training at the wrong location, pointed this out to Mr. Morgan, and actually drove him to the appropriate location.

## TERMINATION OF PLAINTIFF'S EMPLOYMENT FOR "DISCRIMINATION"

18. On Wednesday, March 24, 2004, Plaintiff took a compensation day off from work. On that date he received an e-mail from Defendant Bowden, MBCR's Human Resources Chief, requesting that Plaintiff meet with her and Defendants Urban and Nevero on Friday, March 26, 2004. On Thursday, March 25, 2004, after receiving Defendant Bowden's e-mail, Plaintiff called her office and left a voicemail agreeing to the meeting and requesting a return call as to what the subject of the meeting would be so he could prepare. Plaintiff's only prior interaction with Defendant Bowden had been some mix-ups in the transfer of life insurance benefits for himself and his

wife when MBCR succeeded Amtrak in the MBTA's commuter rail service operations. Defendant Bowden did not return Plaintiff's telephone call.

19.   At a meeting on March 26, 2004, attended by Defendants Bowden, Urban, Nevero and Plaintiff, Defendant Bowden abruptly informed Plaintiff that the purpose of the meeting was allegations that he had engaged in "racial discrimination" in the selection of resumes for interviews based upon where the candidates lived. Bowden stated that it was "felt" that Plaintiff did not want to consider Mr. Morgan as a candidate because his resume indicated that he was from Dorchester, Massachusetts, an indication, according to Bowden, that Morgan was black.

20.   At the time of the meeting, Plaintiff was taking blood pressure medication which slightly slowed his reactions and speech. Plaintiff was stunned and shocked at the accusation of discrimination and the tone with which it was delivered. Plaintiff took some time to gather himself and to try to remember the details of Morgan's selection as a candidate more than three weeks prior to the meeting. He barely recalled reviewing Morgan's resume more than three weeks earlier and did not even notice when he reviewed Mr. Morgan's resume where Morgan had lived. Plaintiff pointed out to Defendants Bowden, Urban and Nevero that he had agreed that Morgan should be interviewed; participated in the interview; and in the selection of Morgan to hire.

21.   Bowden's response was that she, Urban and Nevero considered Plaintiff's delayed reaction as "stonewalling" the accusation. Plaintiff was at this point completely confounded and pointed out to Defendant Bowden that she had not returned his telephone call requesting that he be informed of the subject of the meeting. All three Defendants were supervising Plaintiff and had obviously met and discussed the

accusation without informing Plaintiff.

22.    The assertion by Defendants Bowden, Urban and Nevero at the meeting that Plaintiff knew that candidate Morgan was black during the resume selection process because candidate Morgan was "from Dorchester" is false, without reasonable basis and was done with actual malice. People of all races live in Dorchester and, in fact, Plaintiff did not even notice where candidate Morgan or any other candidate was from when he reviewed their resumes. Plaintiff was extremely upset and disturbed by the accusation of discrimination which Defendants Bowden, Urban and Nevero had made with no basis in fact.

23.    On Tuesday, March 30, 2004, Plaintiff was summoned to another meeting with Defendants Bowden, Urban and Nevero in Nevero's office at 3:00 p.m. At the meeting, Plaintiff was informed by Defendant Nevero, with no prior warning, that his employment was terminated effective immediately. Plaintiff was presented with two letters, one a proposed "resignation" and one a termination. Plaintiff was completely shocked and stunned.

24.    Plaintiff then inquired as to why he was being fired. Defendant Nevero replied that it was based on the fact that Plaintiff had discriminated in his screening of candidate's resumes based on "geography". Plaintiff was informed by Nevero that Plaintiff had had the opportunity at the previous Friday meeting to "set the record straight" but had failed to do so. Defendant Bowden then stated that there was also an issue concerning "female candidates". No explanation was provided to Plaintiff as to what this "issue" was.

