UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ELI MISTOVICH, JR. )<br>      Plaintiff )<br> ) <br>v. ) <br> ) <br>ELIZABETH BOWDEN, STEPHEN )<br>URBAN, STEPHEN NEVERO and )<br>ALISON LEATON )<br>      Defendants )<br> ) | C.A. No. 04-12340-EFH |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

**I.     INTRODUCTION**

Eli Mistovich, Jr. is a former employee of the Massachusetts Bay Commuter Railroad ("MBCR"), who was discharged after MBCR concluded that he was discriminating against African-American job applicants. Recruiter Alison Leaton had reported to MBCR's head of human resources, Elizabeth Bowden, a concern that Mistovich was improperly screening out job applicants. After investigation, MBCR concluded that Leaton's allegations were correct and MBCR General Manager Kevin Lydon decided to terminate Mistovich's employment. Out of these uncontested facts, Mistovich brings claims of intentional interference with contractual relations against Leaton[1] and three of the individuals who investigated Leaton's allegations: Bowden, Stephen Nevero (Mistovich's former supervisor), and Stephen Urban (Nevero's supervisor). Plaintiff's claims fail many times over. Defendants' actions –whether in investigating Leaton's allegations or participating in the termination decision – were privileged as a matter of law and can give rise to no individual liability. Plaintiff has nothing but speculation to suggest that the defendants were motivated

---

[1] Although named a defendant in this action, Leaton was never served with the complaint.

by anything but a sincere belief that he was discriminating. Summary judgment should be granted to the defendants.

## II. FACTUAL BACKGROUND

### A. Parties

Plaintiff Eli Mistovich, Jr. was an employee of the Massachusetts Bay Commuter Railroad ("MBCR"). (See Defendants' Statement of Undisputed Material Facts ("Statement of Facts") at ¶ 1.) On July 1, 2003, MBCR assumed operations of the Massachusetts Bay Transportation Authority's commuter rail system from Amtrak, the previous contractor, and also took on a workforce of approximately 1,600 employees from Amtrak (including Mistovich). (Id.) Mistovich worked as Assistant Chief Engineer in the Track Department and was responsible for directing that department's maintenance activities. (Id.)

Defendant Stephen Nevero, Chief Engineer, was Mistovich's immediate supervisor at MBCR. (Statement of Facts, ¶ 2.) As Chief Engineer, Nevero was responsible for directing and overseeing the maintenance and construction of tracks, bridges, buildings and signal systems. (Id.) Defendant Stephen Urban, Jr. was MBCR's Deputy General Manager as of January 2004. (Id. at ¶ 3.) In that position, he served as chief operating officer, reporting to General Manager Kevin Lydon, and was Nevero's immediate supervisor. (Id.) Defendant Elizabeth Bowden, Manager of Organizational Development, was the head of MBCR's human resources functions. (Id. at ¶ 4.) Alison Leaton was a contract recruiter who worked with MBCR from September 2003 through April 2004. (Id. at ¶ 5.) She was responsible for hiring and filling open positions at MBCR. (Id.)

### B. Leaton Reports That Mistovich Is Screening Out Minority Applicants

On or before March 11, 2004, Leaton reported to Bowden that Mistovich was filtering out job candidates based on their address under the assumption that they were

2

black. (Statement of Facts, ¶ 6.)  Leaton told Bowden that she had the situation under control and that they were going to interview a particular candidate, and if all went well, he would be hired.  (Id.)

On March 11, 2004, Bowden asked Leaton to put her concerns in writing. (Statement of Facts, ¶ 7.)  In an e-mail response, Leaton reported that Mistovich "did not want to interview a person who was, based on name and where he lived being Eli's assumption, that he was black," and that Leaton had pressed Mistovich, and that Mistovich had responded that "he'd not had 'good luck' with people 'like that' in the past" and that there was a "'greater percentage' of people like that" who had been "problems for him."  (Id.)

