UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ELI MISTOVICH, JR.<br>      Plaintiff<br><br>v.<br><br>ELIZABETH BOWDEN, STEPHEN<br>URBAN, STEPHEN NEVERO and<br>ALISON LEATON<br>      Defendants | )<br>)<br>)<br>)<br>)  C.A. No. 04-12340-EFH<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANTS' STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1**

Defendants Elizabeth Bowden, Stephen Nevero and Stephen Urban hereby submit this statement of the material facts of record as to which defendants contends there is no genuine issue to be tried, and based upon which they move for summary judgment.[1]

**A.    Parties**

1.    Plaintiff Eli Mistovich, Jr. ("Mistovich") was an employee of the Massachusetts Bay Commuter Railroad ("MBCR"). (E.g., Deposition of Elizabeth Bowden ("Bowden Dep.") at 16.)  On July 1, 2003, MBCR assumed operations of the Massachusetts Bay Transportation Authority's commuter rail system from Amtrak, the previous contractor, and also took on a workforce of approximately 1,600 employees from Amtrak (including Mistovich). (E.g., Deposition of Stephen Urban, Jr. ("Urban Dep.") at 5, 13-14.)   Mistovich worked as Assistant Chief Engineer in the Track Department, where he was responsible for directing and overseeing that department's maintenance activities. (Deposition of Stephen Nevero ("Nevero Dep.") at 13-14.)

---

[1] In support of this Statement of Undisputed Facts, the defendants have filed the affidavit of Laurie F. Rubin, which includes as attachments the supporting exhibits cited in this Statement.  This Statement is for the purposes of this summary judgment motion only.

2.  Defendant Stephen Nevero ("Nevero"), Chief Engineer, was Mistovich's immediate supervisor at MBCR. (Nevero Dep. at 7, 13.) As Chief Engineer, Nevero was responsible for directing and overseeing the maintenance and construction of tracks, bridges, buildings and signal systems. (Id. at 7.)

3.  Defendant Stephen Urban, Jr. ("Urban") was MBCR's Deputy General Manager as of January 2004. (Urban Dep. at 5, 7.) In that position, he served as chief operating officer, reporting to General Manager Kevin Lydon ("Lydon"), and was Nevero's immediate supervisor. (Urban Dep. at 6; Nevero Dep. at 13.)

4.  Defendant Elizabeth Bowden ("Bowden"), Manager of Organizational Development, was the head of MBCR's human resources functions. (Bowden Dep. at 6-7.)

5.  Alison Leaton ("Leaton") was a contract recruiter who worked with MBCR from September 2003 through April 2004. (Deposition of Alison Leaton ("Leaton Dep.") at 7.) She was responsible for hiring and filling open positions at MBCR. (Id. at 8.)

**B.    Leaton Reports That Mistovich Is Screening Out Minority Applicants**

6.  On or before March 11, 2004, Leaton reported to Bowden that Mistovich was filtering out job candidates based on their address under the assumption that they were black. (Bowden Dep. at 54-55; Leaton Dep. at 68-70.) Leaton told Bowden that she had the situation under control and that they were going to interview a particular candidate, and if all went well, he would be hired. (Leaton Dep. at 70.)

7.  On March 11, 2004, Bowden asked Leaton to put her concerns in writing. (Bowden Dep. at 53-54; Leaton Dep. at 74-75; Nevero Dep. Exhibit 5.) In an e-mail response, Leaton reported that Mistovich "did not want to interview a person who was, based on name and where he lived being Eli's assumption, that he was black," and that Leaton had pressed Mistovich, and that Mistovich had responded that "he'd not had

2

'good luck' with people 'like that' in the past" and that there was a "'greater percentage' of people like that" who had been "problems for him." (Leaton Dep. at 75; Nevero Dep. Exhibit 5.)

