# EXHIBIT A
# (I of V)

1

**CERTIFIED ORIGINAL**
**LEGALINK BOSTON**

VOLUME: I

PAGES:  1 - 330

EXHIBITS:  11 - 27

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                 SUPERIOR COURT DEPARTMENT
                               CIVIL ACTION NO. 04-3746

- - - - - - - - - - - - - - - - - - - x

ELI MISTOVICH, JR.,
                 Plaintiff,

vs.

ELIZABETH BOWDEN, STEPHEN URBAN,
STEPHEN NEVERO, AND ALISON LEATON,
                 Defendants.

- - - - - - - - - - - - - - - - - - - x


DEPOSITION OF ELI MISTOVICH, JR.

Thursday, September 22, 2005, 11:30 a.m.

Prince, Lobel, Glovsky & Tye, LLP

585 Commercial Street

Boston, Massachusetts 02109


Reporter:  Deborah L. Maren, RPR

LegaLink Boston

320 Congress Street, Boston, MA 02210

(617)542-0039

Eli Mistovich, Jr.                                      09/22/2005

32

1          Q.    I'd like to turn to Elizabeth Bowden first.

2     Name each and every way you think that Ms. Bowden

3     wrongfully interfered with your employment relationship

4     with MBCR.

5               MR. TEAGUE:   Note my objection to the form

6     of the question.   You can answer it as best you can.

7          A.    Could you repeat that question?

8          Q.    Sure.   I want you to name each thing you

9     think that Ms. Bowden did or said that wrongly

10    interfered with your employment relationship with MBCR.

11         A.    She presided over the first inquisition on

12    March 26th and was the -- took the lead and asked

13    questions and made several allegations that apparently

14    she got some information from Alison Leaton, which

15    ultimately led her, to the best of my knowledge, to

16    recommend my termination to General Manager Lydon.

17         Q.    So just so that I'm clear, what parts of

18    that are you saying that she did that were wrongful?

19               Are you saying that participating in the

20    March 26th meeting was wrong, her participation in that

21    meeting?

22         A.    I'm saying Bowden, as head of HR, giving

23    credence to allegations from Ms. Leaton, an independent

24    contractor whose six-month contract coincidentally was

Eli Mistovich, Jr.                                    09/22/2005

33

1    up at the end of March of 04, versus an employee with a

2    28-year above average career.

3         Q.    So you're saying it was wrongful for her to

4    believe Alison Leaton instead of you?  Is that correct?

5         A.    Yes.

6         Q.    In addition to her believing Alison

7    Leaton -- and do you have any reason to believe, as you

8    sit here today, that she didn't believe -- strike that.

9              As you understand it, she chose to believe

10   Alison Leaton; is that correct?

11        A.    Yes.

12        Q.    And as far as you know, she believed that

13   you were, in fact, discriminating against black

14   applicants; is that correct?

15        A.    That was her allegation.

16        Q.    That was whose allegation?

17        A.    Leaton and Bowden.

18        Q.    As far as you understand it or as far as

19   you know, Ms. Bowden believed Alison Leaton's

20   allegations that you had, in fact, discriminated against

21   black applicants; is that correct?

22        A.    Yes.

23        Q.    And what you found was wrongful about that

24   was that her not believing you instead of Alison

Eli Mistovich, Jr.                                    09/22/2005

34

1    Leaton; is that correct?

2        A.   Yes.

3        Q.   Apart from that, apart from her believing

4    Alison Leaton instead of you, are there other things

5    that you think Ms. Bowden did that were wrongful and

6    wrongfully interfered with your employment?

7        A.   Could you ask that question one more time?

8        Q.   Okay.  I understand you to say that

9    Ms. Bowden wrongfully interfered with your employment by

10   choosing to believe Alison Leaton over you in terms of

11   whether or not you were discriminating against black

12   applicants.  Is that correct?

13       A.   Yes.

14       Q.   I'm just wondering whether there was any

15   other way that you thought Elizabeth Bowden wrongfully

16   interfered with your employment with MBCR.

17       A.   Well, it was apparent to me she was the

18   driving force behind the decision to terminate me.

