# EXHIBIT A
# (II of V)

Eli Mistovich, Jr.                                    09/22/2005

1    you couldn't answer the questions, then they would have

2    to conclude that you were discriminating?

3         A.    The tone of voice was very accusatory, and

4    it left no doubt in my mind, even in my impaired state

5    sitting there medicated, that she had made her mind up.

6    Right from the get-go of this inquisition, Ms. Bowden's

7    mind was made up.  There was nothing I was going to say

8    that was going to change her mind.

9         Q.    Apart from the tone of voice that she used,

10   was there anything improper in her telling you that if

11   you couldn't answer the questions they were going to

12   have to conclude that you were, in fact, discriminating?

13        A.    One more time?  You're losing me on that

14   question.

15        Q.    Other than the tone of voice that

16   Ms. Bowden used, was there anything improper about her

17   telling you that if you couldn't answer the questions,

18   they were going to have to conclude that you were

19   discriminating?

20        A.    Yes.  I think it was improper.  She came in

21   with scripted -- with a scripted agenda.  I came in

22   stone cold.  So I've already -- we're repeating

23   ourselves here.  I thought it was very improper.

24             She had a prearranged agenda, a scripted

Eli Mistovich, Jr.                                      09/22/2005

70

1    list of questions.  I'm coming in stone cold with no

2    warning.  I tried to contact her to get some idea what

3    the purpose -- with no response.  And I come in stone

4    cold, not proper.

5         Q.   **Apart from her tone of voice and the lack**

6    **of advance notice, was there anything improper about her**

7    **asking you or telling you if you couldn't answer the**

8    **questions they were going to have to conclude that you**

9    **were discriminating?**

10             MR. TEAGUE:  Objection.  He's asked and

11   answered this.  He's already testified to this.  I don't

12   know what else he can --

13        A.   I think it was improper to be putting

14   somebody through an inquisition who's trying to do a

15   decent day's work even though under medication that a

16   lot of people might have not even been at work that

17   day.  I thought the whole thing was improper.

18        Q.   **Okay.  I'm not asking about the whole**

19   **thing.  I'm asking about her telling you that if you**

20   **couldn't answer the questions, they were going to have**

21   **to conclude that you were discriminating.  That's the**

22   **only part of the meeting I'm asking you about right**

23   **now.**

24             **You indicated in response to earlier**

Eli Mistovich, Jr.                                    09/22/2005

71

1    questions about that statement that you felt it was

2    improper because of the tone of voice that she used and

3    the lack of advance notice.  Apart from those two issues

4    -- and, again, I'm just dealing with that statement --

5    is there anything else that was improper about her

6    saying that to you?

7          MR. TEAGUE:  I object to the form of the

8    question because it doesn't accurately summarize his

9    testimony.  You may answer it as best you can.

10       A.    You've got to ask it one more time.

11       Q.    Okay.  You indicated -- and correct me if

12    I'm wrong -- that you felt it was improper for

13    Ms. Bowden to tell you that if you couldn't answer the

14    questions they were going to have to conclude that you

15    were, in fact, discriminating; isn't that correct?

16       A.    Correct.

17       Q.    And you indicated that one reason you felt

18    that that was improper was because she didn't give you

19    advance notice so that you could prepare for the

20    meeting; is that correct?

21       A.    Correct.

22       Q.    And you felt that another reason it was

23    improper was because of the accusatory tone that she

24    used when she was talking with you; is that correct?

Eli Mistovich, Jr.                                        09/22/2005

72

1          A.    Yes.

2          Q.    What I'm asking you is whether there were

3     any other reasons why it was improper for her to say

4     that statement to you at this meeting?

