# EXHIBIT A
# (III of V)

120

1  were working shorthanded out there because MBCR --
2  Mr. Lydon hadn't hired anybody.
3         There was a snow meeting called with the
4  MBTA the following week to discuss the previous
5  weekend's snowstorm and to ensure it didn't happen
6  again.  During the course of the three-hour meeting,
7  there was much discussion about processes.
8         After two hours of listening about
9  processes, I finally spoke up and told Anna Barry, the
10 head of railroad operations who conducted the -- who
11 called the meeting, the reason wasn't the process of
12 dealing with the snowstorm.  We had handled multiple
13 larger snowstorms with Amtrak in routine fashion because
14 we had sufficient forces.  The problem with this storm
15 is that since their arrival, MBCR had not hired anybody
16 into the engineering or the track department.  That was
17 the one and only reason for the fiasco.
18        I told the truth.  That was the true cause.
19 I was told from several different sources that in the --
20 within the following week, Mr. Lydon was overheard
21 commenting at meetings or someplace by two different
22 sources that he was not pleased with my comments that --
23 saying the truth, that the reason for the snow fiasco
24 was lack of MBCR's hiring.

121

1           Did that factor into his decision?  I don't
2  know, but it makes one wonder.
3       Q.   Apart from the 401K issue and the issue
4  about the statements that you made at this meeting, is
5  there any other reason why you think Kevin Lydon may
6  have wanted your employment to end?
7       A.   Yes.
8       Q.   Okay.  I'm asking for each reason.
9       A.   So he could replace me with his cousin, Bob
10 Johnson, which happened shortly after my termination.
11      Q.   Any other reason?
12      A.   I'm sure there are.  I just can't recall
13 them at this moment.
14      Q.   Okay.  On the 401K issue that you say may
15 have motivated Mr. Lydon, did you experience any
16 hostility from Mr. Lydon after you raised the 401K
17 issue?
18      A.   No.
19      Q.   Did you ever have any reason to think that
20 he was concerned about you raising the 401K issue?
21      A.   No.
22      Q.   On the hiring issue, in terms of the
23 statement that you say you made at this meeting, who
24 were the -- you say you heard from several sources that

| | |
|---|---|
| 1 | Kevin Lydon was not pleased with what you had said at |
| 2 | this meeting.  Who were those sources? |
| 3 | A. That's almost two years ago.  I can't |
| 4 | remember who. |
| 5 | Q. You don't know who said that to you? |
| 6 | A. I remember I got it from two different |
| 7 | sources. |
| 8 | Q. But you don't know who those people are? |
| 9 | A. I can't remember who that was. |
| 10 | Q. And what is your understanding about what |
| 11 | you said at this meeting that Kevin Lydon didn't like? |
| 12 | A. He specifically objected to the fact that I |
| 13 | said I told the truth, that the true reason for the lack |
| 14 | of proper handling of that snowstorm was we just did not |
| 15 | have enough bodies to perform snow duty as we routinely |
| 16 | had for the prior 18 winters. |
| 17 | As a matter of fact, Mr. Nevero was at the |
| 18 | same meeting.  I presented Mr. Nevero -- I had a copy of |
| 19 | that memo that has been entered as an exhibit.  We were |
| 20 | 37 people less.  I had previously provided Mr. Nevero -- |
| 21 | as you see, there's an attachment to that letter.  It |
| 22 | wasn't on this one, but I gave him the names of the 37 |
| 23 | people we had the two winters prior. |
| 24 | It was clear and simple, a hundred percent |

123

certain the reason for the fiasco was MBCR did not hire anybody and we were short bodies. We had to decide for the first time ever to clean snow from this platform and not that platform. Never had been done in 18 winters with Amtrak.

Q. When you say the "fiasco," what are you referring to?

A. The fiasco was the two-day snowstorm December 6th and 7th where trains were late, station platforms were not done. They were -- had feet of snow on them. It was a complete fiasco. One employee got killed, struck by a train out at Wellesley Farm, a complete fiasco.

