# EXHIBIT A
# (IV of V)

Eli Mistovich, Jr.                                      09/22/2005

137

1        A.    I don't think -- I believe Mr. Urban to be

2  an intelligent person with an extensive railroad

3  career.  I don't think he really believed such a

4  ridiculous allegation such as --

5        Q.    Do you know whether -- excuse me.  Do you

6  know whether he believed it or not?

7        A.    I don't know for certain.

8        Q.    So you don't know what his belief was?

9        A.    No.

10       Q.    And the only reasons why you think he might

11  not have believed it are because of your long period --

12  long experience working with the railroad company?  Is

13  that fair to say?

14       A.    Where we both -- where we both worked for

15  extensive periods of time with Amtrak in various

16  capacities on both the commuter rail contract and prior

17  to that on the Intercity contract, he knows of my

18  reputation.  I know of his.

19             I don't think an intelligent person, which

20  I believe him to be, would believe something so

21  ridiculous as Alison Leaton looking at a resume and

22  saying that I'm discriminating because I think it's a

23  minority candidate.

24       Q.    Any other reason?

Eli Mistovich, Jr.                                          09/22/2005

138

1          A.    No.

2          Q.    Turning to Stephen Nevero, name each and

3    every way that you think Mr. Nevero wrongly interfered

4    with your employment relationship with MBCR.

5          A.    In the second session, the March 30th

6    session, he -- it was in his office.  And he took the

7    lead to introduce the meeting by saying as my immediate

8    supervisor he regretted -- it was his duty to regret to

9    inform me that my employment with MBCR was terminated.

10              And he had two letters in his possession.

11   One was a letter of resignation.  One was a letter of

12   termination.  And I had a choice of which one to accept.

13         Q.    Apart from what happened in that March 30th

14   meeting with Mr. Nevero, is there any other way that you

15   think Mr. Nevero wrongly interfered with your employment

16   relationship with MBCR?

17         A.    Yes.

18         Q.    Okay.  I'm asking for each way.

19         A.    As my immediate supervisor, during the

20   transition in the first nine months, basically I, along

21   with others, worked to make Steve look good, to make the

22   thing get off the ground, both during the transition and

23   in the first nine months to the point where I would have

24   expected Steve to go to bat for me and to argue against

Eli Mistovich, Jr.                                    09/22/2005

139

1    it.

2              I would have expected that from my

3    immediate supervisor who best knew of the work I had

4    performed for MBCR in the first nine months and during

5    the transition period to ensure their success on the

6    commuter rail.

7         Q.   Okay.  Again, I'm asking you each and every

8    way that you think Mr. Nevero wrongly interfered with

9    your employment relationship.

10             You mentioned his participation in the

11   March 30th meeting, number one.  You indicated, number

12   two, the fact that he didn't go to bat for you.  Is

13   there any other way that you think Mr. Nevero wrongly

14   interfered with your employment relationship?

15        A.   Yes.  Relating to both the meetings,

16   Mr. Nevero, you know, again, as my immediate supervisor,

17   I had bailed him out and made him look good on many

18   different aspects of the transition and the first nine

19   months, including the first winter snowstorm.

20             What I would have expected from him would

21   be a common courtesy.  He knew -- he had advance

22   knowledge of these two meetings.  He had advance

23   knowledge of the content and the gist of what was going

24   to be discussed.  I think it would have been reasonable

Eli Mistovich, Jr.                                    09/22/2005

140

1    and fair for my immediate supervisor to tip me off --

2    give me a little warning or a little -- so I could be

3    prepared, a little information in advance that what the

4    nature of the meetings were.

5             I think that would have been common

6    courtesy from somebody -- from my immediate supervisor.

7    I would have expected a little more.

8        Q.    Okay.  And, again, I'm just asking you to

9    list every reason that you think Mr. Nevero wrongly

10   interfered with your employment relationship with MBCR.

11   You've mentioned three things.  Are there any other ways

12   in which you believe he wrongly interfered -- wrongfully

13   interfered with your employment relationship?

14       A.    Well, again, elaborating on the third point

15   --

16       Q.    I'm going to go back and elaborate -- I'm

17   going to give you the opportunity to elaborate.  I'm

18   just trying to get the list out.

19       A.    Okay.  All right.  Specifically, before the

20   second meeting, he -- it was on that March 30th date.

