# EXHIBIT B

Case 1:04-cv-12340-EFH   Document 15-7   Filed 10/31/2005   Page 1 of 15

Exhibit B

# In The Matter Of:

*Eli Mistovich, Jr.  v.*
*Elizabeth Bowden, et al.*

---

*Elizabeth R. Bowden*
*Vol. 1, September 27, 2005*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA  02110*
*(617) 426-2432*

Original File BOWDEN.V1, 128 Pages
Min-U-Script® File ID: 2270709495

**Word Index included with this Min-U-Script®**

**Page 4**

[1] Eli Mistovich. Have you ever been deposed before in
[2] any deposition?
[3]  A: No.
[4]  Q: I will be asking you some questions. I'd
[5] ask you to wait until I finish the question before
[6] you answer, so the stenographer can take everything
[7] down. And also if the answer is "yes" or "no,"
[8] please don't nod your head. Please just say "yes"
[9] or "no" — it's common things that people do in
[10] depositions — so we can get the answer.
[11]     If you don't understand any of my
[12] questions, just state it, and I'll be happy to
[13] rephrase it. And if you want to take a break at any
[14] time, you just so indicate. Okay?
[15]  A: Okay.
[16]  Q: Would you state your full name for the
[17] record.
[18]  A: Elizabeth Rose Bowden.
[19]  Q: And what's your home address?
[20]  A: 48 Spencer Crescent, Guelph, Ontario,
[21] Canada, N1L1M2.
[22]  Q: And how old are you?
[23]  A: Forty-six.
[24]  Q: Okay. And are you married?

**Page 5**

[1]  A: No.
[2]  Q: Are you a college graduate?
[3]  A: You'll have to explain. American or
[4] Canadian? I apologize.
[5]  Q: Are you a citizen of Canada?
[6]  A: Yes.
[7]  Q: Would you describe your educational
[8] background.
[9]  A: I have a university degree, bachelor of
[10] arts degree from the University of Guelph.
[11]  Q: And what year did you receive that?
[12]  A: 2004.
[13]  Q: And what was your major field of study?
[14]  A: It's a general arts degree.
[15]  Q: And any other — any post-university
[16] education?
[17]  A: Post-graduate?
[18]  Q: Yes.
[19]  A: No.
[20]  Q: Are you presently employed?
[21]  A: Yes.
[22]  Q: And by whom are you presently employed?
[23]  A: Patheon.
[24]  Q: Would you spell that.

**Page 6**

[1]  A: P-a-t-h-e-o-n.
[2]  Q: And where is Patheon located?
[3]  A: Mississauga, Ontario.
[4]  MR. TEAGUE: Off the record.
[5]     (Discussion off the record)
[6]  Q: What's the nature of the business of
[7] Patheon?
[8]  A: Contract pharmaceutical.
[9]  Q: Would you explain what that means.
[10]  A: They either produce or research
[11] pharmaceutical products for other pharmaceutical and
[12] biotech companies.
[13]  Q: And what is your position with Patheon?
[14]  A: Director of human resources.
[15]  Q: And how long have you been with Patheon?
[16]  A: Two months.
[17]  Q: And what was your next previous employment
[18] before Patheon?
[19]  A: MassBay Commuter Railroad Company.
[20]  Q: And during what time period were you
[21] employed by — we'll call it "MBCR" for shorthand
[22] for this deposition.
[23]  A: Okay.
[24]  Q: During what time period were you employed

**Page 7**

[1] at MBCR?
[2]  A: From September 2003 to July 2005.
[3]  Q: And what were the circumstances under which
[4] you left the MBCR?
[5]  A: I tendered my resignation.
[6]  Q: At the time you tendered your resignation,
[7] were you given a choice of resigning or termination?
[8]  A: No.
[9]  Q: So it was a completely voluntary
[10] resignation?
[11]  A: Yes.
[12]  Q: And what was your position during your
[13] employment at MBCR?
[14]  A: Manager of organizational development.
[15]  Q: And what were the duties of that position?
[16]  A: To lead and coordinate the primarily human
[17] resources functions.
[18]  Q: And were you the manager of organizational
[19] development during the entire almost two-year period
[20] that you were with MBCR?
[21]  A: Yes.
[22]  Q: Okay. Were you an employee, considered an
[23] employee of MBCR?
[24]  A: During that period, yes.

Eli Mistovich, 1:04-cv-12340-EFH    Document 15-7    Filed 10/31/2005    Page 5 of 15

Elizabeth R. Bowden
Eli Mistovich v.
Elizabeth Bowden, et al.
Vol. 1, September 27, 2005

Page 16

[1] A: No, I did not.
[2] Q: Okay. And do you recall that Mr. Mistovich
[3] was terminated from his position at MBCR back in
[4] March of 2004?
[5] A: Yes.
[6] Q: And do you know how long sitting here today
[7] Mr. Mistovich worked at MBCR before he was
[8] terminated?
[9] A: He was hired July 1st, 2003.
[10] Q: Did you have any participation in the
[11] hiring of Eli Mistovich?
[12] A: Could you describe "hiring."
[13] Q: You said he was hired July 1st of 2003.
[14] What did you mean by the word "hiring" or "hire"?
[15] A: He — Amtrak employees that were employed
[16] in approximately March of 2002 were offered
[17] employment with MBCR as outlined in the terms and
[18] conditions of the operating agreement between MBCR
[19] and the MBTA. Mr. Mistovich would have received the
[20] letter that all those eligible received.
[21] Q: Okay. Do you recall what Mr. Mistovich's
[22] job title was when he was hired at MBCR?
[23] A: No, I do not.
[24] Q: Okay. Do you know what his

Page 17

[1] responsibilities were as —
[2] A: Specifically, no.
[3] Q: Okay. Between July of 2003 and his
[4] termination in March of 2004, did you have any
[5] interaction with Mr. Mistovich other than the
[6] "termination incident," I'll call it, while he
[7] worked at MBCR?
[8] A: When you mean "interaction," you mean any
[9] contact whatsoever?
[10] Q: Yes.
[11] A: Yes.
[12] Q: And what contact do you recall you had with
[13] him?
[14] A: He was in the board room one day with a
[15] group of other people, and I remember speaking
[16] specifically to him.
[17] Q: Do you recall what the subject of the
[18] discussion was?
[19] A: More just "Hello." In the sense that my
[20] position in the room, as I tried to leave, I had to
[21] ask him to push his chair in, and we said, "Hello,"
[22] and "How are you?"
[23] Q: You didn't discuss anything substantively
[24] having to do with employment, I take it?

