# EXHIBIT D

# In The Matter Of:

*Eli Mistovich, Jr.   v.*
*Elizabeth Bowden, et al.*

---

*Stephen Urban, Jr.*
*Vol. 1, September 14, 2005*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA 02110*
*(617) 426-2432*

*Original File URBAN.V1, 64 Pages*
*Min-U-Script® File ID: 3744443595*

**Word Index included with this Min-U-Script®**

Stephen Urban, Jr.
Vol. 1, September 14, 2005
Case 1:04-cv-12340-EFH · Document 15-9 · Filed 10/31/2005 · Page 3 of 13
Eli Mistovich, Jr. v.
Elizabeth Bowden, et al.

Page 4

DIRECT EXAMINATION
BY MR. TEAGUE:

**Q:** Good morning, Mr. Urban. My name is Frank Teague, and I represent Eli Mistovich, the Plaintiff in this case. You're accompanied by counsel, Attorney Rubin. I'll be asking you some questions. Just a couple of ground rules in depositions. I'd appreciate it if you'd let me finish the question before you start your answer. People tend to try to answer before we finish, but the stenographer has to take everything down. And if you answer "yes" or "no," just say "yes" or "no" rather than nodding your head so that the record may reflect your answer. And if you want to take a break at any time, confer with counsel, just so state. Okay?
Would you state your name for the record.
**A:** Stephen Urban, Jr.
**Q:** And what's your home address?
**A:** 25 Townhouse Road, Attleboro, Mass.
**Q:** And how old are you?
**A:** Fifty-two years old.
**Q:** And are you married?
**A:** Yes, I am.
**Q:** Children?

Page 5

**A:** Two.
**Q:** And are you a high school graduate?
**A:** Yes, I am.
**Q:** And any post high school education?
**A:** Rutgers University.
**Q:** And did you graduate from Rutgers?
**A:** No, I didn't.
**Q:** Okay. Now, are you presently employed by the Massachusetts Bay Commuter Railroad Company?
**A:** Yes, I am.
**Q:** I'll refer to that as "MBCR."
**A:** Correct.
**Q:** Okay. And would you describe for the record what is the business of MBCR.
**A:** We operate the commuter rail service in Eastern Massachusetts under contract with the MBTA.
**Q:** And how long has MBCR operated the commuter rail service under the MBTA contract?
**A:** Since July 1st, 2003.
**Q:** And is that the only business of MBCR?
**A:** Yes, it is.
**Q:** And what's your position at MBCR?
**A:** Deputy general manager.
**Q:** And what are the duties of that position?

Page 6

**A:** In that role I serve as the chief operating officer. I'm responsible for the day-to-day operation with district responsibility for the engineering and mechanical departments.
**Q:** And who's your immediate supervisor?
**A:** Kevin Lydon.
**Q:** And what's his position?
**A:** General manager.
**Q:** And how long have you worked for MBCR?
**A:** Since May of 2003.
**Q:** And MBCR, is that a public-owned company, if you know?
**A:** I'm not quite sure when you say "public-owned."
**Q:** Do you know if MBCR is a corporation?
**A:** Yes, it is, but it does not have public-traded stock, if that's what you mean.
**Q:** My inquiry is based on the nature of the entity, just for the record.
**A:** It's a limited liability corporation.
**Q:** Do you know who owns the company?
**A:** It is owned by three separate corporations: Connex North America, which has a 60 percent share; Bombardier has a 20 percent share, and Alternative

Page 7

Concepts has a 20 percent share.
**Q:** And how long have you been deputy general manager?
**A:** Since January of 2004.
**Q:** And what's your position — strike that. Did you work for MBCR prior to January 2004?
**A:** Yes, I did.
**Q:** And what was your position before January of 2004?
**A:** I was the assistant manager of transportation.
**Q:** And did you have any other jobs at MBCR other than the two that you mentioned?
**A:** No, sir.
**Q:** Okay. Now, where did you work immediately before you went to work for MBCR?
**A:** I worked for Amtrak.
**Q:** Okay. And over approximately what time period did you work for Amtrak?
**A:** Since 1976.
**Q:** So from '76 to — 1976 to 2003 you worked for Amtrak?
**A:** That is correct.

Page 12

[1] **A:** Mr. Mistovich served as the interview
[2] officer for hiring track employees.
[3] **Q:** And for the record what are track
[4] employees?
[5] **A:** Those — that class of employees that
[6] install and maintain the track infrastructure.
[7] **Q:** Were you in a supervisory position to Mr.
[8] Mistovich?
[9] **A:** As the deputy general manager, I did have
[10] overall responsibility for the Engineering
[11] Department, but there was a layer between Mr.
[12] Mistovich and myself, which would have been the
[13] chief engineer.
[14] **Q:** And was that Mr. Nevero, Stephen Nevero?
[15] **A:** Yes.
[16] **Q:** So Mr. Nevero would be considered Mr.
[17] Mistovich's immediate supervisor?
[18] **A:** Yes, sir.
[19] **Q:** Other than his work at Amtrak, did you have
[20] any understanding of Mr. Mistovich's employment
[21] background before he came to work for MBCR?
[22] **A:** Well, I knew that he had worked in the
[23] Track Department and was a track supervisor.
[24] **Q:** Do you know how long he had worked for

