# EXHIBIT E

# In The Matter Of:

*Eli Mistovich, Jr.   v.*
*Elizabeth Bowden, et al.*

---

*Alison Leaton*
*Vol. 1, September 29, 2005*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA  02110*
*(617) 426-2432*

*Original File LEATON.V1, 117 Pages*
*Min-U-Script® File ID: 1940373277*

## Word Index included with this Min-U-Script®

Page 5

[1] A: No.
[2] Q: And when was the last time you were
[3] employed?
[4] A: June.
[5] Q: June of 2005?
[6] A: Yes.
[7] Q: Okay. And who were you employed by then?
[8] A: Spire.
[9] Q: Is that a company?
[10] A: Yes.
[11] Q: And how do you spell that?
[12] A: S-p-i-r-e.
[13] Q: And where is Spire located?
[14] A: Dorchester.
[15] Q: And what is the business of the Spire?
[16] A: Marketing and printing.
[17] Q: And how long did you work for Spire before
[18] June of 2005?
[19] A: Ten months.
[20] Q: And what was your position?
[21] A: Human Resources manager.
[22] Q: And were you an employee of Spire?
[23] A: Yes.
[24] Q: And why did you leave Spire?

Page 6

[1] A: Small family-owned business.
[2] Q: Well —
[3] A: I couldn't do my job because of that.
[4] Q: Could you explain that.
[5] A: I was the only member of the leadership
[6] team that wasn't related.
[7] Q: Okay. Were you asked to leave?
[8] A: No.
[9] Q: Did you resign voluntarily?
[10] A: Yes.
[11] Q: And before — prior to going to work for
[12] Spire, what was your next previous employment?
[13] A: Boston Financial Data Services.
[14] Q: And what did you do at Boston Financial
[15] Data Services?
[16] A: I was a recruiter.
[17] Q: And how long did you work for Boston
[18] Financial Data Services?
[19] A: Approximately two months.
[20] Q: And would that have been between June and
[21] August of two thousand — or between June and August
[22] of 2004?
[23] A: Approximately, yes.
[24] Q: Why did you leave Boston Financial

Page 7

[1] Services?
[2] A: It was a contract. I left for Spire.
[3] Q: Okay. Were you a contractor, independent
[4] contractor, for Boston Financial Services?
[5] A: I was working there through Winter,
[6] Wyman — or, excuse me, Pappas & Pappas.
[7] Q: And before Boston Financial where were you
[8] employed?
[9] A: MBCR.
[10] Q: Okay. And you were a contract employee
[11] at — or a contract, an independent contractor, at
[12] MBCR, correct?
[13] A: Yes.
[14] Q: Did you work full time at MBCR? In other
[15] words —
[16] A: Yes.
[17] Q: Okay. What dates were you employed at MBCR
[18] as an independent contractor?
[19] A: Approximately September — I don't remember
[20] the date I started in September of '03 until
[21] sometime in April of '04.
[22] Q: And did you have a particular job
[23] assignment at MBCR?
[24] A: I was a recruiter.

Page 8

[1] Q: Okay. And what were your duties as a
[2] recruiter?
[3] A: To hire and fill open positions.
[4] Q: Did this include both management positions
[5] and the labor force?
[6] A: Yes.
[7] Q: How did you come to work for MBCR?
[8] A: Winter, Wyman referred my resume to them,
[9] and I interviewed with Liz Bowden.
[10] Q: Did you know Liz Bowden before your
[11] interview?
[12] A: No.
[13] Q: I'm going to show you a document that was
[14] produced by — by MBCR, actually, in this case,
[15] Bates stamped 26 through 28.
[16] A: (Reviewing document)
[17] Q: And do you recognize that document, Ms.
[18] Leaton?
[19] A: Yes.
[20] MR. TEAGUE: Off the record.
[21] (Discussion off the record)
[22] Q: And is that a copy of a resume you
[23] submitted to MBCR?
[24] A: It's a copy of a resume that Winter, Wyman

Page 41

[1] for more diversity in the MBCR workforce?
[2] A: Not that I recall.
[3] Q: And how about prior to March of 2004, do
[4] you recall having any discussions with Ms. Bowden on
[5] that subject?
[6] A: No.
[7] Q: Before March of 2004 do you recall
[8] receiving information from Ms. Bowden or any other
[9] MBCR employee about criticism of MBCR for lack of
[10] minorities in its workforce?
[11] A: No.
[12] Q: Prior to March of 2004, did you have any
[13] discussions with members of the diversity committee
[14] concerning the hiring of minorities in the
[15] workforce?
[16] A: Not that I recall.
[17] Q: And prior to March of 2004, had you ever
[18] received any complaints or information about Eli
[19] Mistovich's practice of hiring minorities either
[20] while at Amtrak or MBCR?
[21] A: Not that I recall.
[22] MR. TEAGUE: If I could just have Exhibit 1
[23] back, please. Thanks.
[24] Q: Prior to March of 2004, had you had any

