UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ELI MISTOVICH, Jr.<br>    Plaintiff<br><br>V.<br><br>ELIZABETH BOWDEN, STEPHEN<br>URBAN, STEPHEN NEVERO and<br>ALISON LEATON,<br>    Defendants | CIVIL ACTION NO. 04-12340-EFH |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Introduction

  Plaintiff's 28 year railroad career was destroyed by false charges of race discrimination in the hiring process. The charges were fabricated by a contract recruiter of Plaintiff's former employer who had no experience in the railroad industry. The charge of racism was adopted, endorsed and forwarded to senior management by Defendants Bowden, Urban and Neverro after a sham "investigation" in which Plaintiff was given no advance notice, information about the accusation, or meaningful opportunity to respond. The circumstances were so egregious that the Defendants' conduct amounted to intentional interference with advantageous relations.

Summary of the Facts

  The detailed facts and annotations to the record are contained in Plaintiff's Statement of Material Facts submitted herewith. These facts may be summarized as follows.

  Until March 30, 2004, Plaintiff, a civil engineer, was a 28 year railroad management employee. He had worked for Penn Central, Conrail and Amtrak. Plaintiff commenced his employment with Amtrak in 1978. In 1987, Plaintiff became assistant division engineer of the

track division with Amtrak's commuter rail service in Boston. Amtrak operated the Boston area commuter rail service pursuant to a contract with the Massachusetts Bay Transportation Authority ("MBTA") from 1987 through 2003. Plaintiff supervised approximately 170 employees and was responsible for track maintenance and other duties. (Plaintiff's Statement of Material Facts, hereinafter "SOF", para. 2, 5).

Massachusetts Bay Commuter Railroad ("MBCR") is a limited liability corporation owned by three other entities. MBCR was organized for the purposes of bidding on the MBTA commuter rail service contract. MBCR was successful in its bid and succeeded Amtrak as the Boston area commuter rail service operator commencing on July 1, 2003. MBCR hired almost all of Amtrak's Boston commuter rail service employees. Approximately 1600 Amtrak employees transitioned to MBCR to continue operating the MBTA's commuter rail service after July 1, 2003. Plaintiff also transitioned from Amtrak to MBCR and his job responsibilities remained exactly the same. (SOF, para. 3, 4).

In his 26 years of employment in Amtrak's track division, including his 18 years service with the commuter railroad, Plaintiff interviewed and made decisions on 99 percent of the hirings in the division. He reviewed thousands of resumes and interviewed over a thousand applicants. Plaintiff was also in charge of terminating employees in the track division. (SOF, para. 11). Plaintiff's written job performance evaluations at Amtrak were always satisfactory or better during his 26 years of employment. Between 1989 and 2000, Plaintiff received at least 8 written commendations for diversity in hiring, exceeding minority hiring goals and adhering to Amtrak's affirmative action and equal opportunity in employment policies. In 1998, 1999 and 2000, Plaintiff was commended in annual performance reviews for exceeding 30 percent minority hiring. (SOF, para. 12). In his 26 years as an Amtrak supervisor, Plaintiff had never

been accused of discrimination by any subordinate or supervisor at Amtrak. Plaintiff had attended training programs in diversity at Amtrak and with MBCR after transitioning his employment to that company. (SOF, para. 13).

There had been no hiring in the track division at Amtrak and later MBCR from the fall of 2001 until November of 2003. During this time, the track division had lost 37 employees through attrition. In the fall of 2003, shortly after transitioning his employment to MBCR, Plaintiff became deeply concerned about this understaffing and its effect on the track division's ability to maintain track safety. Plaintiff was especially concerned as the winter of 2003 approached and snow removal burdens would be placed on the division. On September 25, 2003, Plaintiff communicated his concerns to his immediate supervisor, Defendant Neverro and specifically requested 37 new entry level trackmen be hired to adequately staff the department. In the late fall of 2003, MBCR authorized the track division to hire 4 additional employees. (SOF, para. 17, 18). Defendant Elizabeth Bowden was head of MBCR's Human Resources Department. Bowden hired a contract consultant named Alison Leaton for a six month contract to handle recruitment. Neither Bowden nor Leaton had any experience in hiring entry level railroad personnel; nor any idea of the qualifications necessary to succeed on the job. (SOF, para. 6,9). Plaintiff, as the assistant division engineer, was the hiring manager for the track division and had the final say on hiring. (SOF, para. 11, 16, 29). Plaintiff was informed of the authorization to hire 4 new employees and was instructed to coordinate his hiring process with the recruiter, Leaton. (SOF, para. 18).

