# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ELI MISTOVICH, Jr. | ) | |
| **Plaintiff** | ) | |
| | ) | |
| | ) | CIVIL ACTION NO. 04-12340-EFH |
| V. | ) | |
| | ) | |
| ELIZABETH BOWDEN, STEPHEN | ) | |
| URBAN, STEPHEN NEVERO and | ) | |
| ALISON LEATON, | ) | |
| **Defendants** | ) | |
| | ) | |
| | ) | |

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS

Now comes the Plaintiff Eli Mistovich, Jr. and, pursuant to Local Rule 56.1, makes the following statements of material facts which were either omitted from Defendants' Statement or are in dispute.

Parties

1.    Plaintiff Eli Mistovich, Jr. is a resident of Londonderry, New Hampshire. Plaintiff is 53 years of age. He is married and the father of four children, two of whom were attending college at the time Plaintiff's employment was terminated in 2003. (Affidavit of Eli Mistovich, Jr., Para.1).

2.    Plaintiff graduated from Northeastern University in 1975 with a degree in civil engineering. (Mistovich Dep.[Opposition Exh.1] pp. 23-24). Plaintiff was employed in the railroad industry since he graduated from Northeastern in 1975. Plaintiff worked for the Penn Central Railroad for about one year and thereafter for its successor ConRail from 1976 through 1978. In January of 1978, Plaintiff became employed by Amtrak as an assistant production engineer and later engineer track. In

1987, Plaintiff became assistant division engineer with Amtrak's commuter rail service in Boston. (Mistovich Dep. pp. 24-26). Amtrak operated the commuter rail service under a contract with the Massachusetts Bay Transportation Authority ("MBTA"). (Stephen F. Urban, Jr. Dep.[Opposition Exh. 3] pp. 5, 7).

3. Defendant Massachusetts Bay Commuter Railroad Company ("MBCR") is a limited liability corporation owned by three other corporations: Connex North America, Bombardier Corporation and Alternative Concepts Corporation. (Urban Dep. pp 6-7). On July 1, 2003, MBCR succeeded Amtrak in operating the MBTA's commuter rail service in the Boston Area. (Urban Dep. p. 5).

4. MBCR was organized specifically to bid on the MBTA commuter rail service contract. (Urban Dep. p. 13). After being awarded the contract and succeeding Amtrak, MBCR offered employment to almost all Amtrak union and management employees below the highest level. Approximately 1600 Amtrak employees, including Plaintiff, transitioned to MBCR to operate the commuter railroad after July 1, 2003. (Urban Dep. pp. 13-14).

5. As assistant track engineer at Amtrak and subsequently MBCR, Plaintiff supervised over 170 employees in track maintenance, overseeing capital and infrastructure improvements, meeting budgetary goals, contract administration, customer service, consulting with outside attorneys in defense of suits, interacting with union representatives on collective bargaining issues and interviewing and hiring new employees. (Mistovich Aff. Para.2).

6. Defendant Elizabeth Bowden is a resident of Canada and is a Canadian citizen (Bowden Dep. [Opposition Exh. 2] p. 5). Bowden was employed by MBCR from

September of 2003 through July of 2005 as manager of organizational development.

Her duties were to lead and coordinate MBCR's human resources functions.

(Bowden Dep. p. 7).    Bowden had no railroad labor experience or experience in

managing or supervising railroad labor employees.  (Bowden Dep. pp. 13-14).

7.    From May of 2003 through the present, Defendant Stephen Urban has been employed

by MBCR.  Prior to January of 2004, Urban was employed by MBCR as the assistant

manger of transportation; in January of 2004, Urban became the Deputy General

Manager of MBCR serving as the chief operating officer responsible for day to day

operation with direct responsibility for the engineering and mechanical departments.

(Urban Dep. pp. 6-7).  From 1976 to 2003, Defendant Urban was employed by

Amtrak as a transportation operations officer in various positions in the Northeast

corridor.  Urban had known Plaintiff since 1987 during their employment at Amtrak.

