Eli Mistovich, Jr.                                              09/22/2005

209

1       that effect?

2              A.    Yes.

3              Q.    And then it goes on to say, When asked

4       about this on March 26th by E. Bowden, his first

5       response was that was true, and he had records to

6       validate his statement.

7                    Is that a correct paragraph?

8              A.    That's true.

9              Q.    So your first response to Elizabeth Bowden

10      after she explained was it was true and you had records

11      to validate your statement that you had trouble with

12      people like that in the past?

13             A.    That's correct.  But it didn't address

14      their race.  It was candidates either above average or

15      below average.  The resume was below average for the

16      requirements of the position.  That's what I base it

17      on.  I couldn't tell what the guy's race was.  It was a

18      below average resume.

19             Q.    So you do recall telling Ms. Bowden and the

20      others that you had problems with people like that in

21      the past.  But you were referring to people who had

22      below average resumes?

23             A.    Correct.  Below average resumes,

24      qualifications, job experience.  This candidate that was

Eli Mistovich, Jr.                                      09/22/2005

210

1    being discussed didn't have any construction laborer

2    experience, which was a prerequisite, didn't have a

3    hoisting license.

4            The job -- the position -- the

5    advertisement said able to lift, bend, carry heavy

6    loads.  Hadn't any indication of that.  Didn't have any

7    railroad experience.  There was a gap in his resume from

8    2002.  That was his last job.  There was a gap.  There

9    was a few things that didn't look like this was an above

10   average candidate to me.

11           Q.    The next paragraph, it says, When

12   challenged on this, Eli indicated he had lots of

13   experience in selecting applicants.  And his goal was to

14   select the best or above average candidates.  Eli

15   appeared put out as he outlined that his comments to the

16   recruiter he thought were -- were he thought in

17   confidence.

18           Do you recall that paragraph?  Do you

19   recall the events in that paragraph?

20           A.    Yes.

21           Q.    Is that a true characterization of what

22   happened at the meeting?

23           A.    Yeah, but, again, the context -- you're

24   insinuations here are drifting the wrong way.  I was

Eli Mistovich, Jr.                                        09/22/2005

211

1    trying to select above average applicants because when I

2    don't, I end up with problems down the road.  I've had

3    26 year's experience with this.  I try to get above

4    average applicants.

5              As I've said before, there were four years

6    in a row -- you've got documentation -- that I exceeded

7    the 30 percent guideline.  It's not a minority,

8    non-minority, black, white issue.  It's above average

9    candidates end up being above average employees.  Below

10   average candidates, below average.  And I end up with a

11   lot of discipline problems.

12        Q.   So is the part where you indicated that you

13   thought your recruiters were in confidence -- that your

14   statement to the recruiter were in confidence, is that a

15   statement that you made at this meeting?

16        A.   Possibly.  I can't remember exactly.

17   Again, I was in a daze.

18             MR. TEAGUE:  Just answer the question.

19        Q.   Then it goes on to say, This was agreed to

20   as an acceptable goal.  But the issue was that the

21   interview consideration process, given that the

22   candidate in question met the qualification

23   requirements.  Eli was advised that statements that are

24   contradictory to MBCR policy and in this case a

Eli Mistovich, Jr.                                09/22/2005

215

1        Q.    Okay.  And then it has a response.  The

2   interview process for these openings was ongoing with

3   the first wave of interviews not identifying enough

4   qualified applicants to fill the approved requisition.

5   So the discussion on March 5th was to identify other

6   potential applicants, altogether approximately 15 people

7   we interviewed, one or two minority candidates.

8              Do you recall giving that response at any

9   point?

10       A.    Yes.

11       Q.    And is that accurate to your knowledge?

12       A.    Yes.

13       Q.    Questions three, We have been advised that

14   you would not interview certain applicants because of

15   their name and their address.  The discussions was that

16   you assumed that they were black or minority.  What is

17   your response to this?

18             Do you remember being asked that question?

19       A.    I can't remember exactly.  But I remember

20   Bowden making allegations.  So, yes, I do remember words

21   to that effect.

22       Q.    And then it goes on to say, I always select

23   the best or above average candidates.

24             Do you recall making that response --

Eli Mistovich, Jr.                                    09/22/2005

218

1       being asked these questions.

2               Q.    So you can't recall?

3               A.    No.

4               Q.    All right.  Then it says, As Eli was not

5       providing any information, E. Bowden stated that absent

6       the comment from Eli, the information from the recruiter

7       was considered accurate and without objection.

8                     Do you recall Elizabeth Bowden making a

9       comment to that effect?

10              A.    Yes.

11              Q.    And then it says, Eli stated, It sounds

12      like you've already made up your mind.

13                    Do you recall making that statement in

14      response?

15              A.    Vaguely, yeah, I think I did make that.

16      Yeah.

17              Q.    And then it says, E. Bowden restated that

18      no conclusions have been formed.  That is the purpose of

19      this meeting.  Do you recall her making any statement to

20      that effect?

21              A.    No, I don't remember that part of it.  But,

22      again, it seems to me that I was being set up and even

23      in that impaired state, I could figure out that they had

24      already made up their mind and this was a done deal,

Eli Mistovich, Jr.                                    09/22/2005

237

1          Q.    Okay.  Mr. Mistovich, I'd like to sort of

2    just go back to hiring in general.  During your

3    employment with MBCR, did you have training on anti-

4    discrimination principles?

5          A.    Yes.

6          Q.    And did you also have training on that at

7    Amtrak?

8          A.    Yes.

9          Q.    And I'm going to hand you what has been

10   previously marked as Deposition Exhibit 10.  Is that an

11   accurate representation of the trainings that you

12   received first at Amtrak and later at MBCR?

13         A.    Yes.  It appears to be accurate.

14         Q.    And one of the subjects that was covered

15   was effective interviewing techniques, is that correct,

16   at MBCR?

17         A.    I don't remember that specifically.  It

18   might have included in that training.

19         Q.    If you can refer you to this line here,

20   effective interviewing techniques on November 5th, 2003,

21   does that refresh your memory?

22         A.    Yes, yes.

23               MS. RUBIN:  I'd like to have this marked as

24   the next exhibit.

Eli Mistovich, Jr.                                    09/22/2005

241

1          Q.    Mr. Mistovich, you've been handed what's

2    been marked as Deposition Exhibit No. 17.  Do you

3    recognize it?

4          A.    Yes.

5          Q.    And what is that document?

6          A.    MBCR HR policies and procedures, code of

7    conduct.

8          Q.    And is that a policy that you were aware of

9    at the time you worked at MBCR?

10         A.    Yes.

11         Q.    While you were at Amtrak, did you play any

12   role in the hiring of personnel for Amtrak?

13         A.    Yes.

14         Q.    What was your role?

15         A.    As hiring manager, I would interview and

16   make decisions on anybody in the track department, all

17   track department employees.

18         Q.    And were other people at Amtrak playing

19   that role as well?  Or were you the only person hiring?

20         A.    No, no.  There were various -- each

21   department would do their own hiring, typically.

22         Q.    But were you the only person responsible

23   for hiring in the track department?

24         A.    I did 90, 99 percent of the hiring.

Eli Mistovich, Jr.                                      09/22/2005

242

1    Q.    99 percent?

2    A.    Yes.

3    Q.    In the track department?

4    A.    Yes.

5    Q.    Did you play any role in the hiring of

6    other departments?

7    A.    No.

8    Q.    And while you were working at Amtrak, was

9    it ever accused of discriminatory hiring practices?

10   A.    Not my department wasn't.

11   Q.    Amtrak generally?

12   A.    Amtrak down on the corridor was but not --

13   but not the department I was hiring.  I always exceeded

14   my guideline figures.

15   Q.    So your understanding is that Amtrak in

16   other areas were accused of discriminatory hiring

17   practices; is that correct?

18   A.    Yes.

19   Q.    But the track department that you hired

20   for, to your knowledge, was never accused of

21   discriminatory hiring practices?

22   A.    Correct.

23   Q.    Do you know somebody named Leroy Furgeson?

24   Or Leroy Fergis?  Excuse me.

Eli Mistovich, Jr.                                    09/22/2005

                                                                    246

1    I made a mistake.  That was the gist of the

2    conversation.

3        Q.   Okay.  In your experience in working at

4    Amtrak, were you ever written up in the newspaper in

5    terms of mentioning you in particular in any article

6    saying somebody -- in connection with the hiring

7    practices at MBCR?

8        A.   Not that I can recall.

9        Q.   In terms of the hiring -- need for hiring

10   trackmen at MBCR, when did that hiring process begin?

11       A.   I think I alluded to earlier, late fall

12   early winter of 03.

13       Q.   Of 03.  And what was your role in the

14   hiring process?  Could you walk me through the steps?

15       A.   Well, we had been trying to get people

16   hired without success.  And when authorization finally

17   came, I was told that Alison Leaton -- this individual

18   named Alison Leaton would be the recruiter, and I'd be

19   dealing with her.

20            And so I contacted her, and we started the

21   process.  I recall I sent her all the resumes I had.  I

22   think 60 was the first batch.  And I guess that was 60

23   resumes.  And at some point she got back to me and she

24   was rather irate saying, We only have four -- four or

Eli Mistovich, Jr.                                    09/22/2005

247

1    six vacancies, and 60 is way too many resumes for that

2    amount.  And I'm working by myself.  I can't process

3    that many.  And I certainly can't interview.  So you

4    need to edit that down to 10 or 15 resumes.

5          Q.    And this was in the fall of 2003?

6          A.    It's an ongoing process.  It started in the

7    fall -- in the late fall into the wintertime.

8          Q.    You initially did some interviewing based

9    on a posting in October 2003; is that correct?

10         A.    I think we did -- the first one was for

11    four, and I believe we filled two, if my memory serves

12    me.  We filled two.  So we hired two and still had two

13    vacancies.

14              MS. RUBIN:  I'd like to have this marked as

15    the next exhibit?

16              (Exhibit No. 18 position description

17    marked.)

18         Q.    I'm handing you what has been marked as

19    Deposition Exhibit 18.  Do you recognize that document?

20         A.    Yes.  It's a position description for a

21    trackman.

22         Q.    And is that the position that was posted in

23    October of 2003?

24         A.    Yes.

Eli Mistovich, Jr.                                      09/22/2005

248

1          Q.    And did you play any role in getting that

2    position posted?

3          A.    As far as a position description?  Or as

4    far as to fill vacancies?

5          Q.    To fill vacancies.

6          A.    Yes.

7          Q.    And what role was that?

8          A.    As I testified earlier, there had been a

9    freeze on hiring in the last year and half with Amtrak.

10   And then MBCR didn't hire anybody.  As I previously

11   testified, in August of 03 we had a snow meeting.  I

12   explained to Mr. Nevero we wouldn't have enough people

13   to do snow duty.  Nothing happened.  I followed up with

14   a memo in late September.

15         Q.    And when you say you followed up with a

16   memo in late September, are you referring to Deposition

17   Exhibit No. 1?

18         A.    Yes.

19         Q.    Okay.  That was a memo that you gave

20   Mr. Nevero?

21         A.    Yes.

22         Q.    And then what happened?

23         A.    And some time went by.  And then there was

24   an authorization for four trackmen.

Eli Mistovich, Jr.                                          09/22/2005

249

1          Q.   And this was in the fall of 2003?

2          A.   Yes.

3          Q.   And then you interviewed how many

4    candidates?

5          A.   I can't even remember.

6          Q.   Was that with Alison Leaton?

7          A.   Yes.

8          Q.   And you're saying you filled two of the

9    positions?

10         A.   Yeah.  I seem to recall we filled two, and

11   there were two vacancies.

12              MS. RUBIN:  I'd like to have this marked as

13   the next exhibit.

14              (Exhibit No. 19 interview schedule marked.)

15         Q.   I'm handing you what's been marked as

16   Deposition Exhibit 19.  Do you recognize this?

17         A.   Yes.

18         Q.   What is it?

19         A.   It looks like it's -- Alison Leaton would

20   put out an interview schedule of the candidates for a

21   particular day.  This looks like the two days -- we had

22   two days of interviews lined up and the candidates

23   scheduled for certain times.

24         Q.   And were these the candidates that you did,

Eli Mistovich, Jr.                                09/22/2005

250

1    in fact, interview on October 24th and 25th, 2003?

2         A.    Yeah.  I can't remember exactly, but the

3    names look familiar.

4         Q.    Okay.  And it says, Christen Clark and Gary

5    Collin were both hired.  Is that a correct statement?

6         A.    Correct.

7         Q.    And those were the two people that you said

8    were hired?

9         A.    Yes.

10        Q.    You were trying to hire for four people; is

11   that correct?

12        A.    Correct.

13        Q.    And so you didn't have enough qualified

14   applicants for the other two positions?

15        A.    I can't remember exactly.  We would have

16   liked to, but apparently we didn't have what we felt

17   were above average candidates or whatever reason --

18   no-shows or they withdrew or -- I don't know.  It could

19   be anything.

20        Q.    And all of candidates that you interviewed

21   that day, what were their races?

22        A.    I can't tell looking at the names.

23        Q.    Do you recall whether any of those

24   applicants were minorities?

Eli Mistovich, Jr.                                    09/22/2005

251

1         A.   I can't recall.  It's two years ago --

2    almost two years ago.  I don't remember.

3         Q.   And do you recall what happened next in the

4    hiring process since you still needed to hire some

5    additional trackmen.

6         A.   Well, probably the next thing that happened

7    was the snow storm of December 6th and 7th.  It was a

8    complete disaster.  And apparently that series of events

9    motivated MBCR to authorize additional people to be

10   hired.

11        Q.   And so how many additional people were

12   authorized?

13        A.   I recall four to the original four making a

14   total of eight total authorized.  We already had two so

15   there were six vacancies.

16        Q.   And so was the job reposted?

17        A.   I can't remember whether it was reposted or

18   -- yeah, I don't remember.