25.    At the meeting on March 30, 2004, Defendant Nevero informed Plaintiff that it is

7

were to "resign" rather than accept termination, MBCR would inform future
employers checking references that Plaintiff had "resigned for personal reasons"
rather than inform them of Plaintiff being "terminated for cause". Plaintiff refused to
participate in this lie, and walked out of the office. Defendant Urban thereafter
followed Plaintiff into his office and instructed Plaintiff to return his identification
badge and all other company materials. Defendant Urban insisted that Plaintiff clean
out and turn over the keys of his company truck in full view of other employees in the
building parking lot in a humiliating fashion.

## INTENTIONAL INTERFERENCE WITH ADVANTAGEOUS RELATIONSHIP

26.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 25
       above.

27.    Plaintiff as a railroad employee for over 28 years, and as Assistant Division Engineer
       held a position of responsibility with MBCR based on his competency, skill and
       experience. On March 30, 2004, Plaintiff's salary was $70,000 per year, plus benefits
       including health insurance and a pension. Plaintiff was less than 16 months short of
       the required service in the Railroad Retirement System to make him eligible for
       retirement at age 60.

28.    The statements of Defendant Leaton in accusing Plaintiff of racial and sexual
       discrimination in the resume selection process were false, totally groundless,
       unprivileged and malicious. The actions of Defendants Bowden, Urban and Nevero
       in placing any credibility in such specious accusations; interviewing Plaintiff on
       March 26, 2004, together and in a hostile and confrontational manner, and abruptly
       accusing him of discriminatory hiring practices with no advance warning; concluding,

based on Plaintiff's stunned reactions to such false and shocking allegations, that he was "stonewalling" the accusations, and then deciding to terminate his employment after more than 28 years as a railroad employee based on such allegations and an additional undisclosed allegation of sexual discrimination were without reasonable grounds and done intentionally and with malice.

29.    The actions of Defendants Leaton, Bowden, Urban and Nevero in causing the termination of Plaintiff's employment were committed intentionally and without privilege and have cost Plaintiff the loss of his advantageous employment relationship, and the loss of wages and benefits including a substantial impairment of his railroad pension rights.  Plaintiff's lost wages and health insurance benefits amount to at least $30,000, and the damage to his pension rights must be determined by an actuary, accountant or other financial professional.

WHEREFORE Plaintiff requests the following relief:

1.    Monetary damages against Defendants in such amount as the Court determines;

2.    Such other relief as the Court deems appropriate.

**JURY DEMAND**

Plaintiff claims a trial by jury.

Respectfully submitted,
Plaintiff Eli Mistovich, Jr.

Dated: 9/22/04

Frank J. Teague, Esq.
Frank J. Teague & Associates
One Liberty Square, 4th Floor
Boston, MA 02109
(617) 350-7700
BB0 # 493780

9

| CIVIL ACTION COVER SHEET | 04-3746 | Trial Court of Massachusetts Superior Court Department County: MIDDLESEX X |
|---|---|---|

| PLAINTIFF(S) Eli Mistovich, Jr. | DEFENDANT(S) Elizabeth Bowden, Stephen Urban, Stephen Nevero and Alison Leaton |
|---|---|

| ATTORNEY, FIRM NAME. ADDRESS AND TELEPHONE Frank J. Teague Frank J. Teague & Associates One Liberty Square, 4th Floor, Boston, MA 02109 Board of Bar Overseers number: 493780 | ATTORNEY (if known) |
|---|---|

## Origin code and track designation

Place an x in one box only:

[X] 1. F01 Original Complaint
[ ] 2. F02 Removal to Sup.Ct. C.231,s.104 (Before trial) (F)
[ ] 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)

[ ] 4. F04 District Court Appeal c.231, s. 97 &104 (After trial) (X)
[ ] 5. F05 Reactivated after rescript; relief from judgment/Order (Mass.R.Civ.P. 60) (X)
[ ] 6. E10 Summary Process Appeal (X)

## TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| B99 | Intentional Interference with advantageous relationship | (F) | ( X ) Yes ( ) No |

**The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.**

### TORT CLAIMS
(Attach additional sheets as necessary)

A. Documented medical expenses to date:
  1. Total hospital expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . $.
  2. Total Doctor expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . $.
  3. Total chiropractic expenses . . . . . . . . . . . . . . . . . . . . . . . $.
  4. Total physical therapy expenses . . . . . . . . . . . . . . . . . . . . $.
  5. Total other expenses (describe) . . . . . . . . . . . . . . . . . . . . $.