### C. Incident That Triggered Leaton's Allegations

The incident that served as the basis for Leaton's report occurred on March 5, 2004.  (Statement of Facts, ¶ 8.)  Mistovich was hiring track employees and Leaton, as recruiter, was assisting him in this process.  (Id.)  After some candidates failed to show up for interviews, Leaton and Mistovich spoke about the need to consider additional candidates.  (Id. at ¶ 9.)  Leaton gave Mistovich a stack of resumes to go through.  (Id.) One resume was for a candidate named Marvin Morgan, who Leaton thought was a qualified candidate.  (Id.)

Mistovich told Leaton that he did not want to interview Morgan because he had not had "good luck" with "people like that." (Statement of Facts, ¶ 10.)  Leaton believed that Mistovich was relying on Morgan's listed home address (Dorchester) and name to conclude that Morgan might be black.  Leaton understood that Dorchester was a predominantly black area of Boston, and that the name "Marvin" could be an indication

3

that a person was black. (Id. at ¶ 11.) Mistovich does not challenge the fact that Leaton believed that he was discriminating. (Id.) Leaton did not know Morgan's race at the time. (Id.)

Leaton told Mistovich that what he was doing was against the law and that they needed to interview Morgan. (Statement of Facts, ¶ 12.) Mistovich gives the following account:

> As I was sorting through the pile looking at each one, this one particular resume, as soon as I was putting – I'd examine them. I'd put them aside. And as soon I put one aside in particular, she yelled across the table, You're excluding that resume because with the name Marvin Morgan and being from Dorchester, you think he's a minority. That's discrimination. [Id.]

Leaton told Mistovich that she was not going to make him hire a candidate who was not qualified, but that if the person were qualified, she would go to the mat. (Statement of Facts, ¶ 13.) Mistovich responded that he was not going to win the argument and he saw no point in getting into a discussion that he was not going to win. (Id.) They later interviewed Morgan, who turned out to be African-American. (Statement of Facts, ¶ 14.) Morgan was offered a job and hired by MBCR. (Id.)

### D.     MBCR Investigates Leaton's Allegation

On March 15, 2004, Bowden and her assistant, Beth Trowbridge, met with Leaton to obtain additional information. (Statement of Facts, ¶ 15.) Bowden asked Leaton whether Mistovich's comments could have been misinterpreted. (Id.) Leaton reported that there was no room for misinterpretation. (Id.)

On March 26, 2004, Bowden, Urban, and Nevero met with Mistovich. (Statement of Facts, ¶ 16.) General Manager Lydon had asked Urban to attend this meeting, explaining to Urban that there was an allegation that prospective candidates were being

4

excluded from the hiring pool based on where they lived and that MBCR needed to determine if there was any truth to that allegation. (Id.) Nevero could not recall who had asked him to attend the meeting – he thought it may have been Bowden – and he was similarly told that there was an allegation that Mistovich was screening candidates from certain sections of the city where minorities lived. (Id.)

At the March 26 meeting, Bowden explained to Mistovich – who had no advance notice of the subject of the meeting, other than it was to discuss concerns over the hiring of track employees – that the reason for the meeting was a report from the recruiter, Alison Leaton, that Mistovich was eliminating qualified applicants because of their name and address under the assumption that they were black. (Statement of Facts, ¶ 17.)

Bowden went on to explain that Leaton has reported that Mistovich had declined to interview an applicant, reportedly saying that he had had trouble with "people like that" in the past. (Statement of Facts, ¶ 18.) Mistovich told Bowden, Nevero and Urban that this was correct – and that he had, in fact, had trouble with "people like that," and that he had records to validate this statement. (Id.)