**C.      Incident That Triggered Leaton's Allegations**

8.      The incident that served as the basis for Leaton's report occurred on March 5, 2004. (Leaton Dep. at 53-54.) Mistovich was hiring track employees and Leaton, as recruiter, was assisting him in this process. (Deposition of Eli Mistovich ("Mistovich Dep.") at 246-251.)

9.      After some candidates failed to show up for interviews, Leaton and Mistovich spoke about the need to consider additional candidates. (Mistovich Dep. at 178, 259.) Leaton gave Mistovich a stack of resumes to go through. (Id. at 178, 259-260.) One resume was for a candidate named Marvin Morgan, who Leaton thought was a qualified candidate. (Mistovich Dep. at 264-265; Leaton Dep. at 54-55; Urban Dep. Exhibit 2.)

10.     Mistovich told Leaton that he did not want to interview Morgan because he had not had "good luck" with "people like that." (Leaton Dep. at 55-56.)

11.     Leaton believed that Mistovich was relying on Morgan's listed home address (Dorchester) and name to conclude that Morgan might be black. Leaton understood that Dorchester was a predominantly black area of Boston, and that the name "Marvin" could be an indication that a person was black. (Leaton Dep. at 56-57, 76.) Mistovich does not challenge the fact that Leaton believed that he was discriminating. (Mistovich Dep. at 185-186.) Leaton did not know Morgan's race at the time. (Leaton Dep. at 56.)

3

12. Leaton told Mistovich that what he was doing was against the law and that they needed to interview Morgan. (Leaton Dep. at 58.) Mistovich gives the following account:

> As I was sorting through the pile looking at each one, this one particular resume, as soon as I was putting – I'd examine them. I'd put them aside. And as soon I put one aside in particular, she yelled across the table, You're excluding that resume because with the name Marvin Morgan and being from Dorchester, you think he's a minority. That's discrimination. [Mistovich Dep. at 178.]

13. Leaton told Mistovich that she was not going to make him hire a candidate who was not qualified, but that if the person were qualified, she would go to the mat. (Leaton Dep. at 59; Mistovich Dep. at 264.) Mistovich responded that he was not going to win the argument and he saw no point in getting into a discussion that he was not going to win. (Leaton Dep. at 59.)

14. They later interviewed Morgan, who turned out to be African-American. (E.g., Bowden Dep. at 60-61.) Morgan was offered a job and hired by MBCR. (Id.)

**D.     MBCR Investigates Leaton's Allegation**

15. On March 15, 2004, Bowden and her assistant, Beth Trowbridge, met with Leaton to obtain additional information. (Bowden Dep. at 74, 82-83; Leaton Dep. at 90; Bowden Dep. Exhibit 30.) Bowden asked Leaton whether Mistovich's comments could have been misinterpreted. (Bowden Dep. at 74; Bowden Dep. Exhibit 30.) Leaton reported that there was no room for misinterpretation. (Leaton Dep. at 91, 93; Bowden Dep. at 74-75; Bowden Dep. Exhibit 30.)

16. On March 26, 2004, Bowden, Urban, and Nevero met with Mistovich. (Mistovich Dep. at 207; Bowden Dep. at 89; Mistovich Dep. Exhibit 11 (p. 1, ¶ 2).) General Manager Lydon had asked Urban to attend this meeting, explaining to Urban that

there was an allegation that prospective candidates were being excluded from the hiring pool based on where they lived and that MBCR needed to determine if there was any truth to the allegation. (Urban Dep. at 27, 29.) Nevero could not recall who had asked him to attend the meeting – he thought it may have been Bowden – and he was similarly told that there was an allegation that Mistovich was screening candidates from certain sections of the city where minorities lived. (Nevero Dep. at 36.)

17. At the March 26 meeting, Bowden explained to Mistovich – who had no advance notice of the subject of the meeting, other than it was to discuss concerns over the hiring of track employees – that the reason for the meeting was a report from the recruiter, Alison Leaton, that Mistovich was eliminating qualified applicants because of their name and address under the assumption that they were black. (Bowden Dep. at 90; Mistovich Dep. at 80; Mistovich Dep. Exhibit 11 (p. 1, ¶ 3).)