19       Q.   And what makes you say that?

20       A.   Testimony last week by Mr. Urban, Nevero,

21   and Bowden was in on a meeting with Leaton and

22   recommended my termination.

23       Q.   Any other reasons besides that that makes

24   you say that she was the driving force in your

Eli Mistovich, Jr.                                          09/22/2005

36

1    taking over, held monthly meetings with all commuter

2    rail management to again try to arrange for a smooth

3    transition, including discussions of benefits, what

4    options you had for health care, life insurance, the

5    entire benefits package.

6         Q.    And these were meetings with a bunch of

7    managers and Ms. Bowden?

8         A.    Yes.

9         Q.    And apart from meetings -- participating in

10   these monthly meetings, did you have any other dealings

11   with Ms. Bowden?

12        A.    Yes.

13        Q.    On what issues?

14        A.    Well, there was a contentious issue where

15   MBCR and their pension consultants were trying to force

16   all Amtrak managers to transfer their 401K lump sums to

17   MBCR's custodian, ING.  And at one management meeting --

18   I recognized that as being illegal.  And at one

19   management meeting I spoke up and made it known that

20   there were three options:  That managers could either

21   leave their 401K with Amtrak's custodian Vanguard, the

22   lowest-cost mutual fund company in the world and most

23   efficient, incidentally; or transfer it to MBCR's

24   custodian ING, which concerned me because they have high

Eli Mistovich, Jr.                                          09/22/2005

37

1       fees, high expenses, poor performance and 12B1

2       redemption.  It didn't seem like any anybody acting in a

3       fiduciary capacity would -- could, in good conscience,

4       recommend that.

5             Or the third option was to make an IRA

6       rollover and take control of your own lump sum.  Those

7       were the three legal options that I specified at the

8       general meeting and a follow-up meeting amongst a

9       smaller group, which included Ms. Bowden.

10            Q.   And when were these meetings that you're

11       referring to?

12            A.   Spring of 03.  I can't remember the exact

13       dates.

14            Q.   And do you recall if Ms. Bowden said

15       anything in response to this issue?

16            A.   I can't remember exactly.  At the large

17       meeting -- at the second smaller meeting she was there.

18       I can't recall any particular comment.  I think the

19       pension consultant from New Jersey -- we refer to them

20       as the Slick Brothers -- they did most of the talking.

21            Q.   And in the end, were other options made

22       available to employees?

23            A.   At the conclusion of the second meeting,

24       after listening to the discussion, the general manager,

38

1    Kevin Lydon, said that -- you know, it was clear that

2    they'd have to make all three options available to all

3    employees.

4         And I remember him saying that, you know,

5    when this was said and done, he'd like to sit down with

6    me and maybe I could recommend what he should be doing

7    with his 401K.

8         Q.  Did anybody else raise concerns about the

9    initial lack of options besides yourself?

10        A.  Not that I can recall.

11        Q.  Apart from the meetings that you've

12   referenced with Ms. Bowden, did you have any dealings

13   with Ms. Bowden on any other issues?

14        A.  Yes.

15        Q.  What were the other issues?

16        A.  Upon the transition, all managers needed to

17   attend an enrollment session to enroll for all the

18   benefits, which I believe there were two sessions.  I

19   attended the first of the two and filled out all the

20   forms.

21        And at the second session of BET, I handed

22   Ms. Bowden a complete manilla folder with all my forms,

23   100 percent complete, for all my benefits.

24        It became known to us at some time after

40

1    to be a high rate of turnover in HR working for

2    Ms. Bowden, names like Brian Testa, Lisa, Adam, Emily,

3    and others that I'm sure I'm forgetting.  It ultimately

4    took nine months for me to get two-thirds of the life

5    insurance I had previously had with Amtrak.  And I was

6    finally notified of that approximately one or two weeks

7    before I was terminated.  I'm sure it was just a

8    coincidence.

9          Q.    Apart from the issues that you've

10   mentioned, did you have any dealings with Ms. Bowden on

11   any other issues?