5          A.    Yes.  I think it's improper to take as

6     gospel allegations made by this Ms. Leaton, who was

7     nearing the end of her six-month contract which was not

8     going to be renewed, probably for good cause, and who

9     had had other dealings, arguments, other disputes with

10    other hiring managers -- to give credence to somebody

11    like that versus a long-time 28-year railroad employee

12    who has done thousands of resumes, thousands of

13    interviews, been rated above average four years in a

14    row, exceeded a 30 percent guideline for hiring females

15    and minorities.  That was improper, no matter how you

16    slice it.

17         Q.    So just so that I understand, another

18    reason why you've giving for it being improper for

19    Ms. Bowden to tell you that if you couldn't answer the

20    questions they were going to have to conclude that you

21    were discriminating was that you don't think Ms. Bowden

22    should have given credence to Alison Leaton's

23    allegations to begin with, and also you felt like your

24    hiring record demonstrated that you weren't

Eli Mistovich, Jr.                                    09/22/2005

73

1     discriminating; is that correct?

2          A.   Correct.

3          Q.   Apart from those reasons, are there any

4     other reasons why you felt it was inappropriate for

5     Ms. Bowden to tell you if you couldn't answer the

6     questions they were going to have to conclude that you

7     were discriminating?

8          A.   Yeah.  I think it was improper.  They could

9     have asked if I was under any medication.  Obviously I

10    wasn't acting my normal self like I normally would.  I

11    wasn't totally in control of my faculties.  I was

12    heavily medicated.  The medication slows your entire

13    metabolism down.

14         Q.   So you're adding another reason why it was

15    inappropriate for her to even ask that question or even

16    make that statement to you was because she should have

17    asked you if you were under medication; is that correct?

18         A.   Yes.

19         Q.   Are there any other reasons why you think

20    it was inappropriate for her to make that comment to

21    you?

22         A.   Not that I can recall right now.

23         Q.   Now, you indicated that you believe

24    Ms. Bowden had made up her mind that you were

Eli Mistovich, Jr.                                      09/22/2005

74

1   discriminating before the meeting because of certain

2   issues raised by Chuck Turner; is that correct?

3           A.   Repeat that one?

4           Q.   Is one of the reasons why you believe

5   Ms. Bowden had made up her mind before this meeting that

6   you were discriminating was because of concerns raised

7   by Chuck Turner?

8           A.   Yes.

9           Q.   And what was it about those concerns that

10  made you think that Ms. Bowden had made her mind up

11  before the meeting?

12          A.   I believe that Ms. Bowden was looking for a

13  convenient scapegoat to remove the heat from her and

14  Ms. Leaton and to satisfy City Councilor Chuck Turner.

15  And I believe I was being set up to be a convenient

16  scapegoat for all of MBCR's lack of diversity in

17  hiring.

18          Q.   Tell me each reason why you think you were

19  being set up as a scapegoat.

20          A.   That's my firm belief.  I cannot prove it.

21          Q.   I'm asking you for each reason why you

22  believe it.

23          A.   Well, because Bowden wasn't going to take

24  the heat.  She went to Leaton.  She wasn't going to take

Eli Mistovich, Jr.                                  09/22/2005

75

1    the heat.  So who better to throw under the bus than --

2    I was in the wrong place at the wrong time, apparently.

3        Q.   But what makes you think that Ms. Bowden

4    was even under any heat, as you put it?

5        A.   As I said earlier, I'm not sure of the

6    exact time frame.  But I now believe subsequent events

7    -- I believe that it was in this time frame that

8    Ms. Bowden was under this pressure.  I understand that

9    she got lambasted at this meeting with Chuck Turner.

10       Q.   You're not sure when this meeting

11   ooccurred?

12       A.   No.

13       Q.   You're not sure if this meeting occurred

14   after your termination?

15       A.   My understanding is it took place before.

16       Q.   And what do you base that understanding

17   on?

18       A.   I heard through the grapevine very shortly

19   after I was terminated that such a meeting had taken

20   place.