Q. And where did this meeting take place?

A. At MBTA's 45 High Street operations center.

Q. And who was there -- who was present at that meeting from Mass. Bay Commuter Rail?

A. There was a total of probably 20 people.

Q. Was Mr. Urban there?

A. Mr. Urban -- I can't remember if he was there or not. He probably was, but I don't specifically remember.

Q. Was Mr. Nevero there?

A. Mr. Nevero was there.

Eli Mistovich, Jr.                                              09/22/2005

124

1   Q. Was Liz Bowden there?
2   A. I can't remember. I don't think so, but
3   I'm not sure.
4   Q. And were other employees of Mass. Bay
5   Commuter Rail also saying that Mass. Bay Commuter Rail
6   should have done better or could have done better?
7   A. Yes. In fact, there was one, Peter Wright,
8   for engineering track, spoke up at the beginning of the
9   meeting in an attempt to set the record straight and
10  tell the truth. Mr. Lydon dismissed him from the
11  meeting because he didn't want to hear the truth.
12  Q. So Peter Wright, at this meeting, made
13  similar comments to what you were making?
14  A. Yes.
15  Q. Did anybody else at this meeting make
16  similar comments to what you made?
17  A. Yes.
18  Q. Who?
19  A. My counterpart with B&B, Les Merrill,
20  assistant division engineer of B&B, also spoke out that
21  he didn't have enough bodies because MBCR hadn't hired.
22  Q. Anybody else?
23  A. Not to my knowledge.
24  Q. And did you experience any hostility from

Eli Mistovich, Jr.                                    09/22/2005

125

1    Kevin Lydon after this meeting?
2         A.   Other than the two sources telling me he
3    was not happy with my comments at the meeting, I did not
4    experience anything else directly.
5         Q.   Okay.  And you also understood that
6    Mr. Lydon wasn't happy with Peter Wright?
7         A.   He dismissed him from the meeting.
8         Q.   Okay.  And, to your knowledge, is Peter
9    Wright still an MBCR employee?
10        A.   Yes, he is.
11        Q.   And is there any reason that makes you
12   think that Mr. Lydon wanted your employment to end as a
13   result of what you said in this meeting?
14        A.   Not that I can prove here today.
15        Q.   But I'm asking you whether you have -- the
16   reasons for your belief.
17        A.   My feeling is it played a role in his
18   decision to terminate me.  There's no doubt in my mind.
19   I cannot prove it yet.
20        Q.   And the reasons for that belief are?
21        A.   Mr. Lydon has a reputation of being
22   extremely hot headed, makes rash decisions, spur of the
23   moment.
24        Q.   Apart from the statements that you were

                                                                126

1    told from several -- two sources, neither or which you
2    can recall, is there any reason that makes you think
3    Mr. Lydon was not happy with what you said at this
4    meeting?
5         A.   I lost it.  Please repeat the question.
6         Q.   Let me try it again.  Did anybody ever say
7    or do anything in your presence that indicated that they
8    wanted your employment to end because of the statements
9    that you made at this meeting -- was it in December of
10   2003?
11        A.   The meeting was in December of 2003.
12        Q.   The week after December 6th and 7th?
13        A.   Correct.
14        Q.   And did anybody ever say or do anything in
15   your presence that indicated that they wanted your
16   employment to end because of the statements that you
17   made in this meeting shortly after December 6th and
18   7th?
19        A.   No.  But Mr. Lydon, after my comments, he
20   tried to spin it that -- getting back to the processes
21   and told the MBTA that MBCR was in the process of
22   hiring, which is an absurd comment when you're in the
23   middle of winter, an absurd comment.
24        Q.   Apart from the statements of the two

127

1  unnamed individuals who you can't recall, did you ever
2  learn from anybody else that anybody at MBCR made any
3  statements outside of your presence that they wanted --
4  that indicated that anybody wanted your employment to
5  end because of your comments that you made at this
6  meeting?
7      A.   No, not that I can prove here.
8      Q.   Again, I'm not asking what you can prove.
9  I'm asking you, to your knowledge, did you learn of
10 that -- of anybody -- of somebody making comments
11 outside of your presence?
12     A.   No.
13     Q.   Okay.  And did you say at this meeting that
14 the lack of snow -- or the lack of personnel was a
15 contributing factor to the fatality that occurred that
16 week -- that December 6th and 7th snowstorm?
17     A.   The main subject of the meeting was the
18 snow response in general.  I don't remember specifically
19 the fatality came up.  There was separate meetings
20 around the fatality.  I can't remember almost two years
21 ago that that specifically came up at that meeting.
22     Q.   So the comment that you recall making
23 yourself at the meeting dealt with response to snow
24 removal not the issue of the fatality?