21   Approximately 11 o'clock in the morning, I'm in my

22   office conducting my normal duties.  He popped his head

23   in my door and said, Listen, there's a meeting in my

24   office at 3 o'clock.  We'd like you to be there.  I'd

Eli Mistovich, Jr.                                    09/22/2005

141

1      like you to be there.

2              I said, What's the nature of the meeting?

3      He goes, Well, it's among the same three people that you

4      had a meeting with last Friday.  And that was it.  I

5      mean, I asked for a little more information.  Nothing.

6      You know, I think Steve could have been a little more

7      forthcoming, you know.

8          Q.    Okay.  Any other way in which you think

9      Mr. Nevero wrongfully interfered with your employment

10     relationship with MBCR?

11         A.    Again, Mr. Nevero is a long-time railroad

12     employee and has vast experience in all aspects of

13     railroad engineering.  While I worked for him directly a

14     short time, we knew of each other.  He was the chief

15     engineer in '86 with Gilford when Amtrak came up and

16     assumed the commuter contract.

17             I had met him several times then as part of

18     the transition back then and talked to him and saw him

19     over the years at various times.  So we knew of each

20     other's reputation.

21             I would have expected Steve to -- again,

22     not to give credibility to this six-month, basically,

23     temporary contract employee, Ms. Leaton.  To give

24     credence to her allegations versus mine, I didn't think

Eli Mistovich, Jr.                                    09/22/2005

142

1    it was proper.

2         Q.   Any other way in which you think Mr. Nevero

3    acted wrongfully in terminating -- in whatever his role

4    was in terminating your employment relationship with

5    MBCR?

6         A.   No.

7         Q.   Okay.  I'm just going to list the five

8    reasons I have written down to make sure that there's

9    nothing else.  First, you indicated his participation in

10   the March 30th session.  Second, you indicated his

11   failure to go to bat with you.  Third, you indicated his

12   failure to give advance notice of the March 26th

13   meeting.  Fourth, failure to give you, really, advance

14   notice of what was going to happen at the March 30th

15   meeting.  And fourth was his giving credence to Alison

16   Leaton's allegation -- or fifth if I said that wrong.

17             Is that a correct statement of all the

18   reasons why you think Mr. Nevero wrongfully interfered

19   with your employment relationship?

20        A.   Yes.

21        Q.   Okay.  What was it -- and, again, I'm going

22   to go back through each of those to understand what you

23   felt was wrongful.  What was wrongful about Mr. Nevero's

24   involvement in the March 30th meeting?  What did he do

Eli Mistovich, Jr.                                    09/22/2005

146

 1    could have said, You know, what's going on?  There's

 2    some allegations being made -- anything so that I could

 3    have properly prepared.

 4              I was trying to get this information from

 5    Ms. Bowden without success.  After everything I did for

 6    Mr. Nevero in making him look good as the chief engineer

 7    during the transition and in the first nine months

 8    through the snowstorms, whatever, I don't think it would

 9    have been too much to ask for a little consideration.

10    Just give me a few hints of what the subject of the

11    meeting was so I might be able to prepare a little more

12    intelligently than just walking in and being blind-

13    sided.

14         Q.   And you also indicated that Mr. Nevero

15    acted wrongfully by believing Alison Leaton's

16    allegations.  What was wrongful about Mr. Nevero

17    believing Alison Leaton as opposed to you?

18         A.   I think he testified he didn't even know --

19    he barely ever met Alison Leaton.  For the chief

20    engineer with over 30 years' railroad experience to take

21    the word of some stranger, some independent contract

22    employee he doesn't even know versus somebody who's

23    worked with him the last nine months every day, through

24    snowstorms, different crises that came up to get this

Eli Mistovich, Jr.                                    09/22/2005

147

1    thing off the ground, to try and prevent problems during

2    the six-month transition period, to look ahead and try

3    to eliminate problems that would have developed, to try

4    and make sure the place ran smooth, I don't think it was

5    too much to expect for a little -- a little more

6    consideration.  I got nothing.

7              Q.    Is there any other reason why you think it

8    was wrongful for him to believe Alison Leaton as opposed

9    to you based on -- other than what you've just testified

10   to?

11             A.    Yes.  Because the premise was so absurd

12   that looking at a resume anybody could tell whether

13   somebody is a minority or not and to base the entire

14   scenario on that one fact is just ridiculous for

15   somebody with 30 plus years' railroad experience.