Page 18

[1] A: No.
[2] Q: Other than that do you recall any other
[3] contacts with Mr. Mistovich?
[4] A: Not specific conversations that I've had.
[5] Q: Did you have an understanding as to whether
[6] or not Mr. Mistovich had any supervisory
[7] responsibilities over other employees at MBCR?
[8] A: Could you restate that, please?
[9] Q: Yes. Was it your understanding that Mr.
[10] Mistovich had supervisory authority over other
[11] employees at MBCR?
[12] A: Yes.
[13] Q: And do you know how many employees he
[14] supervised?
[15] A: No, I do not.
[16] Q: Do you know what department he worked in?
[17] A: Engineering.
[18] Q: Engineering. And was there a separate
[19] subdepartment that Mr. Mistovich was involved in, to
[20] your knowledge?
[21] A: Yes.
[22] Q: And what was that?
[23] A: Track.
[24] Q: And do you know what the — do you recall

Page 19

[1] what the responsibilities of, I'll call it, the
[2] Track Department were?
[3] A: No, I don't.
[4] Q: Do you know if Mr. Mistovich had any
[5] dealing with union employees while he worked at
[6] MBCR?
[7] A: Yes.
[8] Q: And do you recall if Mr. Mistovich was a
[9] member of a union?
[10] A: I have no idea.
[11] Q: Okay. You don't know whether he was
[12] management or union?
[13] A: He was classified as a salaried employee.
[14] Q: Okay.
[15] A: I don't know if he was a member of a union.
[16] Q: Do you know if Mr. Mistovich supervised
[17] union employees while he was at MBCR?
[18] A: Directly or indirectly?
[19] Q: No, directly.
[20] A: I don't know that.
[21] Q: How about indirectly?
[22] A: Yes.
[23] Q: And what was your understanding of his
[24] supervisory authority?

Page 52

[1] any actions as head of Human Resources functions at
[2] MBCR?
[3]   A: As a result of the meeting, no.
[4]   Q: Other than these two meetings, did you have
[5] any other discussions face to face or by telephone
[6] with City Councilor Turner concerning the makeup of
[7] the MBCR workforce?
[8]   A: Not to my knowledge.
[9]   Q: Did you have any written communications
[10] with City Councilor Turner either from him to you or
[11] you to him?
[12]   A: No.
[13]   Q: Do you recall having discussions with any
[14] other representative of the City of Boston about the
[15] makeup of the MBCR workforce prior to March of 2004?
[16]   A: No knowledge at all.
[17]   Q: After the first meeting with Councilor
[18] Turner, did you attend any meeting with Kevin Lydon
[19] at which Councilor Turner's concerns were discussed?
[20]   A: None that I can recall.
[21]   Q: After Alison Leaton was contracted to
[22] become a recruiter, did you have discussions with
[23] her about hiring minorities or recruiting minorities
[24] for employment at MBCR?

Page 53

[1]   A: Not to my recollection.
[2]   Q: I'm going to show you what was marked as
[3] Urban Deposition Exhibit 4.
[4]   A: (Reviewing document)
[5]   Q: And have you seen a copy of that letter
[6] before?
[7]   A: Yes.
[8]   Q: And that was given to Mr. Mistovich on
[9] March 30th, 2004; is that correct?
[10]   A: Yes.
[11]   Q: Excuse me one second. (Reviewing
[12] documents) I'm going to show you a copy of Nevero
[13] Deposition Exhibit 5.
[14]   A: (Reviewing document)
[15]   Q: Do you recognize that document or the
[16] contents of the document, Ms. Bowden?
[17]   A: Yes, I've seen them before.
[18]   Q: And the bottom section of it appears to be
[19] an e-mail from you to Alison Leaton —
[20]   A: Uh-huh.
[21]   Q: — dated March 11, 2004, 2:14 p.m.,
[22] correct?
[23]   A: Yes.
[24]   Q: Do you recall sending an e-mail to Ms.

Page 54

[1] Leaton?
[2]   A: Yes.
[3]   Q: And the top portion of Exhibit 5 would Ms.
[4] Leaton's reply to you at about 4:56 p.m., correct?
[5]   A: Yes.
[6]   Q: Before sending this e-mail to Ms. Leaton on
[7] March 11, did you have a conversation with her?
[8]   A: Yes.
[9]   Q: Okay. And was this a telephone
[10] conversation or face-to-face conversation?
[11]   A: Face to face.
[12]   Q: Okay. And where did that occur?
[13]   A: In my office.
[14]   Q: Okay. What was the occasion of her coming
[15] to your office, if you remember?
[16]   A: I do not remember.
[17]   Q: And what do you recall Ms. Leaton saying to
[18] you on March 11, 2004, that triggered you to send
[19] this e-mail?
[20]   A: I'm not certain she spoke with me on March
[21] 2000 — March 11th, 2004.
[22]   Q: Okay. So it was either — it was prior to
[23] the time you sent the e-mail?
[24]   A: Yes.

Page 55

[1]   Q: So you had a conversation with Ms. Leaton
[2] that resulted in you sending this e-mail?
[3]   A: Yes.
[4]   Q: Okay. Was it more than one conversation?
[5]   A: Not to my recollection.
[6]   Q: Was anyone else present during this
[7] conversation?
[8]   A: Not to my recollection.
[9]   Q: All right. And what did many Ms. Leaton
[10] say to you, and what do you recall you said to her?
[11] You don't have to recall the exact words?
[12]   A: That she had concerns that Eli Mistovich
[13] was filtering candidates out based on their address,
[14] and that he was assuming they were black.
[15]   Q: Okay. When you say "filtering candidates
[16] based on their address," are you referring to
[17] resumes?
[18]   A: Yes.
[19]   Q: And did she explain to you what the basis
[20] of that concern was?
[21]   A: She had a particular resume of a candidate
[22] that on paper met all the established
[23] qualifications, and Eli wouldn't consider the
[24] person.