Page 13

[1] Amtrak?
[2] **A:** Many years but I don't know specifically.
[3] **Q:** Now, when you said MBCR started operating
[4] the commuter rail service for the MBTA in July of
[5] 2003 —
[6] **A:** Yes.
[7] **Q:** — was that pursuant to a bidding process
[8] where a contract was awarded?
[9] **A:** Yes, it was.
[10] **Q:** Okay. Now, when — was MBCR organized
[11] specifically to bid on this MBTA contract?
[12] **A:** Yes, it was.
[13] **Q:** Once the contract was awarded, how did MBCR
[14] go about finding employees to perform the services
[15] that were necessary?
[16] **A:** As part of the operating agreement with the
[17] MBTA, MBCR was required to take all the existing
[18] Amtrak commuter rail employees that were employed as
[19] of I believe it was March 2002. If you were an
[20] active employee on that date, you were guaranteed
[21] employment with MBCR, and that included both union
[22] employees as well as salaried employees up to a
[23] certain level.
[24] **Q:** Okay. Approximately how many employees

Page 14

[1] does MBCR have at the present time, if you know?
[2] **A:** About 1,760.
[3] **Q:** And has that — is that an increase —
[4] well, strike that.
[5] Back in 2003 when — after the contract was
[6] awarded and MBCR first started operating, do you
[7] know how many employees they started with?
[8] **A:** It was over 1,600, and subsequently we've
[9] hired more than 100 new employees.
[10] **Q:** Okay. So if my understanding is correct,
[11] pursuant to that agreement MBCR took on all the
[12] Amtrak employees?
[13] **A:** Yes.
[14] **Q:** Do you know if there was any reviewing
[15] process by MBCR going over each employee's records?
[16] **A:** Not to the extent that an MBCR-hired
[17] employee is subjected to today. We took over the
[18] workforce virtually intact.
[19] **Q:** Okay. So there was no individual review of
[20] each employee, I take it?
[21] **A:** No, that is a correct statement.
[22] **Q:** Did MBCR have access to the employee's
[23] personnel files at Amtrak?
[24] **A:** The only information that was conveyed from

Page 15

[1] Amtrak was original date of hire, the basic
[2] personnel information such as age and current
[3] address, dependent status. The discipline records
[4] that were accrued under Amtrak did not come over
[5] unless it involved anything that was federally
[6] mandated under the Federal Railroad Administration
[7] or incidents involving drugs and alcohol.
[8] **Q:** Were any background checks done on the
[9] individual employees; do you know?
[10] **A:** Not those that came over.
[11] **Q:** Okay. Did the — how about the salary and
[12] the benefits of employees, did they change at all in
[13] that transition?
[14] **A:** Yes, they did.
[15] **Q:** And how did they change?
[16] **A:** For the unionized employees there was a
[17] five-year negotiated labor agreement, and for the
[18] salaried employees they all received a five percent
[19] across-the-board wage increase.
[20] **Q:** Was Mr. Mistovich as — I believe you said
[21] his title was assistant track engineer?
[22] **A:** Well, I said I wasn't sure, but I believed
[23] it was assistant division engineer, Track.
[24] **Q:** Was he considered management?

Eli Mistovich, Jr. Case 1:04-cv-12340-EFH   Document 15-9   Filed 10/31/2005   Page 5 of 13
Elizabeth Bowden, et al.
Stephen Urban, Jr.
Vol. 1, September 14, 2005

Page 24

[1] **Q:** And was that an MBCR employee?
[2] **A:** Yes, it was.
[3] **Q:** And did you have any discussions with Mr.
[4] Mistovich about that situation?
[5] **A:** We — I talked to a lot of people about
[6] that situation, and I'm sure that Mr. Mistovich was
[7] present during a lot of these discussions.
[8] **Q:** Do you recall the subject coming up that
[9] one of the problems or one of the factors that
[10] contributed to the death of that employee was the
[11] fact that they, MBCR, was shorthanded with track
[12] people?
[13] **A:** That was an allegation that was made.
[14] **Q:** Do you recall who made the allegation?
[15] **A:** No, I don't.
[16] **Q:** Do you ever remember being at a meeting
[17] with Mr. Mistovich and Mr. Lydon and, perhaps, other
[18] people where Mr. Mistovich informed Mr. Lydon that
[19] he thought that was the reason for the death?
[20] **A:** I don't remember those specific — that
[21] specific allegation being — coming from Mr.
[22] Mistovich to Mr. Lydon. This was a very emotional
[23] time. The loss of an employee is for us a — it's a
[24] tragedy, and it's understandable that emotions run

Page 25

[1] very high when that happens particularly in the
[2] department that it happens in. So it's very
[3] possible that statement that you referred to was
[4] made. I don't remember it being specifically made,
[5] but it's very plausible.
[6] **Q:** Okay. At any rate at some point in
[7] December of 2003 there was a decision to hire new
[8] track people, correct?
[9] **A:** Yes.
[10] **Q:** Did you participate in that decision-making
[11] process?
[12] **A:** Not in December of 2003.
[13] **Q:** Okay. How about prior to that?
[14] **A:** No, it would not have been my
[15] responsibility.
[16] **Q:** Okay. Do you know how many new track
[17] employees were approved to be hired in this time
[18] period?
[19] **A:** I don't know the specific number.
[20] **Q:** Now, in Exhibit 1, which you hadn't seen
[21] before, Mr. Mistovich had requested 30 new employees
[22] or 37 new employees. Do you recall that there was
[23] an approval of that many new employees?
[24] **A:** I don't believe that 37 would have been