Page 42

[1] discussions with Elizabeth Bowden about remarks that
[2] had been made to her by a Boston City Councilor by
[3] the name of Charles Turner concerning minorities in
[4] MBCR's workforce?
[5] A: No.
[6] Q: Had you ever met with a Boston City
[7] Councilor named Turner?
[8] A: No.
[9] Q: Prior to March of 2004, did any officers or
[10] employees of MBCR inform you that MBCR had been
[11] criticized by the Boston City Councilor named Turner
[12] about its minority hiring practice?
[13] A: Not to my recollection.
[14] Q: After your interviews of November 24th and
[15] 25th and you and Mr. Mistovich had agreed on the
[16] candidates to be hired — I believe you said there
[17] were two?
[18] A: That I recall.
[19] Q: That you recall — how were the job offers
[20] communicated to those individuals?
[21] A: I contacted them by telephone and made the
[22] offer over the phone.
[23] Q: Do you recall if the offers that were made
[24] were accepted?

Page 43

[1] A: Yes.
[2] Q: Okay. And after that was there a need
[3] for — well, strike that. Did the two individuals
[4] that were hired in November of 2003, did that fill
[5] the open requisition?
[6] A: No.
[7] Q: Were there more trackmen needed?
[8] A: Yes.
[9] Q: And do you remember how many more?
[10] A: No.
[11] Q: And — okay. What happened next after you
[12] made these job offers and there were still positions
[13] to be filled that you remember?
[14] A: I don't recall.
[15] Q: Did you have discussion with Mr. Mistovich
[16] about the need for additional interviews?
[17] A: Yes.
[18] Q: Okay. And did you agree that additional
[19] interviews would be conducted?
[20] A: Yes.
[21] Q: Okay. And do you remember that discussion?
[22] A: Somewhat.
[23] Q: Where did it take place?
[24] A: After the interviews on the 24th and -5th

Page 44

[1] of November.
[2] Q: Okay. And it was at the interview place,
[3] that Somerville location?
[4] A: I don't know if it was there or over the
[5] phone at a later date, but approximately around
[6] those dates.
[7] Q: What do you recall being said by you and
[8] him in the conversation?
[9] A: We decided that as he anticipated
[10] additional requisitions being approved after the
[11] first of the year, that we would wait and interview
[12] after the first of the year with any new additional
[13] requisitions approved as well.
[14] Q: Okay. And were additional requisitions
[15] approved after the first of the year?
[16] A: I believe so.
[17] Q: So you remember at that point after the
[18] first of the year about how many trackmen could be
[19] hired through these open requisitions?
[20] A: I don't know.
[21] Q: Was it more than ten, if you remember?
[22] A: No.
[23] Q: Okay. And then — I take it, after the
[24] first of the year you received additional open

Page 53

[1] A: I didn't hear any information back.
[2] Q: Okay. So of the ten people scheduled for
[3] interviews on March — well, of the five people
[4] scheduled on March 4th only two showed for
[5] interviews; is that correct?
[6] A: That's correct.
[7] Q: And on March 5th it appears that all five
[8] showed up; is that correct?
[9] A: That's correct.
[10] Q: At the end of the day on March 5th, what
[11] happened?
[12] A: I don't recall.
[13] Q: Well, did you meet with Mr. Mistovich and
[14] discuss whether to hire any of the individuals
[15] interviewed?
[16] A: Yes.
[17] Q: And do you recall whether a decision was
[18] made?
[19] A: I know we talked about making an offer to
[20] Frank Sarrica, and other than that I don't recall —
[21] Q: Okay.
[22] A: — about these specific candidates.
[23] Q: Was there any discussion on March 5th about
[24] the need to conduct additional interviews?