Plaintiff had never met Leaton before this hiring process. In hiring entry level track employees, Plaintiff valued railroad experience and construction experience most highly since entry level trackmen were required to do heavy manual labor and work with basic hand tools in

constructing, maintaining and repairing railroad tracks and appurtenances thereto. A high school diploma and driver's license were required. A commercial driver's license or hoisting license was also preferred. Entry level trackmen were union employees and, after several years on the job, might be asked to drive trucks and heavy equipment. Plaintiff also looked for candidates with meaningful management experience as they would make potential foremen and supervisors. A commercial drivers license was a positive factor, but was not considered as important as construction and railroad experience. (SOF, para. 14, 21).

In his hiring and supervisory experience at Amtrak, Plaintiff had not had positive experiences in hiring candidates with below average qualifications – i.e. lacking in railroad, construction or similar experience. These hires resulted in most of Plaintiff's discipline problems with subordinates over his years of employment with Amtrak. (SOF, para. 15).

As assistant division engineer, Plaintiff periodically received resumes from job seekers which he saved in a file. When he first spoke to Leaton, Plaintiff had accumulated approximately 60 resumes. In his initial discussion with Leaton, Plaintiff informed her of the qualities Plaintiff looked for in entry level trackmen and sent Leaton the approximately 60 resumes in his file with the intention that he and Leaton would interview all 60 candidates. Leaton responded to Plaintiff that this was far too many candidates to interview and directed him to cut the list down to 10 prospective candidates based on their resumes. Plaintiff was successful in persuading Leaton to raise the number to 15. In November of 2003, Plaintiff and Leaton interviewed 9 candidates who Plaintiff had selected and hired 2. (SOF, para. 18).

On December 6 and 7, 2003, a severe snowstorm occurred. Due to lack of personnel, MBCR did not have sufficient employees to clean the snow from platforms and parking lots. It was the worst fiasco that Plaintiff had experienced in a snowstorm in his 18 years of commuter

4

rail service. One MBCR employee was killed when struck by a train. Plaintiff felt that this death was due to the understaffing of snow removal crews and spoke up and informed MBCR's management of this opinion. Thereafter, MBCR increased the authorized number of new track hirees from 4 to 8. Since 2 new trackmen had been hired in November, this left 6 more to be hired. (SOF, para. 19, 20).

On January 20, 2004, Plaintiff forwarded Leaton a list of 40 resumes which he had received through the last round of interviews. He made a list of these resumes. On Leaton's instructions, Plaintiff narrowed this list to 15 candidates based on railroad experience, construction and labor experience, heavy lifting ability, and a hoisting license or CDL. Leaton scheduled 10 interviews from candidates selected by Plaintiff on March 4 and 5, 2004. (SOF, para. 21).

On Thursday, March 4, 2004, three candidates scheduled for interviews by Leaton at 11:30 a.m., 1:00 p.m. and 2:00 p.m. failed to show up. Seven candidates were interviewed by Plaintiff and Leaton on March 4 and 5, and three were hired. During the two and a half hours of dead time on March 4th, when the three candidates failed to show up, Plaintiff and Leaton discussed the need for at least one more day of interviews to fill the remaining vacancies. (SOF para. 22). Leaton handed Plaintiff a stack of between 12 and 24 other resumes which she had in her possession. Plaintiff did not know where these resumes came from and started looking through them. Some of them he had not seen before. Leaton, as recruiter received resumes from various outside sources. On instructions from Bowden, Leaton (without Plaintiff's knowledge) had advertised the position in the Bay State Banner, a community newspaper serving Boston's African American community. Leaton did not advertise the position in the Boston Globe, Herald or any other newspaper. (SOF, para. 24).