(Urban Dep. pp. 7-9).

8.    From July of 2003 through the present, Defendant Stephen Neverro has worked as a

contract consultant with MBCR.  Neverro has served in the position of Chief

Engineer overseeing maintenance and construction of tracks, bridges, buildings and

the signal system.  (Neverro Dep.[Opposition Exh. 4] p. 7).  Defendant Neverro was

Plaintiff's immediate supervisor when Plaintiff worked for MBCR.  (Neverro Dep. p.

13).  Prior to coming to work as a consultant for MBCR, Neverro had worked in the

railroad industry as an employee for Guilford Rail System and its predecessor the

Boston and Maine Corporation.  Neverro then went to work as an employee of HNTB

corporation consulting with various companies on engineering matters.  In the course

of his railroad employment, Defendant Neverro had met Plaintiff while Plaintiff was

3

employed at Amtrak and had conversations over business matters.   (Neverro Dep. pp. 11-12).

9.  Alison Leaton is a resident of Brighton, Massachusetts.  For six months, between September of 2003 and April of 2004, Alison Leaton worked as an independent contractor at MBCR as a recruiter to hire and fill open positions.  (Leaton Dep.[Opppsition Exh.5] pp. 7-8).  Leaton was interviewed and hired by Bowden. (Bowden Dep. p.34).  Leaton had no experience in the railroad industry before working at MBCR.  (Leaton Dep. p. 10).

## Plaintiff's Employment at Amtrak and Commendations for Diversity in Hiring

10.  Plaintiff worked at Amtrak for 26 years prior to July of 2003 when he transitioned, along with almost the entire Amtrak commuter rail workforce in the Boston area, to MBCR. (Mistovich Dep. pp. 25-26).

11.  In his 26 years of employment in the track department at Amtrak, Plaintiff interviewed and made decisions on 99 percent of the hirings in the track department. Plaintiff had reviewed thousands of resumes and interviewed thousands of applicants. (Mistovich Dep. pp. 78, 241-242).  Plaintiff was also in charge of terminating employees in Amtrak's track department.  (Mistovich Dep. p. 308).

12.  At Amtrak, Plaintiff received satisfactory or better performance evaluations during his 26 years of employment.  He was never the subject of any disciplinary actions. (Mistovich Aff. Para.3).  One of the categories in which he was evaluated as a manager was valuing diversity – i.e. "appropriate action in support of employment diversity, supplier diversity and affirmative action as well as the support of equal opportunity policies".  Plaintiff was frequently commended in writing by his Amtrak

4

supervisors for his efforts at hiring minorities and supporting them in training.

Comments from his performance reviews between 1989 and 2000 include the

following:

1989: "Eli has had great involvement in the hiring program during this evaluation period. He is to be commended for the time and effort spent in this task. His adherence to Amtrak's AAP [Affirmative action Program] and corporate policies have enabled the hiring of qualified individuals on a non-discriminatory basis."

1990: "Eli continued his dedicated effort in the area of hiring this year, without sacrificing any of his responsibility. By year's end, more than two hundred and fifty were interviewed with one hundred + being hired. Eli maintained his strict adherence to AAP and corporate policies".

1992 and1993: "Eli perpetuates an environment favorable to the equal growth of all employees heeding corporate policy and procedures".

1994: "Eli maintains and adheres to Amtrak's programs on Affirmative Action and opportunity. Everyone is treated the same in his dealings with managers and personnel".

1998: "promotes equal employment policies and insures open access to all developmental and promotional opportunities in a non discriminatory environment." It was commented that "Eli conducted job interviews one or two days per week during October, November and December to fill twenty eight vacancies. The guideline of thirty percent minority candidates was exceeded."

1999: "during October, November and December Eli conducted over 100 job interviews and subsequently hired six minority and two female candidates; eight of twenty-four total candidates equals thirty-three point three percent thus exceeding the thirty percent goal by eleven percent."