19             (Exhibit No. 20 list marked.)

20        Q.   Handing you what's being marked as

21   Deposition Exhibit No. 20, do you recognize it?

22        A.   Yes.

23        Q.   What is it?

24        A.   It looks like a list that looks like my

Eli Mistovich, Jr.                                     09/22/2005

252

1   printing, a revised list of track resumes dated February

2   9th of 04.

3        Q.   So these were people that you were trying

4   to hire in 2004 or you were considering hiring?

5        A.   Yes.  They were candidates -- what I think

6   this is is the original 60 resumes that I had sent to

7   Alison Leaton, again, as I said earlier, she said,

8   That's way too many for the four or six vacancies we

9   have.  We can't -- that's just too many.  You need to

10  cut that down to -- I think she said 10.  I said, 10?

11  How about 10 to 15?  I didn't want to cut it down too

12  much, you know.  So somehow I agreed on 10 or 15 so I

13  cut the list down to 15 from 60.

14       Q.   And when you were cutting the list down,

15  what were the factors or the criteria that you were

16  using to put people on this list as opposed to not?

17       A.   Well, as the position description said,

18  railroad experience, construction experience, labor

19  experience, manual labor -- lifting, you know, hauling,

20  lifting, carrying, bending, stooping, carry heavy loads,

21  prior railroad experience, hoisting license, CDL

22  license.  Pretty much that's it.

23       Q.   And how is it that you had Exhibit 20 in

24  your possession and could produce it to us is this

Eli Mistovich, Jr.                                    09/22/2005

253

1    lawsuit?

2         A.    I had it -- I mean, if I would take the

3    time to forward 60 resumes and she -- Alison Leaton came

4    and said -- and she was quite emotional about it, I

5    should add -- this is way too many.  She really got --

6    on the phone, she was really getting kind of emotional

7    about it.

8              So I said, Okay.  Fine.  I'll cut it down

9    to 10 or 15, which I did.  So that involves going

10   through the 60 resumes.  If I'm going to go through all

11   that work, I'm not just going to send her a piece of

12   paper and it gets lost somewhere.  I kept a copy for

13   myself so when she called me up I could intelligently

14   discuss candidate one through 15 and so I'd have some

15   record of what I sent her.

16        Q.    Right.  But how did you -- when you left

17   MBCR, how did you end up with this record in your

18   possession?

19        A.    I don't know.  I don't know.

20        Q.    Did you already have it at home before you

21   left MBCR?

22        A.    I don't know.  It might have been in the

23   vehicle.  I don't know.  It might have been in the

24   office.  It might have been in the vehicle.  I don't

Eli Mistovich, Jr.                                      09/22/2005

256

1          Q.    And whose -- there are handwritten notes on
2     the various pages.  Do you recognize the handwriting?
3          A.    Yes.  It looks like mine.
4          Q.    For John Hann?
5          A.    Yes.
6          Q.    And for the next resume, Patrick Hurley?
7     Is that your handwriting as well?
8          A.    Yes.
9          Q.    And then for Kevin Crowly?  There's some
10    underlining and the words, No show.
11         A.    Yes.
12         Q.    Is that your handwriting?
13         A.    Yes.
14         Q.    And then the last page for Vincent -- or
15    the next to last page -- I'm sorry -- Vincent Bovay --
16         A.    Yes.
17         Q.    -- is that your handwriting as well?
18         A.    I don't know about -- oh, yeah.  Lost.
19    That's one of the guys I think he got lost.  Again, I
20    alluded earlier to that Map Quest.
21         Q.    Right.
22         A.    This guy got lost and was a no-show.
23         Q.    That's your handwriting as well?
24         A.    Yes.

Eli Mistovich, Jr.                                    09/22/2005

257

1          Q.    An then on James Fitzgerald, there's just

2    some underlining.

3          A.    Yeah.

4          Q.    Do you recall whether that was your

5    handwriting?

6          A.    It looks like it could be.  It's an

7    underline.  I can't tell for sure, but it could be.

8          Q.    And so these were the candidates that you

9    and Ms. Leaton had scheduled for interviews on March 4th

10   and March 5th?

11         A.    I didn't.

12         Q.    That she had scheduled?

13         A.    Alison Leaton did all the scheduling.

14         Q.    Based on the list, Deposition Exhibit 20,

15   in terms of the individuals that you had called --

16         A.    Yes.

17         Q.    -- is that correct?

18         A.    Yes.

19         Q.    And how is it that you ended up with what's

20   been marked as Deposition Exhibit 21 and the attached

21   resumes in your possession?

22         A.    I have no idea.  I have no idea.  Is this

23   in my possession?

24         Q.    It was in your possession, yes.

Eli Mistovich, Jr.                                    09/22/2005

258

1    A.    I don't know that.  I didn't know that.

2        Q.    After -- the meeting that you said that you

3    had with Alison Leaton where she accused you -- where

4    she handed you Marvin Morgan's resume, do you recall

5    what date that was on?  Was that after one of these sets

6    of interviews?

7        A.    It was -- well, it had to be -- looking at

8    this, it looks like there were three names crossed out.

9    I think that's the three consecutive no-shows I referred

10   to, Cowley, Bovay, and Fitzgerald.  Again, Bovay got

11   lost I think because of the Map Quest directions.

12        But it was in that time frame, I think,

13   where we had three no-shows.  That was the first day,

14   and I think we both realized that, Hey, we're having

15   these no-shows.  Now there are not going to be enough

16   candidates the first day and the second day.  So we're

17   going to need to schedule at least one more day of

18   interviews.

19        Q.    Okay.  And was anybody else present when

20   you had this meeting with Alison Leaton?

21        A.    There were no-shows again.  Scheduled for

22   the interviews there was a diversity representative.  I

23   can't remember who it was.  Whether they stayed the

24   whole time or they went out of the room or -- sometimes

259

1    they rotate.  One would do the morning interviews, one

2    the afternoon.  Or one would do the first two and then

3    have an appointment or a meeting.  And somebody else

4    would rotate in there.  It was all varying types of

5    coverage.

6         Q.    But when Alison Leaton had the discussion

7    with you about Marvin Morgan and handed you his resume,

8    was there anybody else present in the room?

9         A.    There might have been.  I can't remember if

10   there was or not.

11        Q.    Okay.  And where were you meeting when you

12   met with Alison Leaton?

13        A.    Where we were doing the interviews in the

14   -- we had a conference room at BET upstairs.

15        Q.    And after Alison Leaton handed -- well, you

16   were going through -- she told you or you both discussed

17   that you needed to hire some additional people or

18   interview additional people?

19        A.    Correct?

20        Q.    And there were the stack of rejected

21   resumes that you were looking through to see if there

22   was anybody else from there that you originally --

23        A.    I don't know that they were rejected.  I

24   didn't know if they were new, recycled.  I didn't know

Eli Mistovich, Jr.                                    09/22/2005

260

```
1    what they're -- all I knew is she had then a stack of

2    resumes.

3              Q.    They asked you to look through?

4              A.    And she handed them across the table.  And

5    there was a pile in front of me.  And I started looking

6    through them.

7              Q.    And do you recall approximately how many

8    resumes were in the pile?

9              A.    I'm going to say one to two dozen.  I don't

10   know.  12 to 24.  I don't know.

11             Q.    Do you recall?

12             A.    No.  I don't know.  There was a small stack

13   of them.

14             Q.    Okay.  And Marvin Morgan's resume was in

15   that stack?

16             A.    Yes.

17             Q.    And after you -- as you say, you were

18   looking through the resumes and putting them in a pile

19   of those that you were rejecting?

20             A.    My recollection -- here's the pile of

21   resumes.  As I would look through each one, I'd put them

22   right here like this.

23             Q.    Indicating yes or no or indicating

24   anything?
```

Eli Mistovich, Jr.                                    09/22/2005

261

1    A.    Again, I was just looking through them.

2    Q.    **And as you put Marvin's --**

3         MS. RUBIN:  The witness -- let the record

4    reflect that the witness is just indicating that he

5    picked up the document and put it in another pile.

6    Q.    **After you put Marvin Morgan's resume in**

7    **that pile, what was it that Alison Leaton said to you?**

8    A.    As soon as I put it over here, she said,

9    You're putting that resume over there because you're

10   going to exclude that candidate because with the name

11   Marvin Morgan being from Dorchester, you think that's a

12   minority candidate.

13   Q.    **And what did you say in response?**

14   A.    I can't remember exactly.  At first I was

15   stunned.  She kind of said it in a loud voice.  I was

16   kind of stunned and shocked.  I said to myself, What the

17   hell is she talking about?  I didn't understand what

18   shes talking about.

19        I looked at it.  And how can you tell from

20   this -- Marvin Morgan.  I don't know if it's an Irish

21   guy.  I don't know what that is.

22   Q.    **I'm asking you what you said.  I'm not**

23   **asking you what thought --**

24   A.    I can't remember exactly what I said.  I

Eli Mistovich, Jr.                                    09/22/2005

262

1    can't remember exactly what I said.

2         Q.   So you don't know what you said to her in

3    response?

4         A.   I can't recall.

5         Q.   Do you recall making statements to the

6    effect that you had not had good luck with people like

7    that in the past?

8         A.   No.  I recall seeing that candidate -- he

9    didn't have some of the position requirements listed on

10   the job description.  He didn't appear to be an above

11   average candidate to me.  He looked kind of average or

12   below average.

13        Q.   Again, I'm just asking you what you and she

14   communicated to each other.  Did you communicate that to

15   her?

16        A.   I remember saying -- all I remember is

17   saying -- she said, He has a CDL.

18             I said, He's been working as a dumpster, a

19   roll off driver at Jetaway from '93 to 2002.  So for

20   nine years he's been a dumpster route.  I didn't see

21   that that would qualify him to do the track work?

22        Q.   And is that what you said to her at this

23   meeting?  Or can you not recall?

24        A.   I can't recall.  Whether it was then or at

Eli Mistovich, Jr.                                    09/22/2005

263

1    some subsequent -- I don't remember.

2          Q.    All right.  So you don't recall saying

3    anything to her to the effect of that you had not had

4    good luck with people like that in the past?

5          A.    No.  I can remember saying, You know, I

6    want to get above average candidates.  Below average

7    candidates, I usually don't have good luck with them.

8          Q.    Okay.  But you don't recall making a

9    statement to the effect that you didn't good luck with

10   people like that in the past?

11         A.    No.

12         Q.    Is it a statement that you're denying

13   making?  Or you just don't recall?

14         A.    I don't recall.

15         Q.    All right.  Then do you recall her saying

16   anything to the effect that you might not have had good

17   luck with some white people either?

18         A.    No.  That I don't recall.

19         Q.    When you say "that" you don't recall, is

20   that a statement that you're saying that she didn't say?

21   Or you just don't recall?

22              MR. TEAGUE:  When he says he doesn't

23   recall, that's all he's saying.

24         A.    I don't know.  I don't know.

Eli Mistovich, Jr.                                    09/22/2005

264

1          Q.    And then do you recall saying anything back

2     to her to the effect that there had been a greater

3     percentage of people like that who had been problems for

4     him -- for you?

5          A.    No, I don't recall that.

6          Q.    Do you recall her telling you that what you

7     were doing was against the law?

8          A.    No.

9          Q.    And when you say you don't recall, she may

10    have said it but you just can't remember?

11         A.    I don't remember that being said.

12         Q.    Okay.  Do you recall her saying something

13    to the effect of that she wasn't going to make you hire

14    a minority or a person who wasn't qualified; but if they

15    were, she would go to the mat for that person?

16         A.    I don't -- I remember vaguely she did say

17    something like that.  But I can't remember what was the

18    exact --

19         Q.    What is it that you vaguely recall her

20    saying?

21         A.    I can her remember saying, you know, I'm

22    not going to make you hire a minority if they're not

23    qualified.  But if they are qualified, I want you to

24    hire them.  Words to that effect.

Eli Mistovich, Jr.                                      09/22/2005

265

1          Q.    And then did you tell her there was no

2    point in arguing with her because you weren't going to

3    win?

4          A.    I can't recall.

5          Q.    And did you have the impression in this

6    meeting that Alison Leaton wanted to interview Marvin

7    Morgan?

8          A.    By the conclusion, I handed back resumes

9    with the assumption she was going to process them.  His

10   was in that pile to be processed.  So my conclusion -- I

11   assumed he was going to be set up for an interview.

12         Q.    And it was your understanding that she was

13   telling you that she thought you should interview him;

14   is that correct?

15         A.    She felt he was a qualified candidate.

16         Q.    And in your opinion, he did not have the

17   qualifications that other people had; is that correct?

18         A.    I thought he was below average in his

19   qualifications.

20         Q.    And so if she hadn't suggested that you

21   interview him, you would not have interviewed him; is

22   that correct?

23         A.    I don't know.

24         Q.    And what made his qualifications any

Eli Mistovich, Jr.                                    09/22/2005

270

1          A.    That's correct.

2          Q.    I'm handing you what has been previously

3     marked as Deposition Exhibit 8.  What is that?

4          A.    It looks like another list of resumes.

5     It's entitled, New resumes.  New resumes, dated January

6     20th, 04, and listing candidates' names and experience.

7     And it must be -- well, it's a group of -- a batch of

8     new resumes listed.  And at some point it must have been

9     forwarded over to Alison Leaton.

10         Q.    And is that your handwriting?

11         A.    That's my printing, yes.

12         Q.    So that is a list that you prepared?

13         A.    Yes.  Yes.

14         Q.    And your recollection is it was a list of

15    resumes that you provided to Alison Leaton?

16         A.    Yes.

17         Q.    I'm handing you what has been previously

18    marked as Deposition Exhibit 9.  Do you recognize that?