> FILED
> IN THE OFFICE OF THE
> CLERK OF THE COURTS
> MIDDLESEX
> SEP 2 4 2004
> Edward J. Sullivan
> CLERK

B. Documented lost wages and compensation to date . . . . . . . . .    Subtotal $ . . . . . . . . . . .
C. Documented property damages to date . . . . . . . . . . . . . . . .    $ . 29,000.00
D. Reasonably anticipated future medical and hospital expenses . . . . .    $.
E. Reasonably anticipated lost wages . . . . . . . . . . . . . . . . .    $.
F. Other documented items of damages (describe)    $.
  COBRA Health Insurance Payments    $ 7,500.00
G. Brief description of plaintiff's injury, including nature and extent of injury (describe)

  Loss of job, loss of pension benefits (to be determined)

  $. 36,500.00
  TOTAL $ . . . . . . . . . . .

### CONTRACT CLAIMS
(Attach additional sheets as necessary)

Provide a detailed description of claim(s):

TOTAL $ . . . . . . . . . . .

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _____    DATE: 9/22/04

AOTC-6 mtc005-11/99
A.O.S.C. 1-2000

## Commonwealth of Massachusetts
### MIDDLESEX SUPERIOR COURT
### Case Summary
### Civil Docket

# MICV2004-03746
## Mistovich, Jr. v Bowden et al

| | | | | | |
|---|---|---|---|---|---|
| **File Date** | 09/24/2004 | **Status** | Disposed: transfered to other court (dtrans) | | |
| **Status Date** | 11/03/2004 | **Session** | D - Cv D (7A Cambridge) | | |
| **Origin** | 1 | **Case Type** | B99 - Misc tort | | |
| **Lead Case** | | **Track** | F | | |

| | | | | | |
|---|---|---|---|---|---|
| **Service** | 12/23/2004 | **Answer** | 02/21/2005 | **Rule12/19/20** | 02/21/2005 |
| **Rule 15** | 02/21/2005 | **Discovery** | 07/21/2005 | **Rule 56** | 08/20/2005 |
| **Final PTC** | 09/19/2005 | **Disposition** | 11/18/2005 | **Jury Trial** | Yes |

### PARTIES

**Plaintiff**
Eli Mistovich, Jr.
Active 09/24/2004

**Private Counsel 493780**
Frank J Teague
One Liberty Square, 4th Floor
Boston, MA 02109-3525
Phone: 617-350-7700
Fax:
Active 09/24/2004 Notify

**Defendant**
Elizabeth Bowden
Service pending 09/24/2004

**Defendant**
Stephen Urban
Served: 10/14/2004
Served (answr pending) 10/14/2004

**Private Counsel 406640**
Walter B Prince
Prince Lobel Glovsky & Tye
585 Commercial Street
Boston, MA 02109-1024
Phone: 617-456-8000
Fax: 617-456-8100
Active 11/03/2004 Notify

**Private Counsel 564947**
Laurie F Rubin
Prince Lobel Glovsky & Tye
585 Commercial Street
Boston, MA 02109
Phone: 617-456-8000
Fax: 617-456-8100
Active 11/03/2004 Notify

**Commonwealth of Massachusetts**
**MIDDLESEX SUPERIOR COURT**
**Case Summary**
**Civil Docket**

# MICV2004-03746
## Mistovich, Jr. v Bowden et al

**Defendant**
Stephen Nevero
Served: 10/12/2004
Served (answr pending) 10/12/2004

**Private Counsel 406640**
Walter B Prince
Prince Lobel Glovsky & Tye
585 Commercial Street
Boston, MA 02109-1024
Phone: 617-456-8000
Fax: 617-456-8100
Active 11/03/2004 Notify