Based on Mistovich's response, Urban and Nevero believed that Mistovich had admitted to screening out candidates from certain areas of the city. (Statement of Facts, ¶ 19.) In particular, Urban recalled Mistovich responding, "in a moment of candor" that it was "true" that he was excluding certain applicants, and that Mistovich had gone on to say that "he had problems with these people in the past," implying that from "where they came from, they were most likely" minority candidates, and that Mistovich had added "that he had files and records that he had difficulty with these people once they were hired." (Id.) Nevero recalled that Mistovich stated "something to the effect that he had a

problem with those types of people and he could produce a box of documents," and in Nevero's notes of the meeting, he wrote: "Mr. Mistovich's initial response to Elizabeth Bowden's question "Did you say to Alison Leaton that you had trouble with them" was "I can show you a box of documents in my office that will show you the problems." (Id.)

Later in the meeting, Bowden asked for Mistovich to clarify his comment, but Mistovich declined, other than indicating that he had had problems. (Statement of Facts, ¶ 20.) At his *deposition*, Mistovich explained that his statement about having trouble with "people like that" was not meant to refer to minorities, but instead to inferior candidates. (Id.)

Bowden also asked for Mistovich to respond to Leaton's claim that he was refusing to interview qualified applicants because of their name and address on the assumption that they were black. (Statement of Facts, ¶ 21.) Mistovich responded that he always tried to select the best or above average candidates, but he did not provide any further clarification, and he did not deny Leaton's allegations. (Id.)

Bowden told Mistovich that, in the absence of anything further from him, the information from the recruiter would be considered accurate and without objection. (Statement of Facts, ¶ 22.) Mistovich responded that it sounded as if Bowden had already made up her mind and he did not provide any further information. (Id.)

### E.     Lydon Decides to End Mistovich's Employment

On March 29, 2004, General Manager Lydon met with Bowden, Urban, Nevero and MBCR General Counsel Richard Davey to follow up on the investigation. (Statement of Facts, ¶ 23.) Nevero and Urban communicated what happened at the March 26 meeting, and Bowden went over the notes she had taken at the meeting. (Id.)

6

Nevero suggested that perhaps Mistovich could be demoted to a position without hiring authority. (Statement of Facts, ¶ 24.) In the end, Lydon decided to end Mistovich's employment, first giving him the opportunity to resign. (Id.) The group discussed no reasons – other than Leaton's accusation and the results of the investigation – for terminating Mistovich's employment. (Id. at ¶ 25.)

On March 30, 2004, Bowden, Urban and Nevero met again with Mistovich. (Statement of Facts, ¶ 26.) Nevero informed Mistovich that he was being terminated for discriminating against applicants based on geography. (Id.) Nevero explained that Mistovich had had the opportunity to set the record straight but had failed to do so. (Id.) Nevero gave Mistovich the option of resignation or termination. (Id.) Mistovich did not resign and so his employment was terminated, effective that day. (Id.)

### F. Mistovich Faults Defendants For Giving Credence to Leaton's Allegations

Mistovich claims that it was wrong for Bowden, Nevero and Urban to give credence to Leaton's allegations. (Statement of Facts, ¶ 27.) Indeed, Mistovich testified that it was "outrageous" to "lend credence" to Leaton's allegation by "even ask[ing] [him] questions about it." (Id.)

Mistovich contends that Bowden, Urban and Nevero should not have believed Leaton's allegations because, according to Mistovich, it was "ridiculous" to claim that anyone could look at a resume and discriminate against minority candidates. (Statement of Facts, ¶ 28.) In particular, he testified that he did not see how anyone could guess that a person might be black simply because the person lived in a given area, say Mattapan – or anywhere else. (Id.)

7

Bowden testified that she was unfamiliar with the racial makeup of communities in the Greater Boston area, but that she understood that people familiar with the areas could make educated guesses.  (Statement of Facts, ¶ 29.)  United States Census data for 2000 indicates that 43 percent of the state's black population lives in Boston, and within Boston, the black population is almost entirely in three areas:  Dorchester, Roxbury, and Mattapan, all of which have black populations exceeding fifty percent.  (Id.)