18. Bowden went on to explain that Leaton has reported that Mistovich had declined to interview a certain applicant, reportedly saying that he had had trouble with "people like that" in the past. (Mistovich Dep. at 208-209; Mistovich Dep. Exhibit 11 (p. 1, ¶ 4).) Mistovich told Bowden, Nevero and Urban that this was correct – and that he had, in fact, had trouble with "people like that," and that he had records to validate this statement. (Mistovich Dep. at 209; Mistovich Dep. Exhibit 11 (p.1, ¶ 5).)

19. Based on Mistovich's response, Urban and Nevero believed that Mistovich had admitted to screening out candidates from certain areas of the city. (Urban Dep. at 55-56; Nevero Dep. at 53-54.) In particular, Urban recalled Mistovich responding, "in a moment of candor" that it was "true" that he was excluding certain applicants, and that Mistovich had gone on to say that "he had problems with these

people in the past," implying that from "where they came from, they were most likely" minority candidates, and that Mistovich had added "that he had files and records that he had difficulty with these people once they were hired." (Urban Dep. at 32-33.)  Nevero recalled that Mistovich stated "something to the effect that he had a problem with those types of people and he could produce a box of documents," and in Nevero's notes of the meeting, he wrote:  "Mr. Mistovich's initial response to Elizabeth Bowden's question "Did you say to Alison Leaton that you had trouble with them" was "I can show you a box of documents in my office that will show you the problems." (Nevero Dep. at 43-44; Nevero Dep. Exhibit 7.)

      20.     Later in the meeting, Bowden asked for Mistovich to clarify his comment, but Mistovich declined, other than indicating that he had had problems.  (Mistovich Dep. at 221-222; Mistovich Dep. Exhibit 11 (p. 3, response to question 4).)  At his *deposition*, Mistovich explained that his statement about having trouble with "people like that" was not meant to refer to minorities, but instead to inferior candidates. (Mistovich Dep. at 209-210.)

      21.     Bowden also asked for Mistovich to respond to Leaton's claim that he was refusing to interview qualified applicants because of their name and address on the assumption that they were black. (Mistovich Dep. at 215.)  Mistovich responded that he always tried to select the best or above average candidates, but he did not provide any further clarification, and he did not deny Leaton's allegations. (Bowden Dep. at 101; Urban Dep. at 36; Mistovich Dep. at 215-217, 232-233; Mistovich Dep. Exhibit 11 (p. 2, response to question 3).)

22.     Bowden told Mistovich that, in the absence of anything further from him, the information from the recruiter would be considered accurate and without objection. (Mistovich Dep. at 218; Mistovich Dep. Exhibit 11 (p. 2, response to question 3).) Mistovich responded that it sounded as if Bowden had already made up her mind and he did not provide any further information. (Mistovich Dep. at 218; Bowden Dep. at 101; Mistovich Dep. Exhibit 11 (p. 2, response to question 3).)

**E.     Lydon Decides to End Mistovich's Employment**

23.     On March 29, 2004, General Manager Lydon met with Bowden, Urban, Nevero and MBCR General Counsel Richard Davey to follow up on the investigation. (Bowden Dep. at 117; Urban Dep. at 41.) Nevero and Urban communicated what happened at the March 26 meeting, and Bowden went over the notes she had taken at the meeting. (Bowden Dep. at 117; Urban Dep. at 42; Nevero Dep. at 56.)

24.     Nevero suggested that perhaps Mistovich could be demoted to a position without hiring authority. (Urban Dep. at 43; Nevero Dep. at 56-57.) In the end, Lydon decided to end Mistovich's employment, first giving him the opportunity to resign. (Bowden Dep. at 117-118; Nevero Dep. at 56; Urban Dep. at 43.)

25.     The group discussed no reasons – other than Leaton's accusation and the results of the investigation – for terminating Mistovich's employment. (Bowden Dep. at 119; Urban Dep. at 50.)