12         A.    Not that I can recall.

13         Q.    Did you enjoy a good relationship with

14   Ms. Bowden?

15         A.    I thought so with the exception that I

16   could never understand the delay of why it took nine

17   months to procure two-thirds of the life insurance when

18   MBCR was supposed to provide equal benefits.

19         Q.    Did you have any difficulty with Ms. Bowden

20   before the incident that led to your termination?

21         A.    No.

22         Q.    Did Ms. Bowden ever say anything to you

23   that was complimentary about your performance as an MBCR

24   employee?

Eli Mistovich, Jr.                                      09/22/2005

44

1   life insurance, she assured me that she would work with

2   me and get it taken care of in an expeditious fashion,

3   which did not happen.

4           Q.   Any other statements that she made to you

5   that you think weren't true?

6           A.   No.

7           Q.   Did anybody ever tell you that they

8   believed Ms. Bowden lied?

9           A.   No.

10          Q.   Did Ms. Bowden ever do or say anything in

11  your presence that indicated to you that she wanted your

12  employment with MBCR to end?

13          A.   No.

14          Q.   Did you learn that Ms. Bowden did or said

15  anything outside of your presence that indicated she

16  wanted your employment with MBCR to end?

17          A.   Yes.

18          Q.   What was that?

19          A.   As I alluded to earlier, it's my

20  understanding that she -- after the first inquisition,

21  she made a recommendation to terminate my employment to

22  the general manager.

23          Q.   And that was the information that you

24  learned as a result of the deposition last week?

Eli Mistovich, Jr.                                      09/22/2005

45

1      A.    Yes.

2      Q.    Apart from that statement, did you ever

3  learn from any other person that Ms. Bowden did or said

4  anything outside of your presence that indicated she

5  wanted your employment with MBCR to end?

6      A.    No.

7      Q.    Are you aware of any reasons that

8  Ms. Bowden may have wanted your employment to end?

9      A.    Possibly the -- the only possibility would

10  be the incident with the life insurance and the 401K.

11  That's the only thing I can conceive of why she would --

12  she would possibly think that way.

13      Q.    And what was it about the life insurance

14  that made you think she might have wanted your

15  employment to end?

16      A.    I can't say for sure.  It dragged on for

17  nine months, which was inconceivable to me, that the

18  head of HR couldn't make this happen in less than nine

19  months.

20      Q.    This was the delay in your signing up for

21  life insurance?

22      A.    No.  It was -- I signed up at the original

23  enrollment.  But that was delayed.  Then I was on

24  vacation for two weeks in August --

Eli Mistovich, Jr.                                    09/22/2005

46

1        Q.    Right.

2        A.    -- and apparently missed some late

3    enrollment.  And starting in September, Ms. Bowden

4    assured me that she would get me enrolled in life

5    insurance.  And that did not happen until March of 04.

6        Q.    And I'm just trying to understand why you

7    think she may have wanted your employment to end because

8    it took a while for you to get enrolled in life

9    insurance.

10       A.    Speculation on my part.  I'm not sure.

11       Q.    Did she do or say anything that indicated

12   she harbored you any ill will in your attempt to get

13   life insurance?

14       A.    No.

15       Q.    Were there other people who were similarly

16   late in getting enrolled in their life insurance?

17       A.    Not to my knowledge.

18       Q.    Were you aware of the reason why there was

19   a delay in your getting enrolled?

20       A.    Can you clarify the delay?

21       Q.    Okay.  You said that you -- from September

22   through March it took -- you say the paperwork went in

23   in September, and it took until March for you to get

24   life insurance; is that correct?

Eli Mistovich, Jr.                                      09/22/2005

47

1          A.     Correct.

2          Q.     So it's that delay I'm referring to.  Do

3    you know why there was a delay between September and

4    March for you to get enrolled in life insurance?

5          A.     I'm not certain.  I think what contributed

6    to it was there was a series of HR -- probably not

7    employees because MBCR doesn't hire many HR employees.

8    They apparently were independent contractors working for

9    Ms. Bowden.  And there was a high rate of turnover,

10   approximately one per month.  They would stay for a

11   month and leave.  And so there was no continuity in

12   dealing to try to get this matter resolved.

13         Q.     To your knowledge, this was just a matter

14   of getting yourself enrolled in life insurance just like

15   all the other employees; is that correct?