21       Q.   But you can't recall who told you that?

22       A.   No.

23       Q.   And you can't recall whether -- what they

24   said about the meeting other than what you testified; is

Eli Mistovich, Jr.                                    09/22/2005

76

1    that correct?

2         A.    Correct.   But I heard it from more than one

3    source.   That I can remember.   It was multiple sources.

4         Q.    **But you can't recall anyone in particular**

5    **who told you this?**

6         A.    No.

7         Q.    **And what makes you think that it was**

8    **inappropriate for Ms. Bowden to believe Alison Leaton**

9    **instead of you as to whether or not you were**

10   **discriminating?**

11        A.    Well, Ms. Leaton's contract was up at the

12   end of the month of March so it was imminent she was

13   going to be unemployed.   That makes me suspicious of the

14   time.   These just weren't coincidences that happened.

15             Ms. Leaton has had disputes and had

16   problems with other hiring managers.   Or I should say

17   there were disputes with the hiring managers.   There

18   seems to be a common thread here that Ms. Leaton had

19   problems with other hiring managers.

20             When it comes to credibility, putting

21   Alison Leaton, her word, against a long-time railroad

22   employee, to me, Ms. Leaton doesn't have much

23   credibility.   To any reasonable observer, I don't

24   believe Ms. Leaton has much credibility.

Eli Mistovich, Jr.                                        09/22/2005

78

1    Clarify me if I'm wrong.  The reasons why you think that

2    it was inappropriate for Ms. Bowden to believe Alison

3    Leaton instead of you was because of your long

4    experience as an employee in the railroad industry

5    versus Alison Leaton being on a short-term contract; is

6    that correct?

7         A.    Not quite.  That wasn't quite my words.

8         Q.    Okay.

9         A.    Again, not just that.  As I alluded to

10   earlier, over the 26 years, I've looked at thousands of

11   resumes, done thousands of interviews with Amtrak and

12   always in the presence of HR -- never had a problem, was

13   rated above average in valuing diversity, equal

14   employment opportunity, affirmative action, hiring

15   females in non-traditional roles.

16              One of the vacancies we were interviewing

17   for during this time period was a female who resigned

18   and left the railroad.  So don't -- you know, you didn't

19   quite paint an accurate picture.  You base it on the

20   entire career.  You base it on that versus Ms. Leaton --

21   it's apples and oranges when it comes to credibility.

22        Q.    But you had only worked for Mass. Bay

23   Commuter Rail for approximately nine months at this

24   time; isn't that correct?

Eli Mistovich, Jr.                                      09/22/2005

79

1    A.    Correct.

2    Q.    And you had only known Ms. Bowden for

3    approximately a year; isn't that correct?

4    A.    Correct.

5    Q.    And Ms. Bowden, to your knowledge, wasn't

6    familiar with your previous employment history in

7    hiring; is that correct?

8    A.    It was lack of research.  That's her

9    problem and MBCR's, not mine.  My record was out there.

10   It was there to be scrutinized.

11   Q.    But my question to you is:  To your

12   knowledge, Ms. Bowden was unaware of your previous track

13   record in hiring; isn't that correct?

14   A.    Yes.

15   Q.    And you may have been working in the

16   railroad industry many years, but you were only a new

17   employee at MBCR; isn't that correct?

18   A.    Correct.

19   Q.    And when Ms. Bowden was trying to determine

20   whether to believe Alison Leaton or whether to believe

21   yourself, she was looking at an employee who had only

22   worked for MBCR for nine months; isn't that correct?

23   A.    Correct.

24   Q.    Do you think Elizabeth Bowden was the

Eli Mistovich, Jr.                                    09/22/2005

80

1    person who was responsible for what you say was the lack

2    of advance notice about the meeting on March 26th?

3         A.    Yes.

4         Q.    And on what basis do you make that

5    statement?

6         A.    I placed -- when I first became aware -- I

7    placed a call the day before to her to inquire what the

8    nature of this meeting was going to be so I could be

9    better prepared.  As I testified earlier, as usual, you

10   never get her to respond.  You get a voice mail or an

11   answering machine.