1  Mr. McTague had and that he was pushing on the wood
2  crosswalk between tracks.  And then the snow blower
3  struck and killed him.  So apparently, obviously,
4  Mr. McTague was doing something with the snow blower as
5  opposed to watching for the crew.
6       There should have been additional manpower
7  to serve as a watchman or do the work.  But the watchman
8  cannot be a workman.  And, coincidentally, when Kevin
9  Lydon was the Amtrak general manager, engineering had
10 processed a service change to add five or six additional
11 employees for the Worcester line extension.  From
12 Framingham out to Worcester they added about six people
13 at stations there.  This would have given additional
14 personnel to fight snow on that line.  And my
15 understanding is that at the meeting Mr. Lydon bargained
16 that away with the MBTA and never hired the additional
17 five or six people.  And so that -- for B&B, they went
18 five or six short for the rest of their careers.  They
19 lost five or six people.  And that was the line where
20 the guy was struck by the train.
21      Q.  After you raised these concerns that you
22 say you raised at the meeting about the lack of
23 personnel contributing to the issues that occurred
24 during the snowstorm, did you notice any change in how

1  you were treated by Mr. Urban?
2       A.   No.
3       Q.   Did you notice any change in how you were
4  treated by Ms. Bowden?
5       A.   No.
6       Q.   Did you notice any change in how you were
7  treated by Steve Nevero?
8       A.   No.  At the meeting, Mr. Nevero tried to
9  dispute the numbers that I was giving him.  And I had to
10 allude -- I said, Steve, you know, you can spin it any
11 way that you want.  But we're 37 short of what we had
12 two winters ago.
13          No matter how MBCR tried to spin it, we
14 have 37 less bodies this winter than we did two winters
15 ago.  Other than that, there was no other difference in
16 treatment.
17      Q.   And he was just disagreeing with you at the
18 meeting when you say no difference in treatment?
19      A.   Yes.
20      Q.   He didn't express any hostility towards you
21 after the meeting?
22      A.   No.
23      Q.   Did you notice any change in how you were
24 treated by Kevin Lydon after this meeting?

131

1    A.   No, I had very -- I would have very little
2  contact with Mr. Lydon.
3         MR. TEAGUE:  At an appropriate time in the
4  near future, could we take a break?
5         MS. RUBIN:  Sure.  Let me try to finish up.
6         MR. TEAGUE:  I just have to call my office
7  seeing that I'm not going to make some appointments.
8    Q.   Now, going back to the meeting on March
9  26th, did you have any reason to conclude that Mr. Urban
10 acted improperly in looking into the allegations of
11 discrimination brought by Alison Leaton?
12   A.   I thought it was improper to give credence
13 to these allegations from this six-month contract
14 employee versus my long railroad career and Mr. Urban --
15 you know, we worked at Amtrak for a long period of time.
16        Our careers coincided.  So I thought it was
17 improper for him to give credence to Ms. Leaton's
18 allegations.
19   Q.   Okay.  But my question was a different
20 question. My question was:  Was there anything improper
21 about him just looking into the allegations?  Or are you
22 saying he shouldn't even have looked into the
23 allegations?
24   A.   No.

132

 1    Q.    He shouldn't have?
 2    A.    That's not what I'm saying.
 3    Q.    Okay.  So the question is:  Was there
something improper about Mr. Urban looking into the
allegations that were raised by Alison Leaton?
 6    A.    No.
 7    Q.    Was there anything improper about the
manner in which Mr. Urban participated in the
investigation?
10    A.    No.
11    Q.    And it's your understanding that Mr. Urban
believed Alison Leaton's accusations; is that correct?
13    A.    That's correct.
14    Q.    And what is the basis for that belief?
15    A.    Mr. Urban's testimony last week.
16    Q.    Anything else?
17    A.    No.
18    Q.    Do you have any reason to believe that
Mr. Urban didn't believe Alison Leaton's accusations?
20    A.    No.
21    Q.    And do you have any reason to conclude that
Mr. Urban's role in your termination was based on
anything other than his belief that you were
discriminating?