16             Q.    Is there any other reason other than what

17   you've already testified to as to why you think that

18   Mr. Nevero acted wrongfully by believing Alison Leaton

19   instead of you?

20             A.    No.

21             Q.    When did you first meet Steve Nevero?

22             A.    Well, for sure it was December of 1986.  I

23   might have met him before that, but I can't remember

24   back that far.  I know December '86 Amtrak was assuming

Eli Mistovich, Jr.                                          09/22/2005

148

1      the commuter rail contract from Gilford.  And Steve was

2      the chief engineer of Gilford and so I was up here on a

3      transition team to get around the property.

4              And we went and met at several joint

5      facilities where we were going to identify the

6      maintenance responsibility where we coincided -- Gilford

7      and commuter rail coincided.  We were going to go in and

8      delineate the maintenance responsibility.

9              Q.   Before you started working at Mass. Bay

10     Commuter Rail, in the period of time before that, how

11     much did your work bring you into contact with Stephen

12     Nevero?

13             A.   Very -- very seldom.  I mean, occasionally

14     there would be -- but few and far between.  Very seldom.

15             Q.   And, again, in that period of time before

16     he and you became MBCR employees, did you have any

17     experience or involvement in hiring decisions where

18     Steve Nevero would have been aware of your role?

19             A.   No.

20             Q.   Did you ever have any relationship with

21     Steve Nevero outside of work?

22             A.   No.

23             Q.   Turning to the period of time when you

24     became an MBCR employee, Mr. Nevero was your supervisor?

Eli Mistovich, Jr.                                          09/22/2005

149

1        A.    Correct.

2        Q.    And did you work with him closely?

3        A.    Yes.

4        Q.    And did you enjoy a good working

5    relationship with Mr. Nevero?

6        A.    I'd say it was decent.

7        Q.    Did you have any difficulties with

8    Mr. Nevero before the incident that led to your

9    termination?

10       A.    The only difficulty is -- if you would

11   classify it as that, was, as I alluded to earlier, this

12   constant disagreement where I knew we were shorthanded.

13   I demonstrated -- I documented -- I gave him 37 names in

14   that memo that's already an exhibit of how shorthanded

15   -- again, this is during the summer of 03.  I knew what

16   was coming.  I knew the winter was going to be a

17   disaster because MBCR wasn't hiring anybody.

18            I was so frustrated that I could see what

19   was going to happen, and I tried to implore Steve to

20   convince MBCR to hire, without success.  And then the

21   catastrophe hits December 6th and 7th.  An employee gets

22   killed in a complete fiasco in a snowstorm.  Do you know

23   how frustrating it is to know what's going to happen and

24   you try to take steps to prevent it and the individual

Eli Mistovich, Jr.                                    09/22/2005

156

1          And I attached to the original -- you don't

2     have it on your copy -- I attached a list of 37 names of

3     people that were now, through attrition, no longer

4     employed through retirement or resignation or whatever.

5     And he had the audacity at that meeting to say, No, I

6     disagree with that.  We're not 37 short.  We based it on

7     an Amtrak budget, and we're not 37 short.  You could

8     only go around and around so much.  I mean, it was an

9     absolute lie.

10         Q.   Did Mr. Nevero ever do or say anything in

11    your presence that indicated that he wanted your

12    employment with MBCR to end?

13         A.   No.

14         Q.   Did you ever learn that Mr. Nevero did or

15    said anything outside of your presence that indicated he

16    wanted your employment with MBCR to end?

17         A.   No.

18         Q.   Are you aware of any reasons that

19    Mr. Nevero may have wanted your employment to end?

20         A.   Only one possibility, that if he was

21    instructed -- Mr. Lydon wanted to place his cousin, Bob

22    Johnson, in my job.  Perhaps the word came down that I

23    had to vacate the position.  Mr. Nevero was loyal.

24    Whatever his boss tells him, he will do.

Eli Mistovich, Jr.                                    09/22/2005

157

1      Q.    Other than that, is there any other reason

2   that you think that Mr. Nevero may have wanted your

3   employment to end?