Page 56

[1] **Q:** That's what she told you?
[2] **A:** Yes, essentially.
[3] **Q:** And then you recall anything else she said?
[4] **A:** Not specifically at that meeting point.
[5] **Q:** Did she identify the candidate she was
[6] referring to?
[7] **A:** Not to my recollection.
[8] **Q:** Did she show you a copy of the resume?
[9] **A:** Not at that time.
[10] **Q:** Did you see a copy of the resume she was
[11] talking about?
[12] **A:** Not to my recollection.
[13] **Q:** Do you recall the name of any candidate or
[14] candidates she was referring to?
[15] **A:** The candidate's name was Marvin Morgan.
[16] **Q:** I'm going to show you what was marked as
[17] Urban Exhibit 2.
[18] **A:** Okay.
[19] **Q:** Have you seen that — that was identified
[20] at Mr. Urban's deposition as the Morgan resume.
[21] **A:** Okay.
[22] **Q:** Have you seen that before?
[23] **A:** Yes.
[24] **Q:** Okay. Did you see it before the decision

Page 57

[1] was made to terminate Mr. Mistovich?
[2] **A:** I don't know.
[3] **Q:** Okay. When — have you seen it prior to
[4] your deposition today?
[5] **A:** Yes.
[6] **Q:** Okay. Prior to the institution of this
[7] lawsuit, do you recall seeing the Morgan resume or a
[8] copy of it?
[9] **A:** I do not recall.
[10] **Q:** Okay. What is it about that resume that
[11] would suggest Mr. Morgan's race?
[12] **A:** To me? Or to...
[13] **Q:** I take it Ms. Leaton said that Mr.
[14] Mistovich was screening out black candidates because
[15] of addresses in a resume?
[16] **A:** Uh-huh.
[17] **Q:** Well, there was an address in Dorchester.
[18] Was it Ms. Leaton's contention that because Mr.
[19] Morgan was from Dorchester, that he was black? I'm
[20] trying to understand what her allegation was.
[21] **A:** It is the city address that Mr. Mistovich
[22] advised Ms. Leaton that he felt he had adequate
[23] knowledge of the composition of that group of people
[24] that lived there that this candidate had a higher

Page 58

[1] probability of being black.
[2] **Q:** Ms. Leaton told you that's what Mr.
[3] Mistovich told her?
[4] **A:** Essentially, yes.
[5] **Q:** That he actually said, oh, that because
[6] he's from Dorchester, there's a high probability of
[7] him being black?
[8] **A:** Yes.
[9] **Q:** Okay. Is there anything — you looking at
[10] that resume, could you tell Mr. Morgan's race simply
[11] by looking at that resume?
[12] **A:** (Reviewing document) As a non-resident,
[13] I'm not familiar with the composition of the
[14] communities in the greater Boston area, so
[15] personally, no, I could not.
[16] **Q:** Okay.
[17] **A:** However, others familiar with the various
[18] compositions could make educated decisions.
[19] **Q:** You're saying a person from Dorchester,
[20] that another person looking at the resume would know
[21] that a person was black; is that what you're saying?
[22] **MS. RUBIN:** Objection.
[23] **A:** No, that's not what I said.
[24] **Q:** Okay. Maybe I misunderstood you. What is

Page 59

[1] there about that address that you think anyone could
[2] make a determination of a person's race?
[3] **A:** Individuals in individual communities are
[4] made of a composition of people which is on record,
[5] and those familiar with the geographical area would
[6] know what the primary composition of a —
[7] **Q:** You mean the street address or Dorchester
[8] in general?
[9] **A:** A town or city in general, yes.
[10] **Q:** Do you know where Kevin Lydon lives?
[11] **A:** No, I do not.
[12] **Q:** Would it surprise you to learn, be advised,
[13] that he lives in Dorchester, Savin Hill?
[14] **A:** Not surprised by it.
[15] **Q:** Do you know — Mr. Lydon is white, is he
[16] not?
[17] **A:** Yes, he is.
[18] **Q:** So just so I'm clear. Ms. Lydon (sic) told
[19] you that Mr. Mistovich had informed her that because
[20] Mr. Morgan was from Dorchester, he made an
[21] assumption that he was black and did not want to
[22] hire him?
[23] **A:** Did not want to interview him.
[24] **Q:** Or did not want to interview him?

Elizabeth R. Bowden
Vol. 1, September 27, 2005
Case 1:04-cv-12340-EFH   Document 15-7   Filed 10/31/2005   Page 8 of 15
Eli Mistovich, Jr.  v.
Elizabeth Bowden, et al.

Page 60

[1] **A:** Correct.
[2] **Q:** And those were Ms. Leaton's words?
[3] **MS. RUBIN:** Objection.
[4] **A:** No.
[5] **Q:** Okay. Well, maybe I misspoke. The
[6] statement that Morgan was probably black, did that,
[7] according to Ms. Leaton, did that come from Mr.
[8] Mistovich's lips?
[9] **A:** The phrase from — was that he had trouble
[10] with people like that, and when pressed, Ms. Leaton
[11] said, "What do you mean, black?" And he said,
[12] "Yes."
[13] **Q:** How did Ms. Leaton know he was black?
[14] **MS. RUBIN:** Objection.
[15] **A:** I don't know.
[16] **Q:** Well, do you know — Mr. Morgan was
[17] subsequently interviewed and hired, correct?
[18] **A:** That's my understanding.
[19] **Q:** Okay. And he is black; is that your
[20] understanding? Well, let me withdraw the question.
[21] Have you ever met Mr. Morgan?
[22] **A:** No.
[23] **Q:** Do you know what his race is?
[24] **A:** Yes.

Page 61

[1] **Q:** Okay. Is he black?
[2] **A:** Yes.
[3] **Q:** Do you know where Ms. Leaton got Mr.
[4] Morgan's resume?
[5] **A:** No.
[6] **Q:** When you had this conversation with Ms.
[7] Leaton, did she indicate to you that she knew Mr.
[8] Morgan's race?
[9] **A:** She did not indicate to me that she knew
[10] Mr. Morgan's race.
[11] **Q:** Okay. Well, let's look at Exhibit 5. You
[12] asked Ms. Leaton for a detailed outline concerning
[13] the conversation she had with Mr. Mistovich,
[14] correct?
[15] **A:** Yes.
[16] **Q:** Okay. And then she responded to you in the
[17] top part of that?
[18] **A:** Yes.
[19] **Q:** Other than this e-mail response, do you
[20] recall receiving any other information from Ms.
[21] Leaton on March 11th?
[22] **A:** Receiving other information on March 11?
[23] **Q:** Yes.
[24] **A:** I do not recall that.