Page 26

[1] approved.
[2] **Q:** Was it less than ten, if you recall?
[3] **A:** I don't know the number that was approved.
[4] **Q:** At any rate there were new employees hired
[5] in the Track Department, correct, after, let's say,
[6] in the first three months of 2004?
[7] **A:** We were in the process of hiring, yes.
[8] **Q:** Do you know how many were hired?
[9] **A:** I don't know the specific number.
[10] **Q:** Okay. Was it Ms. Leaton's function to
[11] screen the candidates who would be interviewing for
[12] hiring?
[13] **A:** Yes.
[14] **Q:** Do you know whether in this time period Mr.
[15] Mistovich provided any resumes of prospective
[16] candidates to Ms. Leaton?
[17] **A:** He probably did. I don't know
[18] specifically.
[19] **Q:** I'm only asking you your personal —
[20] **MS. RUBIN:** Yes, you shouldn't guess. You
[21] just should...
[22] **A:** I don't know specifically.
[23] **Q:** You may have an understanding based on
[24] something you've seen in the case, but my question

Page 27

[1] is what you knew around the time, if you had
[2] knowledge.
[3] **A:** I don't know specifically that he provided
[4] any.
[5] **Q:** Okay. Is it fair to say you don't know
[6] where the resumes came from that were reviewed for
[7] hiring back in this time period?
[8] **A:** That's fair to say.
[9] **Q:** Okay. Now, let me direct your attention to
[10] March 26th, 2004. Do you recall attending a meeting
[11] with Mr. Mistovich along with Elizabeth Bowden and
[12] Mr. Nevero?
[13] **A:** Yes, I do.
[14] **Q:** And do you recall who requested that you
[15] attend the meeting?
[16] **A:** The general manager.
[17] **Q:** Is that Mr. Lydon?
[18] **A:** Yes.
[19] **Q:** And do you remember what he said to you?
[20] **A:** There was an allegation that had been made
[21] about some questions in hiring practices and that a
[22] meeting was being held to investigate this
[23] allegation; and as Mr. Lydon's deputy and a senior
[24] officer of the company, he asked me to attend.

Page 28

[1]  Q: Okay. And the other people at the meeting
[2] were Elizabeth Bowden and Stephen Nevero from MBCR
[3] besides Mr. Mistovich, correct?
[4]  A: That is correct.
[5]  Q: And do you know how they came to be present
[6] at the meeting?
[7]  A: Well, Liz Bowden was the head of HR and
[8] Steve Nevero was the chief engineer. So you had the
[9] department head as well as the head of HR there.
[10]  Q: Did you have any conversations with
[11] Elizabeth Bowden prior to the meeting about the
[12] subject matter of the meeting?
[13]  A: Only that there was an allegation of an
[14] infraction of our hiring practices, our hiring
[15] policies.
[16]  Q: Okay. You did have a conversation with
[17] her?
[18]  A: (Nods head)
[19]  Q: You have to say "yes."
[20]  A: Yes.
[21]  Q: Was this by telephone or face to face?
[22]  A: This was when I was meeting with the
[23] general manager, Steve Nevero and Liz Bowden prior
[24] to the 26th when this meeting was going to be

Page 29

[1] scheduled.
[2]  Q: So there was a meeting with Mr. Lydon
[3] attended by you, Ms. Bowden and Mr. Nevero?
[4]  A: Correct.
[5]  Q: And he assigned you to conduct this
[6] investigation; is that —
[7]  A: To be a party to the investigation.
[8]  Q: Do you recall any conversation at the
[9] meeting?
[10]  A: Other than it was that we were — it was
[11] alleged that prospective candidates were being
[12] excluded from the hiring pool based on where they
[13] lived, and that's what we were to determine, if
[14] there was any truth to that allegation.
[15]  Q: Do you remember who made that allegation?
[16]  A: The allegation was attributed to Ms.
[17] Leaton.
[18]  Q: And did you receive any information as to
[19] what the basis of the allegation was?
[20]  MS. RUBIN: Objection. You mean prior to
[21] the meeting with —
[22]  MR. TEAGUE: Yes.
[23]  A: No.
[24]  Q: And "at the meeting," I'm talking about the

Page 30

[1] initial meeting between you and Kevin Lydon where
[2] Mr. Mistovich was not present.
[3]  A: At that meeting that's where the allegation
[4] was presented.
[5]  Q: Do you remember about when that meeting
[6] occurred?
[7]  A: Not more than a day or two before the March
[8] 26th meeting.
[9]  Q: Were you shown any documents at this
[10] meeting with Mr. Lydon?
[11]  A: No.
[12]  Q: And prior to the March 26th meeting, were
[13] you shown any documents?
[14]  A: No.
[15]  Q: And prior to the March 26th meeting, did
[16] you talk to Mr. Mistovich about the purpose of the
[17] meeting?
[18]  A: No.
[19]  Q: Do you know if Ms. Bowden talked to Mr.
[20] Mistovich or provided any information to him about
[21] the reason for the meeting?
[22]  A: I have no knowledge of that.
[23]  Q: Okay. How about Mr. Nevero?
[24]  A: Again, I don't know if he did or he didn't.