Page 54

[1] A: Yes.
[2] Q: And what do you recall about that?
[3] A: That we decided we needed to interview
[4] additional candidates based on the outcome of these
[5] interviews.
[6] Q: Okay. Did you make a determination of how
[7] many additional candidates would need to be
[8] interviewed?
[9] A: Not to my recollection.
[10] Q: And at the meeting on March 5th, did you
[11] talk to Mr. Mistovich about what additional
[12] candidates would be interviewed?
[13] A: Yes.
[14] Q: And what do you recall you saying and him
[15] saying?
[16] A: I had resumes of people that I had already
[17] sent him and went back through those resumes and
[18] reviewed each resume with him as to why he didn't
[19] select them.
[20] Q: Okay. And one of those resumes was of a
[21] gentleman named Marvin Morgan; is that correct?
[22] A: That's correct.
[23] Q: And I'm going to show you what we marked as
[24] Exhibit 2 in this proceeding.

Page 55

[1] A: (Reviewing document)
[2] Q: And was he one of the resumes that you
[3] discussed with Mr. Mistovich?
[4] A: Yes.
[5] Q: And what do you recall being said in your
[6] discussion with Mr. Mistovich about Mr. Morgan?
[7] A: I indicated that he had a CDL, which is one
[8] of Eli's preferred requirements/qualifications, he
[9] had a very good work record; and that based on the
[10] people that we interviewed that day, he was more
[11] qualified than many of the people we had interviewed
[12] that day.
[13] Q: And what did Mr. Mistovich say?
[14] A: He said he didn't want to interview him,
[15] and I said, "Why don't you want to interview him?"
[16] Q: And then what did he say?
[17] A: "I haven't had good luck with people like
[18] that."
[19] Q: Okay. And what did you say?
[20] A: I said, "You haven't had good luck with
[21] white people either."
[22] Q: Well, what led you to say that?
[23] A: Based on what he said.
[24] Q: When he said he didn't have good luck with

Page 56

[1] people like that, what did you understand him to
[2] mean?
[3] A: Sorry. Let me back — he asked me — he
[4] said, "I haven't had good luck with people like
[5] that," and I said, "What do you mean by that?" And
[6] he said, "I just haven't had good luck with people
[7] like that." Based on that, I said, "You haven't had
[8] good luck with white people either."
[9] Q: Well, was Mr. Morgan black?
[10] A: I didn't know.
[11] Q: Well, why did you ask why he didn't have
[12] good luck with white people either?
[13] A: Because based on his response to me, I felt
[14] he was making the assumption because of his name and
[15] his address that he must have been black.
[16] Q: You assumed that Mr. Morgan was black
[17] because of his name and address?
[18] A: I did not. I didn't know.
[19] Q: You made the assumption that — the
[20] determination that Mr. Mistovich had made that
[21] assumption?
[22] A: Yes.
[23] Q: What is there about the name "Marvin F.
[24] Morgan, Jr.," that would have led Mr. Mistovich to

Page 57

[1] conclude that he was black?
[2] **A:** It's the address more than anything else.
[3] **Q:** So it was not the name?
[4] **A:** It was the address.
[5] **Q:** Oh, okay. Before you said it was the name.
[6] Did the name have anything to do with suggesting
[7] that he was black?
[8] **A:** I don't recall.
[9] **Q:** The address is 194 Normandy Street,
[10] Dorchester, Massachusetts. What is there about that
[11] address that would lead it — lead you to conclude
[12] that Mr. Mistovich assumed he was black?
[13] **A:** Because it was a predominantly black area
[14] in the city.
[15] **Q:** What is?
[16] **A:** Dorchester.
[17] **Q:** The entire Dorchester neighborhood?
[18] **A:** Yes.
[19] **Q:** Or is it the street "Normandy Street"?
[20] **A:** I don't know where that street is.
[21] **Q:** You have no idea where it's located?
[22] **A:** No.
[23] **Q:** You just thought most people from
[24] Dorchester are black; is that an assumption that you

Page 58

[1] made?
[2] **A:** No.
[3] **Q:** Well, then, I'm a little confused. He's
[4] from Dorchester. Mr. Mistovich said, "I haven't had
[5] good luck with people like that." What is it that
[6] you led you to conclude he was talking about Mr.
[7] Morgan's race?
[8] **A:** Because when I said, "You haven't had good
[9] luck with white people either," his response to me
[10] was, "Well, I've had less" — "I've had more
[11] problems with people like that than with white
[12] people."
[13] **Q:** That's words out of Mr. Mistovich's mouth?
[14] **A:** To the best of my recollection, yes.
[15] **Q:** You're under oath now. That's what you're
[16] saying he said.
[17] **A:** To the best of my recollection, yes.
[18] **Q:** What did you say?
[19] **A:** I told him that it was illegal to
[20] discriminate against candidates based on their race,
[21] and that we needed to interview him. He's as
[22] qualified, and that if he does well on the interview
[23] process and his references pan out, that we should
[24] make him an offer.