Among the resumes handed by Leaton to Plaintiff was that of a candidate named Marvin Morgan whose address was listed as 194 Normandy Street, in Dorchester. Plaintiff had no recollection of seeing Morgan's resume before and it was not on the list of resumes which Plaintiff had previously forwarded to Leaton. Plaintiff briefly looked at Morgan's resume and put it down without making any determination.

Leaton immediately and animatedly accused Plaintiff of "excluding" the resume from further consideration because Plaintiff thought that Morgan was black. Plaintiff was stunned and did not comprehend what Leaton was talking about. He again looked at the resume and did not know how to determine Morgan's race. On further reviewing the resume, Plaintiff noted that Morgan had a CDL, but no construction or railroad experience. Morgan's work experience had been as a dumpster driver from 1993 to 2002 which did not qualify him for manual track work. Additionally Morgan had not worked from 2002 for more than a year through the date of the interview. Plaintiff informed Leaton that based on his brief review of the resume, Morgan did not appear to be what Plaintiff considered to be an above-average candidate that Plaintiff was looking for. Plaintiff explained that he usually did not have good luck with candidates whom he considered below average. Leaton insisted that it was illegal to not interview a "qualified" minority, insisting on injecting a racial issue into the discussion. Plaintiff concluded that Leaton must be aware that Morgan was black since there was no reasonable way to determine from his resume what his race was. Plaintiff then handed all of the resumes back to Leaton to select the interviewees. He voiced no opinion of which resumes he thought should be selected further and had no objection to interviewing Morgan or anyone else in the pile since his main concern was hiring additional candidates. Plaintiff thought Leaton's statements were strange if not bizarre. (SOF, para. 23-25).

On March 11, 2004, Leaton selected 3 candidates for interviews, including Marvin Morgan. A member of MBCR's diversity committee, formerly Amtrak's diversity committee, was present at the Morgan interview as well as all other interviews. Plaintiff observed during the interview, for the first time, that Morgan was indeed black. After the interview, at which Morgan had presented himself well, Plaintiff agreed to hire him. Plaintiff thought nothing further of the matter and resumed his duties as assistant division engineer of the track division. (SOF, para. 26).

Prior to the March 11, 2004 interviews, including Morgan's, Leaton had called Plaintiff and told him that she would be unable to make the interviews which were scheduled in Somerville. Leaton had a doctor's appointment at Brigham and Women's Hospital. Plaintiff had personally driven from Somerville to Brigham and Women's hospital, picked Leaton up and drove her to the Somerville facility in order to finish the interviews. After the interviews, Plaintiff personally drove Leaton to her downtown office in Boston. They made small talk during the rides and did not discuss Morgan nor any racial issues. (SOF, para. 27).

On March 11, 2004, the very day that Plaintiff had decided to hire Morgan and that Plaintiff had driven Leaton to and from the interviews, Leaton telephoned Elizabeth Bowden, MBCR's head of Human Resources. Leaton told Bowden that Plaintiff did not want to interview Morgan because Morgan was black. According to Leaton, Plaintiff had made this "assumption" based on Morgan's "name and where he lived". Leaton informed Bowden that she pushed hard and insisted that Morgan be interviewed because he was as qualified if not more qualified than other candidates. These were blatant misstatements of fact. Morgan lacked any railroad or construction experience which many other candidates had. Neither Leaton nor Bowden had any idea of the requirements of a railroad trackman job. Leaton thereafter e-mailed Bowden at

7

Bowden's request and presented a fabricated version of this alleged conversation and the circumstances of the selection of Morgan. Leaton characterized the e-mail as indicating the decision to hire Morgan was due to her "pushing". In fact the final hiring decision was made by Plaintiff as hiring manager. Bowden did not immediately contact Plaintiff; nor did she ever show Plaintiff Leaton's e-mail. (SOF, para. 28).