2000: "Eli has supported all the myriad training programs and has exceeded his goals in hiring minority candidates this year. Additionally, Eli has provided mentoring support for one of his minority managers who has struggled with assignments. (Mistovich Aff. Para. 4 and Exhibits A – G thereto).

13.    Plaintiff attended and received anti-discrimination and diversity training at both

Amtrak and later at MBCR. (Mistovich Dep. P. 237). In his 26 years at Amtrak,

Plaintiff was never charged with any discriminatory practice. (Mistovich Dep. p.

313).

14.     In hiring entry level track employees at Amtrak, Plaintiff valued railroad experience
and construction experience very highly since entry level trackmen were required to
work with hand tools and do heavy manual labor including hauling, lifting and
carrying heavy loads. A hoisting license was also considered valuable. (Mistovich
Dep. p. 252). Plaintiff also valued managerial experience since it was an indication
that the employee was trusted by his prior employer and had potential to move up to
foremen or supervisors positions. (Mistovich Dep. p. 248 and Dep. Exhibit
18[Copies of Deposition Exhibits are submitted as Opposition Exhibit 6]; pp. 320-
321). A commercial drivers license was a factor to be considered, but not considered
as important as was other qualities since union seniority rules prevented entry level
trackmen from driving trucks for several years. (Mistovich Dep. pp. 319-320).

15.     In his employment experience at Amtrak, Plaintiff had not had good experiences
when he had hired candidates with below average qualifications – i.e. lacking in
railroad, construction or similar experience. Below average hires resulted in
discipline problems for Plaintiff. (Mistovich Dep. pp. 209-211).

16.     After the transitioning of almost the entire Amtrak commuter rail workforce to
MBCR in July of 2003, Plaintiff's job title and responsibilities as assistant division
engineer remained exactly the same. (Mistovich Dep. p. 28).

Shortage of Personnel in Track Department and Catastrophic Consequences

17.     There had been a hiring freeze in the track department at Amtrak from the fall of
2001 through the transition to MBCR in 2003. During this time period the track
department had lost 37 employees through attrition. Plaintiff was deeply concerned
about this understaffing and its effect on the department's track maintenance duties.

Plaintiff was especially concerned as winter approached and snow removal burdens were placed on the department. On September 25, 2003, Plaintiff communicated these concerns in writing to Neverro. (Mistovich Dep. p. 130, 155 and Exhibit 1).

18.     Plaintiff first met Alison Leaton in the late fall or early winter of 2003 in connection with an authorization to hire four additional entry level trackmen. (Mistovich Dep. pp. 186-187). Plaintiff had accumulated about sixty resumes of candidates in his files which he sent to Ms. Leaton as the recruiter. Plaintiff intended to interview all of the candidates. Leaton became irate with the large number of resumes and informed Plaintiff that sixty was too many candidates to interview for only four vacancies. She instructed Plaintiff to edit the number down to ten resumes. (Mistovich Dep. pp. 246-247). Plaintiff convinced Leaton to increase the number of candidates to be interviewed from ten to fifteen and, at Leaton's direction, narrowed the resumes of candidates to be interviewed to fifteen. (Mistovich Dep. p. 152). In November of 2003, Plaintiff and Leaton interviewed nine candidates and hired two (Mistovich Dep. pp. 249-250 and Exhibit 19).

19.     On December 6 and 7, 2003 a severe snowstorm occurred. Because of the lack of personnel, MBCR did not have enough people to clean the snow from platforms and parking lots. It was the worst fiasco that Plaintiff had experienced in a snowstorm in his eighteen years on the commuter rail. One MBCR employee was killed when struck by a train. Plaintiff felt that this death was due to the fact that the snow removal crews were working shorthanded. At a meeting after the employee's death, Plaintiff spoke up and stated that he felt that the reason for the disaster was the fact that MBCR had not hired a significant number of new people in the track department.

(Mistovich Dep. pp. 119-120, 122-123).

<u>Additional Hirings Authorized by MBCR</u>

20.    After the snow storm and fatality, MBCR increased the number of entry level

       trackmen to be hired from four to eight. Since two new trackmen had been hired in

       November, this left six more to be hired. (Mistovich Dep. p. 251).