19         A.    It looks like a list that was prepared by

20    Alison Leaton, her listing of -- a list of resumes from

21    Alison Leaton.

22         Q.    And have you seen that before?

23         A.    Yes, I think I have.

24         Q.    And when did you see that?

Eli Mistovich, Jr.                                            09/22/2005

272

1    Leaton.

2                Q.    It's not your handwriting?

3                A.    It's not mine.

4                MS. RUBIN:  I'd like to have this marked as

5    the next exhibit.

6                (Exhibit No. 23 schedule marked.)

7                Q.    I'm handing you what has been marked as

8    Deposition Exhibit 23.  Do you recognize that?

9                A.    Yes.  It looks like another schedule for

10   March 4 or March 5th.

11               Q.    And do you know whose handwriting is on

12   that?

13               A.    It looks like Alison's.  Same as the prior

14   one.  It looks like Alison Leaton's.

15               Q.    And is that document an accurate reflection

16   of the interviews that were schedule for that day --

17   those days?

18               A.    Well, I think it looks familiar.  I think

19   we've seen one before.

20               Q.    Correct.

21               A.    It looks familiar.  Yeah.  It's similar to

22   Exhibit 21, except some of these names are handwritten

23   in by Alison Leaton instead of on computer.

24               Q.    Okay.  In terms of Marvin Morgan's resume,

1   do you know if he was the only one who had a CDL who did

2   not get placed in the interview pile?

3          A.   No, I think there was one other.

4          Q.   Do you recall who that person was?

5          A.   I think there were others.  I can't recall

6   their names.  He wasn't the only one.  There was other

7   -- at least one, maybe more, with CDLs that didn't get

8   --

9          Q.   But you don't recall who those were?

10         A.   No, I can't remember the name out of 60 or

11  40 or --

12         Q.   And were all the people that you

13  interviewed on March 4th and 5th white?

14         A.   I don't remember.

15         Q.   You don't recall the races of the people

16  you met with on March 4th or 5th?

17         A.   No, not a year and a half ago.

18         Q.   And on March 11th, you recall that Marvin

19  Morgan was black?

20         A.   He came to the interview.  He was black,

21  and he was hired.  And, again --

22         Q.   Do you recall whether any of the other

23  people that were interviewed on March 11th were black?

24         A.   No, I can't remember one way or the other.

Eli Mistovich, Jr.                                        09/22/2005

308

1       A.    Yes.  As she kept making allegations and

2    adding details and ensuing questions, I was sitting

3    there in a stupor.  And I tried to piece together how --

4    what was the origin of this.  And I gradually pieced it

5    together.

6       Q.    But it was -- was it fair to say it was

7    pretty clear the allegation that was being made against

8    you was racism?

9       A.    Yes.

10      Q.    And how did that make you feel?

11      A.    Well, racism is one of those buzz words

12   like, child molester and sexual harassment.  It's one of

13   the worst things you can have because whether the

14   charges are proven or disproven, the stigma sticks.  And

15   then you're forever branded with that tag.

16      Q.    Now, how long were you involved in hiring

17   at Amtrak?

18      A.    26 years.

19      Q.    Were you also involved in terminating

20   employees --

21      A.    Yes.

22      Q.    -- firing decisions?

23            Do you feel an experienced HR person such

24   as Ms. Bowden or experienced supervisors would

Eli Mistovich, Jr.                                    09/22/2005

310

1        A.    Yes.

2        Q.    You said you were given a choice; is that

3   correct?

4        A.    Yes.

5        Q.    And was the choice to either resign or be

6   terminated?

7        A.    Correct.

8        Q.    And what would have been -- or what, if

9   anything, was said would be the impact on your future

10   job references if you resigned?

11        A.    I was told, if I resigned, any future

12   prospective employers that called for a reference would

13   be told that I resigned for personal reasons.  But if I

14   didn't go that route and went to termination, then

15   they'd be told I was terminated for cause.

16        Q.    And why didn't you elect to resign?

17        A.    I sat there for a long period of time,

18   again, I'm still in a semi daze here with this

19   medication, and I was so shocked that my entire 28 year

20   railroad career was being taken away, the more I thought

21   about it, I tried to piece it together in my mind and

22   gather my thoughts.  And I finally said that I wasn't

23   going to resign because there was no reason or

24   justification or grounds for me to resign and I was not

Eli Mistovich, Jr.                                    09/22/2005

311

1     going to resign.

2              And I remember saying specifically that

3     this whole process smells.  Something smells bad.  And

4     then I qualified it.  I said, No, this doesn't just

5     smell.  This wreaks.

6          Q.    In fact, if you had signed a resignation

7     letter, that wouldn't have been accurate, would it?

8          A.    No.

9          Q.    It wouldn't have been truthful to tell

10    other employers, future employers?

11         A.    Absolutely not.

12         Q.    Now, I'm going to show you Exhibit 5, which

13    appears to be an e-mail from Ms. Leaton to Ms. Bowden,

14    March 11th.

15         A.    Yes.

16         Q.    In your conversation with Ms. Leaton on

17    March 5th, did you express to her anything about

18    Mr. Morgan's qualifications?

19         A.    I recall that he was not -- he had -- I

20    remember discussion that he had driven a dumpster route

21    for nine years.  He really didn't have qualifications

22    that I felt were above average.  I thought it was

23    average to below average qualifications for the trackman

24    position.

Eli Mistovich, Jr.                                    09/22/2005

313

1       supervise these employees working there?

2                A.    Yes.

3                Q.    Were you ever subjected to any charge of

4       discrimination?

5                     MS. RUBIN:  Objection.  I've asked these

6       questions?

7                A.    No.

8                     MR. TEAGUE:  My memory fades after nine

9       hours.

10                    MR. DAVEY:  Seven hours.

11                    MR. TEAGUE:  I may have three or four

12      hours.

13                    (Discussion off the record.)

14                    (Recess.)

15               Q.    Let me show you Exhibit 5.  In that first

16      paragraph, Ms. Leaton, in the third line says -- second

17      sentence -- second line in the second sentence, So in

18      that conversation I went over additional resumes that I

19      had screened as yeses, and he did not want to interview

20      a person who was, based on name and where he lived,

21      being Eli's assumption that he was black.  Is that

22      statement accurate?

23               A.    No.  I think that was Alison Leaton's

24      assumption.  It wasn't my assumption.

Eli Mistovich, Jr.                                    09/22/2005

314

1        Q.   Did you ever assume that Marvin -- anything

2   about Marvin Morgan's race --

3        A.   No.

4        Q.   -- based on the resume?

5        A.   No.  That was Alison Leaton.

6        Q.   This is March 11th.  And what happened with

7   you and Alison Leaton on March 11th, aside from this

8   meeting?

9        A.   Well, that was the date, if you recall

10  prior exhibits, we had scheduled for the additional day

11  of interviews.  And it was scheduled and lined up.  And

12  then Alison Leaton called me or let me know that she had

13  a conflict.  She had a doctor's appointment or some

14  medical appointment that she had to go to.  And by the

15  time she took the Green Line in, she was going to have

16  to cancel and miss several of the interviews.

17        Not wanting to -- I wanted to expedite this

18  whole process, so I said, Well, can we work something

19  out here?  And she said the appointment at Brigham and

20  Women's Hospital.  And somehow we came to the conclusion

21  that -- I left my office.  I went over and gave her a

22  ride when she was done from Brigham and Women's Hospital

23  to BET where we were conducting the interviews rather

24  than wait for her to take the Green Line or whatever.

315

1          We did the whole schedule of interviews, as

2     we've seen in prior exhibits.  And when -- at the

3     conclusion, I took her -- by this time her office had

4     been transferred back to 89 South Street downtown.  So I

5     dropped her off there, and we parted ways for the day.

6          Not a was said other than -- untoward, but

7     little did I think that later that afternoon she'd be

8     e-mailing Lis Bowden with another in the series of

9     e-mails concerning these allegations.  So it just struck

10    me -- that, as rather bizarre.  And, again, the fact

11    that -- when I questioned her the day before my first

12    inquisition on March 25th and said, What's the nature of

13    this meeting --

14          Q.    We understand that?

15          A.    So you had -- you picked her up at Brigham

16    and Women's, brought her to the interview place --

17          Q.    Correct.

18          A.    And then brought her from the interview

19    place to her office?

20          A.    Correct.

21          Q.    And you had conversation on the ride?

22          A.    Small talk or talk about the candidates we

23    interviewed that day.

24          Q.    Did she say anything about suspecting that

Eli Mistovich, Jr.                                       09/22/2005

316

1    you were screening a candidate for race?

2           A.    Not a word about any of that.

3           MS. RUBIN:  Objection.  You've already

4    asked and I've asked whether she made any comment to

5    that -- in addition and apart from the meeting on March

6    4th or 5th.  So if you ask the question again and again,

7    I assume he's going to give the same answer.

8           MR. TEAGUE:  You can object all you want.

9           MS. RUBIN:  I'm just trying to move it

10   along.

11          MR. TEAGUE:  Well, maybe you should have

12   moved it along during your nine hours.  Okay?

13          Q.    Did anyone after this meeting ask you if

14   you were on any medication?

15          A.    No.

16          Q.    What, if any, questions were addressed to

17   you prior or during this meeting of March 26th about

18   your health?

19          A.    No.

20          Q.    There were no questions?

21          A.    No questions.

22          Q.    Do you think any reasonably competent human

23   resources director or supervisor or employee would

24   believe in good faith that someone would know a

Eli Mistovich, Jr.                                          09/22/2005

319

1      employment at MBCR was at stake?

2            A.   Not a word with was said.

3            Q.   When you came to work from Amtrak to MBCR,

4      did you fill out personal data forms, if you recall?

5            A.   Yes.

6            Q.   And did they indicate the number of

7      children you had?

8            A.   Yes.

9            Q.   And how old were you at this time?

10           A.   51.

11           Q.   Now, when you were talking about Marvin

12     Morgan, you were talking about the meeting -- when you

13     looked at his resume, you thought he had dumpster work

14     experience.  Was it picking up dumpsters?

15           A.   Yes.

16           Q.   And driving vehicles?

17           A.   Yes.

18           Q.   What were the qualifications that you were

19     looking for for trackman?

20           A.   I was looking for what the position

21     description had.  Prior railroad experience, able to

22     lift, carry, stoop, bend while carrying heavy loads,

23     hoisting license, CDL license.

24           Q.   What was the importance or significance of

Eli Mistovich, Jr.                                    09/22/2005

320

1    a CDL license for an entry-level trackman?

2         A.    Well, due to the union rules -- it's nice

3    to have, but because of union seniority, people don't

4    start driving trucks.  Everyone starts as a trackman or

5    a track laborer.  That's the entry level.  And then it

6    depends on union seniority and bidding or something.  So

7    most people don't start on trucks.  Some take years

8    until they achieve enough seniority to be able to get on

9    a truck.

10        Q.    In the meantime, what kind of work do

11   trackmen do?

12        A.    Trackmen do track laborer work, changing

13   rails, ties, stone, forks, using a lot hand tools --

14   sledgehammer, spike balls, lining bars, claw bars --

15   mostly hand labor, manual labor work.

16        Q.    Is that why the construction experience was

17   important?

18        A.    Yes.

19        Q.    And also people with managerial experience

20   or what you consider significant managerial experience?

21        A.    Yes.

22        Q.    Why was that important?

23        A.    Well --

24              MS. RUBIN:  Objection.

Eli Mistovich, Jr.                                    09/22/2005

321

1          A.    Again, it's all one union you're dealing

2    with.  And at some point you would like to see a

3    progression of the trackman progress up the ladder to a

4    more responsible positions like foreman and ultimately a

5    supervisor, a road master.  We typically promote from

6    within.  And all the current road masters basically

7    start as trackmen.

8          Q.    Now, would you expect Mr. Urban and

9    Mr. Nevero, as experienced railroad people and employees

10   of railroad system to have the same understanding as you

11   as to the qualifications of a trackman?

12         A.    Certainly Mr. Nevero would have a similar

13   career.  I would expect he would -- Urban has been in

14   the transportation -- he's certainly been on the

15   railroad in a different capacity.  As you described, he

16   should have an idea of what it -- what is required.

17         Q.    Now, at the March 26th meeting, you

18   recall -- I know there were a number of things you

19   didn't recall.  But do you recall making a statement

20   that you look for the best candidates available?

21         A.    Yes.

22         Q.    And what understanding or what significance

23   did you feel that would have to people like Urban and

24   Nevero?

**OPPOSITION EXHIBIT 2 – Deposition of Defendant Elizabeth Bowden**

# In The Matter Of:

*Eli Mistovich, Jr.   v.*
*Elizabeth Bowden, et al.*

---

*Elizabeth R. Bowden*
*Vol. 1, September 27, 2005*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA  02110*
*(617) 426-2432*

*Original File BOWDEN.V1, 128 Pages*
*Min-U-Script® File ID: 2270709495*

# Word Index included with this Min-U-Script®

Elizabeth R. Bowden
Vol. 1, September 27, 2005

Eli Mistovich, Jr.    v.
Elizabeth Bowden, et al.

---

Page 4

[1] Eli Mistovich. Have you ever been deposed before in
[2] any deposition?
[3]     A: No.
[4]     Q: I will be asking you some questions. I'd
[5] ask you to wait until I finish the question before
[6] you answer, so the stenographer can take everything
[7] down. And also if the answer is "yes" or "no,"
[8] please don't nod your head. Please just say "yes"
[9] or "no" — it's common things that people do in
[10] depositions — so we can get the answer.
[11]     If you don't understand any of my
[12] questions, just state it, and I'll be happy to
[13] rephrase it. And if you want to take a break at any
[14] time, you just so indicate. Okay?
[15]     A: Okay.
[16]     Q: Would you state your full name for the
[17] record.
[18]     A: Elizabeth Rose Bowden.
[19]     Q: And what's your home address?
[20]     A: 48 Spencer Crescent, Guelph, Ontario,
[21] Canada, N1L1M2.
[22]     Q: And how old are you?
[23]     A: Forty-six.
[24]     Q: Okay. And are you married?