**Private Counsel 564947**
Laurie F Rubin
Prince Lobel Glovsky & Tye
585 Commercial Street
Boston, MA 02109
Phone: 617-456-8000
Fax: 617-456-8100
Active 11/03/2004 Notify

**Defendant**
Alison Leaton
Service pending 09/24/2004

### ENTRIES

| Date | Paper | Text |
|---|---|---|
| 09/24/2004 | 1.0 | Complaint & civil action cover sheet filed |
| 09/24/2004 | | Origin 1, Type B99, Track F. |
| 10/29/2004 | 2.0 | SERVICE RETURNED: Stephen Urban(Defendant) 10/14/04 L&U and by first class mail, 25 Townhouse Road, Attleboro, MA |
| 10/29/2004 | 3.0 | SERVICE RETURNED: Stephen Nevero(Defendant) 10/12/04 L&U, 35 Callahan St., Billerica, MA |
| 11/03/2004 | 4.0 | Case REMOVED this date to US District Court of Massachusetts by defts Stephen Urban and Stephen Nevero |
| 11/03/2004 | | ABOVE ACTION THIS DAY REMOVED TO US DISTRICT COURT |

TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED: —
(TORT) — MOTOR VEHICLE TORT — CONTRACT —
EQUITABLE RELIEF — OTHER

# COMMONWEALTH OF MASSACHUSETTS

........MIDDLESEX........, ss

[seal]

SUPERIOR COURT
DEPARTMENT
OF THE
TRIAL COURT
CIVIL ACTION
No.  04-3746

Eli Mistovich, Jr. ............., Plaintiff(s)

v.

Elizabeth Bowden, Stephen Urban, Defendant(s)
Stephen Nevero & Alison Leaton

# SUMMONS

To the above-named Defendant:  Stephen Nevero

You are hereby summoned and required to serve upon ...Frank J. Teague, Esq.............................

................................................... plaintiff's attorney, whose address is Frank J. Teague & Associates
One Liberty Square, 4th Floor Boston, MA 02109.........., an answer to the complaint which is herewith

served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you

fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also

required to file your answer to the complaint in the office of the Clerk of this court at ...Cambridge.................

.................................................................... either before service upon plaintiff's attorney or within a

reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may

have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's

claim or you will thereafter be barred from making such claim in any other action.

ⁿ Witness, Suzanne V. DelVecchio, Esquire, at .....Cambridge..............................................

the .....6th........................................... day of ...October............................................

...................., in the year of our Lord ........2004........................... .

*Edward J Sullivan*

Clerk

NOTES.

1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all such defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

FORM NO. SUP. — 001

**TO PLAINTIFF'S ATTORNEY:  PLEASE CIRCLE TYPE OF ACTION INVOLVED: —
TORT — MOTOR VEHICLE TORT — CONTRACT —
EQUITABLE RELIEF — OTHER**

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX .............. , ss
[seal]

SUPERIOR COURT
DEPARTMENT
OF THE
TRIAL COURT
CIVIL ACTION
No.  04-3746

Eli Mistovich, Jr. ................... , Plaintiff(s)

v.

Elizabeth Bowden, Stephen Defendant(s)
Urban, Stephen Nevero and Alison Leaton

## SUMMONS

To the above-named Defendant: Stephen Urban

You are hereby summoned and required to serve upon ...Frank J. Teague, Esq..........................

...................................................... plaintiff's attorney, whose address is Frank J. Teague & Associates
One Liberty Square, 4th Floor Boston, MA 02109
.........................................................., an answer to the complaint which is herewith

served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you

fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also

required to file your answer to the complaint in the office of the Clerk of this court at ...... Cambridge ..............

................................................................ either before service upon plaintiff's attorney or within a

reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may

have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's

claim or you will thereafter be barred from making such claim in any other action.

Witness, Suzanne V. DelVecchio, Esquire, at ...... Cambridge ......................................

the .........6th......................................... day of .......October.................................

...................., in the year of our Lord ........2004........................... .

Edward J Sullivan
**Clerk**

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all such defendants should appear in the caption. If a separate summons is used
for each defendant, each should be addressed to the particular defendant.

FORM NO. SUP. — 001