Mistovich also contends that Bowden, Nevero and Urban should not have taken Leaton's word over his, given his 28-year employment history compared to the fact that Leaton was on a short term contract.  (Statement of Facts, ¶ 30.)  Mistovich conceded, however, that he had only worked for MBCR for nine months, that he had only known Bowden for approximately one year, and to his knowledge Bowden, Nevero, and Urban were unaware of his previous hiring record.  (Id.)

Mistovich also claimed that Leaton should not have been believed, based on hearsay accounts that Leaton had had disputes with hiring managers at MBCR, or because her report was somehow "suspicious" because her MBCR contract was ending.  (Statement of Facts, ¶ 31.)  But, Bowden had not received any complaints from MBCR hiring managers about Leaton.  (Id. at ¶ 32.)   And there was nothing out of the ordinary about the ending of Leaton's contract.  When the agreed-upon period for Leaton's work was nearing an end, Leaton communicated to Bowden that she was close to receiving another job.  (Id.)  Because MBCR continued to have recruiting needs, MBCR hired another recruiter and Leaton departed on amicable grounds.  (Id.)

Despite faulting Urban and Nevero for giving credence to Leaton's allegation, Mistovich speculated that both of them might not have really believed Leaton.  For

Urban, this was because Mistovich had heard – from a source he could not identify – that Urban had said that Urban's involvement in Mistovich's termination was the hardest thing that Urban had ever done in his railroad career and because Mistovich did not think that an "intelligent" person would believe Leaton's "ridiculous" allegation. (Statement of Facts, ¶ 33.) For Nevero, this was because Nevero's notes of the March 26 meeting did not state any conclusions and because Nevero had recommended the removal of Mistovich's hiring responsibilities – not his termination. (Id.) But, Mistovich conceded that the notes were "indeterminate" and that he could not tell "for certain" whether Nevero's recommendation of a lesser punishment indicated anything about Nevero's beliefs. (Id.)

      G.      **Mistovich Also Challenges The Investigation**

Mistovich faults Bowden, Nevero, and Leaton for not giving him "prior warning of what was going to be discussed [at the March 26 meeting] so [he] could prepare." (Statement of Facts, ¶ 34.) Mistovich does not know if he was treated differently from any other employee and he cannot say if there are some situations where an employer may want to question an employee without giving the employee time to prepare an answer. (Id.) It was Bowden's standard practice to keep information confidential until face-to-face meetings. (Id.)

Mistovich also faults Bowden for failing to ask him if he was under medication at the March 26 meeting. (Statement of Facts, ¶ 35.) At deposition, Mistovich testified that he could not respond adequately to Bowden's questions because he was on medication for high blood pressure – which made him mentally sluggish – but he admits that he not tell Bowden, Nevero or Urban that he was experiencing any side effects at the time. (Id.)

9

Moreover, Mistovich has no reason to believe that Bowden was aware that he was experiencing any side effects. (Id.) The side effects did not prevent him from carrying out his routine job functions. (Id.)

Finally, Mistovich claims that the investigation was not fair because Bowden's tone of voice and the type of questions she asked "left little doubt" that Bowden had made up her mind ahead of time. (Statement of Facts, ¶ 36.) When asked to identify any improper questions, Mistovich responded that Bowden could have asked him questions without having Urban and Nevero in the room. (Id.) Mistovich also responded that was improper for Bowden to tell him that if he could not respond to her questions, then she would have to assume the allegations were true. (Id.)

### H. Mistovich Offers Nothing But Speculation That The Defendants Acted For An Ulterior Motive

Apart from their participation in this investigation, none of the defendants ever did or said anything that indicated that they wanted Mistovich's employment to end. (Statement of Facts, ¶ 37.) Mistovich never had any difficulty with Bowden until Leaton made her allegations, and he conceded that she harbored no ill will towards him. (Id.) Mistovich also had a "good" or "decent" working relationship with Urban, Nevero and Leaton. (Id.)

Mistovich has no reason to believe that Urban's or Nevero's role in the termination was based on anything other than their belief that Mistovich was discriminating. (Statement of Facts, ¶ 38.) Moreover, Mistovich does not think that Urban or Nevero had any personal motivation to force Mistovich out. (Id.) Mistovich is not aware of any reasons that Leaton may have wanted his employment to end. (Id.)