26.     On March 30, 2004, Bowden, Urban and Nevero met again with Mistovich. (Mistovich Dep. at 233; Bowden Dep. at 119-120.) Nevero informed Mistovich that he was being terminated for discriminating against applicants based on geography. (Mistovich Dep. at 235-236.) Nevero explained that Mistovich had had the

opportunity to set the record straight but had failed to do so. (Id.) Nevero gave Mistovich the option of resignation or termination. (Bowden Dep. at 120-121.) Mistovich did not resign and so his employment was terminated, effective that day. (Id.)

**F.     Mistovich Faults Defendants For Giving Credence to Leaton's Allegations**

27.    Mistovich claims that it was wrong for Bowden, Nevero and Urban to give credence to Leaton's allegations. (Mistovich Dep. at 32-34, 105,141-142.) Indeed, Mistovich testified that it was "outrageous" to "lend credence" to Leaton's allegation by "even ask[ing] [him] questions about it." (Mistovich Dep. at 57-58, 158-159, 162-163.)

28.    Mistovich contends that Bowden, Urban and Nevero should not have believed Leaton's allegations because, according to Mistovich, it was "ridiculous" to claim that anyone could look at a resume and discriminate against minority candidates. (E.g., Mistovich Dep. at 101-102, 137, 146-147.) In particular, he testified that he did not see how anyone could guess that a person might be black simply because the person lived in a given area, say Mattapan – or anywhere else. (Id. at 268-269.)

29.    Bowden testified that she was personally unfamiliar with the racial makeup of communities in the Greater Boston area, but that she understood that people familiar with the areas could make educated guesses. (Bowden Dep. at 58-59.) United States Census data for 2000 indicates that 43 percent of the state's black population lives in Boston, and within Boston, the black population is almost entirely in three areas: Dorchester, Roxbury, and Mattapan, all of which have black populations exceeding fifty percent. (E.g., Kimberly Atkins, The Hard Numbers: Segregation Remains Real, Widespread, BOSTON GLOBE, Mar. 9, 2003, at 5.)

8

30. Mistovich also contends that Bowden, Nevero and Urban should not have taken Leaton's word over his, given his 28-year employment history compared to the fact that Leaton was on a short term contract. (Mistovich Dep. at 32-33, 106-107, 133; 146-147.) Mistovich conceded, however, that he had only worked for MBCR for nine months, that he had only known Bowden for approximately one year, and to his knowledge Bowden, Nevero, and Urban were unaware of his previous hiring record. (Id. at 78-79, 113, 148.)

31. Mistovich also claimed that Leaton should not have been believed, based on hearsay accounts that Leaton had had disputes with hiring managers at MBCR, or because her report was somehow "suspicious" because her MBCR contract was ending. (E.g., Mistovich Dep. at 76.)

32. But, Bowden had not received any complaints from MBCR hiring managers about Leaton. (Bowden Dep. at 122.) And there was nothing out of the ordinary about the ending of Leaton's contract. When the agreed-upon period for Leaton's work was nearing an end, Leaton communicated to Bowden that she was close to receiving another job. (Bowden Dep. at 122-123.) Because MBCR continued to have recruiting needs, MBCR hired another recruiter and Leaton departed on amicable grounds. (Id.)

33. Despite faulting Urban and Nevero for giving credence to Leaton's allegation, Mistovich speculated that both of them might not have really believed Leaton. For Urban, this was because Mistovich had heard – from a source he could not identify – that Urban had said that Urban's involvement in Mistovich's termination was the hardest thing that Urban had ever done in his railroad career and because Mistovich did not think

9

that an "intelligent" person would believe Leaton's "ridiculous" allegation. (Mistovich Dep. at 115-116, 132-138.) For Nevero, this was because Nevero's notes of the March 26 meeting did not state any conclusions and because Nevero had recommended the removal of Mistovich's hiring responsibilities – not his termination. (Mistovich Dep. at 163-165; Nevero Dep. Exhibit 7.) But, Mistovich conceded that the notes were "indeterminate" and that he could not tell "for certain" whether Nevero's recommendation of a lesser punishment indicated anything about Nevero's beliefs. (Mistovich Dep. at 166, 173, 175-176.)