16         A.     Correct.

17         Q.     And Ms. Bowden, to your knowledge, wasn't

18   trying to deprive you of your life insurance; is that

19   correct?

20         A.     I don't know.

21         Q.     Would Ms. Bowden have any motivation for

22   trying to deprive you of your life insurance that you're

23   aware of?

24         A.     Not that I know of.

Eli Mistovich, Jr.                                    09/22/2005

49

1    would make sure that MBCR offered the three options that

2    you felt needed to get offered; is that correct?

3        A.    Yes.

4        Q.    And did anybody from MBCR indicate in any

5    way that MBCR was not willing to offer those three

6    options?

7        A.    The pension consultants weren't too happy.

8    But nobody at MBCR objected.

9        Q.    And did you have any reason to believe that

10   Ms. Bowden was concerned about offering the three

11   options that you felt needed to get offered?

12       A.    No.

13       Q.    And did Ms. Bowden ever say anything to you

14   that indicated she was concerned about your raising that

15   issue?

16       A.    No.

17       Q.    And did anybody ever tell you that

18   Ms. Bowden said anything that indicated she was

19   concerned about raising that issue?

20       A.    No.

21       Q.    And did Ms. Bowden treat you in any way

22   that you considered hostile until the meeting on March

23   26th?

24       A.    No.

Eli Mistovich, Jr.                                    09/22/2005

50

1      Q.    Did you consider that you suffered any

2   different terms and conditions in your employment as a

3   result of raising the issue about the 401K?

4      A.    No.

5      Q.    Did you suffer any changes or differences

6   in your terms and conditions of your employment as a

7   result of raising the issue about the life insurance?

8      A.    No.

9      Q.    So I just want to make sure I understand

10  why you think Ms. Bowden may have wanted to end your

11  employment because you raised the issue about the 401K.

12  What was it about that that makes you think she, in

13  particular, may have wanted to end your employment?

14     A.    As I said previously, I believe I cost

15  somebody a big payday.  Somebody was going to get a

16  percentage of all the money transferred.  Somebody lost

17  out because of me speaking up.  I can't prove who it

18  was, but there is little doubt in my mind that I cost

19  somebody a payday.

20     Q.    Right.  Are you saying that you cost

21  Ms. Bowden a payday?

22     A.    I cannot prove that.

23     Q.    I know you tell me you can't prove it.  Do

24  you have any reason to believe that you were affecting

Eli Mistovich, Jr.                                    09/22/2005

51

1     her economically?

2          A.    No.

3          Q.    Apart from the issues about the 401K and

4     the life insurance, do you have any other reason to

5     think that she may have been out to get you in some way

6     or to end your employment?

7          A.    No.

8          Q.    Now, turning to the meeting on March 26th,

9     is it your understanding that when you met with

10    Ms. Bowden, Mr. Nevero and Mr. Urban on March 26th that

11    that was as part of an investigation into allegations

12    made by Alison Leaton?

13         A.    Yes.

14         Q.    And is it also your understanding that

15    Ms. Leaton was claiming that you screened out applicants

16    that Ms. Leaton thought might be minority or black

17    because of where they lived?

18         A.    Yes.

19         Q.    Do you have any reason to conclude that

20    Ms. Bowden acted improperly in looking into these

21    allegations?

22         A.    Yes.

23         Q.    Why?

24         A.    I believe Ms. Bowden's mind was made up

Eli Mistovich, Jr.                                        09/22/2005

53

1    talking right now about just doing an investigation

2    without dealing with the investigation that she did.

3    Just the idea of doing an investigation.  Was it

4    appropriate for Ms. Bowden to investigate the

5    allegations that Alison Leaton raised against you?

6        A.    Not for me to determine.

7        Q.    Do you have any reason to think that it was

8    inappropriate for her to look into these allegations?

9        A.    No.

10       Q.    Do you have any reason to conclude that

11   Ms. Bowden acted improperly in the manner in which she

12   investigated these allegations?

13       A.    Yes.

14       Q.    Name each way that you thought it was

15   improper.