12        Q.    But you understood that the meeting was

13   going to be discussing concerns about hiring in the

14   track department; isn't that correct?

15        A.    The e-mail she had sent the day previous,

16   which I got the Thursday morning, said there was going

17   to be a meeting to address concerns over hiring in the

18   track department, I think.

19        Q.    So you understood, going to this meeting,

20   that you were going to be discussing concerns about

21   hiring in the track department; isn't that correct?

22        A.    But nowhere near the nature of the meeting

23   as it degenerated, no.  I had no idea -- inkling what

24   was coming.  No.

Eli Mistovich, Jr.                                    09/22/2005

86

1      A.    Well, I don't think it was proper

2  practice.  But at MBCR -- you have to distinguish

3  between normal HR practice and MBCR under this group

4  practice.  This is par for their course.  That's how

5  they treat people.  That's how they did business.

6      Q.    So, to your knowledge, had they had other

7  investigations of other employees where they called

8  those employees in without giving what you would

9  consider to be advance notice?

10     A.    I have no knowledge of that.  I have no

11 knowledge one way or the other.

12     Q.    Okay.  So you don't know if you were

13 treated any differently from anybody else who was

14 investigated by HR in terms of advance notice; is that

15 correct?

16     A.    I have no idea.

17     Q.    Are there some situations where you think

18 an employer would want to question an employee without

19 giving the employee time to prepare an answer?

20     A.    I don't know.

21     Q.    And once you were at this meeting, they did

22 explain the allegations that were against you; isn't

23 that correct?

24     A.    No, I wouldn't say it was explained.  It

Eli Mistovich, Jr.                                    09/22/2005

91

1      -- degenerated, yes, I did understand that.

2          Q.    While you were there, you understood that

3      that was the allegation that was being made?

4          A.    Yes.

5          Q.    And you understood at the time of the

6      meeting while you were in the room that Alison Leaton

7      was making some link between race and where the person

8      lived and their name; is that correct?

9          A.    No.   At the time I couldn't quite figure

10     out and decipher what the hell I was being accused of.

11     I was so shocked and sitting there in a daze, I didn't

12     know what the hell they were saying.   I didn't know what

13     the hell they were accusing me of.   And I just couldn't

14     quite fathom why I was there and what the whole purpose

15     of this thing was.

16         Q.    But you came to understand during the

17     meeting that you were there because they were -- Alison

18     Leaton was accusing you of discriminating against black

19     applicants?

20         A.    Yes.

21         Q.    And did you tell anybody at the meeting

22     that you couldn't respond to any of the allegations

23     because you were not feeling well?

24         A.    I worked on the railroad over 28 years,

Eli Mistovich, Jr.                                      09/22/2005

92

1   never took a sick day.  I've been here no matter how I

2   felt.  That's the kind of dedication I have, which was

3   always rewarded and appreciated by prior employers till

4   this cast of characters came in MBCR.

5        Q.   So the answer to the question is?

6        A.   Repeat the question.

7        Q.   **Did you ever tell anybody at the meeting**

8   **that you couldn't answer the questions because you**

9   **weren't -- respond to the accusations because you**

10  **weren't feeling well?**

11       A.   I didn't know why -- I didn't understand

12  why I was feeling that way.  I didn't understand that

13  until almost a month later when I had a follow up with

14  my personal care physician and he changed the

15  medication.

16            And I explained what I was feeling.  And

17  apparently it was side effects.  It wasn't until early

18  April, after I was terminated.  Only then did I

19  understand side effects.  And he took me off the

20  medication and changed it.  And I was back to normal.  I

21  didn't understand what I was going through.

22            At the time of this session it was

23  approximately one week after I started the medication.