Eli Mistovich, Jr.                                      09/22/2005

133

1  A.  No.

2  Q.  And you say it was wrong for him to give
3  Alison Leaton's allegations credence; is that correct?

4  A.  I'm saying that when it comes to
5  credibility, I think my 28-year career, including
6  thousands of resumes processed, thousands of interviews
7  conducted with above average ratings in hiring diversity
8  and affirmative action and equal employment opportunity
9  should have carried more weight than Ms. Leaton's
10 allegations who has had problems with many other hiring
11 managers.

12 Q.  Apart from that, is there any other reason
13 why you think that Mr. Urban should not have believed
14 Alison Leaton's allegations?

15 A.  No.

16         MS. RUBIN:  Okay.  Do you want to take a
17 short break?

18         MR. TEAGUE:  Yes.

19         (Recess.)

20 BY MS. RUBIN:

21 Q.  For Steve Urban, is it your belief that
22 Steve Urban had already determined that you were
23 discriminating against black applicants before the March
24 26th meeting?

Eli Mistovich, Jr.                                09/22/2005

                                                         134

1        A.   No.

2        Q.   So is it your understanding that he reached

3   that conclusion after or during the March 26th meeting?

4        A.   No.

5        Q.   To your knowledge, when did Mr. Urban

6   conclude that you were discriminating against black

7   applicants?

8        A.   As I alluded to earlier, somebody heard him

9   remark that terminating me was the hardest thing he had

10  ever done in his lengthy railroad career. I don't think

11  Urban believed it. As I said, we worked together in the

12  Amtrak years, not only commuter rail, Intercity, back to

13  those times, late '70s early '80s. He knows of my

14  reputation. He knows of my work ethic. I don't think

15  he believed it.

16          Whether he was told by his supervisor,

17  Mr. Lydon, or coerced by Bowden, I don't know what he

18  did. But I don't think he believed it. I don't think

19  he would believe, as -- nor would any reasonable person,

20  such a ridiculous allegation from Alison Leaton that

21  looking at a resume somebody knows whether they're black

22  or white or because they're from a certain area that

23  they're a minority or not a minority. I think it's so

24  ridiculous, I don't think Urban would believe something

1   like that.
2        Q.  Previously you testified that it was your
3   belief that Mr. Urban had concluded that you were
4   discriminating against black applicants.  Do you recall
5   testifying to that?
6        A.  That's what he said.  I don't believe it
7   for a second.  I don't think he really --
8        Q.  I asked you whether there was any -- you
9   had information -- before the break, I asked you whether
10  you had any information to show that that wasn't true,
11  that that wasn't his belief.  And your answer then was
12  no.  Are you changing your testimony?
13       A.  As I've said, he had been quoted by saying
14  it was the hardest thing he ever had to do in his
15  railroad career.  I don't think he really believed it
16  myself.
17       Q.  And the reason why you're saying you don't
18  think he believed it is because of that statement you
19  heard --
20       A.  Yes.
21       Q.  -- about the hardest thing he had to do in
22  his railroad career?
23       A.  Yes.
24       Q.  Is there any other reason?

136

A. No.

Q. And you don't recall who made that statement to you; is that correct?

A. I can't remember.

Q. And what about that statement makes you think he didn't believe that you were discriminating against black applicants?

A. Knowing Urban as I do, he's done many -- he was a hearing officer, as I was, for long periods of time at Amtrak. He has terminated many people. For him to say it was the hardest thing he ever had to do, I don't believe it was -- he really believed on the merits of the case.

I think he went along with Bowden. And what role his immediate supervisor, Mr. Lydon, might have played in it I can only speculate. But it's a little fishy. It smells bad. It doesn't pass the smell test.

Q. As you sit here today, do you have any reason to believe, apart from the statement that someone -- some unknown person made to you about Mr. Urban saying your termination was the hardest thing he had to do that Mr. Urban didn't believe that you were discriminating against black applicants?