4      A.    No.

5      Q.    And your statement about Kevin Lydon maybe

6   wanting to put his cousin in your job, what makes you

7   think that -- do you have any basis to believe that

8   Mr. Lydon communicated that to Mr. Nevero?

9      A.    No.  I mean, it happened.  I mean,

10  Mr. Johnson, shortly after my demise, was hired and

11  filled my position.  But I have no -- I cannot prove it

12  yet.

13     Q.    Okay.  But I'm asking you a different --

14  I'm not asking what you can prove.  I'm asking you what

15  you know at this point.

16          Do you have any basis to believe that Kevin

17  Lydon communicated to Stephen Nevero that Kevin Lydon

18  wanted to put his cousin in your position?

19     A.    No.

20     Q.    Other than your speculation, do you have

21  any reason to believe that Mr. Nevero was motivated by

22  the goal of putting Kevin Lydon's cousin in your

23  position?

24     A.    No.

Eli Mistovich, Jr.                                          09/22/2005

158

1          Q.    Other than speculation, do you have any

2     reason to conclude that Kevin Lydon wanted your position

3     to end so he could put his cousin in your job?

4          A.    Yes.

5          Q.    And what is that?

6          A.    The fact that it's just incomprehensible to

7     me that Mr. Lydon, in five seconds, can make a decision

8     to terminate my 28-year railroad career when a few years

9     previously Mr. Lydon had signed an Amtrak evaluation

10    indicating that I exceeded the minority -- the 30

11    percent hiring guideline of 30 percent and was rated way

12    above average for all of my hiring practices,

13    affirmative action, equal employment opportunity, et

14    cetera, females in non-traditional roles, et cetera, et

15    cetera.

16          It's incomprehensible to me that Mr. Lydon,

17    based on my record, which he had knowledge of because he

18    signed one of my evaluations; he was the Amtrak general

19    manager -- incomprehensible to me that a responsible

20    chief executive like that could make a decision in five

21    minutes to terminate a long-time railroad career without

22    some other ulterior motive, incomprehensible.

23          Q.    Turning back to Stephen Nevero, do you have

24    any reason to conclude that Mr. Nevero acted improperly

Eli Mistovich, Jr.                                      09/22/2005

159

1    in looking into the allegations that were brought by

2    Alison Leaton?

3         A.    Yes.  As I testified earlier --

4         Q.    I'm not talking about the manner in which

5    he participated in the investigation.  I'm talking about

6    him simply looking into the allegations.  Are you saying

7    it was wrong for him even to look into the allegations?

8         A.    Yes.

9         Q.    And what was wrong about him looking into

10   the allegations?

11        A.    As I alluded to earlier, I worked with this

12   men every day for nine months plus the six-month

13   transition period off and on, made him look good, made

14   the transition look good, made him look good, did a lot

15   of work behind the scenes to ensure this thing happened.

16              Contrary to MBCR's belief, they weren't the

17   reason why there was a smooth transition.  It was the

18   people in the trenches doing the work.  In consideration

19   that -- I thought -- I would have thought that

20   Mr. Nevero or any responsible management person -- how

21   could they give credence to such a ridiculous allegation

22   about one resume and terminate somebody's career on that

23   basis versus the whole body of work?  It's just

24   incongruous.

Eli Mistovich, Jr.                                    09/22/2005

162

1    shape or form was it an impartial investigation.  It was

2    an inquisition.  It was assumed that what Leaton was

3    saying was correct.  And it wasn't any kind of a fair

4    investigation.

5        Q.    Okay.

6            MR. TEAGUE:  Let's wait a minute.  Let me

7    take a minute.

8            MS. RUBIN:  Okay.

9            (Recess.)

10       Q.    Mr. Mistovich, I'm going to repeat the

11   question.  And my question is:  Was it wrong for

12   Mr. Nevero simply to look into the allegations?  I'm not

13   talking about the manner in which he looked into the

14   allegations.  I'm simply talking about whether you think

15   it was wrongful for him to even look into them.

16       A.    Yes.  It was wrong to investigate something

17   on such a specious charge.  It was absolutely

18   ridiculous, I thought.

19       Q.    Okay.  So you thought he shouldn't even

20   have looked into the allegations?

21       A.    Correct.

22       Q.    And the reason for that is because of his

23   experience working with you?

24       A.    That and based on such a ridiculous charge

Eli Mistovich, Jr.                                    09/22/2005

163

1    based on such ridiculous allegations from Leaton.