Page 62

[1] **Q:** Okay. And on the top where Ms. Leaton was
[2] responding to you, she said, "The only conversation
[3] I had with Eli about whom to interview or not was
[4] late last week." So the discussion that she had
[5] with Eli Mistovich had occurred sometime prior to
[6] March 11th, correct?
[7] **A:** That's what she's written, yes.
[8] **Q:** Do you know when this conversation between
[9] Ms. Leaton and Mr. Mistovich occurred?
[10] **MS. RUBIN:** Do you mean now, or did she
[11] know on March 11th?
[12] **Q:** Do you know when the initial conversation
[13] occurred?
[14] **A:** Well, I learned later through further
[15] interviews with Ms. Leaton that it happened.
[16] **Q:** Well, do you know —
[17] **A:** On or about March 5th.
[18] **Q:** Okay. Now, she in this — did you see
[19] anywhere in this narration of the conversation where
[20] Mr. Eli or Mr. Mistovich actually makes the
[21] statement that Mr. Morgan was black? I mean, she
[22] refers to, in the third line, Mr. — Eli's
[23] assumption that he was black.
[24] **A:** Right. That's —

Page 63

[1] **Q:** Well, that's what Ms. Leaton says that Mr.
[2] Mistovich assumed?
[3] **MS. RUBIN:** Do you have a question? I'm
[4] sorry.
[5] **Q:** Yes. Do you see anywhere in there where
[6] there's a statement attributed to Mr. Mistovich that
[7] he considered Mr. Morgan to be black by race?
[8] **A:** So "in that conversation" is the phrase
[9] that implies that it's from Eli's assumption that he
[10] was black. It's in the same sentence.
[11] **Q:** So you construed that as Mr. Mistovich
[12] actually making a statement, Morgan was black, and
[13] he didn't want to hire him?
[14] **A:** He was under that assumption, yes.
[15] **Q:** Well, I didn't ask you what assumption he
[16] was — I'm just wondering your understanding of the
[17] statements that Mr. Mistovich made.
[18] **MS. RUBIN:** Objection.
[19] **Q:** I'm not asking anyone to be a mind reader.
[20] **A:** My understanding was that he wouldn't
[21] consider interviewing the individual because under
[22] the address he made the assumption he was black.
[23] **Q:** Then she says he was not happy about it and
[24] said, "He had not had good luck with people like

Eli Mistovich, Jr. v.
Elizabeth Bowden, et al.
Case 1:04-cv-12340-EFH    Document 15-7    Filed 10/31/2005    Page 9 of 15
Elizabeth R. Bowden
Vol. 1, September 27, 2005

Page 72

[1] Q: And was that on or before March 15, 2004?
[2] A: Yes.
[3] Q: Okay. And did you communicate Ms. Leaton's
[4] concerns to Steven Nevero prior to March — either
[5] on or before March 15?
[6] A: I don't know.
[7] Q: Did you communicate Ms. Leaton's concerns
[8] to Mr. Urban on or before March 15, 2004?
[9] A: I don't know.
[10] Q: Okay. Now, as of March 15, had you
[11] communicated Ms. Leaton's concerns to Mr. Mistovich
[12] as of the date of the meeting?
[13] A: I don't recall doing it.
[14] Q: Okay. Do you recall if you took any notes
[15] of this meeting on March 15, 2004?
[16] A: I do not.
[17] Q: Why did you communicate Ms. Leaton's
[18] concerns to Beth Trowbridge?
[19] A: The recruiter was again reporting to Beth
[20] upon her return from her mat leave to bring her up
[21] to speed.
[22] Q: Did Ms. Leaton communicate her concerns to
[23] Ms. Trowbridge?
[24] A: No.

Page 73

[1] Q: Oh, okay.
[2] A: And Beth subsequently participated in a
[3] meeting with Ms. Leaton and myself.
[4] Q: Okay. Was there a subsequent meeting
[5] between — after March 15th between you and Ms.
[6] Leaton —
[7] MS. RUBIN: Objection.
[8] Q: — and Ms. Trowbridge?
[9] A: There were meetings but the specific dates
[10] I don't have in my head.
[11] Q: Okay. Well, you referred to a meeting —
[12] A: Uh-huh.
[13] Q: — that you had with Beth Trowbridge and
[14] Alison Leaton, correct?
[15] A: Yes, I don't remember the exact date.
[16] Q: Was it after March 15, 2004?
[17] A: I don't remember the exact date.
[18] Q: Well, I'm trying to see if I can give you a
[19] framework to assist you. Was it before the March
[20] 26th meeting with Mr. Mistovich, Urban and Nevero?
[21] A: Yes.
[22] Q: Okay. And was there more than one meeting
[23] you had with Alison Leaton and Beth Trowbridge?
[24] A: Not that I can recall.

Page 74

[1] Q: And where did the meeting with Leaton and
[2] Trowbridge occur?
[3] A: In my office.
[4] Q: And was there anyone else present?
[5] A: No.
[6] Q: And what do you recall being said at the
[7] meeting?
[8] A: We asked Alison, well, to give further
[9] explanation on her concern and the process that she
[10] had gone through to date on this matter.
[11] Q: And what did Ms. Leaton say?
[12] A: She advised the sort of the protocol that
[13] she had taken when she had the initial communication
[14] and questions and concerns that had been raised in
[15] asking Mr. Mistovich for clarification of his
[16] intent, his comment; and we asked her to clarify
[17] whether or not there was any sense of
[18] misunderstanding on her part.
[19] Q: And what was her response?
[20] A: That it was very clear and there was no
[21] misunderstanding of what was intended by Mr.
[22] Mistovich's comments and actions.
[23] Q: Did she quote anything that Mr. Mistovich
[24] said?

Page 75

[1] A: I don't know specifically at this time.
[2] Q: Okay. But she said to you there was no
[3] misunderstanding on her part that Mr. — of what Mr.
[4] Mistovich said and meant; is that correct?
[5] A: Yes, that's —
[6] Q: So there's no misunderstanding on Ms.
[7] Leaton's part that Mr. Mistovich said and meant to
[8] exclude blacks from the interview process?
[9] A: Correct.
[10] Q: Okay. Do you recall anything Beth
[11] Trowbridge said?
[12] A: Nothing. I recall nothing.
[13] Q: Now, you met with Mistovich, Urban and
[14] Nevero on March 26th, 2004, correct?
[15] A: Yes.
[16] Q: And what was the purpose of that meeting?
[17] Well, let me withdraw that question.
[18] Who decided to have a meeting on March
[19] 26th, 2004?
[20] A: I'm not sure I understand what you mean.
[21] Q: Well, there's a meeting. Mr. Mistovich, do
[22] you know when he was notified of the meeting?
[23] A: I do not remember.
[24] Q: I take it, it's fair to say it wasn't Mr.