Page 31

[1]  Q: Did you talk to Alison Leaton before the
[2] meeting?
[3]  A: No.
[4]  Q: Do you recall in your meeting with Mr.
[5] Lydon anyone suggesting that Mr. Mistovich be
[6] informed of the allegations prior to the meeting on
[7] March 26th?
[8]  A: I don't remember if that was discussed.
[9]  Q: Before this initial meeting with Mr. Lydon
[10] and Mr. Nevero and Ms. Bowden, were you aware of any
[11] criticism of MBCR from government officials for
[12] failure to hire minorities?
[13]  A: Not prior to this meeting, no.
[14]  Q: Now, where did the meeting take place?
[15]  MS. RUBIN: Which meeting?
[16]  Q: I'm sorry. Let me go back —
[17]  MR. TEAGUE: You're correct.
[18]  Q: — let me direct your attention to the
[19] March 26th meeting. This is the one that Mr.
[20] Mistovich was present. Where did it take place?
[21]  A: 32 Cobble Hill Road, Somerville.
[22]  Q: Is that the MBCR main office?
[23]  A: That's an engineering office.
[24]  Q: And what time of the day did the meeting

Page 32

[1] occur?
[2] **A:** Late in the afternoon.
[3] **Q:** And did you take any notes of the meeting?
[4] **A:** No, I did not.
[5] **Q:** Did you ever make a written summary of the
[6] meeting?
[7] **A:** I did.
[8] **Q:** And who was that addressed to?
[9] **A:** Our corporate counsel.
[10] **Q:** Let me ask you sitting here what you recall
[11] being said at the meeting, that is, who said what at
[12] the meeting. You don't have to use the exact words,
[13] but your best recollection of the substance of what
[14] was said.
[15] **A:** The meeting was conducted by Liz Bowden.
[16] She went over our equal opportunity policy and then
[17] asked if candidates were excluded from the hiring
[18] pool because of where they lived, and not based on
[19] their qualifications, but solely based on where they
[20] came from, in particular one candidate. Mr.
[21] Mistovich in a moment of candor said that that was
[22] true, and that he had had problems with these people
[23] in the past, implying that they were — that from
[24] where they came from, they were most likely minority

Page 33

[1] employees or minority candidates, and that he had
[2] files and records that he had difficulty with these
[3] people once they were hired.
[4] **Q:** He said that at the meeting?
[5] **A:** Yes, he did.
[6] **Q:** Did — was there a discussion of a
[7] particular candidate?
[8] **A:** There was a candidate who had — let me
[9] just back up for a second. A track employee, like
[10] many railroad employees, the basic requirement is
[11] that they have a high school education, and they're
[12] entry-level positions. If they bring a little more
[13] to the hiring officer, that would give them a leg
[14] up, all things being equal, and that would be
[15] something like some specialized training: CDLs,
[16] hoisting licenses, some welding skills. That gives
[17] them an advantage over anyone else, again, all
[18] things being equal.
[19] This particular candidate did have a CDL,
[20] which is useful to us because we have some fairly
[21] large trucks that have to be driven, and this
[22] candidate had been excluded from the interview pool.
[23] **Q:** In fact, the candidate had been hired; is
[24] that correct?

Page 34

[1] **A:** The candidate ultimately was hired.
[2] **Q:** Okay.
[3] **A:** But only at the insistence of the HR
[4] Department.
[5] **Q:** And do you remember the candidate's name?
[6] **A:** (Pause)
[7] **Q:** Well, did you look at the resume at the
[8] time?
[9] **A:** No, I didn't.
[10] **Q:** Okay. I'm just going to show you a copy of
[11] a document.
[12] **A:** (Reviewing document)
[13] **Q:** And was the candidate Marvin F. Morgan?
[14] **A:** I believe it was, yes.
[15] **Q:** So if I understand your testimony
[16] correctly, Mr. Mistovich at the meeting said that he
[17] was aware that Mr. Morgan was a minority candidate
[18] because of where he was from?
[19] **A:** Mr. Mistovich never said that.
[20] **Q:** Oh, okay.
[21] **A:** What he did was, he implied that he was a
[22] minority candidate because of where he was from.
[23] **Q:** Let me go back. I just want to get your
[24] recollection of what you recall Mr. Mistovich

Page 35

[1] saying, not maybe what you concluded from that or
[2] what you implied from that. What do you remember
[3] Mr. Mistovich saying actually?
[4] **A:** Basically that he didn't want to hire
[5] people from these areas because he had problems with
[6] them in the past.
[7] **Q:** He said words to that effect?
[8] **A:** To that effect.
[9] **MR. TEAGUE:** Okay. Why don't we mark this.
[10] This is my only — I only have one extra copy.
[11] **Q:** You can hang on to that.
[12] **MR. TEAGUE:** Why don't we mark the Morgan
[13] resume as Exhibit 2 for identification.
[14] (Document marked as Urban
[15] Exhibit 2 for identification)
[16] **Q:** Do you have any information as to how many
[17] people Mr. Mistovich hired during his employment at
[18] Amtrak?
[19] **A:** No, I don't.
[20] **Q:** Do you know whether or not he hired people
[21] at Amtrak from Dorchester?
[22] **A:** I don't know that.
[23] **Q:** Do you recall what else anyone said at this
[24] meeting?