Page 59

[1] And I also told him in that same
[2] conversation that I would not make him hire a
[3] minority whom I didn't feel was qualified for the
[4] position or as qualified for the position as someone
[5] who was not a minority, and that if — otherwise, if
[6] they were, I would go to the mat.
[7] **Q:** What did he say?
[8] **A:** He said, "Well," — to the best of my
[9] recollection, he said, "I don't" — "I can't win
[10] this argument. I don't see the point in arguing it.
[11] I'm not getting in a discussion that I'm not going
[12] to win."
[13] **Q:** Well, what was there about his work record
[14] that you thought was good? I mean, he had a CDL —
[15] **A:** He had a CDL and he had almost ten years
[16] with the same company. So he had longevity at one
[17] company and had been consistently employed for a
[18] long period of time.
[19] **Q:** Are you talking about the first, "Jet a Way
[20] Disposal and Recycle"?
[21] **A:** Yes.
[22] **Q:** But it appears that he had left their
[23] employment in 2002; is that correct?
[24] **A:** Correct. According to the document, yes.

Page 60

[1] **Q:** Do you have any information as to why —
[2] what his employment was as of the time of the
[3] interview?
[4] **A:** I don't recall.
[5] **Q:** Do you recall from what source you got Mr.
[6] Morgan's resume?
[7] **A:** By fax.
[8] **Q:** Do you recall if you got it from Mr. Morgan
[9] himself?
[10] **A:** Yes.
[11] **Q:** Did Mr. Mistovich say anything about the
[12] fact that it appeared that Mr. Morgan had been
[13] unemployed after 2002?
[14] **A:** Not to my recollection.
[15] **Q:** Do you recall Mr. Mistovich mentioning it
[16] did not appear that Mr. Morgan had any construction
[17] experience?
[18] **A:** Not to my recollection.
[19] **Q:** Do you see anything on his resume that
[20] indicates that there is construction experience in
[21] Mr. Morgan's background?
[22] **A:** No.
[23] **Q:** What else did you say during the course of
[24] this discussion about Mr. Morgan?

Eli Mistovich, Jr. v.
Elizabeth Bowden, et al.
Case 1:04-cv-12340-EFH   Document 15-10   Filed 10/31/2005   Page 7 of 11
Alison Leaton
Vol. 1, September 29, 2005

Page 65

[1] A: I actually — I think they were because
[2] they usually were.
[3] Q: Let me go back to your discussion with Mr.
[4] Mistovich on March 5th about Mr. Morgan. Was there
[5] a member of the diversity committee present during
[6] that discussion?
[7] A: No.
[8] Q: And you don't recall if someone was there
[9] from the diversity committee during the earlier
[10] interviews; is that correct?
[11] A: I don't recall.
[12] Q: Okay. What do you recall saying to Mr.
[13] Mistovich about Mr. Morgan, and what do you recall
[14] him saying?
[15] A: At what time are you asking?
[16] Q: After the interviews, when you were
[17] determining whether to make any job offers.
[18] A: To my recollection I think I said, "He did
[19] very well. He was an hour early," and that "We
[20] should check his references."
[21] Q: And what, if anything, did Mr. Mistovich
[22] say?
[23] A: "Fine."
[24] Q: I'm sorry?

Page 66

[1] A: "Fine."
[2] Q: Okay. And was a job offer made?
[3] A: Yes.
[4] Q: Did Mr. Mistovich express any reservation
[5] or objection to making an offer to Mr. Morgan?
[6] A: Not to my recollection.
[7] Q: Was Mr. Morgan hired?
[8] A: Yes.
[9] Q: Were any of the two individuals on Exhibit
[10] 22 made — was an offer made to either of those?
[11] A: I don't remember. My notes would indicate
[12] that no.
[13] Q: According to the notes on Exhibit 19 —
[14] which I believe you said were not yours, is that
[15] correct?
[16] A: Yes, those are not mine.
[17] Q: — do you have a recollection that after
[18] the November interviews there were at least two
[19] people hired?
[20] A: Yes.
[21] Q: Okay. And then according to your notes on
[22] Exhibit 23, it appears there were three additional
[23] people hired?
[24] A: Yes.