Thereafter, Leaton's perjorative accusation was circulated by Bowden to MBCR's general manager, deputy general manager, general counsel and chief engineer (Plaintiff's immediate supervisor) and at least one other HR employee. Bowden met with Leaton and either Stephen Neverro or Stephen Urban on March 15, 2004 to discuss Leaton's accusations. Bowden Leaton and another HR employee had another meeting concerning the subject prior to March 26, 2004. After the latter meeting, Bowden prepared a summary of Leaton's statements and forwarded the summary to Leaton for review and comment for its correctness. Leaton informed Bowden that there was "no room for misinterpretation of Plaintiff's racist attitude". Leaton did acknowledge that Plaintiff did not say or do anything differently before, during or after interviews of minority candidates; and that after Morgan's interview, Plaintiff indicated that he would hire Morgan. (SOF, para. 29).

Thereafter Bowden determined that she should conduct a "investigation" into Leaton's accusation of racism. Bowden had never conducted an investigation of racial discrimination before. For 3 weeks, Plaintiff received no information that these accusations had been made; nor was he given any opportunity to respond to them. (SOF, para. 30, 32).

On March 25, 2004, Plaintiff received an innocuous sounding e-mail from Bowden requesting that he meet with her the next day, March 26th, to address hiring concerns in the track division. In Plaintiff's 28 years at Amtrak, his practice had always been to prepare for meetings

on anything other than purely routine matters in order to make an informed presentation. As a matter of practice, he telephoned Bowden and left a voicemail inquiring as to the purpose of the meeting. He was not given the courtesy of a reply. Plaintiff also telephoned Leaton and inquired as to whether she knew what the subject of the meeting was since she had been involved in the hiring process. Leaton lied to Plaintiff and told him that she did not know anything about the meeting and that he needed to speak to Bowden directly. Leaton immediately e-mailed Bowden to tell her of Plaintiff's inquiry and her misinformation to Plaintiff. Bowden was thus aware of Leaton's false statement to Plaintiff. (SOF, para. 34). Bowden was also aware that an abrupt accusation of racism was likely to shock Plaintiff, that Plaintiff would have difficulty recalling the contents of a brief conversation with Leaton which occurred more than three weeks prior to March 26th, and that lack of advance notice of the charges would hinder Plaintiff's ability to make an effective rebuttal. (SOF, para. 35, 38).

Bowden actually scripted out a list of questions to ask Plaintiff at the meeting. She arranged for Urban and Neverro to be present at the meeting without Plaintiff's foreknowledge. (SOF, para. 31).

Several weeks before the March 26, 2004 meeting, Plaintiff began to experience high blood pressure difficulties. One of the veins in his right eye had actually burst due to the high blood pressure and he was literally blind in his right eye. Plaintiff was placed on high blood pressure medication which caused side effects including drowsiness, impaired ability to concentrate and communicate and other symptoms. Plaintiff was blind in one eye and in an impaired medicated state on March 26, 2004; he nevertheless came to work. Plaintiff had never taken one sick day in his 28 years of railroad work and had often worked nights and weekends during snowstorms. (SOF, para. 13).

9

Plaintiff walked into the meeting and observed Bowden with Urban, the second highest ranking MBCR officer and Neverro, his immediate supervisor. Bowden started off the meeting by immediately accusing Plaintiff of racism in hiring. Bowden's tone of voice and body language were extremely accusatory. Bowden stated that she had a report from Leaton that Plaintiff was "eliminating qualified applicants because of their name and home addresses as indicated on their resumes (under the assumption that they were black). Bowden further stated that during a meeting on March 4 or 5, 2004 between Plaintiff and Leaton a qualified resume that Plaintiff had rejected was presented by Leaton and that Plaintiff indicated that he did not want to interview this person as he had trouble with "people like that in the past".

Plaintiff was stunned and shocked by the accusations. In his 26 years of hiring experience at Amtrak, Plaintiff had in fact made efforts to accomplish affirmative action and diversity goals in hiring of minorities and had been frequently commended by his employer for achieving or exceeding diversity goals. An accusation of racism, like child molesting or sexual harassment, is a loaded charge. It had been more than 3 weeks since his brief conversation with Leaton and Plaintiff frankly did not even remember what had been said. Additionally, Plaintiff was in an impaired state due to his high blood pressure medication. Plaintiff initially had no idea what Bowden was talking about. He was however stunned at the accusation and the hostile and accusatory tone in which it was presented. (SOF, para. 38, 39).