21.    In narrowing the resumes of candidates to be interviewed from sixty to fifteen,

       Plaintiff based his decisions on factors such as railroad experience, construction

       experience, labor experience, manual labor experience, a hoisting license and CDL.

       Obviously this required subjective determinations on Plaintiff's part based on his 28

       years of railroad experience and 26 years of hiring in the track department.

       (Mistovich Dep. p. 252). It was Leaton who demanded that the list be narrowed and

       said that Plaintiff's initial list was way too many. Leaton in fact got emotional and

       insistent about narrowing the list. (Mistovich Dep. p. 253). In January of 2004,

       Plaintiff sent Leaton 40 more resumes which he had received. (Mistovich Dep. p.

       270 and Exhibit 8). Plaintiff narrowed this list to 15 manes as required by Leaton and

       sent the list and 15 resumes to Leaton on or about February 9, 2004. (Mistovich Dep.

       pp. 256-261 and Exhibit 20). Thereafter Leaton scheduled ten interviews on

       Thursday March 4th and Friday March 5th, 2004 with candidates selected by Plaintiff.

       The interview schedule was set up by Leaton. (Mistovich Dep. p. 257).

22.    On Thursday, March 4, 2004, three candidates scheduled for interviews at 11:30 a.m.,

       1:00 p.m. and 2:00 p.m. failed to show up. Thus, seven candidates were interviewed

       by Plaintiff and Leaton on March 4th and March 5th and three were hired. (Mistovich

       Dep. pp. 253, 272 and Exhibit 21). During the two and a half hours of dead time

when three straight candidates did not show for interviews, Plaintiff and Leaton

discussed the need for at least one more day of interviews to fill the remaining three

vacancies. (Mistovich Dep. p. 258).

Leaton Interjects Race Issue on One Resume

23.    Leaton then handed Plaintiff a stack of between 12 and 24 other resumes which she

had in her possession.  Plaintiff did not know where these resumes were from and

started looking through them.  (Mistovich Dep. pp. 259-260).  One of the resumes

was from a candidate named Marvin Morgan whose address was listed as 194

Normandy Street in Dorchester.  (Deposition Exhibit 2).  Plaintiff does not recall

seeing Morgan's resume before and it was not on a list of resumes which Plaintiff had

previously sent to Leaton from his files.  (Mistovich Dep. p. 270, and Exhibit 8).

Plaintiff briefly looked at Morgan's resume and put it down without deciding.  Leaton

animatedly accused Plaintiff of excluding the resume from consideration because

Plaintiff thought that Morgan was "black".  (Mistovich Dep. p. 178, 193, 261).

Plaintiff was stunned and did not know what Leaton was talking about.  He again

looked at the resume and did not know how to determine what Morgan's race was.

(Mistovich Dep. p. 261).  Plaintiff looked at Morgan's resume and noted that while

Morgan had a commercial driver's license, he had no construction or railroad

experience.  His work experience had been as a dumpster driver from 1993 to 2002

which did not qualify him for track work.  Additionally, Morgan had a gap in his

employment from 2002 through the date of the interview.  Plaintiff informed Leaton

that based on his brief review of the resume, Morgan did not appear to be what

Plaintiff considered to be an above-average candidate.  Plaintiff informed Leaton that

he was looking for above average candidates and that he usually didn't have good luck with candidates whom he considered below average. (Mistovich Dep. pp. 262-263). Leaton said words to the effect that she would not make Plaintiff hire an unqualified minority; however, if the minority was qualified, she wanted Plaintiff to hire him. (Mistovich Dep. p. 264).