---

Page 5

[1]     A: No.
[2]     Q: Are you a college graduate?
[3]     A: You'll have to explain. American or
[4] Canadian? I apologize.
[5]     Q: Are you a citizen of Canada?
[6]     A: Yes.
[7]     Q: Would you describe your educational
[8] background.
[9]     A: I have a university degree, bachelor of
[10] arts degree from the University of Guelph.
[11]     Q: And what year did you receive that?
[12]     A: 2004.
[13]     Q: And what was your major field of study?
[14]     A: It's a general arts degree.
[15]     Q: And any other — any post-university
[16] education?
[17]     A: Post-graduate?
[18]     Q: Yes.
[19]     A: No.
[20]     Q: Are you presently employed?
[21]     A: Yes.
[22]     Q: And by whom are you presently employed?
[23]     A: Patheon.
[24]     Q: Would you spell that.

---

Page 6

[1]     A: P-a-t-h-e-o-n.
[2]     Q: And where is Patheon located?
[3]     A: Mississauga, Ontario.
[4]     MR. TEAGUE: Off the record.
[5]     (Discussion off the record)
[6]     Q: What's the nature of the business of
[7] Patheon?
[8]     A: Contract pharmaceutical.
[9]     Q: Would you explain what that means.
[10]     A: They either produce or research
[11] pharmaceutical products for other pharmaceutical and
[12] biotech companies.
[13]     Q: And what is your position with Patheon?
[14]     A: Director of human resources.
[15]     Q: And how long have you been with Patheon?
[16]     A: Two months.
[17]     Q: And what was your next previous employment
[18] before Patheon?
[19]     A: MassBay Commuter Railroad Company.
[20]     Q: And during what time period were you
[21] employed by — we'll call it "MBCR" for shorthand
[22] for this deposition.
[23]     A: Okay.
[24]     Q: During what time period were you employed

---

Page 7

[1] at MBCR?
[2]     A: From September 2003 to July 2005.
[3]     Q: And what were the circumstances under which
[4] you left the MBCR?
[5]     A: I tendered my resignation.
[6]     Q: At the time you tendered your resignation,
[7] were you given a choice of resigning or termination?
[8]     A: No.
[9]     Q: So it was a completely voluntary
[10] resignation?
[11]     A: Yes.
[12]     Q: And what was your position during your
[13] employment at MBCR?
[14]     A: Manager of organizational development.
[15]     Q: And what were the duties of that position?
[16]     A: To lead and coordinate the primarily human
[17] resources functions.
[18]     Q: And were you the manager of organizational
[19] development during the entire almost two-year period
[20] that you were with MBCR?
[21]     A: Yes.
[22]     Q: Okay. Were you an employee, considered an
[23] employee of MBCR?
[24]     A: During that period, yes.

---

Page 12

[1]   MS. RUBIN: Objection. You can answer the
[2] question.
[3]   A: It was many years ago. I'm really not
[4] certain of the specific.
[5]   Q: Do you recall if you had to take certain
[6] courses?
[7]   A: There are a number of courses that I had to
[8] take. There were required courses and elective
[9] courses; but the exact number of courses, I can't
[10] remember.
[11]   Q: Did you have to take an exam of any kind
[12] for certification?
[13]   A: There were exams on each course.
[14]   Q: I understand, but in addition to each
[15] course —
[16]   A: I have a Canadian human resources
[17] professional certification, of which a prerequisite
[18] is the certification from one of a number of
[19] institutions and a standardized national
[20] examination.
[21]   Q: Okay.
[22]   A: And a minimum number of years in the
[23] business.
[24]   Q: Do you recall what that number was?

Page 13

[1]   A: Three.
[2]   Q: And where did you work prior to Bombardier?
[3]   A: For an organization originally known as the
[4] Pulp — I'm sorry. It was originally known as the
[5] Ontario Pulp and Papermaker Association, and then it
[6] was renamed; and when I left, it was called the Pulp
[7] and Paper Health and Safety Association.
[8]   Q: How long did you work for that
[9] organization?
[10]   A: Nine years.
[11]   Q: So that would take you back to about 1989?
[12]   A: Yes.
[13]   Q: And what position or positions did you hold
[14] at the, I'll call it, Pulp and Safety Association?
[15]   A: We were combined human resources and safety
[16] consultants for our client groups.
[17]   Q: Okay. Prior to that did you have any
[18] experience in human resources?
[19]   A: No.
[20]   Q: Okay. And do you recall what your last job
[21] was before the Pulp and Safety Association?
[22]   A: Yes.
[23]   Q: And what was that?
[24]   A: The director of standards and

Page 14

[1] certification, St. John Ambulance, Ontario Council.
[2]   Q: And what was the duties of that position?
[3]   A: The maintenance, establishment and
[4] maintenance, of all the training and branch
[5] standards for Ontario.
[6]   Q: Was this — what kind of entity was that
[7] you were working for?
[8]   A: St. John Ambulance is both a volunteer
[9] organization and a professional provider of first
[10] aid, CPR, home health care training in compliance
[11] with the Ontario Worker's Compensation Board.
[12]   Q: Okay. How did you come to become a
[13] consultant for MBCR back in March of 2003?
[14]   A: During the time of the mobilization of
[15] MBCR, I was contacted by a member of the MBCR board
[16] of directors from the parent company Bombardier and
[17] asked to participate in the mobilization.
[18]   Q: And what was that person's name?
[19]   A: Mike Hart.
[20]   Q: And you had — had you worked with Mr. Hart
[21] while you were employed at Bombardier?
[22]   A: Yes.
[23]   Q: Did you have a contract to perform services
[24] between March of '03 and September of '03?

Page 15

[1]   A: Yes.
[2]   Q: And was that a written contract?
[3]   A: Yes.
[4]   Q: And what were your duties under that
[5] contract?
[6]   A: To assist with the development and
[7] implementation of the MBCR human resources
[8] functions.
[9]   Q: And how did you come to be an employee of
[10] MBCR back in September of '03?
[11]   A: During the time that we were completing the
[12] mobilization, I was approached and asked if I would
[13] take on the permanent position.
[14]   Q: And who approached you and asked you?
[15]   A: Kevin Lydon.
[16]   Q: Were you acquainted with Mr. Lydon before
[17] you came to perform services at MBCR?
[18]   A: No.
[19]   Q: Now, at some point after you started
[20] performing services at MBCR, did you make Eli
[21] Mistovich's acquaintance?
[22]   A: Yes.
[23]   Q: And, I take it, you didn't know Mr.
[24] Mistovich before you started working at MBCR?

Page 32

[1] the applications and resumes, coordinate the
[2] development of the interview guide and coordinate
[3] any testing, coordinate the interviews, and
[4] participate in the interview, coordinate the
[5] background checks and the offer letters.
[6]   Q: I'm sorry. And the?
[7]   A: Offer letters.
[8]   Q: And did the MBCR departments that were
[9] seeking to hire the new employees, made the
[10] requisition, what participation did they have in
[11] this process?
[12]   A: They were responsible for developing the
[13] job description, which had to be attached to the
[14] requisition, and then all the coordination phases:
[15] participating in the interviews, the question keys,
[16] confirming any testing that they liked what they
[17] position and confirming that they liked what they
[18] saw from the background checks, and then the offer
[19] letters.
[20]   Q: Who would make the decision to hire a
[21] particular applicant or candidate?
[22]   A: The hiring managers.
[23]   Q: I'm going to show you a document that was
[24] marked as Exhibit 1 at Mr. Urban's deposition, which

Page 33

[1] is a memo to Mr. Nevero from Mr. Mistovich of
[2] September 25th, 2003. I'm just going to ask you if
[3] you ever recall seeing it before. Take whatever
[4] time you need to look at it.
[5]   A: (Reviewing document) I've never seen it.
[6]   Q: Okay. Now, you said earlier that your
[7] understanding was that Mr. Mistovich did have some
[8] responsibilities in hiring employees?
[9]   A: Yes.
[10]   Q: Do you know who assigned him these
[11] responsibilities?
[12]   A: No.
[13]   Q: Do you know if Mr. Mistovich had any hiring
[14] responsibilities at Amtrak before he came to work at
[15] MBCR?
[16]   A: No.
[17]   Q: Were you aware of any complaints that were
[18] made against Mr. Mistovich at Amtrak in connection
[19] with hiring?
[20]   A: No.
[21]   Q: When — okay. You identified the recruiter
[22] as Alison Leaton; is that correct?
[23]   A: Yes.
[24]   Q: Was she the recruiter — well, strike that.

Page 34

[1]   Do you recall when she contracted with MBCR
[2] to become the recruiter?
[3]   A: September 2003.
[4]   Q: And did you personally have any
[5] participation in contracting with Ms. Leaton?
[6]   A: I interviewed her.
[7]   Q: And what was the purpose of having a
[8] contract recruiter as opposed to an employee?
[9]   A: When MBCR transitioned the Amtrak
[10] workforce, there was no understanding or clarity on
[11] whether more staff would be needed, we basically
[12] thought we had a full workforce, and it was after
[13] the initial transition that we realized there were
[14] vacancies and believed that it was a temporary
[15] thing, hence the contractor.
[16]   Q: And how long was she contracted — was her
[17] contract for?
[18]   A: I don't know specifically.
[19]   Q: Was it more than a year?
[20]   A: No.
[21]   Q: Okay. Was it less than a year?
[22]   A: Yes.
[23]   Q: Okay. And did you select Ms. Leaton as the
[24] person to be the recruiter?

Page 35

[1]   A: I was part of it. I'm not certain if there
[2] is anyone else.
[3]   Q: Did you know Ms. Leaton before you
[4] interviewed with her?
[5]   A: No.
[6]   Q: Okay. And was Ms. Leaton's contract
[7] renewed at the end of the initial contract?
[8]   A: I'm not certain.
[9]   Q: Now, you also said there was a Mr.
[10] Coffey —
[11]   A: Uh-huh.
[12]   Q: — that was a contract employee?
[13]   A: Yes.
[14]   Q: Were there other contract employees that
[15] had HR responsibilities besides Ms. Leaton and Mr.
[16] Coffey?
[17]   A: During which period?
[18]   Q: Between July of 2003 and March of 2004?
[19]   A: Yes.
[20]   Q: And who were they?
[21]   MS. RUBIN: Now, I just want to interrupt
[22] for a second. You just used the term "contract
[23] employees," and the people who were on contract were
[24] not employees.

Page 40

[1] **Q:** And the hiring managers also participated?
[2] **A:** Yes.
[3] **Q:** Was there anyone else besides the hiring
[4] managers and Ms. Leaton to your knowledge that were
[5] involved in the recruiting function?
[6] **A:** Not other than the, like I say, the
[7] reception who might do photocopying.
[8] **Q:** Prior to September of 2003 when Ms. Leaton,
[9] I believe you testified, started at MBCR, did she
[10] have any experience, to your knowledge, in hiring
[11] railroad personnel?
[12] **A:** Not to my knowledge.
[13] **Q:** Do you recall what her background was?
[14] **A:** I do not recall.
[15] **Q:** Let me direct your attention to the fall or
[16] winter of 2003. Do you recall if there was a
[17] requisition from the Engineering Department to hire
[18] additional trackmen?
[19] **A:** I do not recall when the specifics of that
[20] happened.
[21] **Q:** Okay. Do you recall receiving any
[22] information in the fall or winter of 2003 that
[23] MBCR's Track Division was understaffed or
[24] shorthanded?

Page 41

[1] **A:** No, I do not recall.
[2] **Q:** Do you recall that there was an MBCR track
[3] employee killed during a snow emergency during the
[4] winter of 2003?
[5] **A:** Yes, I recall.
[6] **Q:** And do you recall receiving any information
[7] that the safety operations of the Track Department
[8] during snow emergencies were adversely affected
[9] because of being shorthanded?
[10] **A:** I have no knowledge of that.
[11] **Q:** Do you remember during the same time
[12] period, fall or winter of 2003, having any
[13] discussions with Mr. Mistovich about the need for
[14] additional track employees?
[15] **A:** I do not recall.
[16] **Q:** How about with Mr. Nevero?
[17] **A:** I do not recall.
[18] **Q:** Okay. Now, Mr. Mistovich was terminated
[19] because of certain incidents or allegations that
[20] were made about him during the hiring process; is
[21] that fair to say?
[22] **A:** Can you rephrase that.
[23] **Q:** Sure. You recall Mr. Mistovich being
[24] terminated; is that correct?

Page 42

[1] **A:** Yes.
[2] **Q:** And he was terminated because of certain
[3] allegations that were made concerning how he
[4] selected candidates for interviews?
[5] **A:** As a result of an investigation based on
[6] that, yes.
[7] **Q:** Do you recall that the employees that he
[8] was reviewing for interviews or whose resumes he was
[9] reviewing with Ms. Leaton were to be hired by the
[10] Track Department?
[11] **A:** I'm sorry?
[12] **Q:** Yes. Mr. Mistovich was in some fashion
[13] screening candidates for employment at MBCR; is that
[14] correct?
[15] **A:** Yes.
[16] **Q:** And do you know what the function or the
[17] job of those candidates was?
[18] **A:** Not specifically.
[19] **Q:** If I suggested trackmen, would that refresh
[20] your recollection?
[21] **A:** Not specifically.
[22] **Q:** Okay. Prior to — well, strike that.
[23] Is it your understanding that Ms. Leaton
[24] worked with Mr. Mistovich in seeking employees or

Page 43

[1] recruiting employees or hiring employees for the
[2] Track Department?
[3] **A:** Yes.
[4] **Q:** And do you recall having any discussions
[5] with Ms. Leaton before she started working with Mr.
[6] Mistovich concerning that particular hiring?
[7] **A:** No.
[8] **Q:** Prior to March of 2004, had MBCR received
[9] any criticism from any government source over its
[10] minority hiring or number of minorities in its
[11] workforce?
[12] **A:** What do you mean by "government source"?
[13] **Q:** Any Boston — elected official from the
[14] City of Boston or the State of Massachusetts?
[15] **A:** We participated in meetings with Councilor
[16] Turner.
[17] **Q:** Is it Councilor Charles Turner?
[18] **A:** Yes.
[19] **Q:** And when did those meetings take place?
[20] **A:** I have no recollection.
[21] **Q:** Did you personally attend the meetings?
[22] **A:** I attended two meetings that I know of.
[23] **Q:** And where did these meetings take place?
[24] **A:** In a room at City Hall.