Mistovich speculates that although Urban and Nevero had no personal motivation to end his employment, perhaps they were doing General Manager Lydon's bidding. (Statement of Facts, ¶ 39.) As to Lydon's motivation, Mistovich admitted that he could "only speculate." (Id.)

As to possible ulterior motives – on anyone's part – Mistovich offered the following theories:

(a) <u>401(k) issue</u>: Mistovich wondered whether Bowden (or Lydon) wanted his employment to end because Mistovich had complained – a year before – about MBCR's proposed handling of the rollover of 401(k) accounts. (Statement of Facts, ¶ 40(a).) But, Mistovich concedes that he did not experience any hostility after raising this issue and he has no reason to think that Lydon or Bowden were concerned about this issue. (Id.) Moreover, Mistovich testified that Lydon's response at the time was "when this was said and done, he'd like to sit down with me and maybe I could recommend what he should be doing with his 401(k)." (Id.) Mistovich also admitted that no one from MBCR ever indicated any unwillingness to go along with his suggestion for the 401(k) rollover. (Id.)

(b) <u>Delay in Processing Life Insurance</u>: Mistovich speculated that Bowden may have had an ulterior motive because there had been a delay in processing his life insurance application. (Statement of Facts, ¶ 40(b).) Mistovich explained that this was "only speculation on [his] part" and that he was "not sure" if this played any role in her treatment of him. (Id.) He conceded that the life insurance issue was simply a matter of his becoming enrolled, just like all employees, and that he was not aware of any motivation on Bowden's part to deprive him of life insurance. (Id.) He explained that

11

the delay seemed to have been caused, at least in part, by a turn over in staff reporting to Bowden. (Id.) He experienced no difference in the terms and conditions of employment because of his application for life insurance. (Id.)

(c)     Concerns Over Lack of Diversity:  Mistovich speculated that Bowden or Leaton may have wanted his employment to end because of concerns allegedly raised by Boston City Councilor Charles Turner about the lack of diversity in MBCR's workforce. (Statement of Facts, ¶ 40(c).)  According to Mistovich, he had heard through the "grapevine" that Leaton was getting pressure from Bowden, who was getting pressure from Councilor Turner about the lack of diversity. (Id.) But Leaton did not have any discussions with Bowden or anyone else regarding any lack of minorities in the workforce or about Councilor Turner's alleged concerns. (Id.) Mistovich has no direct knowledge that this occurred, and relies on unidentified and unknown sources. (Id.)

(d)     Political Antagonism:  Mistovich also "wonder[ed]" whether Leaton "concoct[ed] this scheme" because (according to him) she was an avid supporter of Dean and later Kerry (while he supported Bush). (Statement of Facts, ¶ 40(d).)  But he could not say "how much of a factor" this played. (Id.)

(e)     Leaton's Contract:  Mistovich also speculated that by accusing him of discrimination, Leaton may have been thinking that it would cause MBCR to extend her employment contract. (Statement of Facts, ¶ 40(e).)  Mistovich concedes, however, that he does not know if this was the case. (Id.)

(f)     Comments About Understaffing:  Mistovich speculated that Lydon may have been the moving force behind his termination because Mistovich had informed the MBTA, in a meeting in December 2003, that MBCR had experienced problems in

12

clearing snow because MBCR failed to hire needed personnel. (Statement of Facts, ¶ 40(f).) Mistovich admitted that he did not know and could not prove if this factored into the termination decision, but it "makes one wonder," explaining that two sources – that he could not identify – had purportedly told him that Lydon was not pleased with Mistovich's comments. (Id.) Mistovich did not experience any change in his treatment after the December meeting, and another employee, who raised similar concerns, was still employed by MBCR. (Id.)