**G.** **Mistovich Also Challenges The Investigation**

34. Mistovich faults Bowden, Nevero, and Leaton for not giving him "prior warning of what was going to be discussed [at the March 26 meeting] so [he] could prepare." (Mistovich Dep. at 53-54, 139-140, 180.) Mistovich does not know if he was treated differently from any other employee and he cannot say if there are some situations where an employer may want to question an employee without giving the employee time to prepare an answer. (Id. at 86.) It was Bowden's standard practice to keep information confidential until face-to-face meetings. (Bowden Dep. at 84-85.)

35. Mistovich also faults Bowden for failing to ask him if he was under medication at the March 26 meeting. (Mistovich Dep. at 73.) At deposition, Mistovich testified that he could not respond adequately to Bowden's questions because he was on medication for high blood pressure – which made him mentally sluggish – but he admits that he not tell Bowden, Nevero or Urban that he was experiencing any side effects at the time. (Id. at 55, 91-94.) Moreover, Mistovich has no reason to believe that Bowden was

aware that he was experiencing any side effects. (Id. at 95.). The side effects did not prevent him from carrying out his routine job functions. (Id. at 94.)

36. Finally, Mistovich claims that the investigation was not fair because Bowden's tone of voice and the type of questions she asked "left little doubt" that Bowden had made up her mind ahead of time. (Mistovich Dep. at 59.) When asked to identify any improper questions, Mistovich responded that Bowden could have asked him questions without having Urban and Nevero in the room. (Id. at 60.) Mistovich also responded that was improper for Bowden to tell him that if he could not respond to her questions, then she would have to assume the allegations were true. (Id. at 66-73.)

### H. Mistovich Offers Nothing But Speculation That The Defendants Acted For An Ulterior Motive

37. Apart from their participation in this investigation, none of the defendants ever did or said anything that indicated that they wanted Mistovich's employment to end. (Mistovich Dep. at 44, 117-118, 156, 195-196.) Mistovich never had any difficulty with Bowden until Leaton made her allegations, and he conceded that she harbored no ill will towards him. (Id. at 40, 46.) Mistovich also had a "good" or "decent" working relationship with Urban, Nevero and Leaton. (Mistovich Dep. at 113, 149, 187.)

38. Mistovich has no reason to believe that Urban's or Nevero's role in the termination was based on anything other than their belief that Mistovich was discriminating. (Mistovich Dep. at 132-133, 177.) Moreover, Mistovich does not think that Urban or Nevero had any personal motivation to force Mistovich out. (Id. at 118, 156-157.) Mistovich is not aware of any reasons that Leaton may have wanted his employment to end. (Id. at 196.)

11

39.     Mistovich speculates that although Urban and Nevero had no personal motivation to end his employment, perhaps they were doing General Manager Lydon's bidding.  (Mistovich Dep. at 118, 156-157.)  As to Lydon's motivation, Mistovich admitted that he could "only speculate."  (Mistovich Dep. at 136.)

40.     As to possible ulterior motives – on anyone's part – Mistovich offered the following theories:

(a)     401(k) issue:  Mistovich wondered whether Bowden (or Lydon) wanted his employment to end because Mistovich had complained – a year before – about MBCR's proposed handling of the rollover of 401(k) accounts.  (Mistovich Dep. at 36-37, 45, 118.)   But, Mistovich concedes that he did not experience any hostility after raising this issue and he has no reason to think that Lydon or Bowden were concerned about this issue.  (Id. at 49-51, 121.)  Moreover, Mistovich testified that Lydon's response at the time was "when this was said and done, he'd like to sit down with me and maybe I could recommend what he should be doing with his 401(k)."  (Id. at 38.)  Mistovich also admitted that no one from MBCR ever indicated any unwillingness to go along with his suggestion for the 401(k) rollover.  (Id. at 49.)