16       A.    I thought it was, as I described earlier,

17   similar to the Spanish inquisition.  I was brought into

18   a room with three people sitting there with no prior

19   warning of what was going to be discussed so I could

20   prepare.

21            Ms. Bowden started right off, and as I

22   described earlier, took the lead and made these

23   allegations about me.  And I just thought the whole

24   thing was a Spanish inquisition, very poorly done.

Eli Mistovich, Jr.                                         09/22/2005

54

1          Q.    Okay.   What I'm asking you about -- why you

2    felt it was a Spanish inquisition.   I'd like you to

3    explain each and every way you felt that it was an

4    improper kind of meeting.

5               I understand you said that you had no

6    advance notice.   I got that.   In addition to having no

7    advance notice, what was it that happened in the meeting

8    that you felt was an inappropriate way to conduct an

9    investigation?

10         A.    I called Ms. Bowden's office the day before

11   to inquire as to the details of the meeting so I could

12   better prepare and, as usual, got voice mail or a

13   machine.   And she never returned my call, which was

14   standard procedure for her.   So I had no knowledge, no

15   preparation.   I'm performing my normal duties.   And I go

16   in and get blind-sided by these three.

17         Q.    Mr. Mistovich, I'm just going to interrupt

18   for a second.   I'm going to go back and ask you the

19   details of each -- for each of the reasons why you say

20   that you thought that the manner in which she

21   investigated these allegations was improper.

22              But I'm just trying to get -- before we go

23   into the details of each of those reasons what -- you

24   know, in a general sense what each of those reasons

55

1    were.  And then we're going to go back, and I'm going to

2    ask you some follow-up questions.

3                So you've talked about no advance notice.

4    And I'm going to go back and ask you questions about

5    that.  I'm trying to understand what else it was on a

6    general statement in the meeting.  And then I'm going to

7    go back and you're going to have the opportunity to say

8    what you want to communicate.

9                But if you could just list on a general

10   level each of the things that you felt were

11   inappropriate about the manner in which this meeting was

12   conducted.  I've got lack of advance notice.

13        A.    Your question is?

14        Q.    What were the other reasons that you felt

15   the meeting was inappropriately conducted besides lack

16   of advance notice?

17        A.    She hit me with these allegations.  You

18   know, again, I had no preparation.  I'm sitting there in

19   a daze.  I'm on medication for high blood pressure.  And

20   my whole mentality was slowed.  Mentally I was sluggish.

21   I couldn't quite grasp what was going on.  It was

22   surreal to me to be hit with these allegations.

23                She accused me of stonewalling.  The

24   allegation was so outrageous that I was speechless.  I

Eli Mistovich, Jr.                                    09/22/2005

57

1    have even asked you about the allegations that Alison

2    Leaton brought against you?

3        A.    There could have been some advance warning

4    so I at least could have been better prepared to discuss

5    it rather than hit stone cold and blind-sided.    It

6    almost appeared like a set-up to me.

7        Q.    Again, apart from the advance warning -- I

8    understand that you were concerned because you say you

9    didn't have advance warning.    Are you saying that it was

10   improper for Ms. Bowden to ask you questions about your

11   hiring practices?

12       A.    No.

13       Q.    Are you saying that there was anything

14   improper about Ms. Bowden asking you the questions that

15   she asked you in this meeting?

16       A.    Can you repeat that question?

17       Q.    Are you saying that there was anything

18   improper about the questions that Ms. Bowden asked you

19   in this meeting?

20       A.    Yes.

21       Q.    What was improper about the questions that

22   she asked you?

23       A.    I thought it was outrageous for her to have

24   apparently taken some allegations made by Alison Leaton

Eli Mistovich, Jr.                                    09/22/2005

58

1    and lend credence to them to even ask me questions about

2    it.  I thought it was absurd.

3         Q.   So you didn't think she should even ask you

4    these questions; is that correct?

5         A.   I thought it was outrageous.

6         Q.   You thought it was outrageous that she even

7    asked you any questions?

8         A.   Yes.

9         Q.   So did you think it was outrageous that she

10   even conducted an investigation then?

11        A.   I thought it wreaked.  As I said at the

12   second session, it smelled.  But then I corrected

13   myself.  It wreaked.  It wreaked that I was being set

14   up.