24  As far as I was concerned, it says it takes your body a

Eli Mistovich, Jr.                                    09/22/2005

93

1    while to adjust to any new medication.  I'd never been

2    on high blood pressure medication in my life.  This was

3    the first time.

4              I figured my body was adjusting.  I didn't

5    know what condition I was in at the time.  And I didn't

6    know till a month later or till the first week of April

7    after I had been on the medication for more than a

8    month.  Once I was off it, then I understood what I had

9    been experiencing.

10         Q.   You know, you need to respond to the

11   question.  Did you tell anybody at the meeting that you

12   couldn't answer the questions because you weren't

13   feeling well?

14         A.   No.  I didn't understand what my state was.

15         Q.   Okay.  So you didn't tell anybody at the

16   meeting that you couldn't answer the questions because

17   you weren't feeling well --

18         A.   No.

19         Q.   -- is that correct?  You didn't tell them?

20         A.   That's correct.

21         Q.   And what were the side effects of this

22   medication that you were experiencing on March 26th at

23   the time of the meeting?

24         A.   Mental sluggishness.  The medication acts

Eli Mistovich, Jr.                                      09/22/2005

94

1    to slow your entire metabolism, heart beat, pulse, blood

2    pressure.  It affects your mental capability, severe

3    headaches, diarrhea, gas, problems digesting anything.

4    That's the major ones.

5         **Q.  And when you say mental sluggishness, what**

6    **did that mean?  How did that affect your ability to hear**

7    **what they were telling you at the meeting?**

8         A.  As I described, it was almost a surreal --

9    like I was in a daze or a stupor sitting there.  And I

10   was able to do my routine day-to-day stuff and get by.

11   But I was hit with this.

12              This was not routine.  This was -- ended up

13   being career threatening.  I just -- I just couldn't

14   deal with it.  I didn't understand what the hell was

15   going on.  And I didn't have the mental capacity to -- I

16   wasn't sharp enough to respond or to intelligently have

17   a two-way discussion.

18        **Q.  And so the mental sluggishness that you say**

19   **you were experiencing didn't affect your ability to do**

20   **other aspects of your job at MBCR; is that correct?**

21        A.   I was doing routine stuff, the day-to-day

22   stuff.  I've been doing it for 28 years.  I can get by,

23   the routine stuff.  I have enough experience.  I could

24   get by.

Eli Mistovich, Jr.                                    09/22/2005

95

```
 1              But was I ready to deal with a major
 2   career-threatening series of circumstances and being
 3   bombarded with all these ridiculous accusations?
 4   Mentally I couldn't cope with that.
 5        Q.   And do you have anything -- any reason to
 6   believe that Ms. Bowden understood that you were
 7   experiencing these side effects of your medication at
 8   the time of the meeting?
 9        A.   No.
10        Q.   Do you have any reason to believe or to
11   conclude that Ms. Bowden's role in your termination was
12   based on anything other than a belief on her part that
13   you were discriminating?
14        A.   I believe the nine-month marathon to get
15   life insurance, my speaking out the truth about the 401K
16   scam, I believe that had an impact on the decision to
17   terminate me.  There's no doubt in my mind.
18        Q.   What was it about what Ms. Bowden did or
19   said that leads you to conclude that her role in your
20   termination was motivated by either the insurance issue
21   or the 401K as opposed to her belief that you were
22   discriminating?
23        A.   I can't prove that.  That's my belief.  I
24   cannot prove that --
```

Eli Mistovich, Jr.                                      09/22/2005

101

1    has discriminated against black applicants?

2        A.    Yes, it is improper because I don't

3    discriminate against black or minority applicants.    I

4    try to select above average candidates.    That resume was

5    a blow average candidate, period.

6        Q.    I'm not talking about you.    You're still

7    not responding to the question.    Is there something --

8            MR. TEAGUE:    Let me -- do you want to take

9    a break for five minutes?    Or we'll be here all day --

10           MS. RUBIN:    Okay.

11           MR. TEAGUE:    -- going back and forth.

12           MS. RUBIN:    Sure.

13           (Recess.)