2        Q.    Okay.  So you thought he shouldn't even

3    have looked into it based on the allegations themselves,

4    which you thought was ridiculous, and based on his

5    knowledge from working with you?

6        A.    Yes.

7        Q.    Is there any other reason why you think

8    Mr. Nevero shouldn't even have looked into the

9    allegations?

10        A.    No.

11        Q.    And you indicated that you believe

12    Mr. Nevero concluded that Alison Leaton's accusations

13    were correct.  Is that fair to say?

14        A.    No.

15        Q.    What is wrong with that?

16        A.    His testimony the other day where he said

17    he believed I was guilty of what I was charged with

18    contradicted his notes from the original meeting which

19    didn't allude in any way, shape or form to those

20    conclusions.  So it would indicate to me that Mr. Nevero

21    was coached or coerced or somehow convinced to change

22    his mind based on his observations and the notes he had

23    from the first meeting.

24        Q.    And apart from what you refer to, is there

Eli Mistovich, Jr.                                    09/22/2005

164

1    any other reason why you think Mr. Nevero didn't believe

2    Alison Leaton's accusations?

3         A.    I don't think he believed them because,

4    again, as -- again, it's more contradictory testimony.

5    But it was Mr. Urban testified that Mr. Nevero's take on

6    it was that he felt termination was too severe and

7    recommended a demotion with a restriction from being

8    involved in hiring activities.  So there's contradictory

9    testimony.

10        Q.    Do you have any information as you sit here

11   today that leads you to believe that Mr. Nevero did not

12   believe you were discriminating?

13        A.    Can you repeat that one?

14        Q.    Yes.  Do you have any reason to believe

15   that Mr. Nevero did not believe you were discriminating

16   against black applicants?

17        A.    Yes.

18        Q.    And what was that?

19        A.    I believe his own notes from that first

20   meeting I don't think indicated any way, shape or form

21   that I was discriminating.  I don't think he drew that

22   conclusion.  And that's the basis for that.

23        Q.    So the basis for your statement that

24   Mr. Nevero did not believe you were discriminating is

Eli Mistovich, Jr.                                    09/22/2005

165

1    purely based on a review of Mr. Nevero's notes; is that

2    correct?

3        A.    No.

4        Q.    Okay.

5        A.    As I just said, based on the notes and

6    based on Mr. Urban's testimony that his recollection was

7    Mr. Nevero recommended for less than termination, for a

8    demotion and restriction from any hiring activities.

9        Q.    Any other reason?

10       A.    No.

11       Q.    Let's see the exhibits.  I'm handing you

12   what has been previously marked Deposition Exhibit 7.

13   Are those the notes that you're referring to when you

14   say those -- what led you to conclude that Mr. Nevero

15   did not believe you were discriminating?

16       A.    Yes.

17       Q.    If you look at this first bullet point in

18   the note, Mr. Mistovich's initial response to Elizabeth

19   Bowden's questions, Did you say to Alison Leaton that

20   you had trouble with them was, quote, I can show you a

21   box of documents in my office that will show you the

22   problems, end quote.  Do you see that?

23       A.    Yes.

24       Q.    Do you recall Mr. Nevero's testimony that

Eli Mistovich, Jr.                                    09/22/2005

166

1     he had concluded that you were discriminating as a

2     result of that statement?

3          A.    No.

4          Q.    You don't recall Mr. Nevero's testimony at

5     his deposition that he concluded that you were

6     discriminating?

7          A.    No.

8          Q.    And as you look at that statement that's

9     written down there, is there anything in it that

10    suggests to you that Mr. Nevero thought you were not

11    discriminating?

12         A.    Indeterminate.  You can't tell.

13         Q.    You can't tell from that -- you're saying

14    you can't tell from that whether he thought you were

15    discriminating or not?

16         A.    Correct.

17         Q.    So what makes you say that based on a

18    review of this document you concluded that he determined

19    that you had not discriminated?

20         A.    Well, it certainly doesn't conclude that he

21    determined I did discriminate.

22         Q.    And that's the sole basis for your

23    statement?

24         A.    As I've said, back in Mr. Urban's

Eli Mistovich, Jr.                                    09/22/2005

173

1          A.    No, I don't recall that.

2          Q.    Okay.  Do you recall me asking you each and

3     every way in which Mr. Nevero wrongfully interfered with

4     your employment relationship with MBCR?