Page 80

[1] **A:** Yes.
[2] **Q:** Let me show you another — what appears to
[3] be a set of e-mails produced by MBCR Bates stamped
[4] No. 5 and 6.
[5] **A:** (Reviewing document)
[6] **Q:** Do you recognize those e-mails, Ms. Bowden?
[7] **A:** Yes.
[8] **Q:** Now, it looks like, if you start on Page 6,
[9] there's a repetition of a previous e-mail we
[10] discussed?
[11] **A:** Yes.
[12] **Q:** Okay. By the way, in that e-mail that's —
[13] the last comment you made to Ms. Leaton is, "I need
[14] this" — that is her detailed outline — "by the
[15] close of business Friday by e-mail." Do you recall
[16] why you needed her detailed outline by the close of
[17] business — this is Friday, March 11th — so that
[18] would be Friday, March 12th?
[19] **A:** I do not recall.
[20] **Q:** Was this a concern of some urgency to you;
[21] do you recall?
[22] **A:** I do not recall. I do not recall why I
[23] asked for that specific...
[24] **Q:** Then on the first page of this — these

Page 81

[1] documents, there's a repeat of Ms. Leaton's e-mail
[2] to you of March 11th, and then above that, you
[3] e-mail her on March 15th at 8:26 p.m. "Please
[4] review attached. Have I captured the meeting
[5] correctly? Please review and advise Tuesday." When
[6] you say "attached," were you referring to her
[7] previous e-mail to you?
[8] **A:** No.
[9] **Q:** Was there something else that you were
[10] referring to?
[11] **A:** Yes.
[12] **Q:** What was that?
[13] **A:** An attachment of notes taken that was held,
[14] a meeting held between Beth and between Alison and
[15] I.
[16] **Q:** So you took notes of the meeting with Beth,
[17] Alison and you that you refer to, and you sent those
[18] to Ms. Leaton?
[19] **A:** Uh-huh.
[20] **Q:** Okay.
[21] **A:** Yes.
[22] **Q:** Let me show you another two documents that
[23] are Bates stamped 2 and 3 from MBCR production and
[24] ask you to take a look at that.

Page 82

[1] **A:** (Reviewing document)
[2] **MR. TEAGUE:** While you're looking, why
[3] don't we mark the series of e-mails that had the top
[4] e-mail of Tuesday, March, 16, 2004, at 9:28 p.m.,
[5] from Alison Leaton to Elizabeth Bowden and Elizabeth
[6] Trowbridge. I believe it would be Bowden Exhibit
[7] 29.
[8]      (Document marked as Bowden
[9] Exhibit 29 for identification)
[10] **Q:** Okay. Now, the document stamped 2 and 3,
[11] do you recognize those, Ms. Bowden?
[12] **A:** Yes.
[13] **Q:** And what are those — what is that
[14] document?
[15] **A:** Summary of the meeting that was held on
[16] March 15 with Alison Leaton, Beth Trowbridge and
[17] myself.
[18] **Q:** Okay. And did you send a copy of this
[19] summary to Ms. Leaton?
[20] **A:** Yes.
[21] **Q:** Okay. And that's the document that's
[22] referred to in the middle e-mail on the first page
[23] of Exhibit 29?
[24] **A:** Yes.

Page 83

[1] **MR. TEAGUE:** Okay. Why don't we have the
[2] summary of the March 15 meeting marked as — we'll
[3] call it "Bowden Exhibit 30."
[4]      (Document marked as Bowden
[5] Exhibit 30 for identification)
[6] **Q:** Did you ever show Exhibit 30 to Eli
[7] Mistovich?
[8] **A:** Not to my knowledge.
[9] **Q:** Did you show it to the members of the team
[10] or committee, as you referred to them, Mr. Urban or
[11] Nevero or Lydon or counsel?
[12] **A:** I don't know.
[13] **Q:** Okay. Now, do you know who communicated to
[14] Mr. Mistovich that there would be a meeting on March
[15] 26th?
[16] **A:** I don't remember.
[17] **Q:** Do you recall having any communications
[18] with Mr. Mistovich prior to March 26th about the
[19] meeting?
[20] **A:** I don't recall.
[21] **Q:** Do you remember receiving any voice mail
[22] from Mr. Mistovich about the purpose of a meeting he
[23] was asked to attend on March 26th?
[24] **A:** I don't remember a voice mail.

Page 84

[1] **Q:** Now, when you and Elizabeth Trowbridge met
[2] with Alison Leaton on March 15th, did you inform Ms.
[3] Leaton of the purpose of that interview prior to
[4] March 15 or prior to the interview being conducted?
[5] **A:** I don't recall.
[6] **Q:** To your knowledge did either Mr. Nevero or
[7] Mr. Urban discuss the purpose of the meeting with
[8] Mr. Mistovich before March 26th?
[9] **A:** I have no knowledge of that.
[10] **Q:** Did you ever tell Mr. Nevero not to tell
[11] Mr. Mistovich the purpose of the meeting?
[12] **A:** Not to my knowledge.
[13] **Q:** Was there a reason you did not inform Mr.
[14] Mistovich of the purpose of the meeting prior to
[15] March 26th?
[16] **A:** It's standard practice during
[17] investigations to keep the primary details of the
[18] investigation confidential until the conducting of
[19] the face-to-face meetings.
[20] **Q:** Well, the details had been discussed with
[21] Ms. Leaton on at least two occasions and e-mailed
[22] back and forth; is that correct?
[23] **A:** From her knowledge of it, yes.
[24] **Q:** Yes. And Ms. Trowbridge was aware of it?

Page 85

[1] **A:** Yes.
[2] **Q:** And the members of the team, Mr. Davey, Mr.
[3] Leaton (sic), Mr. Nevero, Mr. Urban and you were
[4] aware of it, correct?
[5] **A:** Yes.
[6] **Q:** So the only one that wasn't aware of the
[7] purpose of the meeting and the allegations on March
[8] 26th to your knowledge was Mr. Mistovich; is that
[9] correct?
[10] **MS. RUBIN:** Objection.
[11] **A:** I don't know who else had knowledge.
[12] **Q:** I said do you know of anyone else — do you
[13] know if Mr. Mistovich had any advance knowledge of
[14] this meeting?
[15] **A:** I don't know.
[16] **Q:** Did anyone ever suggest that it might be
[17] fair to inform him in advance of the purpose of the
[18] meeting?
[19] **A:** As I said, it's practice of investigations
[20] of this nature that the substantive information is
[21] retained confidential until the time of the
[22] face-to-face meeting.
[23] **Q:** When you say "standard practice," where is
[24] that standard practice? What's the source of that?