Page 36

[1] A: The questions continued by Ms. Bowden, and
[2] Mr. Mistovich then only answered in one way, and
[3] that was "I try to hire the best, most qualified
[4] employee" virtually to every question until such a
[5] point where he stopped answering questions
[6] altogether; and Ms. Bowden made a statement to the
[7] effect of, you know, "By not answering we can only
[8] assume that this is true." There was no response to
[9] that. Ms. Bowden also said that Mr. Mistovich was
[10] stonewalling, in which Mr. Mistovich replied in
[11] referencing some benefits issues that he had with
[12] the HR Department. But it was clear to me that his
[13] initial response was in a moment of candor. In
[14] realizing what he had said, he then went to this, "I
[15] only hire the best and most qualified."
[16] Q: Did Mr. Mistovich ever say that he did not
[17] hire people because they were minorities?
[18] MS. RUBIN: Objection.
[19] Q: You may answer the question.
[20] MS. RUBIN: Right. I'm not telling you not
[21] to answer.
[22] THE WITNESS: Oh.
[23] A: No, he never said that.
[24] Q: Okay. Before or at the meeting, did anyone

Page 37

[1] make any inquiry into Mr. Mistovich's health?
[2] A: No.
[3] Q: Was any inquiry made as to whether he was
[4] taking any medication which might affect his mental
[5] condition?
[6] A: No.
[7] Q: Now, at the meeting — this was on March
[8] 26th, correct?
[9] A: Yes.
[10] Q: And the incident that arose if I understand
[11] correctly was an allegation that Ms. Leaton made
[12] that during the selection process Mr. Mistovich had
[13] indicated reluctance to hire people from these
[14] areas, referring to Mr. Morgan?
[15] A: Yes.
[16] Q: Do you know when the incident between Ms.
[17] Leaton and Mr. Mistovich occurred?
[18] A: No, I don't.
[19] Q: Do you know how long before March 26th it
[20] occurred?
[21] A: No, I don't know.
[22] Q: Do you know in that hiring process — well,
[23] let me go back a second. Was it your understanding
[24] that it was Ms. Leaton and Mr. Mistovich that were

Page 38

[1] involved in selecting resumes of candidates to be
[2] interviewed?
[3] A: Yes.
[4] Q: And do you know how many resumes Mr.
[5] Mistovich and Ms. Leaton reviewed?
[6] A: No, I don't.
[7] Q: Do you know how many candidates they
[8] interviewed for the job?
[9] A: No, I don't.
[10] Q: Do you know if — well, let me go back a
[11] step. Let me show you a document that was produced
[12] by your counsel in this proceeding. It's —
[13] MR. TEAGUE: I only have one extra copy.
[14] It's Bates stamped No. 1.
[15] Q: It appears to be e-mails between Elizabeth
[16] Bowden and Alison Leaton, and I ask you if you've
[17] seen this before.
[18] A: (Reviewing document) I have not seen this
[19] before.
[20] Q: Okay. Calling your attention to the —
[21] there's an e-mail, the top e-mail, from Alison
[22] Leaton to Liz Bowden dated Thursday, March 11, 2004,
[23] and that refers to a conversation that — in the
[24] first paragraph — Ms. Leaton had with Eli, which is

Page 39

[1] referred to as "late last week."
[2] A: Okay.
[3] Q: I assume would put it around March 4th or
[4] March 5th, the conversation.
[5] MS. RUBIN: Objection. You're asking him
[6] whether — he doesn't know.
[7] MR. TEAGUE: I haven't asked him a
[8] question. If you'll allow me ask my question —
[9] MS. RUBIN: Okay. Your voice went up, so
[10] it sounded like you were asking a question.
[11] MR. TEAGUE: I haven't asked it yet; so if
[12] you'll allow me to do that.
[13] Q: Looking at that does that refresh your
[14] recollection or understanding in any way of how long
[15] before the March 26th meeting the incident with Ms.
[16] Leaton and Mr. Mistovich occurred?
[17] A: The only knowledge I have is that it
[18] happened a few weeks prior. That's all.
[19] Q: So you knew it was maybe two or three weeks
[20] prior?
[21] A: It's very possible.
[22] MS. RUBIN: Objection. Do you know? You
[23] answered "it's possible."
[24] A: I have no direct knowledge of when the

Eli Mistovich, Jr. v.
Elizabeth Bowden, et al.
Case 1:04-cv-12340-EFH    Document 15-9    Filed 10/31/2005    Page 9 of 13
Stephen Urban, Jr.
Vol. 1, September 14, 2005

Page 40

[1] interviews took place or when this — when the
[2] resumes were screened or anything that led up to the
[3] March 26th meeting, what the time frame was.
[4] **Q:** Did it — when the meeting of March 26th
[5] occurred, did Ms. Bowden make inquiry as to —
[6] specifically about Mr. Morgan?
[7] **A:** I think he was referred to as a candidate
[8] for employment.
[9] **Q:** Did it occur to you that Mr. Mistovich was
[10] having trouble recalling exactly what Ms. Bowden was
[11] talking about?
[12] **A:** No.
[13] **Q:** Did he recall the Morgan resume?
[14] **A:** Yes. Well, he recalled the candidate. I
[15] don't know specifically the resume, but...
[16] **Q:** Okay. Do you recall Mr. Mistovich making a
[17] comment to the effect of words something like, "It
[18] sounds like you've already made up your mind"?
[19] **A:** I don't recall that specific comment.
[20] **Q:** Did you consider that a fair way of
[21] approaching an allegation like this to Mr.
[22] Mistovich?
[23] **MS. RUBIN:** Objection.
[24] **A:** Yes, I did.