Page 67

[1] Q: And then Mr. Morgan was hired after the
[2] interviews of March 11th, correct?
[3] A: Yes.
[4] Q: And that would make a total of six, by my
[5] primitive arithmetic, correct?
[6] A: Yes.
[7] Q: Do you recall whether there were other
[8] trackmen hired other than the six that appear on
[9] these exhibits?
[10] A: Not to my recollection.
[11] Q: And do you recall after Mr. Morgan was
[12] hired that the open requisition for trackmen was
[13] filled?
[14] A: I don't recall.
[15] Q: Do you have any recollection of whether
[16] there were additional interviews scheduled for
[17] trackmen after March 11th, 2004?
[18] A: Not that I recall.
[19] Q: Do you recall how you got to the Somerville
[20] facility for the interviews on March 11th, 2004?
[21] A: I drove.
[22] Q: Do you have any recollection of Mr.
[23] Mistovich driving you to the facility from a medical
[24] appointment that you had?

Page 68

[1] A: Oh, yes, sort of. I think, maybe.
[2] Q: Okay. Let me see if I can refresh your
[3] recollection. Mr. Mistovich has testified that his
[4] recollection was that on March 11th you had some
[5] difficulty with scheduling interviews because you
[6] had a medical appointment that he had picked you up
[7] from?
[8] A: That sounds right.
[9] Q: Okay. And do you recall that at the
[10] conclusion of the interviews he drove you from the
[11] Somerville facility back to the Boston office?
[12] A: That sounds right.
[13] Q: Do you recall having any discussions or
[14] conversations with Mr. Mistovich either on the ride
[15] to the Somerville facility or the ride back to your
[16] Boston office after the interviews were over?
[17] A: Not that I recall.
[18] Q: After March 5th and before March 11th, did
[19] you have any further discussions with Mr. Mistovich
[20] about Marvin Morgan?
[21] A: Not that I recall.
[22] Q: Now, at some point did you contact
[23] Elizabeth Bowden concerning the conversation that
[24] you had with Mr. Mistovich about Marvin Morgan on

Page 69

[1] March 5th, 2004?
[2] A: Yes.
[3] Q: And when did you first contact Ms. Bowden?
[4] A: I don't recall the specific date.
[5] Q: Do you recall whether it was on March 5th
[6] after you had your discussion?
[7] A: Probably not. Probably the next day,
[8] maybe.
[9] MS. RUBIN: Don't speculate.
[10] THE WITNESS: Okay.
[11] Q: Was it, your discussion with Ms. Bowden,
[12] before March 11th?
[13] A: Yes.
[14] Q: Okay. And was this a telephone discussion?
[15] A: No.
[16] Q: Face-to-face discussion?
[17] A: Yes.
[18] Q: Was there more than one discussion between
[19] March 5th and March 11th?
[20] A: I don't recall.
[21] Q: Okay. Where did the discussion take place?
[22] A: In her office.
[23] Q: Where was her office?
[24] A: Oh, sorry. South Street.

Page 70

[1] Q: Basically where yours was?
[2] A: Yes.
[3] Q: And what did you say and what did Ms.
[4] Bowden say during this discussion before March 11th?
[5] A: I let her know that a discussion had taken
[6] place with Mr. Mistovich regarding this candidate,
[7] and that the situation was under control but that
[8] she needed to be aware of it.
[9] Q: Well, did you elaborate on what the
[10] situation was?
[11] A: Yes. I told her about the conversation I
[12] had with Eli — excuse me — Mr. Mistovich, and that
[13] we were interviewing the candidate, and I had
[14] communicated to Mr. Mistovich that if all went well,
[15] we would hire the candidate, and I told her all of
[16] that.
[17] Q: Why did you inform Ms. Bowden of this?
[18] A: It's my obligation — it was my obligation
[19] to the organization to communicate anything that I
[20] thought was discriminatory or of any other kind of
[21] harassment-issue type thing to my superior.
[22] Q: Did you tell Mr. Mistovich you were going
[23] to inform Ms. Bowden of this?
[24] A: No.

Page 71

[1] Q: Why not?
[2] A: I don't know. I just didn't.
[3] Q: What, if anything, did Ms. Bowden say?
[4] A: She thanked me for letting her know about
[5] the situation.
[6] Q: Anything else you recall Ms. Bowden saying?
[7] A: Not that I recall.
[8] Q: Did she suggest you take any action?
[9] A: Not that I recall.
[10] Q: And other than that conversation prior to
[11] interviewing Mr. Morgan on March 11th, did you have
[12] any other communications with Ms. Bowden concerning
[13] this matter?
[14] A: Not that I recall.
[15] Q: Did you have any communications with any
[16] members of the diversity committee concerning this
[17] issue?
[18] A: Not that I recall.
[19] Q: Did you have any discussions with any other
[20] officers or employees of MBCR between March 5th and
[21] March 11th, 2004 —
[22] A: Not that —
[23] Q: — concerning your discussion with Eli
[24] Mistovich?