Plaintiff sat in stunned silence as Bowden went on leveling quotes at Plaintiff which had been provided by Leaton in writing and which Plaintiff never had the opportunity to see, review or formulate a response to. Plaintiff said that the accusations in the presence of two hostile managerial employees were like a "Spanish Inquisition". (SOF, para. 39).

As Bowden went on, Plaintiff eventually began to recall bits of the strange conversation

10

he had had over three weeks previously with Leaton concerning Marvin Morgan. Plaintiff however tried to point out in fact he had hired Morgan and did not understand what the problem was. He also noted that he had much experience in selecting candidates and that his goal was always simply to select the best, and that he had always exceeded diversity goals with his previous employer Amtrak. Bowden continued leveling quotes from Leaton and asked Plaintiff if in fact he had made certain statements attributed to him. Plaintiff struggled to recall the exact statements that were made and the context in which he made them. He did not know how to respond any further than to confirm that he always selected the best candidates regardless of race. (SOF, para. 39).

Bowden then said that she concluded that Plaintiff's stunned silence and repeated answers of selecting the best candidates were "stonewalling" and an admission of the accuracy of Leaton's comments. Plaintiff's only rejoinder was that it seemed that Bowden, Urban and Neverro had already made up their minds. Plaintiff thereafter left the meeting stunned and shocked at what had occurred. Bowden made notes of her conversation, and stated that Plaintiff did not deny the overall circumstances of the meeting with Leaton and its contents (which he could hardly remember) and that he had not denied that he was not biased in hiring practice. Neither Urban nor Neverro, experienced railroad men, had anything of substance to say at the meeting. (SOF, para. 40-41).

The next working day was Monday, March 29, 2004. Bowden, along with Urban and Neverro, met with MBCR's general manager, Kevin Lydon, and general counsel, John Davey. Bowden reported her version of the events and stated that since Plaintiff did not effectively deny the allegations which she had leveled, he was guilty of racism in hiring practices. Urban and Neverro said that they concurred with that assessment. Plaintiff was not invited to the meeting;

11

nor was he allowed to provide further comments orally or in writing; nor was he even informed that such a meeting concerning his continued employment was taking place.. Plaintiff still had not been shown any of the written descriptions of the conversations which Leaton had provided to Bowden, at Bowden's request.

On Tuesday, March 30, 2004, Plaintiff was asked, again with no advance notice, to meet with Bowden, Neverro and Urban at the Somerville office. Plaintiff was summarily informed that he was being terminated from his employment because he had screened applicants based on racial factors. Plaintiff was given the option of resigning (in which case future employment references would be informed that he voluntarily left employment) or being terminated for cause. Plaintiff was again shocked and stunned. He could not believe that his 28 year railroad career in which he had been often commended for diversity in hiring was being ended due to racial allegations on such baseless grounds. Plaintiff refused to resign since it was a fabrication and a falsehood. He was then summarily marched out of the room by Urban and forced to clean out his office and company vehicle in the full view of other employees, a humiliating experience. (SOF, para. 42).

Argument

I.   Standard for Summary Judgment

Under Rule 56(c), F.R.Civ.P., summary judgment should be rendered only if the pleadings and other materials in the record show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Barbour v. Dynamics Research Corp., 63 F.3d 32, 36-37 (1st Cir. 1995), cert. denied, 516 U.S.1113 (1996). All inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).

Questions of motive or state of mind are particularly difficult to determine on summary judgment. Broderick v. Roach, 996 F.2d. 1294, 1299 n.9 (1st Cir. 1993). Based on the foregoing standards, it is clear that Defendants' Motion for Summary Judgment should be denied.