24. Plaintiff concluded that Leaton must have been aware that Morgan was black, since it would have been racist for her to have concluded that a candidate was black based on his name and a Dorchester residential address. (Mistovich Dep. p. 193). It is reasonable to infer that Leaton was well aware of Morgan's race. Leaton, on instructions from Bowden, had advertised the Trackmen's position in the Bay State Banner, a community newspaper for black Boston residents. Leaton did not advertise the position in the Boston Globe, Herald or any other newspaper. Leaton received some resumes as a result of these postings. Plaintiff, even though he was the hiring manager, was not informed of this posting. (Leaton Dep. pp. 14-15; Mistovich Aff. para.4 and Exh. H thereto). Bowden, apparently in response to meetings with a black Boston City Councilor, gave this instruction to Leaton in an effort to increase minority hiring. (Bowden Dep. pp. 43-51). Advertising for a position only in a media outlet circulating in the black community is racism since it excludes qualified applicants of other races based solely on race.

25. Plaintiff handed the additional resumes back to Leaton to select the interviewees. Plaintiff voiced no opinion of which resumes he thought should be selected for interviews. He had no objection to interviewing Morgan or anyone else in the pile since his main focus was to get qualified people in place in light of the snow

emergency fiasco. (Mistovich Dep. p. 265). Plaintiff did think Leaton's behavior strange, if not bizarre. (Mistovich Dep. p. 190).

26.     On March 11, 2004, Leaton scheduled three interviews, including one with Marvin Morgan. (Mistovich Dep. Exh. 21, and 22). Plaintiff, as hiring manager, had the final say in hiring decisions. (Leaton Dep. pp. 95-96). Morgan was interviewed by Plaintiff and Leaton for approximately one hour. On March 11th, Plaintiff observed that Morgan was black. After the interview, Morgan was hired with Plaintiff's approval. (Mistovich Dep. p. 273).

27.     Prior to the interviews on March 11, 2004, Leaton called Plaintiff and informed him that she had a conflict due to a doctor's appointment at Brigham and Women's Hospital in Boston. Leaton stated that she would be unable to keep the interview appointments because it would take her too long to get from the Doctor's office by public transportation to the MBCR office in Somerville where the interviews were scheduled. In order to keep the interviews scheduled, Plaintiff personally picked Leaton up at Brigham and Women's Hospital and drove her to Somerville. After the interviews, Plaintiff then personally drove Leaton from MBCR's Somerville facility back to her office at 89 South Street in Boston. They made conversation during the rides and nothing was said about Morgan's race. (Mistovich Dep. pp. 314-316).

<u>Leaton's Character Assassination of Plaintiff</u>

28.     On March 11, 2004, the very day that Plaintiff had interviewed and hired Morgan, and drove Leaton to and from the hiring interview, Leaton telephoned Bowden, MBCR's head of human resources. Leaton informed Bowden that Plaintiff did not want to interview Morgan because Morgan was black. According to Leaton, Plaintiff

had made this "assumption" based on Morgan's "name and where he lived" set forth

on the resume.  Leaton further informed Bowden that she "pushed very hard and

basically told [Plaintiff] that we were going to interview him because he was as

qualified, if not more so, than other candidates".  (Bowden Dep. pp. 53-54 and

Exhibit 5).  This was a misstatement of fact.  Morgan lacked any railroad or

construction experience which many of the other candidates had.  Neither Leaton nor

Bowden had any idea of the requirements of a railroad trackman job.  Leaton

thereafter e-mailed Bowden at Bowden's request and presented her version of this

alleged conversation and the circumstances of the selection of Morgan.  Leaton

characterized the e-mail as indicating that the decision to hire Morgan was due to her

"pushing".  (Bowden Dep. p. 54).  This e-mail was never shown to Plaintiff.

(Bowden Dep. p. 69; Leaton Dep. p. 72).