Elizabeth Bowden v. Eli Mistovich, Jr. v. Elizabeth Bowden, et al.

Vol. 1, September 27, 2005

Case 1:04-cv-12340-EFH    Document 17-5    Filed 11/28/2005    Page 46 of 58

Page 44

[1]  **Q:** And who else was present besides you and
[2] Mr. Turner?
[3]  **A:** I don't know all the people that were
[4] there.
[5]  **Q:** Do you know any of the people who were
[6] there?
[7]  **A:** Not all the same people were at both
[8] meetings.
[9]  **Q:** Well, let's take the first meeting. Who do
[10] you remember being present at the first meeting?
[11]  **A:** Richard Davey, Dennis Coffey, Harold
[12] Hoffman, Beth Trowbridge, Councilor Turner, Bill
[13] Regan, Tony Pinckney.
[14]  **Q:** Anyone else?
[15]  **A:** An MBCR employee, last name Crawford. I
[16] don't remember the first name.
[17]  **Q:** And was anyone else present besides Mr.
[18] Turner that represented the City of Boston, to your
[19] knowledge?
[20]  **A:** Not to my knowledge.
[21]  **Q:** Okay. Richard Davey is the general counsel
[22] of MBCR, correct?
[23]  **A:** Yes.
[24]  **Q:** And Dennis Coffey was a contract employee

Page 45

[1] or a contract person —
[2]  **A:** Uh-huh.
[3]  **Q:** — with MBCR?
[4]  **A:** Yes, yes.
[5]  **Q:** And — I know you told me — what was his
[6] title?
[7]  **A:** I don't know.
[8]  **Q:** Oh, okay. Who is Howard Hoffman?
[9]  **A:** Harold Hoffman.
[10]  **Q:** Harold Hoffman. Who was that?
[11]  **A:** He's an MBCR employee.
[12]  **Q:** And do you know what his position was —
[13]  **A:** No, I don't.
[14]  **Q:** — at the time of the meeting?
[15]  **A:** No, I don't.
[16]  **Q:** Is he a minority?
[17]  **A:** He's a salaried employee.
[18]  **Q:** Salaried employee. Is he a minority?
[19]  **A:** Yes.
[20]  **Q:** Who is Beth Towbridge?
[21]  **A:** Trowbridge.
[22]  **Q:** Trowbridge?
[23]  **A:** Human Resources.
[24]  **Q:** She was a Human Resources employee?

Page 46

[1]  **A:** Yes.
[2]  **Q:** What was her position?
[3]  **A:** She was the generalist that went on mat
[4] leave.
[5]  **Q:** I'm —
[6]  **A:** She's the generalist that went on mat
[7] leave.
[8]  **Q:** And you said Phil Regan?
[9]  **A:** Bill Regan.
[10]  **Q:** Bill Regan. I can't read my writing. What
[11] was his position?
[12]  **A:** He's an MBCR employee. I don't know his
[13] exact position.
[14]  **Q:** Is he a minority?
[15]  **A:** No.
[16]  **Q:** How about Beth Trowbridge? Was she a
[17] minority?
[18]  **A:** How do you define "a minority"?
[19]  **Q:** Is she black?
[20]  **A:** No.
[21]  **Q:** She's a woman, obviously?
[22]  **A:** Yes.
[23]  **Q:** Was she Hispanic origin?
[24]  **A:** No.

Page 47

[1]  **Q:** And then there's another name, a Tony —
[2]  **A:** Pinckney.
[3]  **Q:** — Pinckney. What was his position?
[4]  **A:** MBCR employee. I don't know his title.
[5]  **Q:** And how about Mr. Crawford?
[6]  **A:** MBCR employee. I don't know his title.
[7]  **Q:** How did the other MBCR employees come to be
[8] present at the meeting with Mr. Turner?
[9]  **A:** Some of them were invited and some — by
[10] Mr. Coffey, and some were part of a committee that
[11] Councilor Turner has been working with.
[12]  **Q:** Is this a committee of MBCR employees?
[13]  **A:** Yes.
[14]  **Q:** And did it have a name or a designation?
[15]  **A:** I don't know the name of it.
[16]  **Q:** Okay. And how did you come to attend the
[17] meeting?
[18]  **A:** Mr. Coffey invited me.
[19]  **Q:** Okay. What was the purpose of the meeting?
[20]  **MS. RUBIN:** Objection.
[21]  **Q:** Well, did you have an understanding of the
[22] purpose of the meeting before you attended?
[23]  **A:** Follow-up. Councilor Turner had met with
[24] this group of employees over a period of time before

Page 48

[1] MBCR became an organization, and he was following up
[2] on different subjects that were of interest to them.
[3] Q: Were the members of the committee Amtrak
[4] employees?
[5] A: Yes.
[6] Q: Okay. So was this committee established at
[7] Amtrak?
[8] A: I don't know.
[9] Q: Oh, okay.
[10] A: I don't know. I have no recollection of
[11] it.
[12] Q: And what do you recall Mr. Perkins saying
[13] at the meeting, the substance?
[14] A: I'm sorry. Who?
[15] Q: I'm sorry. Mr. — Councilor Turner.
[16] A: Okay.
[17] Q: I've got the wrong name. What, if
[18] anything, do you recall him saying at the meeting?
[19] A: I don't recall specifics of the meeting at
[20] all.
[21] Q: Do you recall anything that was said?
[22] A: Him sort of outlining the purpose of us
[23] being together to meet.
[24] Q: Do you recall what that purpose was?

Page 49

[1] A: As follow-up to concerns and subjects of
[2] interest by this group of employees.
[3] Q: Do you have an understanding of what the
[4] concerns were?
[5] A: There was concern regarding the diversity
[6] amongst the commuter railroad.
[7] Q: Did Mr. Turner express that concern?
[8] A: He just highlighted that as a...
[9] Q: Did he indicate that he felt there was not
[10] a diverse workforce in the commuter railroad?
[11] A: I can't recollect that.
[12] Q: Do you recall him expressing any
[13] dissatisfaction with the makeup of the commuter
[14] railroad workforce?
[15] A: I don't recall him saying that he was
[16] dissatisfied with it.
[17] Q: Did he express any criticism of the hiring
[18] process at MBCR?
[19] A: No.
[20] Q: Did the members of the committee that you
[21] identified, had they expressed any dissatisfaction
[22] to you as head of HR as to the diversity of the MBCR
[23] workforce?
[24] MS. RUBIN: Do you mean apart from this

Page 50

[1] meeting?
[2] MR. TEAGUE: Yes.
[3] A: No.
[4] Q: Did you attend any meetings with members of
[5] this committee other than with Mr. Turner?
[6] A: No.
[7] Q: Okay. Then you also said there was a
[8] second meeting?
[9] A: Yes.
[10] Q: Okay. How long after the first meeting did
[11] the second meeting occur?
[12] A: I don't know.
[13] Q: Okay. And do you recall at the second
[14] meeting who was in attendance other than the people
[15] that you already named?
[16] A: Those people weren't at the second meeting
[17] necessarily. I only remember specifically that
[18] myself and Delvine Okereke from MBCR were there.
[19] Q: And what was her position at MBCR?
[20] A: Manager of equal opportunity and diversity.
[21] Q: Okay. Anyone else from MBCR?
[22] A: Obviously, Councilor Turner was there, but
[23] I cannot remember anyone else present at that
[24] meeting.

Page 51

[1] Q: Okay. And do you recall any discussion
[2] with Councilor Turner at the meeting?
[3] A: No, I don't remember the specifics of the
[4] meeting.
[5] Q: Was there a discussion about the diversity
[6] of the workforce at the second meeting?
[7] A: I really don't remember the details of the
[8] meeting.
[9] Q: I understand. I'm trying to refresh your
[10] recollection. Do you recall him expressing any
[11] criticism or complaints about the diversity of the
[12] workforce?
[13] A: I can't say there were criticisms or
[14] complaints. I do not remember that. Again, he
[15] stated that there was concerns; but as MBCR had
[16] inherited a workforce from Amtrak, the transitioning
[17] workforce, it wasn't the MBCR hiring practices that
[18] Councilor Turner had concerns about, because we
[19] hadn't done any substantial hiring.
[20] Q: So do you recall what year these meetings
[21] occurred? In 2003?
[22] A: I know the first one was in 2003. I have
[23] no idea when the second one was.
[24] Q: As a result of these meetings, did you take

Page 52

[1] any actions as head of Human Resources functions at
[2] MBCR?
[3] **A:** As a result of the meeting, no.
[4] **Q:** Other than these two meetings, did you have
[5] any other discussions face to face or by telephone
[6] with City Councilor Turner concerning the makeup of
[7] the MBCR workforce?
[8] **A:** Not to my knowledge.
[9] **Q:** Did you have any written communications
[10] with City Councilor Turner either from him to you or
[11] you to him?
[12] **A:** No.
[13] **Q:** Do you recall having discussions with any
[14] other representative of the City of Boston about the
[15] makeup of the MBCR workforce prior to March of 2004?
[16] **A:** No knowledge at all.
[17] **Q:** After the first meeting with Councilor
[18] Turner, did you attend any meeting with Kevin Lydon
[19] at which Councilor Turner's concerns were discussed?
[20] **A:** None that I can recall.
[21] **Q:** After Alison Leaton was contracted to
[22] become a recruiter, did you have discussions with
[23] her about hiring minorities or recruiting minorities
[24] for employment at MBCR?

Page

[1] Leaton?
[2] **A:** Yes.
[3] **Q:** And the top portion of Exhibit 5 would Ms.
[4] Leaton's reply to you at about 4:56 p.m., correct?
[5] **A:** Yes.
[6] **Q:** Before sending this e-mail to Ms. Leaton on
[7] March 11, did you have a conversation with her?
[8] **A:** Yes.
[9] **Q:** Okay. And was this a telephone
[10] conversation or face-to-face conversation?
[11] **A:** Face to face.
[12] **Q:** Okay. And where did that occur?
[13] **A:** In my office.
[14] **Q:** Okay. What was the occasion of her coming
[15] to your office, if you remember?
[16] **A:** I do not remember.
[17] **Q:** And what do you recall Ms. Leaton saying to
[18] you on March 11, 2004, that triggered you to send
[19] this e-mail?
[20] **A:** I'm not certain she spoke with me on March
[21] 2000 — March 11th, 2004.
[22] **Q:** Okay. So it was either — it was prior to
[23] the time you sent the e-mail?
[24] **A:** Yes.

Page 53

[1] **A:** Not to my recollection.
[2] **Q:** I'm going to show you what was marked as
[3] Urban Deposition Exhibit 4.
[4] **A:** (Reviewing document)
[5] **Q:** And have you seen a copy of that letter
[6] before?
[7] **A:** Yes.
[8] **Q:** And that was given to Mr. Mistovich on
[9] March 30th, 2004; is that correct?
[10] **A:** Yes.
[11] **Q:** Excuse me one second. (Reviewing
[12] documents) I'm going to show you a copy of Nevero
[13] Deposition Exhibit 5.
[14] **A:** (Reviewing document)
[15] **Q:** Do you recognize that document or the
[16] contents of the document, Ms. Bowden?
[17] **A:** Yes, I've seen them before.
[18] **Q:** And the bottom section of it appears to be
[19] an e-mail from you to Alison Leaton —
[20] **A:** Uh-huh.
[21] **Q:** — dated March 11, 2004, 2:14 p.m.,
[22] correct?
[23] **A:** Yes.
[24] **Q:** Do you recall sending an e-mail to Ms.

Page

[1] **Q:** So you had a conversation with Ms. Leaton
[2] that resulted in you sending this e-mail?
[3] **A:** Yes.
[4] **Q:** Okay. Was it more than one conversation?
[5] **A:** Not to my recollection.
[6] **Q:** Was anyone else present during this
[7] conversation?
[8] **A:** Not to my recollection.
[9] **Q:** All right. And what did many Ms. Leaton
[10] say to you, and what do you recall you said to her?
[11] You don't have to recall the exact words?
[12] **A:** That she had concerns that Eli Mistovich
[13] was filtering candidates out based on their address,
[14] and that he was assuming they were black.
[15] **Q:** Okay. When you say "filtering candidates
[16] based on their address," are you referring to
[17] resumes?
[18] **A:** Yes.
[19] **Q:** And did she explain to you what the basis
[20] of that concern was?
[21] **A:** She had a particular resume of a candidate
[22] that on paper met all the established
[23] qualifications, and Eli wouldn't consider the
[24] person.