      (g)    <u>Replacement</u>: Finally, Mistovich speculated that Lydon may have wanted him gone so that Lydon could replace him with a cousin, which Mistovich contends happened after his termination. (Statement of Facts, ¶ 40(g).) When asked if he had any support for this theory, other than speculation, Mistovich testified that it was "incomprehensible" to Mistovich that Lydon would have ended Mistovich's employment unless Lydon had an ulterior motive. (Id.) Mistovich admits that he has nothing but speculation that Lydon conveyed this concern to Nevero. (Id.)

### III. ARGUMENT

**Plaintiff's Claim Fails Because the Defendants' Conduct Was Privileged**

Plaintiff seeks damages against the defendants individually, claiming that they interfered with his employment relationship with MBCR. To sustain such a claim, plaintiff must show that: (1) he had an advantageous employment relationship with his employer; (2) the defendants knowingly induced the employer to sever that relationship; (3) the defendants' interference, in addition to being intentional, was improper in motive or means; and (4) that plaintiff was harmed by the defendants' actions. E. g., <u>Weber v. Community Teamwork, Inc.</u>, 434 Mass. 761, 781, 752 N.E.2d 700, 715 (2001).

In the employment context, Massachusetts law provides corporate officers with a conditional privilege in order to protect their freedom of action as they conduct corporate affairs. A "defendant may escape liability if the interference [is] privileged as part of his employment responsibilities. This rule has particular force as applied to corporate officers, since their freedom of action toward corporate purposes should not be curtailed by fear of personal liability." Steranko v. Inforex, Inc., 5 Mass. App. Ct. 253, 273, 362 N.E.2d 222, 235 (1977) (internal citations omitted).

Accordingly, so long as management personnel act within the scope of their employment responsibilities, they are shielded from personal liability. The privilege is lost only if a plaintiff can prove that the managers "acted out of malevolence, that is, with 'actual' malice." Gram v. Liberty Mutual Ins. Co., 384 Mass. 659, 663, 429 N.E.2d 21, 24 (1981). In other words, a plaintiff "must show, for the purposes of the third element, that the improper motive or means rose to the level of 'actual malice' and was the 'controlling factor' in the defendant's interference." Sklar v. Beth Israel Deaconess Medical Center, 59 Mass. App. Ct. 550, 554, 797 N.E.2d 381, 385, review denied, 440 Mass. 1110, 801 N.E.2d 803 (2003). See also, e.g., Alba v. Sampson, 44 Mass. App. Ct. 311, 314, 690 N.E.2d 1240, 1243 ("In the employment and discharge context" Massachusetts law "protect[s] a corporate official's freedom of action by requiring proof that the official acted with actual malice."), review denied, 427 Mass. 114, 695 N.E.2d 667 (1998).

To reach the level of "actual malice," there must be a "'spiteful, malignant purpose, unrelated to the legitimate corporate' interest of the employer." Weber, 434 Mass. at 782, 752 N.E.2d at 715 (quoting Boothby v. Texon, Inc., 414 Mass. 468, 487, 608 N.E.2d 1028 (1993)). A supervisor's simple negligence, want of sound judgment, hasty action, or even sloppy and unfair business practices in the discharge of an employee will not jeopardize the

14

privilege. Such conduct is not actionable. Weber, 434 Mass. at 783, 752 N.E.2d at 716 (citing Gram, 384 Mass. at 665, 429 N.E.2d at 25). See also Sklar, 59 Mass. App. Ct. at 556, 797 N.E.2d at 386 ("negligent, sloppy or callous investigation" is not actionable); Alba, 44 Mass. App. Ct. at 316, 690 N.E.2d at 1244 (citing Mathias v. Beatrice Foods Co., 23 Mass. App. Ct. 915, 917, 500 N.E.2d 812 (1986)). Instead, to defeat summary judgment, a plaintiff must produce evidence that the supervisor's motivation was purely personal and gratuitously malevolent. Alba, 44 Mass. App. Ct. at 314-315, 690 N.E.2d at 1243.