(b)     Delay in Processing Life Insurance:  Mistovich speculated that Bowden may have had an ulterior motive because there had been a delay in processing his life insurance application.  (Mistovich Dep. at 45.)  Mistovich explained that this was "only speculation on [his] part" and that he was "not sure" if this played any role in her treatment of him.  (Id. at 46.)  He conceded that the life insurance issue was simply a matter of his becoming enrolled, just like all employees, and that he was not aware of any motivation on Bowden's part to deprive him of life insurance.  (Id. at 47.)   He explained

that the delay seemed to have been caused, at least in part, by a turn over in staff reporting to Bowden. (Id. at 46-47.) He experienced no difference in the terms and conditions of employment because of his application for life insurance. (Id. at 50.)

(c) <u>Concerns Over Lack of Diversity</u>: Mistovich speculated that Bowden or Leaton may have wanted his employment to end because of concerns allegedly raised by Boston City Councilor Charles Turner about the lack of diversity in MBCR's workforce. (Mistovich Dep. at 63-64, 73-76.) According to Mistovich, he had heard through the "grapevine" that Leaton was getting pressure from Bowden, who was getting pressure from Councilor Turner about the lack of diversity. (Id. at 74-75.) But Leaton did not have any discussions with Bowden or anyone else regarding any lack of minorities in the workforce or about Councilor Turner's alleged concerns. (Leaton Dep. at 41-42.) Mistovich has no direct knowledge that this occurred, and relies on unidentified and unknown sources. (Mistovich Dep. at 75, 195, 198-200.)

(d) <u>Political Antagonism</u>: Mistovich also "wonder[ed]" whether Leaton "concoct[ed] this scheme" because (according to him) she was an avid supporter of Dean and later Kerry (while he supported Bush). (Mistovich Dep. at 182-183.) But he could not say "how much of a factor" this played. (Id. at 191-193.)

(e) <u>Leaton's Contract</u>: Mistovich also speculated that by accusing him of discrimination, Leaton may have been thinking that it would cause MBCR to extend her employment contract. (Mistovich Dep. at 197-198.) Mistovich concedes, however, that he does not know if this was the case. (Id. at 198, 205.)

(f) <u>Comments About Understaffing</u>: Mistovich speculated that Lydon may have been the moving force behind his termination because Mistovich had informed the

13

MBTA, in a meeting in December 2003, that MBCR had experienced problems in clearing snow because MBCR failed to hire needed personnel.  (Mistovich Dep. at 118-121.)   Mistovich admitted that he did not know and could not prove if this factored into the termination decision, but it "makes one wonder," and he explained that two sources – that he could not identify – had purportedly told him that Lydon was not pleased with Mistovich's comments.  (Id. at 120-122, 125.)  Mistovich did not experience any change in his treatment after the December meeting, and another employee, who raised similar concerns, is still employed by MBCR.  (Id. at 124-125, 129-131.)

(g)     Replacement:  Finally, Mistovich speculated that Lydon may have wanted him gone so that Lydon could replace him with a cousin, which Mistovich contends happened after his termination.  (Mistovich Dep. at 121.)  When asked if he had any support for this theory, other than speculation, Mistovich testified that it was "incomprehensible" to Mistovich that Lydon would have ended Mistovich's employment unless Lydon had an ulterior motive.  (Id. at 158.)  Mistovich admits that he has nothing but speculation that Lydon conveyed this concern to Nevero.  (Id. at 157.)

    Respectfully submitted,

    **ELIZABETH BOWDEN, STEPHEN URBAN and STEPHEN NEVERO,**

    By their attorneys,

       /s/ Laurie F. Rubin
    Walter B. Prince, BBO# 406640
    Laurie F. Rubin, BBO# 564947
    Prince, Lobel, Glovsky & Tye LLP
    585 Commercial Street
    Boston, MA 02109
Dated:  October 31, 2005    (617) 456-8000