15        Q.   Are you saying that Ms. Bowden should not

16   have asked you any questions about Alison Leaton's

17   allegations?

18        A.   I'm saying it could have been done in a

19   different format.  The way it was done, similar to an

20   inquisition, I thought was outrageous for somebody who

21   had spent their entire career in the railroad industry

22   and had been doing hiring for 26 years with many

23   commendations, outrageous.

24        Q.   I just want to be clear because it's

Eli Mistovich, Jr.                                    09/22/2005

59

1    unclear to me what was outrageous.  It was outrageous

2    that you were brought in without advance notice; is that

3    correct?

4         A.   Yes.

5         Q.   Once you were in the room, was there -- and

6    I understand that you're concerned about the lack of

7    advance notice -- was there anything outrageous about

8    her simply asking you the questions that she asked you?

9         A.   I thought so, to be bombarded with these

10   allegations sitting there under heavy medication.  I

11   didn't know what to do or say or respond.  I was -- I

12   was speechless.

13        Q.   But was there something about the questions

14   that she asked that you thought were improper?

15        A.   Yes.

16        Q.   What was improper about the questions that

17   she asked?

18        A.   I felt the tone and the type of questions

19   was such that it left little doubt in my mind that

20   Ms. Bowden had made up her mind to give credence to

21   whatever allegations -- absurd allegations Alison Leaton

22   made, irregardless of my response.

23        Q.   And when you say the tone, what was it

24   about the tone that she used that made you believe that?

Eli Mistovich, Jr.                                    09/22/2005

60

1          A.    Very accusing, not what you would call a

2     fair, impartial tone of voice and very curt questions.

3     And the whole mannerisms and tone was very accusing and

4     left no doubt that she had already made her mind up.  So

5     it was a charade, a set-up, basically.

6          Q.    What were the types of questions that she

7     asked that made you conclude that they were improper?

8     What were the questions that you were referring to when

9     you say they were improper questions?

10         A.    She -- one -- one I recall was she was

11    asking me about -- accusing me of, in reviewing resumes,

12    that I'm excluding resumes based on where a candidate

13    lives.  I had no idea what she was talking about.

14         Q.    Do you think it was inappropriate for her

15    to ask you that question?

16         A.    I think it could have been asked in a

17    different forum.  But in the forum with her asking --

18    and the other two gentlemen there, what their roles

19    were, I don't know -- witnesses or observers, whatever.

20              To me, the deck was stacked already.

21    Somebody had made up their mind that this must have been

22    true, and let's set Eli up, for whatever reason.  I

23    don't know.

24         Q.    Well, name each reason why you think

Eli Mistovich, Jr.                                    09/22/2005

63

1    the questions that she asked.  And you said that she

2    accused you of stonewalling.  Apart from those three

3    things, is there anything that she said or did that led

4    you to believe that she had made up her mind that you

5    were discriminating before you went into the room on

6    March 26th?

7                MR. TEAGUE:  I object to the form of the

8    question.

9        A.    Yes.

10       Q.    What was that?

11       A.    Subsequent to this meeting, I became aware

12   that there had been some concerns raised by Boston City

13   Councilor Chuck Turner concerning MBCR's hiring and lack

14   of diversity in the workforce and that Ms. Bowden and I

15   believe Robin McCullen Diaz, one of the other four

16   members of the diversity subcommittee that would sit in

17   and observe interviews, went up to Boston City Hall and

18   had a meeting with the councilor.  And my understanding

19   is they were lambasted by the councilor.

20               What I believe happened is that Ms. Bowden

21   came back and blasted Ms. Leaton, who is the sole

22   recruiter, and who, again, coincidentally was nearing

23   the end of her six-month contract, which was not going

24   to be renewed for reasons we can only speculate about.

Eli Mistovich, Jr.                                      09/22/2005

                                                                64

1    And I got thrown under the bus by Ms. Leaton in a

2    desperate attempt to salvage her contract or her job.