14       BY MS. RUBIN:

15       Q.    Before the break I had asked you a question,

16   and I'm going to ask it again or words to that effect.

17   Assuming that Elizabeth Bowden, head of HR for MBCR,

18   determined that an employee was discriminating against

19   black applicants, is there anything improper about her

20   terminating an employee based on that belief?

21       A.    I can't believe that any competent human

22   resource person would base such a decision on such

23   ridiculous evidence as a resume and where the guy

24   allegedly lives.    It's absurd.    No competent HR person,

Eli Mistovich, Jr.                                    09/22/2005

102

1    without checking with any of my co-workers what my

2    history was -- as we said, the entire work force came

3    over.  People who had been working with me for 18 years

4    on commuter rail, some 25 years on Amtrak.  No competent

5    HR person would make that decision based on such flimsy,

6    ridiculous evidence.

7         Q.   I'm not talking about you.  Okay?  I'm

8    talking about in general.  If an HR manager were to

9    determine that one of her employees was discriminating

10   against black applicants, is there anything improper

11   about recommending the termination of that employee on

12   that basis?

13        MR. TEAGUE:  You mean as an abstract

14   proposition?

15        MS. RUBIN:  Correct.

16        A.   One more time?

17        Q.   Is there anything improper about an HR

18   manager recommending the termination of an employee

19   where that HR manager believed that that employee has

20   discriminated against black applicants?

21        A.   I think you have to have more than belief.

22   You have to have real solid proof, more than Alison

23   Leaton's opinion that what I looked at a resume.  I

24   don't think that was proper belief.

105

1          Q.    Apart from Mr. Urban's participation in the

2     two meetings and the manner in which he escorted you to

3     your office and then escorted you to the vehicle, is

4     there any other way that you feel he wrongfully

5     interfered with your employment relationship with MBCR?

6          A.    Yes, by his -- by his recommendation, as

7     testified to, that he voted in the kangaroo court that I

8     should be terminated.  So by his own testimony -- so,

9     yes, he did have an impact.

10          Q.    Okay.  Apart from his -- Mr. Urban's

11     participation in the two meetings, the manner in which

12     he escorted you to the office and then to the vehicle

13     and the recommendation for your termination, is there

14     any other way that you think Mr. Urban wrongfully

15     interfered with your employment relationship at MBCR?

16          A.    Yes.  By giving credence to these

17     ridiculous allegations made by Alison Leaton and going

18     along for the ride, I think he did.  Yes, he did.

19          Q.    Okay.  So the question is -- I'm looking

20     for each and every way that you believe Mr. Urban

21     wrongfully interfered with your employment relationship

22     with MBCR.  You named four things:  The participation in

23     the two meetings, the manner in which he escorted you to

24     your office and then to the car, the recommendation that

106

1   he voted for your termination, and by giving credence to

2   Alison Leaton's allegations.   Is there any other way

3   that you believe Mr. Urban wrongfully terminated --

4   wrongfully interfered with your employment relationship

5   with MBCR?

6        A.   No.

7        Q.   And what was it about Mr. Urban's

8   participation in these two meetings -- and the two

9   meetings that we're referring to are the March 26th

10  meeting and the March 30th meeting; is that correct?

11       A.   Correct.

12       Q.   What was it about Mr. Urban's participation

13  in those two meetings that you think was wrongful?

14       A.   Well, for him to give credence to these

15  ridiculous allegations made by Alison Leaton, who was --

16  as I previously testified, has had problems with other

17  hiring managers and her contract was not renewed, and

18  the fact that I've known Steve Urban a long time -- he's

19  known of my work record; he's known of my work ethic

20  going back to Amtrak commuter rail time and even before

21  that back to Amtrak Intercity time we worked together

22  back as far as the late '70s -- he certainly was aware

23  of my reputation and certainly -- you know, MBCR said

24  they didn't do much checking of my Amtrak background.