5          A.    Yes.

6          Q.    And do you recall that one of the reasons

7     that you gave me for him wrongfully interfering with

8     your employment relationship with MBCR was that he chose

9     to credit -- to give credibility to Alison Leaton's

10    allegations rather than to you?

11         A.    That's what he testified in his own

12    testimony.

13         Q.    I'm asking you what your belief is.  I

14    don't care what he testified.  I'm asking you what you

15    believe.

16         A.    I'm not sure.

17         Q.    Okay.  So you're not sure if he gave

18    credibility to Alison Leaton's allegations?

19         A.    I don't know.

20         Q.    And is there something about Mr. Urban's

21    statement that you referred to with Mr. Nevero saying

22    that he was recommending something less than a demotion

23    that makes you think or conclude that Mr. Nevero did not

24    believe you were discriminating?

Eli Mistovich, Jr.                                    09/22/2005

175

1    couldn't he still have concluded that you were

2    discriminating?

3         A.    I don't know.  You'd have to ask him.

4         Q.    Okay.  So I'm just trying to -- you had

5    indicated that because he had been seeking a demotion,

6    that was some evidence you had in your mind that he

7    concluded that you may not have been discriminating.

8    I'm just trying to understand what you meant by that.

9         A.    The question is --

10        Q.    The question is:  What was it about

11   Mr. Urban's relaying of Mr. Nevero's comment about the

12   demotion that makes you think that Mr. Nevero may have

13   concluded that you were not discriminating?

14        A.    The fact that he was recommending a lesser

15   punishment.

16        Q.    So if he concluded that you were

17   discriminating, you think he would have recommended a

18   termination?

19        A.    I don't know.

20        Q.    So do you know then whether this statement

21   indicates a belief whether you were discriminating?

22        A.    I can't tell for certain.

23        Q.    Okay.  And do you believe if Mr. Nevero had

24   concluded that you had done nothing wrong that he would

Eli Mistovich, Jr.                                    09/22/2005

176

1    have recommended a demotion?

2        A.    Possibly he would have to salvage --

3    salvage my career.  And it's possible he would have done

4    that to save me from the termination.

5        Q.    But you're speculating; is that correct?

6        A.    Yes.

7        Q.    Do you have any reason to conclude that

8    Mr. Nevero's role in your termination was based on

9    anything other than a belief that you were

10   discriminating?

11       A.    I can't be sure.  I can't be sure based on

12   Steve's entire career.  He's sacrificed many people but

13   always kept his job.  He's chopped many people in his

14   career because his boss told him to.

15       Q.    So are you saying that it's possible that

16   Mr. Nevero may have played a role in your termination

17   because he was told to do so?

18       A.    It's possible.

19       Q.    Do you have any information one way or the

20   other?

21       A.    I can't prove it yet.

22       Q.    Again, I'm not asking what you can prove.

23   I'm asking whether you have any information one way or

24   the other.

Eli Mistovich, Jr.                                  09/22/2005

                                                        177

1          A.    No.

2          Q.    Is there anything that Mr. Nevero did or

3     said that indicated his involvement in this was

4     motivated by anything other than a belief that you were

5     discriminating?

6          A.    No.

7          Q.    Let's turn to Alison Leaton.    Name each and

8     every way you think that Alison Leaton wrongly

9     interfered with your employment relationship with MBCR.

10         A.    Well, apparently this termination started

11    with an allegation that Leaton made to Bowden that I was

12    excluding resumes based on where a candidate lived and

13    the thought that I could determine whether they were a

14    minority or not.

15         Q.    And when did you come to hear that?

16         A.    Well, those were the allegations made at

17    the first meeting.   By the time the first meeting

18    concluded, that was made very clear to me that was the

19    gist of the allegation.

20         Q.    That was the March 26th meeting you're

21    referring to?

22         A.    Correct.

23         Q.    And apart from Alison Leaton making

24    comments to Liz Bowden to this effect, is there any

Eli Mistovich, Jr.                                    09/22/2005

178

1    other way that you think Alison Leaton wrongfully

2    interfered with your employment relationship at MBCR?

3         A.    Yes.

4         Q.    Okay.  I want you to name each reason.

5         A.    The original incident that led to this

6    episode, we had three no-shows.  We were scheduled for a

7    day of interviews.  There were three no-shows.