Page 86

[1] **A:** The guideline approach that's used to
[2] complete detailed investigations of this nature.
[3] **Q:** Is there a written guideline for conducting
[4] investigations as to —
[5] **A:** No.
[6] **Q:** — as to allegations of racial
[7] discrimination?
[8] **A:** Not to my knowledge.
[9] **Q:** Okay. What were you referring to when you
[10] said "guidelines"?
[11] **A:** It's best practice used within
[12] organizations to complete investigations.
[13] **Q:** This is your understanding of the practices
[14] that are used? In other words, is there any written
[15] document that says you shouldn't inform the subject
[16] of an investigation of the purpose of it prior to
[17] the interview?
[18] **A:** I'm not aware of a specific document.
[19] **Q:** Okay. Had you conducted any previous
[20] investigations, as you call them, of discrimination
[21] in hiring at MBCR?
[22] **A:** No.
[23] **Q:** Had you conducted any investigations of
[24] racial discrimination in hiring in any of the other

Page 87

[1] organizations you were employed by?
[2] **A:** No.
[3] **Q:** Now, the meeting on March 26th, 2004, what
[4] room did that occur in?
[5] **A:** I don't know the name of it.
[6] **Q:** Was it a conference room?
[7] **A:** Yes.
[8] **Q:** Where was the location, the address?
[9] **A:** 33 Cobble Hill Road.
[10] **Q:** And did — do you recall who sat where at
[11] this meeting?
[12] **A:** Relative to what?
[13] **Q:** Well, were you sitting across from Mr.
[14] Mistovich?
[15] **A:** Not directly. Almost on the same angle
[16] that we are at this point in time now.
[17] **Q:** So Mr. Mistovich was on one side of the
[18] table; is that correct?
[19] **A:** (Nods head)
[20] **Q:** And you were on the other side of the
[21] table?
[22] **A:** Yes.
[23] **Q:** Were Mr. Nevero and Mr. Urban on your side
[24] of the table?

Eli Mistovich, Jr. v.
Elizabeth Bowden, et al.
Case 1:04-cv-12340-EFH    Document 15-7    Filed 10/31/2005    Page 12 of 15
Elizabeth R. Bowden
Vol. 1, September 27, 2005

Page 88

[1] A: No.
[2] Q: Were they on Mr. Mistovich's side of the
[3] table?
[4] A: Mr. Nevero was.
[5] Q: Okay. And where was Mr. Urban?
[6] A: At the head of the table.
[7] Q: So Nevero (sic) is at the head. You're
[8] across from Mr. Mistovich, and Mr. Nevero is sitting
[9] beside Mr. Mistovich; is that how people were
[10] seated?
[11] THE WITNESS: (To the stenographer) You
[12] may want to read back what he just he just said. I
[13] don't think he phrased it properly.
[14] Q: You were across a table from Mr. Mistovich,
[15] is that correct —
[16] A: Yes.
[17] Q: — at the meeting? Mr. Urban, the number
[18] two man in MBCR, was seated at the head of the
[19] table?
[20] A: Yes.
[21] Q: And then that left Mr. Nevero?
[22] A: Yes.
[23] Q: And where was he seated —
[24] A: On the same side —

Page 89

[1] Q: — in relation — let me finish the
[2] question — in relation to Mr. Mistovich?
[3] A: To Mr. Mistovich's right.
[4] Q: Okay. Did you ask Mr. Mistovich to bring
[5] any records or documents to the meeting with him?
[6] A: No.
[7] Q: Did you suggest that he take notes at the
[8] meeting?
[9] A: Not that I recall.
[10] Q: Did you take notes at the meeting?
[11] A: I did.
[12] Q: All right. Let me show you what we've
[13] marked at Mr. Mistovich's deposition as Exhibit 11.
[14] A: Okay. (Reviewing documents)
[15] Q: Do you recognize that document or those
[16] documents?
[17] A: Yes.
[18] Q: And what are those?
[19] A: The notes that I prepared in summary of the
[20] meeting held on March 26th.
[21] Q: And when did you prepare this document?
[22] A: March 26th.
[23] Q: Okay. Were — was the conversation with
[24] Mr. Mistovich recorded?

Page 90

[1] A: Not to my knowledge.
[2] Q: And did you make handwritten notes of the
[3] meeting on which you based the summary?
[4] A: Yes.
[5] Q: And do you know where those notes are?
[6] A: No, I do not.
[7] Q: Okay. Now, the initial conversation
[8] between Leaton and Eli Mistovich that triggered this
[9] incident or this investigation occurred on March 4th
[10] or March 5th, correct?
[11] A: That is my understanding.
[12] Q: That was some three weeks before this
[13] meeting with Eli Mistovich, correct?
[14] A: Yes.
[15] Q: Okay. And then in Paragraph 3 of Exhibit
[16] 11 you indicate you made a statement. Do you see
[17] that?
[18] A: Uh-huh.
[19] Q: You recall making a statement to that
[20] effect?
[21] A: Yes.
[22] Q: And telling Mr. Mistovich the reason for
[23] the meeting; do you see that?
[24] A: Yes.

Page 91

[1] Q: Okay. Prior to that, I take it, you have
[2] no knowledge of anyone informing Mr. Mistovich of
[3] the purpose of the meeting?
[4] A: I have no knowledge, correct.
[5] Q: Now, in the next to last sentence of the
[6] third paragraph, the one I was just referring to,
[7] you refer to eliminating qualified "applicants" in
[8] the plural because of their name and their home
[9] address. Again, I'll ask you, at the meeting did
[10] you have any other applicant in mind other than Mr.
[11] Morgan that this had occurred to?
[12] A: No, I did not.
[13] Q: Did Mr. Mistovich appear surprised when you
[14] informed him of the purpose of the meeting?
[15] A: Not to my recollection.
[16] Q: It's fair to say you expected Mr. Mistovich
[17] to be surprised by this accusation, did you not?
[18] MS. RUBIN: Objection.
[19] A: No.
[20] Q: This is an accusation of racism, isn't it?
[21] A: Yes.
[22] Q: And you would not expect an employee to be
[23] surprised by an accusation of racism?
[24] MS. RUBIN: Objection.