Page 41

[1] **Q:** What happened next after the meeting?
[2] **A:** There was —
[3] **Q:** Well, let me be more specific. The meeting
[4] was on March 26th?
[5] **A:** Yes.
[6] **Q:** I believe it was a Thursday? Do you recall
[7] the day of the week?
[8] **A:** I don't recall what day of the week it was.
[9] **Q:** So he was terminated on March 30th; do you
[10] recall that?
[11] **A:** Yes.
[12] **Q:** Between the March 26th meeting and March
[13] 30th, did you have conversations with Ms. Bowden or
[14] Mr. Nevero concerning the meeting?
[15] **A:** There was a conversation with Ms. Bowden,
[16] Mr. Nevero, Mr. Lydon and our counsel about the
[17] results of the interview process with Mr. Mistovich.
[18] **MS. RUBIN:** I'm just going to interrupt for
[19] a second here. This is a conversation that occurred
[20] in the presence of Rich Davey, who was general
[21] counsel for MassBay Commuter Rail. I'm going to
[22] allow him to testify about what was said during that
[23] meeting just as long as you are in agreement that
[24] that does not waive the attorney/client privilege as

Page 42

[1] to other communications that may have occurred in
[2] other settings.
[3] **MR. TEAGUE:** Okay. That's so agreed.
[4] **A:** We discussed what our findings were of the
[5] interview with Mr. Mistovich, and that's where —
[6] that's where it was determined Mr. Mistovich would
[7] be given the opportunity to either resign or we
[8] would terminate him.
[9] **Q:** Do you remember when this meeting with
[10] general counsel and Mr. Lydon took place?
[11] **A:** A few days after. It may have been the
[12] next day or the day after that.
[13] **Q:** And before the meeting had you had any
[14] conversations with Mr. Lydon or Mr. Nevero?
[15] **A:** No, I had not.
[16] **Q:** And how long did the meeting with Mr. Lydon
[17] and general counsel take?
[18] **A:** I don't remember. An hour.
[19] **MS. RUBIN:** Objection. Don't guess if you
[20] don't know.
[21] **A:** I don't know.
[22] **Q:** If you don't remember —
[23] **A:** I don't know.
[24] **Q:** Okay. Do you remember any specific

Page 43

[1] comments that were said at the meeting?
[2] **A:** The issue was discussed, the behaviors were
[3] discussed, how it impacted what our policies were
[4] and what course of action we should take, and those
[5] were the issues that were discussed at that meeting.
[6] **Q:** Did anyone make any comments that some
[7] action short of termination should be made?
[8] **A:** Yes.
[9] **Q:** And who made that — or who made those
[10] comments, if any?
[11] **A:** Mr. Nevero.
[12] **Q:** And what, if anything, did he say?
[13] **A:** He recommended or suggested that Mr.
[14] Mistovich be demoted and not be allowed to handle
[15] any hiring responsibilities.
[16] **Q:** And who was it that made the actual
[17] decision to terminate?
[18] **A:** That would be the responsibility of the
[19] general manager.
[20] **Q:** What, if anything, did you say at this
[21] meeting?
[22] **A:** I listened to the arguments on all sides,
[23] and I felt that based on what I knew, what the
[24] position of MBCR is or was, that the termination or

Page 48

[1] **Q:** Do you know how long Mr. Mistovich had
[2] worked for Amtrak or other railroad employers —
[3] **A:** No.
[4] **Q:** — prior to the termination?
[5] **A:** No, I don't.
[6] **Q:** Did you ever receive any information of
[7] that regard?
[8] **A:** No.
[9] **Q:** You were aware that he had worked at
[10] Amtrak's commuter rail service for what, about 1987?
[11] **A:** Yes.
[12] **Q:** Okay. Did anyone from MBCR review his
[13] personnel file there to determine his work history?
[14] **MS. RUBIN:** Objection. I mean, he's
[15] already testified that he didn't have the Amtrak
[16] personnel file.
[17] **MR. TEAGUE:** I'm not asking Amtrak.
[18] **MS. RUBIN:** Oh.
[19] **Q:** I'm asking if you reviewed the MBCR
[20] personnel file to determine how long he'd worked in
[21] the railroad system.
[22] **A:** I have no knowledge of that.
[23] **Q:** You didn't have those files with you at the
[24] meeting in which the termination decision was made;

Page 49

[1] is that correct?
[2] **A:** The files pertaining to his previous
[3] employment?
[4] **Q:** Yes.
[5] **A:** No.
[6] **Q:** Prior to the March 30th meeting, did you
[7] recall discussing anything about Mr. Mistovich's
[8] family situation?
[9] **A:** No.
[10] **Q:** Did anyone mention how many children he had
[11] or where he lived or anything like that?
[12] **A:** No.
[13] **Q:** Or prior to the termination decision, did
[14] anyone say anything favorable about Mr. Mistovich?
[15] **MS. RUBIN:** At any time in his employment
[16] or immediately at the termination?
[17] **MR. TEAGUE:** No.
[18] **Q:** I'm talking about the termination meeting,
[19] the decision between the March 26th meeting with Mr.
[20] Mistovich and then there was a second meeting with
[21] Mr. Lydon and counsel at which a decision to
[22] terminate was made. Any time prior to that decision
[23] to terminate, do you recall anyone making any
[24] favorable comments about Mr. Mistovich?