Page 72

[1] A: Not that I recall.
[2] Q: Okay. On March 11th or any time prior
[3] thereto, did you tell Mr. Mistovich of what you had
[4] informed Ms. Bowden of?
[5] A: No.
[6] Q: Was there a reason why you didn't tell Mr.
[7] Mistovich?
[8] A: It wasn't necessary to tell him.
[9] Q: You didn't think he should know that you
[10] made that kind of report to the head of HR of MBCR?
[11] A: Yes.
[12] Q: Why was that?
[13] A: It wasn't relevant to let him know. It
[14] wasn't necessary.
[15] *Q. Fair to say you didn't want him to be able
[16] to talk to Ms. Bowden about his comments; is that
[17] correct?
[18] *MS. RUBIN: Objection.
[19] *A. No.
[20] Q: After March 11th — well, strike that.
[21] On March 11, 2004, do you recall having —
[22] MS. RUBIN: Before you start asking the
[23] question, can we take a break?
[24] MR. TEAGUE: Sure.

Eli Mistovich, Jr. v.
Elizabeth Bowden, et al.
Case 1:04-cv-12340-EFH   Document 15-10   Filed 10/31/2005   Page 9 of 11
Alison Leaton
Vol. 1, September 29, 2005

Page 73

[1] (Brief recess)
[2] MR. TEAGUE: Can you read the last question
[3] and answer.
[4] *(Record read)
[5] BY MR. TEAGUE:
[6] Q: Let me show you Mr. Morgan's resume again.
[7] It's Exhibit 2. Is there anything on Mr. Morgan's
[8] resume that indicates to you that he had any
[9] railroad work experience?
[10] A: No.
[11] Q: Is there anything that indicates he had any
[12] hoisting experience?
[13] A: He's got "Hydraulic heavy equipment
[14] operator."
[15] Q: You consider that to be hoisting experience
[16] for a trackmen?
[17] A: To my knowledge.
[18] Q: Is there anything on his resume that
[19] indicated he did any heavy bending or lifting during
[20] his work experience?
[21] A: Yes.
[22] Q: What's that?
[23] A: At the Delta Airlines position when he was
[24] unloading and loading cargo.

Page 74

[1] Q: Okay. That was back in 1990, correct?
[2] A: Yes.
[3] Q: Okay.
[4] A: As well as he was working in a warehouse
[5] after that. He retrieved merchandise for shipping
[6] and stocked merchandise in the warehouse facility.
[7] Q: Okay. May I see Mr. Morgan's resume. You
[8] do recall on March 11 that there was a member of the
[9] diversity committee present, correct?
[10] A: Yes.
[11] Q: But you don't recall the identity of the
[12] person?
[13] A: No.
[14] Q: Okay. Let me direct your attention to
[15] March 11. After the interviews had taken place, did
[16] you have a discussion with Ms. Bowden concerning Mr.
[17] Morgan and Mr. Mistovich?
[18] A: Not that I recall specifically.
[19] Q: Okay. Let me show you a document marked as
[20] Exhibit 5, and do you recognize that document, Ms.
[21] Leaton?
[22] A: Yes.
[23] Q: And that's a — two e-mails. The bottom
[24] part is one from Ms. Bowden to you of March 11, and,

Page 75

[1] I take it, the top one is your reply; is that
[2] correct?
[3] A: That's correct.
[4] Q: Prior to Ms. Bowden sending you this
[5] e-mail, which appears to be April — March 11 at
[6] 2:14 p.m., had you had a conversation with her?
[7] A: Yes, as previously discussed.
[8] Q: Well, I don't mean — I mean on March 11.
[9] I should narrow my question. Was there a
[10] conversation with Ms. Bowden prior to 2:14 on March
[11] 11 with Ms. Bowden?
[12] A: I don't recall.
[13] Q: Do you recall replying to Ms. Bowden's
[14] e-mail?
[15] A: Yes.
[16] Q: And in the first paragraph of your e-mail,
[17] the second sentence, you said, "So in that
[18] conversation I went over additional resumes that I
[19] screened as 'yeses,' and he did not want to
[20] interview a person who was based on name and where
[21] he lived being Eli's assumption that he was black."
[22] And, again, I'll ask you, why did you mention the
[23] fact that Mr. Morgan's name would have led Mr.
[24] Mistovich to the assumption that he was black?