II.     Elements of Interference with Advantageous Relations

The elements of the tort of interference with advantageous relations under the common law of Massachusetts are:

(1) an existing contract or other advantageous relationship;

(2) that the Defendant knew of such relationship;

(3) that the Defendant intentionally interfered with that relationship by improper motive or improper means; and

(4) that Plaintiff's loss of that advantageous relationship resulted from Defendants' conduct. United Truck Leasing Corp. v. Geltman, 406 Mass. 811 (1990); Comey v. Hill, 387 Mass. 11 (1982).

Where a claim of intentional interference is against a supervisory official of the Plaintiff's employer, the Plaintiff must show, as to improper motive or means, that the controlling factor was actual malice. Weber v. Community Teamwork, Inc., 434 Mass. 761, 781 (2001); Gram v. Liberty Mutual Insurance Co., 384 Mass. 659, 664 (1981). "Malice" in the employment context indicates a spiteful or malignant purpose unrelated to the legitimate business interest of the employer. Boothby v. Textron, Inc., 418 Mass. 468, 487 (1983). Unfair or sloppy business practices are insufficient to show malice. Gran v. Liberty Mutual Insurance Co., supra at 665. This is sometimes referred to as a qualified or conditional privilege to protect corporate officers from fear of personal liability in exercising their freedom of action towards corporate purposes. Steranko v. Inforex, Inc., 5 Mass. App. Ct. 253, 273 (1977).

Defendants of course rely on these cases and assert that their actions were privileged and that they therefore are entitled to summary judgment. The burden of proof of establishing the privilege is on the Defendant. Owen v. Williams, 322 Mass. 356, 360-361 (1948). However, it is submitted that the conditional privilege does not justify a management employee intentionally or recklessly forwarding a falsehood and misstatements which will certainly result in a fellow employee's termination. Malice sufficient to support the tort may be established by reasonable inference. Gram, supra, at 664.

An employee claiming the privilege and representing another employee's misconduct cannot make false statements. See Draghetti v. Chmielinski, 416 Mass. 808, 816 (1994). If the employee claiming the privilege is repeating information represented to him, the employee must establish that he was credibly informed that the Plaintiff engaged in the misconduct which was reported (even if the Plaintiff had not). The dissemination of credible information, even if wrong, is not actionable. However, the dissemination of false information with knowledge or reckless disregard of its lack of truth is tantamount to malice. Owen v. Williams, supra at 360. A supervisor's knowingly making a false statement or repeating false statements with reckless disregard of the truth is not protected. The knowing transmittal of defamatory statements which a supervisor knows or should know to be false about an employee resulting in his termination constitute malice. Draghetti v. Chmielinski, supra.

In the instant case, Leaton's unsubstantiated accusations were clearly incredible. Plaintiff, as hiring manager, had the final authority in the decision of whether or not to hire Marvin Morgan. Plaintiff, after interviewing Morgan decided to hire him. This fact was conveniently overlooked by Defendants in forwarding Leaton's reports to MBCR.

Incredibly, Leaton accused Plaintiff, based upon his brief scanning of one among many

14

resumes, of being able to determine Morgan's race based solely upon Morgan's name and residential address. Each of the Defendants testified under oath that they could not determine Morgan's race based upon his resume. They surely could not have attributed such an ability to Plaintiff. Plaintiff had never seen Morgan's resume until Leaton abruptly handed it to him at the March 4 meeting when three candidates did not show up. Neither Leaton nor Bowden informed Plaintiff or MBCR's management that they had only advertised the position in a community newspaper for Boston's black neighborhoods. It is reasonable to infer that Leaton was aware of Morgan's race when she handed the resume to Plaintiff since she had solicited resumes of black applicants.

Additionally, the manner in which this so called "investigation" was conducted was unconscionable. Bowden had never conducted an investigation into employment discrimination before and had no idea as to the proper procedure to follow. Bowden interviewed Leaton and permitted her to make written statements of comments attributed to Plaintiff on at least two occasions. Bowden had at least two face to face discussions and at least two telephone discussions with Leaton concerning her assertions.