29.    Thereafter, unbeknown to Plaintiff, Leaton's accusation took on a life of its own as

Leaton and Bowden repeated and circulated it throughout the HR department and

among Plaintiff's supervisors.  Leaton's accusation was that somehow Plaintiff had

discerned that Morgan was black based solely on his name and residential Dorchester

address, and had excluded him from consideration for interviews due to that fact.  On

March 15, 2004, Bowden, Leaton and either Stephen Neverro or Stephen Urban had a

meeting to discuss Leaton's accusations.  (Bowden Dep. p. 70 and Deposition Exhibit

6).  Bowden, Leaton and another HR employee had another meeting concerning this

subject prior to March 26, 2004.  Again Plaintiff had no idea that these condemnatory

allegations of racism were swirling around.  Bowden made notes of her interview

with Leaton and sent the notes to Leaton for review and comment for accuracy by e-

12

mail on March 16, 2004. (Bowden Dep. p. 83; Exhibits 29 and 30). Leaton informed Bowden that there was "no room for misinterpretation" of Plaintiff's alleged racism. (Bowden Dep. Exhibit 30). Leaton did acknowledge that before, during or after interviews of minority candidates, Plaintiff did not say or do anything differently; Leaton further acknowledged that after Morgan's interview, Plaintiff had indicated that he would hire Morgan. Leaton also acknowledged that Plaintiff, as the hiring manager, had the final say on who to hire. (Dep. Exhibit 30, p. 2). Leaton told Bowden that there was no misunderstanding, that Plaintiff intended to exclude Morgan from the hiring process due to his race. (Bowden Dep. p. 74).

30. Thereafter, Bowden determined that she would conduct an "investigation" into Leaton's accusation that Plaintiff was "screening candidates for interviews based on names and addresses". Bowden had no experience in conducting an employment discrimination investigation. (Bowden Dep. p. 86). Bowden contacted Plaintiff's immediate superior, Stephen Neverro, and Stephen Urban, the deputy general manager and informed them of the accusations and the investigation. Bowden had meetings with MBCR's General Manager, Kevin Lydon and counsel, John Davey and informed them of Leaton's accusations. (Bowden Dep. pp. 76-77). On March 25, 2004, Plaintiff received an e-mail from Bowden requesting that Plaintiff meet with her the next day, Friday, March 26, to address "hiring concerns in the track department". (Mistovich Dep. p. 80).

31. Bowden actually scripted out a list of questions to ask Plaintiff at the meeting. (Bowden Dep. pp. 78-79 and Exhibit 28). Bowden arranged for Urban and Neverro to be present at the meeting.

32.    The only notice Plaintiff received of the meeting was the innocuous e-mail from Bowden on March 25th, requesting that he meet with her on March 26th. (Mistovich Dep. p. 80).

## Plaintiff's High Blood Pressure and Medication

33.    Several weeks before March 26th, Plaintiff began to experience high blood pressure difficulties. One of the veins in his right eye had burst due to the blood pressure problem and Plaintiff was literally blind in one eye. Plaintiff was placed on high blood pressure medication which caused side effects including drowsiness, impaired ability to concentrate and communicate and other symptoms. Thus Plaintiff was blind in one eye and in an impaired state on March 26, 2004. (Mistovich Dep. p. 91-94, 192). It should be noted that in twenty-eight years of employment at Amtrak and MBCR, Plaintiff had never taken one sick day. Plaintiff was a dedicated and loyal employee who was aware of the need for attendance. Plaintiff had often worked nights and weekends during emergencies and snowstorms. (Mistovich Dep. p. 91-92).

## Failure to Provide Plaintiff with Notice of Purpose of Meeting

34.    In Plaintiff's twenty eight years at Amtrak, his practice was to prepare for meetings on anything other than routine matters, so the participants could prepare and discuss matters intelligently. (Mistovich Dep. pp. 82, 84). As a matter of practice, he telephoned Bowden and left a voicemail inquiring as to the purpose of the meeting. Bowden did not provide Plaintiff with the courtesy of a response. (Mistovich Dep. p. 80). On March 25, 2004, the day before the meeting, Plaintiff telephoned Leaton and inquired as to whether she knew what the subject of the meeting was since she was

14

involved in the hiring process. Leaton lied to Plaintiff and told him that she didn't know anything about the meeting and that he needed to speak to Bowden about it. (Mistovich Dep. p. 81; Leaton Dep. pp. 102-103). Leaton then immediately e-mailed Bowden to tell her about Plaintiff's inquiry. (Bowden Dep. pp. 113-114 and Exhibit 31). Bowden was thus aware of Leaton's false statement to Plaintiff. It was clear that Bowden intended to keep Plaintiff in the dark as to the subject of the meeting and to level the accusation of racism directly at him at the meeting with no advance warning.