Page 68

[1] **Q:** In your deliberations over Mr. Mistovich's
[2] history, employment, did you ever review the
[3] statement that was posted or the job, I should call
[4] it, the job posting?
[5] **A:** Yes.
[6] **Q:** Okay. And did you consider that Mr. Morgan
[7] met all of those qualifications?
[8] **A:** He met the minimum qualifications to get to
[9] the interview process.
[10] *Q. Do you know whether or not Ms. Leaton had
[11] indicated to Mr. Mistovich that there was a limit on
[12] the number of people they would interview?
[13] *A. I'm not aware of that.
[14] **MR. TEAGUE:** Oh, okay. Why don't I just
[15] take this back.
[16] **THE WITNESS:** I'm sorry.
[17] **MR. TEAGUE:** Keep things organized here.
[18] (The witness confers with counsel)
[19] **THE WITNESS:** Could I take a break?
[20] **MR. TEAGUE:** No problem.
[21] (Brief recess)
[22] **MR. TEAGUE:** Could you read my last
[23] question.
[24] *(Record read)

Page 70

[1] 11th?
[2] **Q:** At any time.
[3] **A:** Not that I can remember.
[4] **Q:** I'm going to show you a document we've
[5] marked as Nevero Exhibit 6. Do you recognize that
[6] document, Ms. Bowden?
[7] **A:** Looks like my handwriting out of my
[8] notebook that I keep when I go in and out of
[9] meetings.
[10] **Q:** Okay. And that's dated — there's a date
[11] "March 15, '04"; is that correct?
[12] **A:** Yes.
[13] **Q:** And do you recall a meeting on March 15,
[14] 2004, concerning Mr. Mistovich?
[15] **A:** Not specifically.
[16] **Q:** The entries are reasonably brief, and the
[17] first line says, "Beth, Liz, Steve." Do you have an
[18] understanding of who you were referring to?
[19] **A:** "Beth" and "Liz," I do. I don't know
[20] whether it was "Nevero" or "Urban."
[21] **Q:** Okay. "Liz" is you, I take it?
[22] **A:** Yes.
[23] **Q:** Who would "Beth" be?
[24] **A:** Beth Trowbridge.

Page 69

**BY MR. TEAGUE:**
[1]
[2] **Q:** On March 11 when you received these
[3] communications from Ms. Leaton, did you contact Mr.
[4] Mistovich?
[5] **A:** No.
[6] **Q:** Now, do you recall a meeting with Mr.
[7] Mistovich and Mr. Urban and Mr. Nevero on March
[8] 26th, 2004?
[9] **A:** Yes.
[10] **Q:** Between March 11th and March 26th, did you
[11] contact Mr. Mistovich about the allegations that Ms.
[12] Leaton had made?
[13] **A:** Specifically, no.
[14] **Q:** Did you e-mail or show him a copy of
[15] Exhibit 5, which was Ms. Leaton's report of the
[16] conversation that we were looking at a little
[17] earlier?
[18] **A:** Not to my knowledge.
[19] **Q:** Did you ever show him a copy of that
[20] document?
[21] **A:** Not to my knowledge.
[22] **Q:** Was there any other resume involved in Ms.
[23] Leaton's concerns besides that of Mr. Morgan?
[24] **MS. RUBIN:** Objection. You mean on March

Page 71

[1] **Q:** Beth Trowbridge, she was the generalist
[2] that worked in the HR Department?
[3] **A:** Right. She had been out on mat leave but
[4] was subsequently back.
[5] **Q:** And by "Steve," you're not sure if it's
[6] Urban or Nevero?
[7] **A:** No, I'm not.
[8] **Q:** The second line — I'll let you read your
[9] writing — what does that say?
[10] **A:** "Eli-track interviews-follow-up
[11] discussion."
[12] **Q:** Okay. You have no recollection of meeting
[13] with the individuals Elizabeth Trowbridge or one of
[14] the Steves concerning Mr. Mistovich?
[15] **A:** I do not.
[16] **Q:** Is it fair to say that based on your notes
[17] that there was such a meeting?
[18] **A:** Yes.
[19] **Q:** But you have no — absolutely no
[20] recollection of what occurred at the meeting?
[21] **A:** I really do not.
[22] **Q:** Did you communicate Ms. Leaton's concerns
[23] to Beth Trowbridge?
[24] **A:** Yes.

Page 72

[1]    **Q:** And was that on or before March 15, 2004?

[2]    **A:** Yes.

[3]    **Q:** Okay. And did you communicate Ms. Leaton's

[4] concerns to Steven Nevero prior to March — either

[5] on or before March 15?

[6]    **A:** I don't know.

[7]    **Q:** Did you communicate Ms. Leaton's concerns

[8] to Mr. Urban on or before March 15, 2004?

[9]    **A:** I don't know.

[10]    **Q:** Okay. Now, as of March 15, had you

[11] communicated Ms. Leaton's concerns to Mr. Mistovich

[12] as of the date of the meeting?

[13]    **A:** I don't recall doing it.

[14]    **Q:** Okay. Do you recall if you took any notes

[15] of this meeting on March 15, 2004?

[16]    **A:** I do not.

[17]    **Q:** Why did you communicate Ms. Leaton's

[18] concerns to Beth Trowbridge?

[19]    **A:** The recruiter was again reporting to Beth

[20] upon her return from her mat leave to bring her up

[21] to speed.

[22]    **Q:** Did Ms. Leaton communicate her concerns to

[23] Ms. Trowbridge?

[24]    **A:** No.

Page 73

[1]    **Q:** Oh, okay.

[2]    **A:** And Beth subsequently participated in a

[3] meeting with Ms. Leaton and myself.

[4]    **Q:** Okay. Was there a subsequent meeting

[5] between — after March 15th between you and Ms.

[6] Leaton —

[7]    **MS. RUBIN:** Objection.

[8]    **Q:** — and Ms. Trowbridge?

[9]    **A:** There were meetings but the specific dates

[10] I don't have in my head.

[11]    **Q:** Okay. Well, you referred to a meeting —

[12]    **A:** Uh-huh.

[13]    **Q:** — that you had with Beth Trowbridge and

[14] Alison Leaton, correct?

[15]    **A:** Yes, I don't remember the exact date.

[16]    **Q:** Was it after March 15, 2004?

[17]    **A:** I don't remember the exact date.

[18]    **Q:** Well, I'm trying to see if I can give you a

[19] framework to assist you. Was it before the March

[20] 26th meeting with Mr. Mistovich, Urban and Nevero?

[21]    **A:** Yes.

[22]    **Q:** Okay. And was there more than one meeting

[23] you had with Alison Leaton and Beth Trowbridge?

[24]    **A:** Not that I can recall.

Page 74

[1]    **Q:** And where did the meeting with Leaton and

[2] Trowbridge occur?

[3]    **A:** In my office.

[4]    **Q:** And was there anyone else present?

[5]    **A:** No.

[6]    **Q:** And what do you recall being said at the

[7] meeting?

[8]    **A:** We asked Alison, well, to give further

[9] explanation on her concern and the process that she

[10] had gone through to date on this matter.

[11]    **Q:** And what did Ms. Leaton say?

[12]    **A:** She advised the sort of the protocol that

[13] she had taken when she had the initial communication

[14] and questions and concerns that had been raised in

[15] asking Mr. Mistovich for clarification of his

[16] intent, his comment; and we asked her to clarify

[17] whether or not there was any sense of

[18] misunderstanding on her part.

[19]    **Q:** And what was her response?

[20]    **A:** That it was very clear and there was no

[21] misunderstanding of what was intended by Mr.

[22] Mistovich's comments and actions.

[23]    **Q:** Did she quote anything that Mr. Mistovich

[24] said?

Page 75

[1]    **A:** I don't know specifically at this time.

[2]    **Q:** Okay. But she said to you there was no

[3] misunderstanding on her part that Mr. — of what Mr.

[4] Mistovich said and meant; is that correct?

[5]    **A:** Yes, that's —

[6]    **Q:** So there's no misunderstanding on Ms.

[7] Leaton's part that Mr. Mistovich said and meant to

[8] exclude blacks from the interview process?

[9]    **A:** Correct.

[10]    **Q:** Okay. Do you recall anything Beth

[11] Trowbridge said?

[12]    **A:** Nothing. I recall nothing.

[13]    **Q:** Now, you met with Mistovich, Urban and

[14] Nevero on March 26th, 2004, correct?

[15]    **A:** Yes.

[16]    **Q:** And what was the purpose of that meeting?

[17] Well, let me withdraw that question.

[18]    Who decided to have a meeting on March

[19] 26th, 2004?

[20]    **A:** I'm not sure I understand what you mean.

[21]    **Q:** Well, there's a meeting. Mr. Mistovich, do

[22] you know when he was notified of the meeting?

[23]    **A:** I do not remember.

[24]    **Q:** I take it, it's fair to say it wasn't Mr.

Page 76

[1] Mistovich's idea to have that meeting, correct?
[2]    A: I would say that's fair, yes.
[3]    Q: Now, was it you that decided to have the
[4] meeting?
[5]    A: No.
[6]    Q: Okay. Who decided to have the meeting?
[7]    A: There were a number of discussions, and it
[8] would have been done by almost — by committee or by
[9] team.
[10]    Q: Okay. There were a number of discussions.
[11] Who participated in the discussions?
[12]    A: At different times, not necessarily all the
[13] time and at every meeting, but at different times it
[14] would have been Mr. Urban, Nevero, Lydon, Davey,
[15] myself.
[16]    Q: So how many discussions did you have on
[17] this subject with some or all of that group of five
[18] people prior to March 26th, 2004?
[19]    A: I don't know.
[20]    Q: Mr. Urban was the deputy — Mr. Lydon's
[21] assistant general manager?
[22]    A: Yes, he's the deputy general manager.
[23]    Q: Mr. Nevero, do you recall his title?
[24]    A: Chief engineer.

Page 77

[1]    Q: And Mr. Mistovich's immediate supervisor?
[2]    A: Yes.
[3]    Q: And we've identified Lydon and Davey. You
[4] don't recall how many discussions you had with these
[5] individuals; is that correct?
[6]    A: That is correct.
[7]    Q: Fair to say more than one?
[8]    A: Yes.
[9]    Q: Was it more than five?
[10]    A: Not to my knowledge.
[11]    Q: And you related to them what Ms. Leaton had
[12] informed you of; is that correct?
[13]    A: Yes.
[14]    Q: And did you show them Ms. Leaton's e-mail?
[15]    A: I do not recall.
[16]    Q: Okay. And so in the course of these
[17] discussions, there was a decision made by this group
[18] or team or committee, as you said, to hold a meeting
[19] with Mr. Mistovich?
[20]    A: Correct.
[21]    Q: Okay. I'm going to show you a document
[22] that was produced by MBCR that has the Bates stamp
[23] No. 8 on it.
[24]    A: (Reviewing document)

Page 78

[1]    Q: Can you tell me what that document is?
[2]    A: It's a draft of proposed questions —
[3]    Q: Are these proposed —
[4]    A: — for the interview.
[5]    Q: Go ahead. I'm sorry.
[6]    A: For the interview to be conducted with Mr.
[7] Mistovich.
[8]    Q: And did you prepare the questions?
[9]    A: I drafted them, yes.
[10]    Q: And did you circulate that to Mr. Urban and
[11] Mr. Nevero before the meeting?
[12]    A: I don't recall.
[13]    Q: Did you have the draft list of questions at
[14] the meeting with you?
[15]    A: Yes.
[16]    Q: And did you use that to ask questions of
[17] Mr. Mistovich?
[18]    A: Yes.
[19]    MR. TEAGUE: Okay. Why don't we mark that
[20] as an exhibit. I don't think I have extra copies,
[21] but I'll make them.
[22]    MS. RUBIN: Okay. Fine.
[23]    MR. TEAGUE: Where are we?
[24]    MS. RUBIN: Twenty-eight.

Page 79

[1]    MR. TEAGUE: So why don't we call this
[2] "Bowden 28."
[3]    (Document marked as Bowden
[4] Exhibit 28 for identification)
[5]    MR. TEAGUE: I'm sorry. I do have copies.
[6]    Q: Why did you prepare a list of questions
[7] before your meeting with Mr. Mistovich?
[8]    A: As part of a standard practice for
[9] organized investigations, it is common practice to
[10] prepare questions in advance to insure a logical
[11] process.
[12]    Q: I'm sorry. Go ahead.
[13]    A: And to have them reviewed by general
[14] counsel prior to the meeting.
[15]    Q: And were these questions reviewed by
[16] general counsel before the meeting?
[17]    A: Yes.
[18]    Q: Is it fair to say you like to be prepared
[19] for an important meeting?
[20]    A: Yes.
[21]    Q: You agree when you're prepared, you can
[22] make a much more effective presentation than if
[23] you're unprepared?
[24]    MS. RUBIN: Objection.

Page 80

[1] **A:** Yes.
[2] **Q:** Let me show you another — what appears to
[3] be a set of e-mails produced by MBCR Bates stamped
[4] No. 5 and 6.
[5] **A:** (Reviewing document)
[6] **Q:** Do you recognize those e-mails, Ms. Bowden?
[7] **A:** Yes.
[8] **Q:** Now, it looks like, if you start on Page 6,
[9] there's a repetition of a previous e-mail we
[10] discussed?
[11] **A:** Yes.
[12] **Q:** Okay. By the way, in that e-mail that's —
[13] the last comment you made to Ms. Leaton is, "I need
[14] this" — that is her detailed outline — "by the
[15] close of business Friday by e-mail." Do you recall
[16] why you needed her detailed outline by the close of
[17] business — this is Friday, March 11th — so that
[18] would be Friday, March 12th?
[19] **A:** I do not recall.
[20] **Q:** Was this a concern of some urgency to you;
[21] do you recall?
[22] **A:** I do not recall. I do not recall why I
[23] asked for that specific...
[24] **Q:** Then on the first page of this — these

Page 81

[1] documents, there's a repeat of Ms. Leaton's e-mail
[2] to you of March 11th, and then above that, you
[3] e-mail her on March 15th at 8:26 p.m. "Please
[4] review attached. Have I captured the meeting
[5] correctly? Please review and advise Tuesday." When
[6] you say "attached," were you referring to her
[7] previous e-mail to you?
[8] **A:** No.
[9] **Q:** Was there something else that you were
[10] referring to?
[11] **A:** Yes.
[12] **Q:** What was that?
[13] **A:** An attachment of notes taken that was held,
[14] a meeting held between Beth and between Alison and
[15] I.
[16] **Q:** So you took notes of the meeting with Beth,
[17] Alison and you that you refer to, and you sent those
[18] to Ms. Leaton?
[19] **A:** Uh-huh.
[20] **Q:** Okay.
[21] **A:** Yes.
[22] **Q:** Let me show you another two documents that
[23] are Bates stamped 2 and 3 from MBCR production and
[24] ask you to take a look at that.