Evidence of a spiteful purpose or hostility may be shown by facts "from which a reasonable inference of malice may be drawn," and must be based on "probabilities rather than possibilities." Gram, 384 Mass. at 664, 429 N.E.2d at 24-25. Proof by inference "will not succeed if the plaintiff can show nothing more" than a "'laundry list' of facts which may or may not indicate the defendant acted out of actual malice." Sklar, 59 Mass. App. Ct. at 555, 797 N.E.2d at 386. See also Shea v. Emmanuel College 425 Mass. 761, 763-764, 682 N.E.2d 1348, 1350 (1997) (speculation about employer's motivations in discharging plaintiff is not sufficient to create a dispute of material fact).

These principles doom plaintiff's claim. Bowden, Nevero and Urban were all acting within the scope of their employment. Bowden was investigating the allegations as the head of human resources. Nevero was Mistovich's supervisor and Urban was Nevero's supervisor. General Manager Lydon and/or Bowden directed Urban and Nevero to participate in the investigation. The defendants' actions were privileged – and they were free to inform Lydon of their conclusions as to whether they believed that Mistovich was discriminating – unless they acted with "actual malice."

In an effort to establish malice, Mistovich offers nothing but speculation. Plaintiff concedes that the defendants harbored him no ill will. He concedes that Nevero and Urban had no personal motive to end his employment – and speculates merely that they were acting

15

on Lydon's wishes. As for Bowden (or Leaton or Lydon), Mistovich offers nothing but more speculation. His "laundry list" of possible motivations is based on possibilities, not probabilities. He has no admissible evidence in support of any of his varied theories.

Here, the undisputed evidence demonstrates that defendants were responding to an allegation by Leaton, that they investigated the allegation and concluded that Mistovich was discriminating against African-American applicants. MBCR was free to terminate an employee for engaging in what it thought was unlawful discrimination – and the individual defendants were free to report their findings without exposing themselves to individual liability.

Boiled down, Mistovich's claim is based on two things: (1) Mistovich's contention that Leaton's allegation was "ridiculous" and that he should have been believed over her, and (2) Mistovich's contention that the investigation was flawed in various ways. Neither allows him to survive summary judgment. The Supreme Judicial Court, in Gram, rejected almost identical arguments:

> [Plaintiff] argues that it is incredible that [individual defendants] really believed that he had violated a company rule. He says the level of stupidity required to hold that belief was so low that they could not really have believed their stated reason for discharging [plaintiff]. [Plaintiff] argues that, because their stated reasons were incredible, the jury could reasonably draw the inference that the individual defendants acted maliciously. We note, however, that their stated reason was not devised after the discharge as a justification. They did not act on their own because they subjected their conclusions for consideration by their superiors. Even if we assume . . . that [defendants] did not conduct an adequate investigation of the alleged rule violation and that, in fact, there was no new or good reason to justify [plaintiff's] discharge, an inference of an intent to obtain [plaintiff's] discharge out of ill will toward him is no more probable that is the inference that [defendants] acted in response to a sincerely held but erroneous belief that [plaintiff violated] company policy. [Gram, 384 Mass. at 665, 429 N.E.2d at 25.]

Mistovich cannot succeed on his claim by labeling Leaton's allegation "ridiculous" or by pointing to purported flaws in the investigation.

16

Overall, plaintiff cannot meet his burden of establishing actual malice and summary judgment should be granted to the individual defendants.

IV. **CONCLUSION**

For all of the above reasons, summary judgment should be granted in favor of Elizabeth Bowden, Stephen Urban and Stephen Nevero.

          Respectfully submitted,

          **ELIZABETH BOWDEN, STEPHEN URBAN and STEPHEN NEVERO,**

          By their attorneys,

          /s/ Laurie F. Rubin
          Walter B. Prince, BBO# 406640
          Laurie F. Rubin, BBO# 564947
          Prince, Lobel, Glovsky & Tye LLP
          585 Commercial Street
          Boston, MA 02109

Dated: October 31, 2005          (617) 456-8000