3          So I believe Ms. Bowden had an agenda

4    entering that first inquisition that -- and I believe I

5    was made out to be a sacrificial lamb to solve all of

6    MBCR's hiring ills.

7          Q.    And who told you about this meeting with

8    Councilor Chuck Turner?

9          A.    I can't recall.

10         Q.    And are you saying this meeting with

11   Councilor Turner was after the March 26th meeting?

12         A.    I'm not sure of the exact date, but I'd

13   love to find out.

14         Q.    And you're saying that Ms. Bowden made up

15   her mind as a result of what happened in this meeting

16   with Chuck Turner?  Is that correct?

17         A.    I believe she was looking for a sacrificial

18   lamb to take the heat off her, Ms. Leaton, and MBCR.

19   And along comes Eli as a convenient scapegoat for every

20   department's ills in MBCR.  That is outrageous.

21         Q.    Okay.  In addition to -- the question

22   before you are all the reasons why you believe

23   Ms. Bowden had made up her mind before the meeting on

24   March 26th that you were discriminating against African-

Eli Mistovich, Jr.                                    09/22/2005

66

1   were asked.  And, again, I was speechless for periods of

2   time.  I just didn't know how to respond to these -- and

3   she immediately accused me of stonewalling and said

4   that, Well, you're stonewalling this.  You're not going

5   to respond so we have to assume that Ms. Leaton's

6   allegations are true.  That's the gist of my

7   recollection.  And I just thought that was incredible.

8        Q.   So you thought it was incredible that when

9   you were unable to respond to her questions that she

10  told you that they were going to have to believe Alison

11  Leaton's allegations were true; is that correct?

12       A.   Not just the subject but the way it was

13  said left no doubt in my mind that Ms. Bowden had her

14  mind made up.

15       Q.   So when you say the way it was said, you

16  mean her tone of voice; is that correct?

17       A.   Yes.

18       Q.   But I'm trying to understand.  Apart from

19  her tone of voice, is there anything about her telling

20  you that if you were unable to answer the questions that

21  they were going to have to conclude Alison Leaton's

22  allegations were true that led you to believe that she

23  had made up her mind?

24       A.   Could you repeat that one?  You lost me.

Eli Mistovich, Jr.                                          09/22/2005

67

1        Q.    You indicated that because she -- because

2    Ms. Bowden said that if you couldn't answer the

3    questions they were going to conclude that you had

4    discriminated, is there anything about her telling you

5    that, apart from her tone of voice, that you think was

6    improper?

7        A.    I think it was improper to be accused of

8    something like that.  I'm sitting there in a daze,

9    unable to respond.  I thought it was incredibly

10   improper, the whole inquisition.

11       Q.    What was improper about her telling you

12   that if you couldn't answer the questions they were

13   going to have to conclude that they were true?  What was

14   improper about that?

15       A.    What was improper is Ms. Bowden came in

16   with a prearranged list of questions all scripted out.

17   I'm coming in stone cold, not a clue what's going on,

18   heavily medicated with high blood pressure -- a total

19   contrast.  It was -- it was unfair, to say the least.

20   The whole process was unfair.

21       Q.    Was there anything improper -- here's my

22   question to you on specifics.  I understand you're

23   complaining about things generally.  But I'm trying to

24   figure out for each of those things whether you thought

Eli Mistovich, Jr.                                    09/22/2005

68

1      it was improper or not.

2              So when she told you that if you couldn't

3      answer her questions they were going to have to conclude

4      that you, in fact, were discriminating, was it improper

5      for her to tell you that?

6          A.    I don't know.  I can't recall exactly.  I'm

7      sitting there in a daze.  I don't know whether it was

8      improper or not.

9          Q.    So you don't know whether it was improper

10     for her to tell you that if you couldn't answer the

11     questions they were going to have to conclude that you

12     were discriminating?

13         A.    I feel it was improper.

14         Q.    Okay.  Well, that's my question.  What was

15     improper about it?

16             MR. TEAGUE:  I think that's been asked and

17     answered.

18             MS. RUBIN:  Well, it's been asked, but it

19     hasn't been answered.

20             MR. TEAGUE:  I tend to disagree, and you're

21     starting to argue with the witness so I'm going to

22     object.

23         Q.    Could you please explain each reason why

24     you thought it was improper for her to tell you that if