1          Certainly -- he worked for both firms.  As

2    deputy general manager he certainly could have made an

3    attempt to research or investigate my past record, if he

4    didn't already know just from common work knowledge.  So

5    he could have done that, but apparently he didn't do any

6    of that and just took these ridiculous allegations that

7    Leaton made at face value and voted for my termination.

8          Q.   Okay.  I'm going back to the issue of his

9    participation -- Mr. Urban's participation in the two

10   March meetings.  You think that -- you testified that

11   that was wrongful -- his participation in those meetings

12   was wrongful because he was giving credence to Alison

13   Leaton's allegations and that he had prior knowledge of

14   you and could have done some additional research with

15   Amtrak to look at your prior record.  Is that what you

16   -- is that the reasons why you think his participation

17   was wrongful?

18         A.   Correct.

19         Q.   Are there any other reasons why you think

20   his participation in those two meetings was wrongful?

21         A.   No.

22         Q.   And what was wrongful about the manner in

23   which he escorted you first to your office and then to

24   your car after your termination?

Eli Mistovich, Jr.                                      09/22/2005

113

1          Q.    And during the period of time after you

2    became an MBCR employee, did you have any relationship

3    with him outside of work?

4          A.    No.

5          Q.    Before you became an MBCR employee in your

6    interactions with Mr. Urban, did he have any familiarity

7    with your hiring practices, to your knowledge?

8          A.    He might have.  I have no specific

9    knowledge of that.

10         Q.    And in the course of your employment after

11   you became an MBCR employee, approximately how

12   frequently did you have interactions with Mr. Urban?

13         A.    Maybe once every two weeks.

14         Q.    And on what kinds of issues?

15         A.    I'd see him at Cobble Hill on routine

16   issues.  I can't remember the exact nature of it.

17         Q.    Did you enjoy a good working relationship

18   with Mr. Urban?

19         A.    I seemed to.

20         Q.    Do you have any difficulties with Mr. Urban

21   before the March 26th meeting?

22         A.    Only once.

23         Q.    And what was that?

24         A.    Are you referring to MBCR or Amtrak?

Eli Mistovich, Jr.                                    09/22/2005

115

1          Q.    While you were at Mass. Bay Commuter Rail,

2    did you have any -- strike that.

3                Again, now I'm just focusing on the period

4    of time when you were at Mass. Bay Commuter Rail.  Did

5    Mr. Urban ever say anything that was complimentary to

6    you about your performance as an MBCR employee?

7          A.    Not that I can recall.

8          Q.    Did anybody ever tell you that Mr. Urban

9    said anything -- did anybody ever tell you that

10   Mr. Urban said anything that was complimentary about

11   your performance?

12         A.    Yes.

13         Q.    And what was that?

14         A.    Somebody told me that -- and I don't know

15   how they -- whether it was directly from Urban or what

16   -- that he had related that his participation in this

17   process in terminating me was the hardest thing he ever

18   had to do in the railroad -- in his railroad career.

19         Q.    And who told you that?

20         A.    It was long -- I can't remember who said

21   that.

22         Q.    And what did you understand that remark to

23   mean?

24         A.    I thought it meant that it was the hardest

Eli Mistovich, Jr.                                          09/22/2005

116

1    thing -- I thought it meant that Mr. Urban really didn't

2    believe that was the proper action, that there should

3    have been some action less than termination taken, some

4    intermediary action, that it really didn't warrant

5    terminating a 28-year railroad career.

6         Q.    Did Mr. Urban ever say anything to you that

7    was critical about your performance as an employee?

8         A.    No.

9         Q.    Did anybody ever tell you that Mr. Urban

10   said anything that was critical about your performance

11   as an MBCR employee?

12        A.    No.

13        Q.    Did Mr. Urban ever say anything to you that

14   was complimentary about your hiring practices at MBCR?