8              During this time we realized because of the

9    no-shows we'd have to consider additional candidates.  I

10   had previously sent Alison Leaton all the resumes I had

11   in my possession which I gathered from employee

12   references.  And she now showed me a stack of resumes --

13   I don't know, a dozen, 15, 25, something like that or a

14   stack of resumes -- and said, We'd better start

15   considering these because with these no-shows we are

16   going to need to set up an additional day of

17   interviews.

18             As I was sorting through the pile looking

19   at each one, this one particular resume, as soon as I

20   was putting -- I'd examine them.  I'd put them aside.

21   And as soon I put one aside in particular, she yelled

22   across the table, You're excluding that resume because

23   with the name Marvin Morgan and being from Dorchester,

24   you think he's a minority.  That's discrimination.

Eli Mistovich, Jr.                                          09/22/2005

180

1        A.    Yes.

2        Q.    **Again, I'd like you to list all the**

3   **reasons.**

4        A.    As I testified earlier, she lied to me.

5   When I inquired about -- after receiving an e-mail from

6   Liz Bowden and attempting to contact her on Thursday,

7   March the 25th without success, a little later that

8   morning, I attempted to contact the only other person

9   who -- the only person who was involved in the hiring

10  process, Alison Leaton.

11             I called her up.  She answered.  I

12  inquired, What's this about a meeting tomorrow?  What

13  can you tell me?  What's going on?

14       Q.    **I just want to interrupt you.  You don't**

15  **have to repeat testimony that you already gave.  It will**

16  **speed things up if you can just refer back.**

17       A.    Okay.  And her reply was, Well, I don't

18  know.  You'll have to contact Liz Bowden.

19             Now, that's an outright lie.  She did have

20  knowledge.  She had, unbeknownst to me, been trading

21  e-mails with Liz Bowden concerning this whole subject.

22  So that was an outright lie.  She could have given me a

23  tip, again, to allow me to be prepared.

24             By it's obvious to me it was a set-up.

Eli Mistovich, Jr.                                    09/22/2005

182

1      and place for their interview.

2                By failing to do that -- as we know, Map

3      Quest, there are many mistakes in their directions, many

4      people -- maybe that's the reason for the three no-shows

5      which led to this whole bizarre series of events that

6      there were -- no wonder there were three no-shows.  She

7      was referring to Map Quest, and people were calling and

8      coming late saying they had trouble with Map Quest

9      directions.

10               Why wouldn't Ms. Leaton take the basic

11     courtesy of having a stock set of directions that she

12     could recite to the prospective candidates?  That's how

13     every other HR person I've ever dealt with in my 26

14     years' of being involved in hiring did it.  Why didn't

15     Ms. Leaton take that simple step?  It probably would

16     have avoided this entire fiasco.

17          Q.   **Is there any other reason other than the**

18     **reasons you've mentioned that you think Ms. Leaton**

19     **wrongfully interfered with your employment relationship**

20     **with MBCR?**

21          A.   Yes.

22          Q.   **Okay.  List it.**

23          A.   During this time period, the presidential

24     primary elections were ongoing.  In the normal course

Eli Mistovich, Jr.                                    09/22/2005

183

1    of -- between interviews or business, we ended up

2    discussing, you know, the candidates.  And it turned out

3    she was an avid supporter of Howard Dean and later John

4    Kerry.  And I was supporting George Bush.  And she would

5    carry on about that in an irrational manner to the point

6    where -- at the time I dismissed it.  But looking back

7    at the series of events, I have to wonder, Did this play

8    a role?  Was she out to get me?  She hated Bush and the

9    Republicans that much that -- would she stoop this low

10   to concoct this scheme?

11        Q.   Okay.  The question I'm asking you isn't --

12   I'm not asking about her motivation.  I'm asking about

13   what she did that you thought wrongfully interfered with

14   your employment.  I'm going to ask you about her

15   motivation -- what you think about her motivation later

16   on.

17             But in terms of what she did that

18   wrongfully interfered with your employment, that's the

19   only question before you right now.  Other than the

20   things you've already testified to, is there anything

21   else that you think she wrongfully did?

22        A.   No, not that I can recall right now.  There

23   might be one or two, but I can't recall.

24        Q.   So the things that I've got listed are her