Page 100

[1] A: We prepared a spreadsheet of the
[2] qualifications of those that had CDL.
[3] Q: When you say "we prepared the spreadsheet,"
[4] who prepared it?
[5] A: The Human Resources Department coordinated
[6] that.
[7] Q: Well, who prepared it? Ms. Leaton?
[8] A: Yes.
[9] Q: Oh, okay. The accuser prepared it?
[10] **MS. RUBIN:** Objection.
[11] Q: Correct?
[12] A: Yes.
[13] Q: The person who made the —
[14] A: Yes. I thought it was a statement, not a
[15] question.
[16] Q: Okay. Then you said Eli would not respond
[17] beyond this comment. I'm going back to your —
[18] A: What page, please?
[19] Q: Right where you're looking on Page 2,
[20] Question 3.
[21] A: Okay.
[22] Q: After —
[23] A: Yes.
[24] Q: — "This was not challenged." Did you ask

Page 101

[1] him for any response? It says, "I always select the
[2] best or above-average candidates." And then you
[3] said, "The point of who got selected for interviews
[4] was." Did you anticipate a further response?
[5] A: I don't recollect the specifics.
[6] Q: Okay. Then in the next paragraph you said,
[7] "As Eli was not providing any information, E. Bowden
[8] stated that 'In the absence of comment from Eli, the
[9] information from the recruiter was considered
[10] accurate and without objection.'" Do you recall
[11] making that statement?
[12] A: I do recall making that statement.
[13] Q: And then Eli's response was, "It sounds
[14] like you've already made up your mind." You
[15] remember him saying that?
[16] A: Yes.
[17] Q: And then you said that, "No conclusions
[18] have been formed. That's the purpose of this
[19] meeting," and then you said, "Eli chose not to add
[20] anything more to the comment and not clarify any
[21] points." At this time point did he appear upset?
[22] A: I don't remember specifically.
[23] Q: Okay. Then on the next page, which is
[24] Bates stamped 11, you had another question. Again,

Page 102

[1] you're quoting from Ms. Leaton's version of the
[2] conversation that she had with Mr. Mistovich three
[3] weeks prior to your interview, correct?
[4] **MS. RUBIN:** Objection.
[5] A: Correct.
[6] Q: Okay. And did you expect him to recall the
[7] comments of Ms. Leaton at this meeting?
[8] **MS. RUBIN:** Objection.
[9] A: I'm sorry?
[10] Q: You're quoting — in Question 4 you're
[11] taking Ms. Leaton's version of a conversation and
[12] presenting it to Mr. Mistovich, correct?
[13] A: Correct.
[14] Q: And this conversation that Ms. Leaton had
[15] with Mr. Mistovich occurred three weeks prior to
[16] your talking to him?
[17] A: Yes.
[18] Q: Is it — and did you expect him to remember
[19] the exact content of the words that he said to Ms.
[20] Leaton some three weeks later when he had no advance
[21] notice of this meeting?
[22] **MS. RUBIN:** Objection.
[23] A: I did not expect him to remember his exact
[24] words.

Page 103

[1] Q: For instance you said, "Your response was
[2] you had more problems with people like that. What
[3] did you mean by that statement?" And then you said,
[4] "No further comment be added after the original
[5] statement indicating he had, in fact, had problems."
[6] Then it says, "Eli stated that during the hiring
[7] requirements at his previous employer, he always
[8] exceeded the required number." Do you recall him
[9] making that statement?
[10] A: Yes.
[11] Q: And you knew his previous employer was
[12] Amtrak, correct?
[13] A: Yes.
[14] Q: What, if any, efforts did you make to
[15] validate Mr. — or verify Mr. Mistovich's hiring
[16] record at Amtrak?
[17] A: None.
[18] Q: What did you mean when it says, "This
[19] cannot be validated by MBCR"?
[20] A: Cannot practice to go to a prior employer
[21] to ask about someone's behaviors when completing an
[22] investigation at a current employer.
[23] Q: Yes, but this was — all of Amtrak's
[24] employees, including Mr. Mistovich, were

Page 116

[1] mean you would be a good railroad trackman; is that
[2] correct?
[3] **MS. RUBIN:** Objection.
[4] **A:** Correct.
[5] **Q:** Would you agree that someone with railroad
[6] experience and knowledge of a trackman's particular
[7] duties might look for specifics in a work history?
[8] **MS. RUBIN:** Objection.
[9] **A:** Might, yes.
[10] **Q:** Did you ever show this e-mail of March 26th
[11] to Mr. Mistovich for a comment?
[12] **A:** Not to my knowledge.
[13] **MR. TEAGUE:** Why don't we mark this e-mail
[14] from Ms. Leaton to Ms. Bowden of March 26th as
[15] Exhibit 32.
[16]   (Document marked as Bowden
[17] Exhibit 32 for identification)
[18] **Q:** Was —
[19] **MR. TEAGUE:** Off the record.
[20] (Discussion off the record)
[21] **Q:** Let me show you a document that's been
[22] Bates stamped No. 25.
[23] **A:** (Reviewing document)
[24] **Q:** Can you identify that?

Page 117

[1] **A:** Yes.
[2] **Q:** And what is it?
[3] **A:** It's a section of my notebook that I keep
[4] when I go to meetings. It's dated March 29th. A
[5] meeting that was held in Kevin Lydon's office with
[6] Kevin, himself, Steve Nevero, Steve Urban, Rich
[7] Davey, and myself to follow up on the meeting we had
[8] had on the 26th.
[9] **Q:** And can you read the entries and tell me
[10] what you recall about what they mean?
[11] **A:** Kevin Lydon led the meeting and asked first
[12] Steve Nevero for his take on the meeting and the
[13] outcome of the meeting, and he summarized that he
[14] felt that Eli was evading answers. He asked —
[15] Kevin asked Steve Urban the same question. He gave
[16] the same answer as Steve Nevero. He asked me and I
[17] shared the summary notes that were previously
[18] highlighted here. Rich reviewed the summary
[19] document that Alison had prepared and was
[20] completing, and then Kevin had a conversation with
[21] the group regarding the discussion of releasing Eli
[22] from MBCR giving him the opportunity to resign if he
[23] chose or to be terminated.
[24] **Q:** Did anyone at the meeting suggest talking