Page 50

[1] **A:** Other than Mr. Nevero stating that he would
[2] have — that he provided value to the organization,
[3] and that he would have liked to have seen him
[4] demoted and restricted from the hiring process.
[5] Other than that, no.
[6] **Q:** The termination decision was based solely
[7] on what — the conversation at that — as far as you
[8] were concerned, at that March 26th meeting, correct?
[9] **A:** I don't quite understand your question.
[10] **Q:** The decision to terminate Mr. Mistovich was
[11] based solely on the subject matter of the March 26th
[12] meeting, that would be Ms. Leaton's accusation and
[13] then your meeting with Mr. Mistovich?
[14] **A:** That is correct.
[15] **Q:** There were no other factors that anyone —
[16] **A:** No.
[17] **Q:** — brought to your attention?
[18] **A:** No, sir.
[19] **Q:** Now, after you told Mr. Mistovich his
[20] options to resign or be terminated, and he indicated
[21] that he would not resign; is that correct?
[22] **A:** That's correct.
[23] **Q:** Okay. And then did you personally — what
[24] happened next that you recall?

Page 51

[1] **A:** After he took the option of termination, I
[2] walked with him to his office to get his
[3] company-issued material. We had arranged for a
[4] private car service to take him home, because he had
[5] use of a company vehicle at that point, and helped
[6] him gather up his personal belongings and load them
[7] in the vehicle we had provided to bring him home.
[8] **Q:** And was this in the view of other employees
[9] at the facility?
[10] **A:** The — well, his office, of course, is a
[11] closed-in office. His car was parked outside in the
[12] parking lot. It's very possible that it could have
[13] been, yes.
[14] **Q:** Do you think it was embarrassing or do you
[15] consider it embarrassing for him to have been
[16] terminated in that fashion, walked out of the
[17] office?
[18] **MS. RUBIN:** Objection.
[19] **A:** It was a termination. That's all I have to
[20] say.
[21] **Q:** Okay. How did Mr. Mistovich appear to take
[22] the decision?
[23] **A:** He was angry.
[24] **Q:** Did he say anything to you after the

Page 52

[1] meeting?
[2]   A: We spent quite a bit of time together after
[3] that in gathering up all his stuff and the stuff
[4] that was in his truck. We probably spent 45 minutes
[5] to an hour —
[6]   Q: Uh-huh.
[7]   A: — you know, gathering up his personal
[8] belongings and loading them into the other car. He
[9] was in shock that this had happened.
[10]   MS. RUBIN: Again, I just want to
[11] interrupt. You should only talk about what you
[12] observed, what — not put your own —
[13]   MR. TEAGUE: He can give — if he appeared
[14] to be in shock —
[15]   A: He was angry. He was angry.
[16]   Q: Did he appear to be shocked by the
[17] decision?
[18]   A: He was.
[19]   Q: Do you remember anything he said?
[20]   A: Other than he couldn't believe that this
[21] had happened to him.
[22]   Q: And did you say anything —
[23]   A: No.
[24]   Q: — in this conversation? I'm going to show

Page 53

[1] you a document which your client or your counsel
[2] provided in the case or which actually MBCR
[3] provided, Bates stamped No. 18, and it's called
[4] "MBCR Training Department"; and under the name "Eli
[5] Mistovich," it appears to have various training
[6] courses. Have you ever seen this document before?
[7]   A: Not this specific one, no.
[8]   Q: Okay. Do you know what it is?
[9]   A: Appears to be a record of training.
[10]   Q: Okay. If you look down in the record, it
[11] appears to show training going back to at least
[12] 1996. "June 5th, 1996," is the first entry, which
[13] is when Mr. Mistovich worked at Amtrak, correct?
[14]   A: Yes.
[15]   Q: So this would be a summary of his training
[16] at Amtrak, and then the bottom entry seems to
[17] indicate training at MBCR?
[18]   A: Yes.
[19]   Q: Do you know who assembled this document?
[20]   A: No.
[21]   Q: If you look about — at the halfway down
[22] there's an entry, "May 1st, 2000." It says
[23] "Diversity." It indicates there was a 16-hour
[24] training program provided to Mr. Mistovich at

Page 54

[1] Amtrak. Did that ever come to your attention
[2] before?
[3]   A: That Mr. Mistovich had attended this
[4] training?
[5]   Q: Or that there was at least a record of it
[6] by MBCR?
[7]   A: No.
[8]   Q: Okay. Then there was — about the fifth
[9] line up from the bottom, there's an entry, "Human
[10] Resources Orientation, October 6, 2003," which is
[11] when he would have worked for MBCR, correct?
[12]   A: Yes.
[13]   Q: And that there was a four-hour orientation
[14] on that?
[15]   A: Yes.
[16]   Q: Do you know what that consisted of?
[17]   A: Yes.
[18]   Q: And what did that consist of?
[19]   A: We did, for all employees regardless of how
[20] long they had been employed in the railroad
[21] industry, MBCR did an eight-hour course on MBCR
[22] values, goals, policies, procedures, who we were,
[23] where we were going, and what we expected of our
[24] employees.