Page 76

[1] A: It's traditionally in some cases an
[2] African-American name based on —
[3] Q: What is? Marvin Morgan?
[4] A: Morgan. In often cases.
[5] Q: You believe the name "Morgan" would
[6] indicate the race of a candidate?
[7] A: Not necessarily.
[8] Q: Okay. Well, let me ask you. What do you
[9] mean "the name" —
[10] A: I think Marvin more than anything.
[11] Q: The first name Marvin is an indication that
[12] a person is black; is that your testimony?
[13] A: It can be.
[14] Q: Well, the name "Joseph" could be a black
[15] person's name, could it not?
[16] A: Yes.
[17] Q: What is there about the name Marvin that
[18] suggests to you that another person could determine
[19] his race?
[20] A: It wasn't just the name. It was the name
[21] and the address, as I indicated in this e-mail and
[22] in prior statements to you.
[23] Q: Well, I thought you indicated previously it
[24] wasn't the name. It was the address. Now, you're

**Page 89**

[1] Q: Do you recall seeing that document before?
[2] A: Yes.
[3] Q: Okay. And when did you see this document?
[4] A: I don't recall.
[5] Q: Do you recall having an interview —
[6] MS. RUBIN: Can I just interrupt. The
[7] Exhibit 30 has more than one page, and the document
[8] you gave her is just one page.
[9] MR. TEAGUE: Oh, sorry. There is a second
[10] page.
[11] MS. RUBIN: I just want it to be clear.
[12] MR. TEAGUE: You're correct. Somehow that
[13] detached.
[14] Q: Take a look at the second page.
[15] A: (Reviewing document)
[16] Q: And, again, you say — my understanding of
[17] your testimony is you recall seeing Exhibit 30
[18] before?
[19] A: Yes.
[20] Q: Do you recall seeing it before this case
[21] started?
[22] A: Yes.
[23] Q: Okay. You have no recollection of when you
[24] saw this document, correct?

**Page 90**

[1] A: No.
[2] Q: Do you recall meeting with Ms. Bowden
[3] concerning — after March 11th concerning the e-mail
[4] that you had sent to her on March 11th?
[5] A: Yes.
[6] Q: And where did that meeting take place?
[7] A: Her office.
[8] Q: And who was present besides you and Ms.
[9] Bowden, if anyone?
[10] A: Beth Trowbridge.
[11] Q: And who was Beth Trowbridge?
[12] A: HR generalist.
[13] Q: Does she work under Ms. Bowden?
[14] A: Yes.
[15] Q: And what do you recall being said at the
[16] meeting of March — the meeting after March 11th?
[17] A: I don't recall anything specifically.
[18] Q: Okay. Was the subject of the meeting Mr.
[19] Mistovich's comments back on March 5th?
[20] A: Yes.
[21] Q: And if you take a look at Exhibit 30, does
[22] that refresh your recollection as to what, if
[23] anything, was said during that meeting?
[24] A: I guess so.

**Page 91**

[1] MS. RUBIN: Well, either it does or it
[2] doesn't. Don't guess.
[3] A: Yes.
[4] Q: It does?
[5] A: Uh-huh.
[6] Q: Okay. Is that an accurate — well, let me
[7] strike that.
[8]     Let's go back to Exhibit 29.
[9] A: Uh-huh.
[10] Q: And on March 16th you replied to Ms.
[11] Bowden, "Liz, this looks accurate to me." Do you
[12] know what you were referring to?
[13] A: The attachment.
[14] Q: Okay. Did she send you a copy of this
[15] document, Exhibit 30?
[16] A: Yes.
[17] Q: And so then you reviewed it and then
[18] replied that the attachment looked accurate,
[19] correct?
[20] A: Yes.
[21] Q: Okay. And I'm just going to ask you about
[22] certain questions that appear on Exhibit 30. The
[23] third question states, "How many positions were
[24] being filled?" You see that?

**Page 92**

[1] A: Yes.
[2] Q: Then there is two follow-ups: "How many
[3] people were interviewed? How many minority
[4] candidates interviewed?"
[5] A: Yes, uh-huh.
[6] Q: And you said, "Five trackmen," and "There
[7] were 11 interviews," correct?
[8] A: According to this, yes.
[9] Q: And "There were approximately 50 resumes
[10] reviewed." Your recollection, your memory of
[11] events, was better at the time of this interview
[12] than it is now; is that correct?
[13] A: Given it was a year and a half ago, yes.
[14] Q: Okay. Now, about two paragraphs down, Ms.
[15] Bowden states a question: "What specifically did
[16] Eli say regarding the address and that he assumed
[17] that people were black? Did he specifically say,
[18] quote, black, close quote?" And you said, "Why
[19] don't you want to interview this person?" And then
[20] it says, "So you're telling me you don't want to
[21] interview this person because you think they're
[22] black?" Those are your words; are they not?
[23] A: Yes.
[24] Q: And then it says, "Did you ask him what he