Bowden reported these false accusations of racism to at least five other MBCR employees including the general manager, general counsel, deputy general manager and chief engineer who was Plaintiff's immediate supervisor. Yet neither Bowden, Urban nor Neverro ever showed or informed Plaintiff of the accusation for more than three weeks.

Additionally, Bowden refused to return Plaintiff's telephone call inquiring as to the purpose of the March 26, 2004 meeting, and additionally, was aware that Leaton had directly lied to Plaintiff when Plaintiff inquired of Leaton as to her understanding of the purpose of the meeting. Bowden, Urban and Neverro clearly intended that Plaintiff have no advance notice or

warning or ability to rebut these assertions. At the meeting on March 26, 2004, Plaintiff was abruptly confronted with a hostile interrogator and two higher management "observers" in an inquisitorial confrontation. Plaintiff was accused of racism in screening applicants. Plaintiff could not initially understand what the accusation was based on, let alone reply to Bowden's staccato accusatory questions about direct quotations lifted from Leaton's e-mail and other reports. Plaintiff could not immediately recall the details of a conversation three weeks ago. It was wholly unreasonable to anticipate that Plaintiff could have such direct and immediate recall. It was also reasonable to anticipate that a well intentioned employee would be shocked at an accusation of racism.

There was no excuse for Bowden, Urban or Neverro failing to make inquiry of numerous Amtrak employees who were now employed by MBCR as to whether Plaintiff had ever demonstrated racial bias. Plaintiff's former supervisors and subordinates at Amtrak were still working with him at MBCR. Certainly, discreet questions could have been made about Plaintiff's hiring and supervisory practices. Additionally, Bowden discredited in writing Plaintiff's verbal assertion at the meeting that he had met diversity hiring goals at Amtrak. Bowden informed the general manager and general counsel of MBCR that these statements "could not be verified". In fact, neither Bowden, Urban nor Neverro made any inquiry in this respect. Urban was acquainted with many of these former Amtrak employees working for MBCR, including minorities, and could easily have made inquiry. There is no evidence of any inquiry being made to members of MBCR's (formerly Amtrak's) diversity committee who were present during all job interviews. Bowden, Urban and Neverro failed to ask Plaintiff for authorization to see his personnel records or afford him the opportunity to present his numerous commendatory performance evaluations at Amtrak for diversity in hiring going back well over a

decade.

Bowden was able to produce records dating back to Plaintiff's employment at Amtrak showing that he had undergone diversity training (trying to establish that Plaintiff should have known better than to be screening applicants based on race). However no effort was made to see Plaintiff's many commendatory performance reviews.

Plaintiff was suffering from high blood pressure and blindness in one eye related thereto at the time of his meeting. Neither Bowden, Neverro nor Urban took the trouble to make inquiry to Plaintiff as to whether or not he was on medication at this confrontational investigation session during which his career was at stake.

Even after the meeting, Plaintiff was afforded no additional opportunity to rebut Leaton's statements. Bowden gave Leaton's allegations three weeks to percolate throughout the company; yet failed to afford Plaintiff even one day to address them. Plaintiff was never shown any of Leaton's written and false reports of statements attributed to Plaintiff.

Additionally, Bowden was wholly unjustified in her concluding that Plaintiff's silence at such shocking accusations was "stonewalling" and an admission that Leaton's comments were accurate. Reporting these conclusions to the general manager and general counsel of MBCR and causing Plaintiff's termination can only be deemed as malice.

The unquestioned acceptance of Leaton's statements as gospel without giving Plaintiff reasonable opportunity for rebuttal constitutes malice in the employment context. See <u>Owen v. Williams</u>, <u>supra</u>. No public policy is served by allowing company officials to engage in character assassination and destroy the 28 year career of a 50 year old father of four children so abruptly.

For the foregoing reasons it is submitted that Defendants' are not entitled to summary

17

judgment as a matter of law.

                                                      Respectfully submitted,
Eli Mistovich, Jr.,
by his attorney,

*/s/ Frank J. Teague*
Frank J. Teague, Esq.
Frank J. Teague & Associates
One Liberty Square, 4th Floor
Boston, MA 02109
(617) 350-7700
BBO# 493780

Dated: 11/08/05