35.    Bowden was well aware that advance notice would allow Plaintiff an opportunity to prepare and make an effective presentation, yet gave no notice to Plaintiff of the accusations of racism that would be made against him at the meeting; or that any "investigation" was occurring. (Bowden Dep. pp 79-80).

36.    Both Urban and Neverro had discussed Leaton's allegations against Plaintiff with Bowden prior to March 26. Neither Urban nor Neverro, Plaintiff's immediate supervisor, who were well aware of the purpose of the meeting, communicated with Plaintiff to inform him of the subject of the March 26th meeting. (Urban Dep. pp. 28-29; Neverro Dep. pp. 40-41).

Meeting of March 26, 2004

37.    On March 26th, Plaintiff went to the meeting and saw that Bowden was present with Urban and Neverro. Plaintiff did not even bring a notebook to the meeting with him since he had no idea what the meeting was about. (Mistovich Dep. pp. 206, 207 and Exhibit 11). Neither Bowden, Urban nor Neverro asked Plaintiff about his health or whether he was on medication at the meeting. (Urban Dep. pp. 36-37). Bowden did not think such questions were appropriate, even though Plaintiff's job was at stake.

38.     Bowden started off the meeting speaking to Plaintiff in an accusatory tone and

leveled accusations of racism in hiring at him.  (Mistovich Dep. p. 53).  Bowden

started off the meeting by telling Plaintiff that the reason for the meeting was the

report from Leaton that Plaintiff was "eliminating qualified applicants because of

their name and home address as indicated on their resume (under the assumption that

they were black)".  (Mistovich Dep. p. 207 and Exhibit 11, 3rd paragraph).  Bowden

further stated that during the meeting on March 5, 2004 between Plaintiff and Leaton,

a qualified resume which Plaintiff had passed over was presented and Plaintiff

indicated that he did not want to interview this person as he had trouble with "people

like that "in the past".  Plaintiff understood that he was being accused of racism and

was stunned and shocked by the allegation.  In his 26 years of hiring experience, he

had in fact been commended for efforts to reach and exceed company diversity goals

in his hiring of minorities.  It had been more than three weeks since his March 4th

conversation with Leaton, and Plaintiff had no idea what Bowden was talking about.

He simply could not remember or call to mind the issue.  (Mistovich Dep p. 60).

Additionally, Plaintiff was in an impaired state due to the medication he was on.

Bowden anticipated that Plaintiff would have trouble recalling a conversation which

had occurred over three weeks ago without any advance notice, and that an accusation

of racism would surprise an employee who had not engaged in racism.  (Bowden

Dep. pp. 91-93, 102).

39.     Plaintiff sat in stunned silence as Bowden went on and on in her accusatory tone

reading from a prepared script and leveling quotes at Plaintiff provided by Leaton to

Bowden in writing.  Plaintiff never had the opportunity to see, review or formulate a

16

response to any of these accusations and was frantically trying to recall his conversations with Leaton. (Mistovich Dep. p. 67, 89-90). Bowden's hostile tone of voice in the presence of two supervisors made Plaintiff feel like the process was a "Spanish Inquisition". (Mistovich Dep. p. 56). During this process, Plaintiff eventually recalled bits of the strange conversation he had with Leaton concerning Marvin Morgan. (Mistovich Dep. p. 91). Plaintiff tried to point out that in fact he had hired Morgan and didn't understand what the problem was. He also noted that he had much experience in selecting candidates and that his goal was always simply to select the best candidates and that he had always exceeded diversity hiring goals with his previous employer, Amtrak. (Mistovich Dep. pp. 207, 211, 215). Plaintiff informed Bowden that he did not know whether Morgan was black or white from his resume. (Mistovich Dep. pp. 98-99). Plaintiff understandably did not know how to respond. However, it was clear to Plaintiff based on the lack of any advance notice of these allegations and meaningful opportunity to prepare to rebut them; the scripted inquiry and the accusatory and hostile tone of the questions that the three "investigators" had already made up their minds. Plaintiff so informed them at the meeting. (Mistovich Dep. p. 218).