Page 82

[1] **A:** (Reviewing document)
[2] **MR. TEAGUE:** While you're looking, why
[3] don't we mark the series of e-mails that had the top
[4] e-mail of Tuesday, March, 16, 2004, at 9:28 p.m.,
[5] from Alison Leaton to Elizabeth Bowden and Elizabeth
[6] Trowbridge. I believe it would be Bowden Exhibit
[7] 29.
[8]    (Document marked as Bowden
[9] Exhibit 29 for identification)
[10] **Q:** Okay. Now, the document stamped 2 and 3,
[11] do you recognize those, Ms. Bowden?
[12] **A:** Yes.
[13] **Q:** And what are those — what is that
[14] document?
[15] **A:** Summary of the meeting that was held on
[16] March 15 with Alison Leaton, Beth Trowbridge and
[17] myself.
[18] **Q:** Okay. And did you send a copy of this
[19] summary to Ms. Leaton?
[20] **A:** Yes.
[21] **Q:** Okay. And that's the document that's
[22] referred to in the middle e-mail on the first page
[23] of Exhibit 29?
[24] **A:** Yes.

Page 83

[1]    **MR. TEAGUE:** Okay. Why don't we have the
[2] summary of the March 15 meeting marked as — we'll
[3] call it "Bowden Exhibit 30."
[4]    (Document marked as Bowden
[5] Exhibit 30 for identification)
[6] **Q:** Did you ever show Exhibit 30 to Eli
[7] Mistovich?
[8] **A:** Not to my knowledge.
[9] **Q:** Did you show it to the members of the team
[10] or committee, as you referred to them, Mr. Urban or
[11] Nevero or Lydon or counsel?
[12] **A:** I don't know.
[13] **Q:** Okay. Now, do you know who communicated to
[14] Mr. Mistovich that there would be a meeting on March
[15] 26th?
[16] **A:** I don't remember.
[17] **Q:** Do you recall having any communications
[18] with Mr. Mistovich prior to March 26th about the
[19] meeting?
[20] **A:** I don't recall.
[21] **Q:** Do you remember receiving any voice mail
[22] from Mr. Mistovich about the purpose of a meeting he
[23] was asked to attend on March 26th?
[24] **A:** I don't remember a voice mail.

Page 84

[1]   Q: Now, when you and Elizabeth Trowbridge met
[2] with Alison Leaton on March 15th, did you inform Ms.
[3] Leaton of the purpose of that interview prior to
[4] March 15 or prior to the interview being conducted?
[5]   A: I don't recall.
[6]   Q: To your knowledge did either Mr. Nevero or
[7] Mr. Urban discuss the purpose of the meeting with
[8] Mr. Mistovich before March 26th?
[9]   A: I have no knowledge of that.
[10]   Q: Did you ever tell Mr. Nevero not to tell
[11] Mr. Mistovich the purpose of the meeting?
[12]   A: Not to my knowledge.
[13]   Q: Was there a reason you did not inform Mr.
[14] Mistovich of the purpose of the meeting prior to
[15] March 26th?
[16]   A: It's standard practice during
[17] investigations to keep the primary details of the
[18] investigation confidential until the conducting of
[19] the face-to-face meetings.
[20]   Q: Well, the details had been discussed with
[21] Ms. Leaton on at least two occasions and e-mailed
[22] back and forth; is that correct?
[23]   A: From her knowledge of it, yes.
[24]   Q: Yes. And Ms. Trowbridge was aware of it?

Page 85

[1]   A: Yes.
[2]   Q: And the members of the team, Mr. Davey, Mr.
[3] Leaton (sic), Mr. Nevero, Mr. Urban and you were
[4] aware of it, correct?
[5]   A: Yes.
[6]   Q: So the only one that wasn't aware of the
[7] purpose of the meeting and the allegations on March
[8] 26th to your knowledge was Mr. Mistovich; is that
[9] correct?
[10]   MS. RUBIN: Objection.
[11]   A: I don't know who else had knowledge.
[12]   Q: I said do you know of anyone else — do you
[13] know if Mr. Mistovich had any advance knowledge of
[14] this meeting?
[15]   A: I don't know.
[16]   Q: Did anyone ever suggest that it might be
[17] fair to inform him in advance of the purpose of the
[18] meeting?
[19]   A: As I said, it's practice of investigations
[20] of this nature that the substantive information is
[21] retained confidential until the time of the
[22] face-to-face meeting.
[23]   Q: When you say "standard practice," where is
[24] that standard practice? What's the source of that?

Page 86

[1]   A: The guideline approach that's used to
[2] complete detailed investigations of this nature.
[3]   Q: Is there a written guideline for conducting
[4] investigations as to —
[5]   A: No.
[6]   Q: — as to allegations of racial
[7] discrimination?
[8]   A: Not to my knowledge.
[9]   Q: Okay. What were you referring to when you
[10] said "guidelines"?
[11]   A: It's best practice used within
[12] organizations to complete investigations.
[13]   Q: This is your understanding of the practices
[14] that are used? In other words, is there any written
[15] document that says you shouldn't inform the subject
[16] of an investigation of the purpose of it prior to
[17] the interview?
[18]   A: I'm not aware of a specific document.
[19]   Q: Okay. Had you conducted any previous
[20] investigations, as you call them, of discrimination
[21] in hiring at MBCR?
[22]   A: No.
[23]   Q: Had you conducted any investigations of
[24] racial discrimination in hiring in any of the other

Page 87

[1] organizations you were employed by?
[2]   A: No.
[3]   Q: Now, the meeting on March 26th, 2004, what
[4] room did that occur in?
[5]   A: I don't know the name of it.
[6]   Q: Was it a conference room?
[7]   A: Yes.
[8]   Q: Where was the location, the address?
[9]   A: 33 Cobble Hill Road.
[10]   Q: And did — do you recall who sat where at
[11] this meeting?
[12]   A: Relative to what?
[13]   Q: Well, were you sitting across from Mr.
[14] Mistovich?
[15]   A: Not directly. Almost on the same angle
[16] that we are at this point in time now.
[17]   Q: So Mr. Mistovich was on one side of the
[18] table; is that correct?
[19]   A: (Nods head)
[20]   Q: And you were on the other side of the
[21] table?
[22]   A: Yes.
[23]   Q: Were Mr. Nevero and Mr. Urban on your side
[24] of the table?

Eli Mistovich, Jr. v.
Elizabeth Bowden, et al.
Case 1:04-cv-12340-EFH    Document 17-5    Filed 11/28/2005    Page 54 of 58
Elizabeth R. Bowden
Vol. 1, September 27, 2005

Page 88

[1] **A:** No.

[2] **Q:** Were they on Mr. Mistovich's side of the
[3] table?

[4] **A:** Mr. Nevero was.

[5] **Q:** Okay. And where was Mr. Urban?

[6] **A:** At the head of the table.

[7] **Q:** So Nevero (sic) is at the head. You're
[8] across from Mr. Mistovich, and Mr. Nevero is sitting
[9] beside Mr. Mistovich; is that how people were
[10] seated?

[11] **THE WITNESS:** (To the stenographer) You
[12] may want to read back what he just said. I
[13] don't think he phrased it properly.

[14] **Q:** You were across a table from Mr. Mistovich,
[15] is that correct —

[16] **A:** Yes.

[17] **Q:** — at the meeting? Mr. Urban, the number
[18] two man in MBCR, was seated at the head of the
[19] table?

[20] **A:** Yes.

[21] **Q:** And then that left Mr. Nevero?

[22] **A:** Yes.

[23] **Q:** And where was he seated —

[24] **A:** On the same side —

Page 89

[1] **Q:** — in relation — let me finish the
[2] question — in relation to Mr. Mistovich?

[3] **A:** To Mr. Mistovich's right.

[4] **Q:** Okay. Did you ask Mr. Mistovich to bring
[5] any records or documents to the meeting with him?

[6] **A:** No.

[7] **Q:** Did you suggest that he take notes at the
[8] meeting?

[9] **A:** Not that I recall.

[10] **Q:** Did you take notes at the meeting?

[11] **A:** I did.

[12] **Q:** All right. Let me show you what we've
[13] marked at Mr. Mistovich's deposition as Exhibit 11.

[14] **A:** Okay. (Reviewing documents)

[15] **Q:** Do you recognize that document or those
[16] documents?

[17] **A:** Yes.

[18] **Q:** And what are those?

[19] **A:** The notes that I prepared in summary of the
[20] meeting held on March 26th.

[21] **Q:** And when did you prepare this document?

[22] **A:** March 26th.

[23] **Q:** Okay. Were — was the conversation with
[24] Mr. Mistovich recorded?

Page 90

[1] **A:** Not to my knowledge.

[2] **Q:** And did you make handwritten notes of the
[3] meeting on which you based the summary?

[4] **A:** Yes.

[5] **Q:** And do you know where those notes are?

[6] **A:** No, I do not.

[7] **Q:** Okay. Now, the initial conversation
[8] between Leaton and Eli Mistovich that triggered this
[9] incident or this investigation occurred on March 4th
[10] or March 5th, correct?

[11] **A:** That is my understanding.

[12] **Q:** That was some three weeks before this
[13] meeting with Eli Mistovich, correct?

[14] **A:** Yes.

[15] **Q:** Okay. And then in Paragraph 3 of Exhibit
[16] 11 you indicate you made a statement. Do you see
[17] that?

[18] **A:** Uh-huh.

[19] **Q:** You recall making a statement to that
[20] effect?

[21] **A:** Yes.

[22] **Q:** And telling Mr. Mistovich the reason for
[23] the meeting; do you see that?

[24] **A:** Yes.

Page 91

[1] **Q:** Okay. Prior to that, I take it, you have
[2] no knowledge of anyone informing Mr. Mistovich of
[3] the purpose of the meeting?

[4] **A:** I have no knowledge, correct.

[5] **Q:** Now, in the next to last sentence of the
[6] third paragraph, the one I was just referring to,
[7] you refer to eliminating qualified "applicants" in
[8] the plural because of their name and their home
[9] address. Again, I'll ask you, at the meeting did
[10] you have any other applicant in mind other than Mr.
[11] Morgan that this had occurred to?

[12] **A:** No, I did not.

[13] **Q:** Did Mr. Mistovich appear surprised when you
[14] informed him of the purpose of the meeting?

[15] **A:** Not to my recollection.

[16] **Q:** It's fair to say you expected Mr. Mistovich
[17] to be surprised by this accusation, did you not?

[18] **MS. RUBIN:** Objection.

[19] **A:** No.

[20] **Q:** This is an accusation of racism, isn't it?

[21] **A:** Yes.

[22] **Q:** And you would not expect an employee to be
[23] surprised by an accusation of racism?

[24] **MS. RUBIN:** Objection.

Page 92

[1]  A: Not if that's how they practiced and made
[2] decisions and lived their life.
[3]  Q: But you didn't know that's how Mr.
[4] Mistovich practiced prior to the meeting, did you?
[5]  A: I did not know.
[6]  Q: Okay. Had you made up your mind as to the
[7] truth of these allegations before the meeting?
[8]  A: No.
[9]  Q: At the meeting or prior to the meeting did
[10] you or Mr. Nevero or Mr. Urban ask Mr. Mistovich
[11] about his health, state of his health, that
[12] particular day?
[13]  A: No.
[14]  Q: Did you ask him whether or not he was on
[15] any medication?
[16]  A: No.
[17]  Q: You think that questions about whether an
[18] employee under investigation being interviewed on a
[19] subject like this, that it might be appropriate for
[20] an investigation or to ask about his health or
[21] whether he was on medication?
[22]  MS. RUBIN: Objection.
[23]  A: Could you rephrase that, please.
[24]  Q: Yes. Do you think it was appropriate to

Page 93

[1] ask an employee who's under investigation as to the
[2] state of his health at the time of the interview?
[3]  MS. RUBIN: Objection.
[4]  A: No.
[5]  Q: And do you think it's appropriate to ask an
[6] employee who's under investigation for a serious
[7] charge about whether or not he's on medication at
[8] the time of the investigation?
[9]  MS. RUBIN: Objection.
[10]  A: No.
[11]  Q: Did you expect Mr. Mistovich to instantly
[12] recall who you were talking about some three weeks
[13] after a conversation that Ms. Leaton had with him?
[14]  MS. RUBIN: Objection.
[15]  A: No.
[16]  Q: Did Mr. Mistovich indicate to you, not by
[17] language, but by his reaction that he was having
[18] difficulty understanding who you were talking about?
[19]  A: No.
[20]  Q: Well, there were times when Mr. Mistovich
[21] was "silence" — I'm reading through your notes —
[22] correct?
[23]  MS. RUBIN: Are you referring to a
[24] particular section?