15        A.    No.

16        Q.    Did anyone ever tell you that Mr. Urban

17   said anything that was complimentary about your hiring

18   practices at MBCR?

19        A.    No.

20        Q.    Did Mr. Urban ever say anything to you that

21   was negative about your hiring practices at MBCR?

22        A.    No.

23        Q.    Did anyone ever tell you that Mr. Urban

24   said anything that was negative about your hiring

Eli Mistovich, Jr.                                      09/22/2005

117

1    practices at MBCR?

2         A.   No.

3         Q.   Did you regard Mr. Urban as an approachable

4    person, someone you could speak to if you had to?

5         A.   Yes.

6         Q.   Did you trust him?

7         A.   No.

8         Q.   Why not?

9         A.   I never trusted Steve Urban.  His nickname

10   for years was Snively Whiplash.  He was just not

11   somebody that could be trusted.

12        Q.   And did you ever have any experiences with

13   him where you knew him to be untrustworthy?

14        A.   Well, the dispatching incident that I

15   alluded to earlier.  But not specifically.  But there

16   was just something about him, again, that I didn't think

17   he could be trusted.

18        Q.   To your knowledge, did Mr. Urban ever lie?

19        A.   Not that I can recall.

20        Q.   Did Mr. Urban ever do or say anything in

21   your presence that indicated to you that Mr. Urban

22   wanted your employment with MBCR to end?

23        A.   No.

24        Q.   Did you ever learn that Mr. Urban did or

Eli Mistovich, Jr.                                      09/22/2005

118

1    said anything outside of your presence that indicated he

2    wanted your employment with MBCR to end?

3         A.    No.

4         Q.    Are you aware of any reasons that Mr. Urban

5    may have wanted your employment to end?

6         A.    Only that as the deputy general manager, he

7    reported directly to Kevin Lydon so that that's the only

8    possible connection that if Lydon wanted me gone, Urban

9    would do his bidding.

10        Q.    Apart from Mr. Urban's role as reporting to

11   Kevin Lydon, is there any other reason that you can

12   think of that Mr. Urban may have wanted your employment

13   to end?

14        A.    No.

15        Q.    Are you aware of any reason why Kevin

16   Lydon may have wanted your employment to end?

17        A.    Well, there's some possibilities.

18        Q.    Name them.

19        A.    The 401K scam that I alluded to earlier

20   cost somebody a payday, a big payday.  It came to my

21   attention -- one reason why we were finally going

22   through this hiring process is that we were

23   shorthanded -- MBCR was shorthanded.  There had been a

24   freeze on hiring for the last year and a half at

Eli Mistovich, Jr.                                     09/22/2005

119

1    Amtrak.  And then MBCR came on the scene.

2              Due to normal attrition, entering the

3    winter of 2003, 2004, I had 37 fewer track department

4    employees than I had two winters ago with Amtrak.  I

5    made this known through the normal chain of command at

6    our snow meetings -- with my meetings with supervisor

7    Steve Nevero.

8              And after a month nothing happened so I

9    wrote a memo, which you have as an exhibit in front of

10   you, from Mr. Nevero's testimony.

11             As relates to Mr. Lydon, the first

12   snowstorm at MBCR's tenure was December 6th and 7th of

13   2003.  It snowed most of the weekend.  And it

14   degenerated into a complete fiasco where we didn't even

15   have enough forces to go out and clean certain platforms

16   and parking lots.  And I believe the memo -- it was the

17   worst fiasco of any snowstorm since I had been on the

18   commuter rail.

19             And despite the fact that at Amtrak we had

20   handled many larger storms in routine fashion because we

21   had the proper forces, the storm was such a fiasco --

22   including there was one fatality, incidentally.  There

23   was a B&B employee, a Mr. McTague who was killed by a --

24   struck by a train.  One contributing factor was they