Page 118

[1] further to Mr. Mistovich?
[2] **A:** Not to my recollection.
[3] **Q:** Did anyone at the meeting suggest checking
[4] further with people who had worked with or under or
[5] above Mr. Mistovich at Amtrak?
[6] **A:** Not to my recollection.
[7] **Q:** At the March 30th meeting, I take it, you
[8] had this document, Nevero Exhibit 9?
[9] **MS. RUBIN:** Objection. You mean March
[10] 29th?
[11] **MR. TEAGUE:** What did I say?
[12] **Q:** March 29th meeting, you were referring to a
[13] summary, "Alison completing."
[14] **A:** Yes, that's what Rich had, yes.
[15] **Q:** Did you examine that at the meeting?
[16] **A:** I don't recall.
[17] **Q:** Okay. Were you — did anyone at the
[18] meeting refer to the fact that Mr. Mistovich had
[19] worked for Amtrak for more than 25 years before he
[20] came to MBCR?
[21] **A:** I'm not aware of that specific
[22] conversation.
[23] **Q:** Did anyone at the meeting bring up or
[24] mention that Mr. Mistovich had participated in

Page 119

[1] hiring while he worked at Amtrak?
[2] **A:** I don't recall.
[3] **Q:** Other than Leaton's accusations and your
[4] summary of the meeting of March 26th, was there any
[5] other reason discussed for terminating Mr.
[6] Mistovich's employment at this March 29th meeting?
[7] **A:** I'm sorry. Can you restate that?
[8] **Q:** Sure. The March 29th meeting, you and
[9] Nevero and Urban, you summarized and gave your
[10] impressions of the meeting with Mr. Mistovich of
[11] March 26th, correct?
[12] **A:** Yes, I shared the notes.
[13] **Q:** Okay. And other than that incident, the
[14] Alison Leaton accusations and the meeting that you
[15] had concerning them, were there any other reasons
[16] discussed at the meeting for terminating Mr.
[17] Mistovich?
[18] **A:** No.
[19] **Q:** Now, do you recall a meeting on March 30th
[20] at the Cobble Hill facility with Mr. Mistovich?
[21] **A:** Is that the date of the termination?
[22] **Q:** Well, yes, that's the date of the
[23] termination letter.
[24] **A:** Okay.

Page 120

[1] **Q:** Okay. You recall a meeting in which Mr.
[2] Mistovich was informed of the termination?
[3] **A:** Yes.
[4] **Q:** And who was present at that meeting?
[5] **A:** Steve Nevero, Steve Urban and myself, and
[6] Mr. Mistovich.
[7] **Q:** And at that meeting Mr. Mistovich was —
[8] what do you recall happening at that meeting? Why
[9] don't you tell me your recollection.
[10] **A:** Mr. Nevero led the meeting, and he outlined
[11] to Mr. Mistovich the outcome and decision of the
[12] details that had transpired over the previous few
[13] weeks and advised Mr. Mistovich that his employment
[14] with MBCR was being terminated and that he had two
[15] choices: he could resign or be terminated by the
[16] company. Mr. Mistovich was very, you know,
[17] surprised and upset. He inquired on whether he
[18] could stay involved in the organization employed,
[19] involved, however, not be involved in hiring, and
[20] Mr. Urban — I'm sorry — Mr. Nevero, I apologize —
[21] Mr. Nevero, again, leading the meeting, advised him
[22] that that was not an option. Mr. Mistovich inquired
[23] on whether he would be given a chance to think about
[24] the two choices that had just been presented to him,

Page 121

[1] and he was advised that he had to decide then; and
[2] he was not prepared to resign, and Mr. Nevero
[3] proceeded to then advise him that he would be
[4] terminated effective immediately. There was a
[5] reasonable silence in the room. Mr. Mistovich asked
[6] a question that I cannot remember at this point, but
[7] Mr. Urban responded, and then Mr. Urban escorted Mr.
[8] Mistovich out.
[9] **Q:** Was the decision to terminate Mr. Mistovich
[10] made at the March 29th meeting that we previously
[11] discussed?
[12] **A:** The decision to end his employment with
[13] MBCR was made then. So he was given the choice of
[14] whether to resign or to be terminated, but releasing
[15] him from employment from MBCR was decided at this
[16] meeting on the 29th.
[17] **Q:** Did anyone at the meeting of March 29th
[18] suggest a, perhaps, less drastic sanction —
[19] **A:** Not that I —
[20] **Q:** — than terminating an employee?
[21] **A:** Sorry. Not that I recall.
[22] **Q:** Were you aware that Mr. Mistovich on March
[23] 30th, 2004, had four children, two of whom were in
[24] college?

Page 122

[1] **A:** No, I was not.
[2] **Q:** Was any severance pay offered to Mr.
[3] Mistovich?
[4] **A:** Not to my knowledge.
[5] **Q:** When did Alison Leaton cease working as a
[6] consultant for MBCR?
[7] **A:** I don't know exactly.
[8] **Q:** Was it before you resigned in July of 2005?
[9] **A:** Yes.
[10] **Q:** And was someone else hired as a contract
[11] recruiter?
[12] **A:** Yes.
[13] **Q:** And what, if any, complaints did you
[14] receive from MBCR hiring managers about Alison
[15] Leaton prior to the termination of her contract?
[16] **A:** None to my knowledge.
[17] **Q:** Do you know why or have an understanding of
[18] the reason why she ceased working as a contractor
[19] for MBCR?
[20] **A:** Her contract — and I don't have the exact
[21] dates — but the length of the agreement, as I had
[22] previously advised, we expected this whole process
[23] to be temporary, short term, but we did want a
[24] commitment from the person in the position that they

Page 123

[1] wouldn't leave us two or three weeks into the
[2] project, so we had an understanding of some number
[3] of months, three, four, six, some number that she
[4] would agree to stay.
[5] So as that began to wind down, she said,
[6] "Look, I have to look for another job." We said,
[7] "Great. We understand that." So it was kind of a
[8] combination of she was very close with interviews
[9] and so on and giving a lot of indication that she
[10] was imminent to have a job and would give us only,
[11] of course, two weeks notice, which would be great,
[12] but we needed to get another contract recruiter in.
[13] So it ended up that we happened to find a
[14] contract recruiter, and we did a two —
[15] approximately two-week transition with Alison and
[16] the other recruiter. It was very amicable. And
[17] then Alison transitioned out, and the other
[18] recruiter then continued in the contract capacity.
[19] **Q:** Do you know where she went to work after
[20] MBCR?
[21] **A:** Alison?
[22] **Q:** Yes.
[23] **A:** No, I do not.
[24] **Q:** When was the last time you spoke to Alison