Page 55

[1]   Q: And was the diversity policy of MBCR
[2] discussed at that —
[3]   A: Yes.
[4]   Q: — meeting? Do you recall anyone prior to
[5] Mr. Mistovich's termination discussing the effect
[6] that a termination would have on his railroad
[7] retirement benefits?
[8]   A: I don't believe that was discussed.
[9]   Q: When you — were you aware of Mr.
[10] Mistovich's educational background?
[11]   A: No, I wasn't.
[12]   Q: Do you have any understanding of whether he
[13] had an engineering degree?
[14]   A: I don't know.
[15]   Q: Let me go back to your meeting of March
[16] 26th when — if I recall correctly, you testified
[17] that Mr. Mistovich made comments about — I'm
[18] paraphrasing what you said — about the location or
[19] the place a person lived indicated on the resume
[20] would make — would be some indication to him he
[21] would have difficulties with the person?
[22]   A: Yes.
[23]   Q: And that you concluded that that was an
[24] indication of some kind of racial bias, I take it?

Eli Mistovich, Jr. v.
Elizabeth Bowden, et al.
Case 1:04-cv-12340-EFH   Document 15-9   Filed 10/31/2005   Page 12 of 13
Stephen Urban
Vol. 1, September 14, 20

Page 56

[1] A: Yes.
[2] Q: Did you consider that to be a strange
[3] subject for someone of Mr. Mistovich's background to
[4] make?
[5] MS. RUBIN: Objection.
[6] A: I actually thought it was strange to be
[7] made in this day and age particularly given that the
[8] history of railroad hiring and the amount of
[9] training that we had gone through. If I may?
[10] Q: Sure.
[11] A: Amtrak as well as the MBTA had been under
[12] years of pressure because of discriminatory hiring
[13] practices. Amtrak was served with a class action
[14] suit by minority candidates particularly in the
[15] Track Department because they were excluded from
[16] positions. The training that we went through as
[17] Amtrak officers was very intensive and fairly
[18] regular into how we were supposed to behave in
[19] compliance with the federal law about hiring.
[20]     So to answer your question, given the
[21] training that we had had, it was. That anyone in
[22] this day and age would even think in those terms is
[23] strange.
[24] Q: And at Amtrak did you have any hiring

Page 57

[1] responsibilities?
[2] A: Yes, I did.
[3] Q: And, in fact, do you receive performance
[4] evaluations —
[5] A: Yes, I did.
[6] Q: — working at Amtrak, did you not?
[7] A: Yes.
[8] Q: In your performance evaluation was your
[9] diversity in hiring one of the categories in which
[10] you were evaluated?
[11] A: Yes, absolutely. Every manager had that.
[12] Q: So that was a very important subject at
[13] Amtrak?
[14] A: Yes, it was.
[15] Q: So would it be reasonable to infer that Mr.
[16] Mistovich had the same experience at Amtrak that you
[17] had?
[18] A: Yes.
[19] MS. RUBIN: Objection.
[20] THE WITNESS: Oh, sorry.
[21] Q: Did you say anything to Mr. Mistovich about
[22] how you felt it was strange that he would make this
[23] comment?
[24] A: No.

Page

[1] MR. TEAGUE: Let me just take a moment to
[2] confer with Mr. Mistovich. I'll be back.
[3] MS. RUBIN: Okay.
[4]     (Brief recess)
[5] MR. TEAGUE: I just have a few more
[6] questions, so if you just want to go ahead, I'll be
[7] finished in a couple of minutes.
[8] MS. RUBIN: Okay. Great.
[9]         BY MR. TEAGUE:
[10] Q: Let me go back to a couple of points we
[11] discussed earlier, Mr. Urban. If any — you did
[12] mention early on there were some discussions after
[13] the death of an employee as to — in the snowstorm?
[14] A: Yes.
[15] Q: Do you recall having any discussions or
[16] hearing Mr. Lydon make any remarks to the effect
[17] that he took exception to anything Mr. Mistovich
[18] said in connection with that incident?
[19] A: I don't recall anything like that.
[20] Q: Now, between the July of '03 and the
[21] present, I believe you testified that MBCR has hired
[22] well over 100 new employees, correct?
[23] A: Yes.
[24] Q: Have you had any complaints from any

Page 59

[1] government agency about failing to hire a sufficient
[2] number of minorities?
[3] A: There is an ongoing issue with Councilman
[4] Turner.
[5] Q: Is that a Boston City Councilor?
[6] A: Boston City Councilor.
[7] Q: Would you describe what that issue is.
[8] A: Well, he thinks we should turn around our
[9] entire workforce. It is a political issue with him,
[10] it has been since the Amtrak days, and how it
[11] relates to the MBTA hiring. That's an ongoing issue
[12] with Councilman Turner. We have not been cited by
[13] any federal agencies. There have been no — if
[14] that's what you mean?
[15] Q: Yes.
[16] A: No.
[17] Q: How about the Massachusetts Commission
[18] Against Discrimination?
[19] A: There are employees that bring cases before
[20] MBCR at the MCAD, yes, there is.
[21] Q: Have any cases been brought for
[22] discrimination in hiring as opposed to termination?
[23] A: I don't know specifically.
[24] Q: Okay. Do you know about how many cases

Exhibit E