Page 93

[1] meant by "people like that"? And then your response
[2] according to Ms. Bowden's note is, "What do you
[3] mean? No answer given." And then you say, "It's
[4] illegal Eli to do that, not interview people because
[5] you think they're black?" And then it says,
[6] "Greater percentage of people like that, again, did
[7] you confirm that he meant blacks or all diversity?
[8] Was there any room for misinterpretation?" And then
[9] you said, "No confirmation." Do you recall that?
[10]   A: Not specifically, but...
[11]   Q: But you had indicated to Ms. Bowden in your
[12] e-mail of March 16th that that was an accurate
[13] summary of your meeting?
[14]   A: Yes.
[15]   Q: Okay. So do you recall other than what's
[16] stated here making any efforts to confirm that Eli,
[17] Mr. Mistovich, meant blacks?
[18]   A: Not other than we've discussed prior.
[19]   Q: Okay. And then you said, "No room for
[20] misinterpretation." Do you recall saying that?
[21]   A: Well, she asked me, "Was there any room for
[22] misinterpretation?" And I said, "No."
[23]   Q: And there was no doubt in your mind that he
[24] had meant to eliminate Mr. Morgan from the interview

Page 94

[1] process because he was black?
[2]   A: No.
[3]   Q: Okay. Now, on the second page — and it's
[4] detached on what you're looking at — it says, "What
[5] did Eli say or do differently before, during or
[6] after the interviews of minority candidates?" You
[7] said, "No difference. When asked what he thought,
[8] Eli said, 'Fine.'" That refers to Mr. Morgan; is
[9] that correct?
[10]   A: Yes.
[11]   Q: "Of the 11 interviewed" or "How many of the
[12] 11 interviewed are prospective hires?" You said,
[13] "Seven," correct?
[14]   A: Uh-huh.
[15]   Q: "If the references of all seven are
[16] positive, who would make the final decision?" And
[17] you said, "The hiring manager" —
[18]   A: Uh-huh.
[19]   Q: — correct? You have to say "Yes."
[20]   A: Oh, sorry, yes.
[21]   Q: So is it fair to say that it was Eli
[22] Mistovich that made the final decision to hire Mr.
[23] Morgan?
[24]   A: I'm not sure.

Page 95

[1]   Q: Well, if it wasn't Mr. Mistovich, who did
[2] make the final decision to hire Mr. Morgan?
[3]   A: Well, based on the discussions that he and
[4] I had prior, he knew it was not a negotiation if
[5] everything went well with the interview and the
[6] references.
[7]   Q: Did he say that to you?
[8]   A: No. Based on the other conversations we
[9] had.
[10]   Q: Okay. Well, then, when you said, "The
[11] hiring manager made the final decision," to Ms.
[12] Bowden on March 16th, 2004, was that a correct
[13] statement?
[14]   A: In 99 percent of the cases, yes.
[15]   Q: Well, you didn't say 99. You said, "The
[16] hiring manager." She was referring to the seven
[17] track positions, correct?
[18]   A: Correct.
[19]   Q: It was a specific question, "If all the
[20] references of all seven were positive, who would
[21] make the final decision?" And your answer was, "The
[22] hiring manager," correct?
[23]   A: Yes.
[24]   Q: And you confirmed that those questions were

Page 96

[1] accurate in your e-mail of March 16th, 2004; is that
[2] correct?
[3]   A: Uh-huh.
[4]   Q: You have to say "yes."
[5]   A: Yes.
[6]   Q: Are you telling us now that that answer is
[7] incorrect?
[8]   A: No.
[9]   Q: Okay. So it's fair to say as of March
[10] 16th, 2004, you were aware that Ms. Bowden was
[11] conducting an inquiry as to what had happened during
[12] your conversation, correct?
[13]   A: Correct.
[14]   Q: And you were aware that this inquiry could
[15] result in the termination of Mr. Mistovich's
[16] employment, correct?
[17]   A: Potentially.
[18]   Q: As of March 16th, did you inform Mr.
[19] Mistovich as to the report that you had made to Ms.
[20] Bowden?
[21]   A: No.
[22]   Q: Between — well, let's go back a step.
[23] Were you aware that Ms. Bowden had scheduled a
[24] meeting with Mr. Mistovich on March 26th, 2004, to