40.    Bowden informed Plaintiff that his stunned silence to her accusations was considered "stonewalling" and an admission of the accuracy of Leaton's comments. Plaintiff thereafter left the meeting, stunned and shocked at what had occurred. Bowden made notes of her conversation and concluded that "at no point did Eli indicate that he was not biased in his hiring practice and did not deny the overall circumstances of the meeting and its contents – when pressed on the issues he opted to say nothing".

17

(Exhibit 11, p.3). After the March 26th meeting, Bowden again contacted Leaton and requested again that Leaton summarize her conversation with Plaintiff on March 5th. Leaton, who had been focusing on her version of events for three weeks, furnished a written summary again accusing Plaintiff of racism. (Bowden Dep. pp. 115-116 and Exhibit 32). This was not shown to Plaintiff, nor was he given any opportunity to present his version of events in writing.

## Decision to Terminate Plaintiff

41. Neither Urban nor Neverro, experienced railroad men, had anything of substance to say at the meeting. Defendants have acknowledged that they could not determine Mr. Morgan's race based upon his resume name and address. (Bowden Dep. pp.58,112; Neverro Dep. p.50). Thereafter, Bowden met on the next working day, Monday, March 29, 2004 with MBCR's general manager Kevin Lydon and general counsel John Davey. Urban and Neverro were present at the meeting. Bowden reported her version of the events and stated that since Plaintiff did not effectively rebut the accusations which she had leveled, he was guilty of racism. No one bothered to speak up for Plaintiff at this meeting. Plaintiff was not informed that the meeting was occurring; that his employment future was at stake, nor given an opportunity to speak at the meeting or otherwise rebut the accusations made so abruptly to him at the March 26, 2004 meeting. Neither Bowden, Urban, nor Neverro checked in to Plaintiff's hiring history at Amtrak. Notwithstanding the fact that numerous former Amtrak supervisors, peers and subordinates worked at MBCR. (Bowden Dep. p. 113). Bowden stated in writing that Plaintiff had tried to bring up his commendatory hiring record at Amtrak during the meeting, but stated falsely that "this comment

cannot be validated by MBCR." Neither Bowden, Urban nor Neverro made any effort to validate Plaintiff's record at Amtrak. (Bowden Dep. p. 103; Urban Dep. p. 45; Neverro Dep. p. 65). Urban was aware from his own experience at Amtrak that managers such as Plaintiff were evaluated annually on their diversity in hiring practices, yet made no effort to check Plaintiff's minority hiring history. (Urban Dep. pp. 56-57).

42.     On March 30, 2004, Plaintiff was asked to meet again with Bowden, Neverro and Urban. Plaintiff was summarily told that he was being terminated from his employment based on his screening of applicants based on racial factors. Plaintiff was given the option of resigning (in which case future employment references would be told that he had voluntarily left his employment) or being terminated (in which case future employment references would be informed that Plaintiff was terminated for cause). Plaintiff was again shocked and stunned. He could not believe that his twenty eight year railroad career in which he had been commended for hiring minorities, had been terminated on such flimsy grounds because of a baseless accusation of racism with no opportunity to refute. Plaintiff refused to resign since it was a fabrication and falsehood. Plaintiff was marched out of the office by Urban, forced to clean out his office and then go to the parking lot and clean out his company vehicle into another car in full view of all employees. Plaintiff was humiliated by this treatment. (Mistovich Dep. pp. 108-110, 310-311).

Respectfully submitted,
Eli Mistovich, Jr.,
by his attorney,

Frank J. Teague, Esq.
Frank J. Teague & Associates
One Liberty Square, 4th Floor
Boston, MA 02109
(617) 350-7700
BBO# 493780

Dated: 11/28/05