Page 94

[1]  Q: Well, I'll be happy to dig through them.
[2] (Reviewing document) Let me go to the second page
[3] of your notes, which is the list of questions. It
[4] says, "How did you select the candidates for
[5] interviews? How many resumes did you receive and
[6] review?" And then Mr. Mistovich said, "I sent
[7] approximately 60 resumes to Alison, the recruiter,
[8] and was going to interview all of them. She said
[9] that was too many and to cull it down based on the
[10] specifics of the requirements, selecting the CDL and
[11] other related certifications. There were
[12] approximately 15 applications and a couple of extra
[13] provided by senior MBCR or MBA staff." Do you
[14] recall that?
[15]  MS. RUBIN: "MBTA staff." I think you said
[16] "MBA staff"?
[17]  Q: "MBTA staff." I misspoke. Do you recall
[18] him making those comments?
[19]  A: Yes.
[20]  Q: Did you have any reason to doubt the
[21] accuracy of the comments in the first sentence?
[22]  A: No.
[23]  Q: Okay. Then — I'm not going to bother to
[24] repeat and read the question and answer in the

Page 95

[1] second, but did you have any reason to doubt the
[2] accuracy of Mr. Mistovich's answer to your second
[3] question?
[4]  A: (Reviewing document) No reason to doubt.
[5]  Q: Okay. Now, your third question, you said,
[6] "We have been advised that you would not interview
[7] certain applicants because of their name and their
[8] address, the discussion was that you assumed they
[9] were black. What is your response to this?" And
[10] Mr. Mistovich said, "I always select the best or
[11] above-average candidates." Was that his answer?
[12]  A: Yes.
[13]  Q: Okay. Did you have any reason to doubt
[14] that he always selected the best or above-average
[15] candidates?
[16]  A: No reason to doubt.
[17]  Q: And is selecting the best or above-average
[18] candidates any indication to you of discrimination
[19] or racism in any way?
[20]  A: No.
[21]  Q: Then it says, "This was not challenged, the
[22] point of who got selected for interviews." Is that
[23] a statement that he made? Is that a comment you
[24] made or what is the third paragraph or the third

---

Page 100

[1] **A:** We prepared a spreadsheet of the
[2] qualifications of those that had CDL.
[3] **Q:** When you say "we prepared the spreadsheet,"
[4] who prepared it?
[5] **A:** The Human Resources Department coordinated
[6] that.
[7] **Q:** Well, who prepared it? Ms. Leaton?
[8] **A:** Yes.
[9] **Q:** Oh, okay. The accuser prepared it?
[10] **MS. RUBIN:** Objection.
[11] **Q:** Correct?
[12] **A:** Yes.
[13] **Q:** The person who made the —
[14] **A:** Yes. I thought it was a statement, not a
[15] question.
[16] **Q:** Okay. Then you said Eli would not respond
[17] beyond this comment. I'm going back to your —
[18] **A:** What page, please?
[19] **Q:** Right where you're looking on Page 2,
[20] Question 3.
[21] **A:** Okay.
[22] **Q:** After —
[23] **A:** Yes.
[24] **Q:** — "This was not challenged." Did you ask

Page 101

[1] him for any response? It says, "I always select the
[2] best or above-average candidates." And then you
[3] said, "The point of who got selected for interviews
[4] was." Did you anticipate a further response?
[5] **A:** I don't recollect the specifics.
[6] **Q:** Okay. Then in the next paragraph you said,
[7] "As Eli was not providing any information, E. Bowden
[8] stated that 'In the absence of information from Eli, the
[9] information from the recruiter was considered
[10] accurate and without objection.'" Do you recall
[11] making that statement?
[12] **A:** I do recall making that statement.
[13] **Q:** And then Eli's response was, "It sounds
[14] like you've already made up your mind." You
[15] remember him saying that?
[16] **A:** Yes.
[17] **Q:** And then you said that, "No conclusions
[18] have been formed. That's the purpose of this
[19] meeting," and then you said, "Eli chose not to add
[20] anything more to the comment and not clarify any
[21] points." At this time point did he appear upset?
[22] **A:** I don't remember specifically.
[23] **Q:** Okay. Then on the next page, which is
[24] Bates stamped 11, you had another question. Again,

Page 102

[1] you're quoting from Ms. Leaton's version of the
[2] conversation that she had with Mr. Mistovich three
[3] weeks prior to your interview, correct?
[4] **MS. RUBIN:** Objection.
[5] **A:** Correct.
[6] **Q:** Okay. And did you expect him to recall the
[7] comments of Ms. Leaton at this meeting?
[8] **MS. RUBIN:** Objection.
[9] **A:** I'm sorry?
[10] **Q:** You're quoting — in Question 4 you're
[11] taking Ms. Leaton's version of a conversation and
[12] presenting it to Mr. Mistovich, correct?
[13] **A:** Correct.
[14] **Q:** And this conversation that Ms. Leaton had
[15] with Mr. Mistovich occurred three weeks prior to
[16] your talking to him?
[17] **A:** Yes.
[18] **Q:** Is it — and did you expect him to remember
[19] the exact content of the words that he said to Ms.
[20] Leaton some three weeks later when he had no advance
[21] notice of this meeting?
[22] **MS. RUBIN:** Objection.
[23] **A:** I did not expect him to remember his exact
[24] words.

Page 103

[1] **Q:** For instance you said, "Your response was
[2] you had more problems with people like that. What
[3] did you mean by that statement?" And then you said,
[4] "No further comment added after the original
[5] statement indicating he had, in fact, had problems."
[6] Then it says, "Eli stated that during the hiring
[7] requirements at his previous employer, he always
[8] exceeded the required number." Do you recall him
[9] making that statement?
[10] **A:** Yes.
[11] **Q:** And you knew his previous employer was
[12] Amtrak, correct?
[13] **A:** Yes.
[14] **Q:** What, if any, efforts did you make to
[15] validate Mr. — or verify Mr. Mistovich's hiring
[16] record at Amtrak?
[17] **A:** None.
[18] **Q:** What did you mean when it says, "This
[19] cannot be validated by MBCR"?
[20] **A:** Cannot practice to go to a prior employer
[21] to ask about someone's behaviors when completing an
[22] investigation at a current employer.
[23] **Q:** Yes, but this was — all of Amtrak's
[24] employees, including Mr. Mistovich, were

Page 112

[1] **A:** I don't know.
[2] **Q:** Okay. You agree you can't tell a person's
[3] race by the town that they're from; is that correct?
[4] **MS. RUBIN:** Correct.
[5] **A:** As I advised earlier that the town does
[6] show patterns.
[7] **Q:** Is it your testimony that "Dorchester"
[8] shows you a pattern of black people that live in
[9] Dorchester?
[10] **MS. RUBIN:** Objection.
[11] **A:** No, that's not my testimony.
[12] **Q:** Can you show me one town or city on that
[13] list that would indicate that the candidate was of a
[14] black race?
[15] **MS. RUBIN:** Objection.
[16] **A:** No, I cannot.
[17] **Q:** Do you know whether Mr. Mistovich ever
[18] hired anyone from Dorchester in his career at
[19] Amtrak?
[20] **A:** I have no idea.
[21] **Q:** Did you ask him that question?
[22] **A:** No, I did not.
[23] **Q:** Did you have Exhibit 9 at the investigation
[24] meeting when you met with Mr. Mistovich on March

Page 113

[1] 26th?
[2] **A:** I do not recall.
[3] **Q:** Did you ever show this to Mr. Mistovich,
[4] Exhibit 9?
[5] **A:** I don't recall doing it.
[6] **Q:** Let me show you a document that's been
[7] Bates stamped as No. 7, and this is produced by
[8] MBCR. Do you recall receiving this e-mail from Ms.
[9] Leaton?
[10] **A:** I don't recall receiving it.
[11] **Q:** Okay. At least in the e-mail it indicates
[12] that Ms. Leaton informed you that Mr. Mistovich had
[13] called and asked her if she knew anything about the
[14] e-mail you sent to him asking him to contact you
[15] about concerns about some of the recent hiring
[16] decisions that have been made. Does that refresh
[17] your recollection as to whether or not you had
[18] contacted Mr. Mistovich prior to the meeting?
[19] **A:** It does not.
[20] **Q:** Do you recall sending any e-mail to Mr.
[21] Mistovich asking him to come to the meeting?
[22] **A:** I do not.
[23] **Q:** Okay. And, in fact, had you told Ms.
[24] Leaton that you would be conducting that meeting of

Page 114

[1] March 26th with Mr. Mistovich?
[2] **A:** I don't recall.
[3] **MS. RUBIN:** Why don't we just mark this
[4] e-mail from Ms. Leaton to Ms. Bowden of March 25 as
[5] Bowden Exhibit 31.
[6] (Document marked as Bowden
[7] Exhibit 31 for identification)
[8] **Q:** Did you have a conversation with Ms. Leaton
[9] after the meeting with Mr. Mistovich of March 26th?
[10] **A:** I don't recall.
[11] **Q:** Let me show you an e-mail or what appears
[12] to be a copy of an e-mail Bates stamped No. 13.
[13] **A:** (Reviewing document)
[14] **Q:** And ask you if you recognize that document.
[15] **A:** I have seen this before, yes.
[16] **Q:** And that's dated Friday, March 26th, 5:15
[17] p.m.?
[18] **A:** Yes.
[19] **Q:** And Ms. Leaton says to you, "Liz, per our
[20] earlier conversation." Do you recall having a
[21] conversation earlier in the day on March 26th with
[22] Ms. Leaton?
[23] **A:** No.
[24] **Q:** Did you ask her to send you any additional

Page 115

[1] information?
[2] **A:** I don't recall.
[3] **Q:** Do you know what prompted her, sitting here
[4] today, to send you this e-mail?
[5] **A:** No, I don't.
[6] **Q:** Okay. Now, let me take you one, two,
[7] three, four — about the third bullet point from the
[8] bottom, okay. It says Ms. Leaton says to you, "It
[9] was clear to me that Marvin was well qualified as he
[10] had a CDL and a good work history." Is it your
[11] understanding that a CDL and good work history make
[12] a candidate a good candidate for a trackman?
[13] **A:** A good candidate to be interviewed for
[14] trackman.
[15] **Q:** Yes.
[16] **A:** Yes.
[17] **Q:** Do you know — did you ask Mr. Mistovich
[18] what particular characteristics he considered to be
[19] indicative of a candidate making a good trackman?
[20] **A:** The hiring manager is responsible for the
[21] job description which outlines the characteristics
[22] suitable for the position.
[23] **Q:** Well, "good work history," you could be a
[24] school teacher or biology professor. It does not

Elizabeth R. Bowden
Vol. 1, September 27, 2005

---

Page 116

[1] mean you would be a good railroad trackman; is that
[2] correct?
[3]     MS. RUBIN: Objection.
[4]     A: Correct.
[5]     Q: Would you agree that someone with railroad
[6] experience and knowledge of a trackman's particular
[7] duties might look for specifics in a work history?
[8]     MS. RUBIN: Objection.
[9]     A: Might, yes.
[10]     Q: Did you ever show this e-mail of March 26th
[11] to Mr. Mistovich for a comment?
[12]     A: Not to my knowledge.
[13]     MR. TEAGUE: Why don't we mark this e-mail
[14] from Ms. Leaton to Ms. Bowden of March 26th as
[15] Exhibit 32.
[16]     (Document marked as Bowden
[17] Exhibit 32 for identification)
[18]     Q: Was —
[19]     MR. TEAGUE: Off the record.
[20]     (Discussion off the record)
[21]     Q: Let me show you a document that's been
[22] Bates stamped No. 25.
[23]     A: (Reviewing document)
[24]     Q: Can you identify that?

---

Page 118

[1] further to Mr. Mistovich?
[2]     A: Not to my recollection.
[3]     Q: Did anyone at the meeting suggest checking
[4] further with people who had worked with or under or
[5] above Mr. Mistovich at Amtrak?
[6]     A: Not to my recollection.
[7]     Q: At the March 30th meeting, I take it, you
[8] had this document, Nevero Exhibit 9?
[9]     MS. RUBIN: Objection. You mean March
[10] 29th?
[11]     MR. TEAGUE: What did I say?
[12]     Q: March 29th meeting, you were referring to a
[13] summary, "Alison completing."
[14]     A: Yes, that's what Rich had, yes.
[15]     Q: Did you examine that at the meeting?
[16]     A: I don't recall.
[17]     Q: Okay. Were you — did anyone at the
[18] meeting refer to the fact that Mr. Mistovich had
[19] worked for Amtrak for more than 25 years before he
[20] came to MBCR?
[21]     A: I'm not aware of that specific
[22] conversation.
[23]     Q: Did anyone at the meeting bring up or
[24] mention that Mr. Mistovich had participated in

---

Page 117

[1]     A: Yes.
[2]     Q: And what is it?
[3]     A: It's a section of my notebook that I keep
[4] when I go to meetings. It's dated March 29th. A
[5] meeting that was held in Kevin Lydon's office with
[6] Kevin, himself, Steve Nevero, Steve Urban, Rich
[7] Davey, and myself to follow up on the meeting we had
[8] had on the 26th.
[9]     Q: And can you read the entries and tell me
[10] what you recall about what they mean?
[11]     A: Kevin Lydon led the meeting and asked first
[12] Steve Nevero for his take on the meeting and the
[13] outcome of the meeting, and he summarized that he
[14] felt that Eli was evading answers. He asked —
[15] Kevin asked Steve Urban the same question. He gave
[16] the same answer as Steve Nevero. He asked me and I
[17] shared the summary notes that were previously
[18] highlighted here. Rich reviewed the summary
[19] document that Alison had prepared and was
[20] completing, and then Kevin had a conversation with
[21] the group regarding the discussion of releasing Eli
[22] from MBCR giving him the opportunity to resign if he
[23] chose or to be terminated.
[24]     Q: Did anyone at the meeting suggest talking

---

Page 119

[1] hiring while he worked at Amtrak?
[2]     A: I don't recall.
[3]     Q: Other than Leaton's accusations and your
[4] summary of the meeting of March 26th, was there any
[5] other reason discussed for terminating Mr.
[6] Mistovich's employment at this March 29th meeting?
[7]     A: I'm sorry. Can you restate that?
[8]     Q: Sure. The March 29th meeting, you and
[9] Nevero and Urban, you summarized and gave your
[10] impressions of the meeting with Mr. Mistovich of
[11] March 26th, correct?
[12]     A: Yes, I shared the notes.
[13]     Q: Okay. And other than that incident, the
[14] Alison Leaton accusations and the meeting that you
[15] had concerning them, were there any other reasons
[16] discussed at the meeting for terminating Mr.
[17] Mistovich?
[18]     A: No.
[19]     Q: Now, do you recall a meeting on March 30th
[20] at the Cobble Hill facility with Mr. Mistovich?
[21]     A: Is that the date of the termination?
[22]     Q: Well, yes, that's the date of the
[23] termination letter.
[24]     A: Okay.

---